```
                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                                - - -

UNITED STATES OF AMERICA,      :  CIVIL ACTION NO. 15-6264
et al.,                        :
              Plaintiffs       :
                               :
            v.                 :  Easton, Pennsylvania
                               :  June 1, 2017
MEDTRONIC, INC.,               :  10:32 o'clock a.m.
              Defendants       :
. . . . . . . . . . . . . . . .

              ORAL ARGUMENT ON MOTION TO DISMISS
           BEFORE THE HONORABLE EDWARD G. SMITH
             UNITED STATES DISTRICT COURT JUDGE

                                - - -

APPEARANCES:

For the Plaintiffs:       SUSAN LAURA BURKE, ESQUIRE
                          Law Offices of Susan L. Burke
                          1611 Park Avenue
                          Baltimore, MD  21217

For the Defendant:        KIRSTEN V. MAYER, ESQUIRE
                          MITCHELL DYLAN STROMBERG, ESQUIRE
                          Ropes & Gray LLP
                          Prudential Tower
                          800 Boylston Street
                          Boston, MA  02199-3600

                          KATHERINE M. GLASER, ESQUIRE
                          Pepper Hamilton LLP
                          3000 Two Logan Square
                          18th and Arch Streets
                          Philadelphia, PA  19103-2799

Courtroom Deputy/ESR:     Jaime Kulick

Transcribed by:           Tracey J. Williams, CET
                          Paula Curran, CET

(Proceedings recorded by For the Record Gold digital sound
recording; transcript provided by AAERT-certified
transcribers.)

                    Laws Transcription Service
                      48 W. LaCrosse Avenue
                       Lansdowne, PA 19050
                         (610)623-4178
```

2

1          (The following occurred in open court at 10:32

2      o'clock a.m.)

3          THE COURT:  Good morning.  You may be seated.  Thank

4      you.

5          The Court is called to order in the matter of

6      Cathleen Forney v. Medtronic, this is Docket No. 15-6264, and

7      the Court convenes today to hear argument with respect to the

8      motion to dismiss that has been filed by Medtronic, Inc.

9          Present in the courtroom on behalf of the plaintiff

10     is Attorney Susan Burke.  Good morning.

11         MS. BURKE:  Good morning.

12         THE COURT:  And on behalf of the defendant,

13     Medtronic, is Kirsten Mayer, Mitchell Stromberg, and

14     Katherine Glaser.  Good morning and welcome to Easton.

15         MS. MAYER:  Thank you.

16         THE COURT:  I guess we'll begin with the defendants,

17     who have raised several issues where you believe the

18     complaint in this case is deficient.  Most interesting, of

19     course, is this whole issue of whether a staffing kickbacks

20     constitute a violation of the anti-kickback statute.

21         If you would like to proceed.

22         MS. MAYER:  Yes, your Honor.  I think that is a good

23     place to start, because it frames the 9(b) issues as well.

24         I think the premise of the complaint, and in

25     particular the opposition defending the quality of the

3

1    complaint or the adequacy of the complaint, is that if the

2    relator alleges that free staffing or free services were

3    provided and that at least for some of that the physician

4    customer, you know, would otherwise have had to pay a fee for

5    that service or incur an expense for that service, that that

6    alone is enough to plead an anti-kickback violation.

7           And counsel has pointed to predominantly some

8    guidance from OIG and fraud alerts, has pointed to some

9    excerpts from the AdvaMed Code, in order to support that

10   statement.

11          What I want to go through very briefly for your

12   Honor, but just to highlight this critical point, is that it

13   is crystal clear from the AdvaMed Code, the OIG Guidance to

14   Pharmaceutical Companies, and indeed the fraud alerts that

15   relator's counsel cites, that you can provide as a

16   manufacturer free services and free staffing that conveys a

17   value to the doctor, but as long as it's not independent of

18   the product you're selling, it's outside the scope of the

19   anti-kickback statute.  It's not remuneration, because it's

20   part and parcel of product support service that you're

21   allowed to provide.  So free services is only an issue if the

22   service that's provided is outside of what's permitted.

23          And I want to make it concrete.  So if you turn to

24   the AdvaMed Code, so if you look at the AdvaMed Code, it

25   opens on page 1 -- and I want to -- the AdvaMed Code is not a

4

1    statute or a court case, so it's not law, but it is guidance

2    to the industry that's recognized by a leading industry

3    organization as providing ethical compliance guidance for

4    what is and isn't permissible conduct.

5            And, again, I think DOJ and also relator's counsel

6    points to the AdvaMed Code as relevant authority in

7    evaluating whether a free service or conduct constitutes

8    conduct that would implicate the anti-kickback statute.

9            And so in the AdvaMed Code, in just page 1 to 2 for

10   medical devices, it not only notes that many medical

11   technologies require technical support during and after

12   deployment, but also says that the safe and effective use of

13   sophisticated electronic, in vitro, diagnostic, surgical, or

14   other medical technologies often requires companies to

15   provide health care professionals appropriate instruction,

16   education, training, and technical support, and notes that

17   regulators often require this type of training as a condition

18   of product approval, which again is just another piece of

19   information.

20           So we have here the notion that providing technical

21   support, education and training enhances patient safety, is

22   often required by regulators, but in any event is something

23   that is appropriate for medical technology companies to do in

24   connection with the sale of their products.  But it doesn't

25   stop there.

5

1           Further into the AdvaMed Code, the code talks about

2    additional types of services that can be provided.  For

3    example, on pages 8 to 9 it talks about the provision of

4    coverage, reimbursement and health economics information, and

5    says that "as devices have become increasingly complex, so

6    have coverage and reimbursement policies," and patient access

7    benefits when doctors have accurate information and

8    assistance with this.

9           And it says that permissible activities in this area

10   include, but are not limited to, collaborating with health

11   care professionals to secure coverage; promoting accurate

12   claims by providing accurate and objective information about

13   reimbursement and coverage; facilitating patient access by

14   providing health care professionals with assistance in

15   obtaining coverage, which may include providing information

16   or training, but also providing sample letters and

17   information on medical necessity and assistance with appeals

18   of denied claims.  It even says that "subject to appropriate

19   privacy safeguards, the company may assist the patient by

20   facilitating the preparation and submission of requests for

21   coverage determinations, prior authorization, pre-

22   certification, and appeals relating to a company's own

23   product."  And this is the key limiting factor here.

24           And, you know, I won't belabor going through the

25   pharma compliance guidance and I will spend one moment on an

1  OIG fraud alert that I think is directly relevant here,

2  because what allows a company to do this without it being

3  considered free services that implicates the anti-kickback

4  statute is that it relates to the company's own product that

5  it is selling.  So it's that link; it's not independent of

6  the product is the way it's viewed.

7       This encompasses conduct that clearly provides a

8  value to the doctor.  The way you measure that is if the

9  manufacturer weren't providing that patient with assistance

10  in achieving coverage or information about accurate

11  reimbursement rules, or collaborating with the physician to

12  achieve coverage, the physician would have to have one of his

13  own staff do that work.

14       So out of the gate, if -- you know, we see here that

15  the standard for whether something is remuneration that

16  triggers the anti-kickback statute, the standard has to be

17  it's not enough to say it's a free service, because we've

18  just seen a list of services that are provided for free in

19  connection with the sale of the product, and it's not enough

20  to say that the physician would have to pay somebody to do

21  the same work if the manufacturer didn't do it, because of

22  course they would.  The physician has to get paid for the

23  claims, they would need to either hire a separate staff

24  person or take time from an existing staff person to go do

25  that work.

1          So the key question if you're going to plead free

2    services or free staffing assistance as kickback is you can't

3    just say that alone, you also have to plead facts that

4    demonstrate plausibly under Rule 8 and with specificity under

5    Rule 9(b) that the service, the conduct was independent of

6    the product.

7          If you turn to the OIG fraud alerts that relator

8    cites, which issued in 1994, there's I think a particularly

9    helpful and instructive one towards the end of that rather

10   short set of guidances, which talks about in the clinical

11   laboratory, outside clinical laboratory context the provision

12   of phlebotomy services to physicians by an outside clinical

13   laboratory.  And here the OIG in a special alert is saying

14   that when permitted by state licensing laws, which is not at

15   issue here, a laboratory, an outside lab may make available

16   to a physician's office a phlebotomist to collect specimens

17   from patients for testing by the outside laboratory.

18         So here we have a doctor who is buying and

19   contracting for outside laboratory services and this is the

20   OIG saying it's okay for that outside lab to place a

21   phlebotomist at the outside lab's expense in the doctor's

22   office to collect specimens from patients, provided those

23   specimens are for testing by the outside lab.  This is

24   another example of the concept that this is a free service

25   clearly that's being provided that the doctor would otherwise

1    have to pay someone in his office to do that's permitted and

2    doesn't implicate the anti-kickback statute because it's part

3    and parcel of that purchased outside laboratory service.  So

4    providing free service is not in and of itself something that

5    implicates the anti-kickback statute.

6           This OIG fraud alert goes on to try to provide a

7    little bit more information about what might -- where this

8    otherwise permissible conduct could cross the line and it

9    says the statute would be implicated, the anti-kickback

10   statute, it is implicated when the phlebotomist performs

11   additional tests that are normally the responsibility of the

12   physician's office staff.  These can include taking vital

13   signs or other nursing functions, testing for the physician's

14   own office laboratory, for performing clerical services that

15   are not related to the collection and processing of the

16   specimens by the outside laboratory.

17          So here you see OIG fleshing out the kinds of facts

18   that would potentially implicate the anti-kickback statute.

19   You've got an outside lab placing a phlebotomist not just to

20   collect specimens and perform clerical functions and medical

21   functions related to the collection and processing by the

22   outside lab of that outside lab testing specimen, but also

23   taking over the mind run routine nursing functions that the

24   doctor's office would provide that's independent of the

25   outside lab service.

9

1              The way that works in the medical device context

2    would be, again, if you have a device manufacturer whose rep

3    in the office supporting the product with education,

4    technical support, troubleshooting, ensuring the doctor is

5    using the device correctly with the patient and understanding

6    information the doctor gets from the device and the patient,

7    that's all product, integral to the sale of product.

8              However, if that rep was then also providing

9    reimbursement advice about general ENM services or something

10   like that, general services that the doctor provides to their

11   patients that are unrelated to the product, that would

12   potential -- that would be something that's unrelated to the

13   product that might be implicated.  Or if the sales rep was,

14   you know, literally replacing the doctor and performing

15   clinical services, right?  That would be obviously exercising

16   clinical judgment.  Writing prescriptions for patients, you

17   know, that would raise medical licensor issues and

18   malpractice issues as well, but that's something that's

19   different from --

20             THE COURT:  And in trying to draw that line, isn't

21   that where the difficulty -- part of the difficulty is this

22   is a complaint prior to discovery, which means the available

23   facts to the plaintiff are limited, because when do you get

24   from -- and I'm not sure in this case, because I can't tell

25   from the complaint -- obviously, if Medtronic sent just a

1  surgery nurse to just replace a surgery nurse that would

2  otherwise be there and it had nothing specific to do with

3  this particular device, that would appear to start be going

4  on the side of the anti-kickback statute that it was just

5  saving the doctor money.  But even there I have a little bit

6  of a problem, because who hires -- and I don't know what

7  these people were doing, because if I'm assuming it's a

8  pacemaker and I'm assuming it's during surgery, perhaps I'm

9  assuming too much, because maybe it is counseling to the

10  patient before, having somebody who has technical expertise

11  in the pacemaker, what you can do, what you can't do, et

12  cetera, if somebody like that is sent to counsel somebody

13  who's getting the pacemaker, obviously that would be okay --

14  I shouldn't say obviously, but that would be okay.

15          If the particular implant device requires a great

16  deal of technical skill beyond what a normal surgeon would

17  have or even to complement the normal surgeon's expertise and

18  you send somebody, here's the pacemaker and here's the person

19  to help you understand this pacemaker, and we do this all the

20  time; this is our pacemaker, we know it and we've studied it

21  and we're going to give you some advice, if you want it,

22  during the insertion of this pacemaker, that would seem to be

23  fine.  If on the other hand you say, hey, you know what,

24  we're going to send you a free anesthesiologist to put the

25  person under or we're going to send you a free surgical nurse

1    to help you out there and close up the surgery, then it

2    starts to look as though it's a benefit that has a

3    substantial independent value to the purchaser.

4           And I guess the question I have is, there's no

5    question you can provide free services, in my mind, I think

6    there's no question.  It benefits the patient, it benefits

7    the doctor, it protects the manufacturer, it makes sure the

8    product is used the way it was intended to be used, et

9    cetera.  It's at what point -- suppose you were a very crafty

10   medical device manufacturer and you're trying -- you can't

11   give money outright to the doctor, you can't even take him

12   out to dinner, what can we do for him?  Well, we can reduce

13   his staffing costs.  So how are we going to compete with the

14   others?  We'll reduce your staffing cost.  You buy this,

15   Medicare will pay for it, and we'll reduce your overhead

16   expenses.

17          I could see certainly, and that's what's suggested

18   here, I could see ways that a medical device company could

19   craft such a marketing scheme with the idea of providing this

20   substantial, independent value to the purchaser.  I just

21   don't know from the facts in this complaint whether it's

22   exactly as you say, you're sending technical assistance,

23   you're sending somebody familiar with the product and it's

24   integral to the product that is being -- and is all of this

25   pacemakers or does it involve the stents and other things?

1          MS. MAYER:  No, it involves all -- it all involves

2     implantable cardiac devices, but it includes -- it's not just

3     pacemakers, it also includes devices that have a built-in

4     defibrillator, so that if your heart stops, it will jump

5     start your heart.

6          THE COURT:  Oh, I thought they were talking about

7     external defibrillators.

8          MS. MAYER:  No, no.

9          THE COURT:  So that's internal?

10          MS. MAYER:  Yes, it's internal.

11          THE COURT:  Okay.

12          MS. MAYER:  Yes.

13          THE COURT:  And they're very sophisticated, complex

14     devices.

15          MS. MAYER:  They're computers that are implanted and

16     regulate -- monitor and regulate the rhythm of your heart.

17          THE COURT:  So who does Medtronic, when do they send

18     them, and is it before surgery, is it during surgery?  Who

19     are you sending?

20          MS. MAYER:  So what I want to do is answer your

21     questions, at the risk of answering a question with a

22     question, I think I want to highlight a couple really

23     critical things here --

24          THE COURT:  Sure.

25          MS. MAYER:  -- in this case at this stage.

13

1          What I think is clear is you're saying I don't know

2     what is allegedly going on here --

3          THE COURT:  That's because the complaint is

4     insufficient.

5          MS. MAYER:  -- because the complaint doesn't say.

6          THE COURT:  Right.

7          MS. MAYER:  It doesn't say who, it doesn't say what.

8     Who's going in, in terms of position, it doesn't say what's

9     going on, it doesn't -- you know, it might say free staffing,

10    but it doesn't say, you know, is it just a random

11    anesthesiologist who's going to be in the OR for the day --

12         THE COURT:  For some reason --

13         MS. MAYER:  -- for something else.

14         THE COURT:  -- I jumped to the conclusion it was a

15    nurse, but I don't know that it is a nurse.

16         MS. MAYER:  Right, there's no information pled.  So

17    that's -- and that in and of itself demonstrates that the

18    complaint fails to satisfy Rule 8 because it hasn't pled a

19    violation.  It's pled facts at a general level that depending

20    on other facts might state a claim, but at the level at which

21    they're pled are entirely consistent with legal conduct.

22    Now, that doesn't mean that there couldn't be additional

23    facts that flesh out theoretically and state an anti-kickback

24    violation and remuneration, but it doesn't actually provide

25    those facts, first.

1          Second, you raise the question of this is a motion

2     to dismiss, isn't that a discovery question?  How much do we

3     expect a relator to be able to plead?

4          And I want to flag something for you.  Ms. Forney,

5     the relator here, started work at Medtronic in April 1996,

6     according to her complaint.  She joined the company and rose

7     through the professional ranks, reaching the executive

8     position of district service manager.  So she was in the

9     field organization.  And she was terminated by Medtronic in

10    2012, supposedly in retaliation for her refusal to acquiesce

11    in Medtronic's knowing and persistent violations of HIPAA,

12    which we talk about elsewhere.  She pleads that she has

13    direct and independent knowledge of Medtronic's staffing

14    kickbacks and HIPAA violations, and acquired this knowledge

15    through her career of employment related to cardiac care.

16         So she is pleading, first of all, she was employed

17    at the company for -- I'm not going to do the math correctly,

18    but 16 years?  And was in the field sales organization when

19    she left.  So during the relevant time period for this case

20    she says she was in the field where the conduct was going on

21    and she pleads that she has direct, independent personal

22    knowledge of the staffing kickbacks.

23         So she is not a plaintiff who is saying, for

24    example, I worked at Medtronic, I had no window into what

25    Iver was doing or what Smith & Nephew was doing, right?

1    Sometimes you get a case where you have the plaintiff from

2    one company who's then pleading more on information and

3    belief about what maybe other codefendant companies are

4    doing.  This is not that case.  She specifically says she saw

5    it, so she is not someone who is incapable of pleading this.

6         Furthermore -- you know, so I submit that it's

7    either she lacks facts that would support her claim and

8    therefore she has pled at a general level, or she with

9    consideration of counsel has made a strategic decision to

10   hold facts back that would allow the Court to answer exactly

11   the questions that the Court is asking.  And we're now on a

12   first amended complaint and the motion to dismiss and counsel

13   has not to this point in the case offered what if any

14   additional facts she would plead, if she were allowed to

15   amend, that would enable the Court to assess whether

16   remuneration that implicates the anti-kickback statute as

17   opposed to free services or free staffing that is perfectly

18   allowable occurred.

19        And I think in this case it's particularly of

20   concern and why I don't think the Court should think that the

21   cure is to allow amendment for two reasons.  First of all,

22   where she does offer a little more information other than

23   just free services or free staffing about what the conduct

24   was, she says it's either internal marketing strategy like

25   Medtronic reps engaged in marketing strategic plans, which

1    obviously is not a service to anybody, or Medtronic developed

2    patient relationships, which obviously isn't a free service

3    to anyone.  Or the free staffing and free services, she talks

4    about troubleshooting, technical support, providing

5    information about billing and reimbursement, all of this

6    based on the AdvaMed Code, the pharma compliance guidance,

7    the special fraud alert is perfectly acceptable.

8            She talks about Medtronic reps being present in

9    clinics after implantation to help with medical procedures,

10   checking on the devices.  Well, that's just like the

11   phlebotomist in the clinical laboratory guidance.  As long as

12   the technical and troubleshooting support that's being

13   provided is to help the doctor and the doctor's staff

14   appropriately use the product with a patient, it's not a free

15   service or staffing that provides a kickback.

16           And so where she has pled facts that give a little

17   more of a window into what she alleges is going on, they are

18   facts that are consistent with legal conduct.  And so from

19   that, I think based on the fact that the Court has recognized

20   there are critical questions that would require an answer in

21   order to conclude that she has plausibly demonstrated that a

22   violation occurred based on facts, and where she does plead

23   facts, they go the other way, I think -- and that she's had

24   already an opportunity to amend the complaint and has not

25   proffered a proposed amended complaint suggesting in any way

1    that she could cure these defects in a way that would state a

2    viable kickback claim, we think that with respect to the

3    remuneration point, which I think is -- you know, is our lead

4    argument, you know, is critical here.

5            And it's not in our reply brief and I apologize, but

6    there are a couple cases in the Third Circuit that make

7    crystal clear that if you want to amend a complaint, the

8    courts expect that you'll supply a proposed amended

9    complaint, so the court can evaluate it and, you know, the

10   other side has a chance to evaluate it as well.

11           THE COURT:  Well, free surgical support, what does

12   that mean?

13           MS. MAYER:  We don't know.  It's free surgery --

14           THE COURT:  Or implant device followup?  Now,

15   implant device followup certainly sounds like something that

16   would be an appropriate free service if it's the manufacturer

17   of the device following up on the success of the surgery and

18   the success of the device as it's operating, it would seem,

19   unless it's really just a way to put a staff member into the

20   office that replaces another staff member that no longer has

21   to be paid.  And even that gets a little difficult, because

22   in today's medical world some doctors are still independent,

23   but it's becoming more and more rare, few doctors who are

24   independent employ surgical staff, but the hospital does.

25   When claims are put in, if the doctor is independent, he puts

1 an independent claim in to Medicare, the hospital would put

2 its own claim in to Medicare.  I'm not quite sure who puts

3 the claim in for the device itself, I presume it's the doctor

4 puts it in on behalf of the -- I don't even know, but in

5 trying to determine what benefit, what substantial

6 independent value went to the purchaser, and I'm assuming the

7 purchaser here is the patient ultimately pays for it through

8 Medicare.  The doctor, is he getting a benefit from this

9 surgical support?  Is the hospital getting a benefit from

10 free surgical support?

11         It gets very confusing to see just where the money

12 is going into the pocket of somebody as a result of a false

13 claim.

14         MS. MAYER:  I think it's a fair question.  I mean,

15 we haven't briefed the reimbursement structure here, but the

16 way in-patient care typically works under Medicare is there

17 is a payment for the overall -- to the hospital for the

18 overall in-patient care and the doctor may have his or her

19 own, you know, entitlement to bill for services rendered.

20 But, you know, if the surgery is performed in a hospital, the

21 hospital is typically procuring the device.  The physician

22 may have say in whose device is used for which patient, so I

23 don't want to suggest there's no opportunity for physicians

24 to weigh in depending on the circumstances of the particular

25 hospital and their arrangements with their staff.  It may

1   also depend on whether the surgeon is employed or is a

2   surgeon resident kind of practice with privileges to perform.

3          THE COURT:  Well, you just raised a great question.

4   Who decides it's going to be a Medtronic pacemaker?

5          MS. MAYER:  Again, we don't have any allegations.

6   And this is part of what we focused on it in the 9(b)

7   context, but there is no connecting the dots.  The focus of

8   the pleading, to the extent it exists, is on alleging over

9   and over again that there was this free service, free

10  staffing allowed doctors to avoid, you know, paying for

11  someone to do -- who otherwise would be paid to do the work,

12  which we've explained isn't sufficient under Rule 8 to state

13  a claim.  But when you move to 9(b), it's crystal clear under

14  False Claims Act that what is prohibited is not violating the

15  anti-kickback statute, it's not, you know, doing any panoply

16  of failure to comply with other regulations.  All of those

17  things only matter under the False Claims Act to the extent

18  they result in false claims being submitted to a Government

19  payer.  False claims being submitted to a private payer, not

20  a False Claims Act case.  Violation of some really serious

21  criminal statute?  Not a violation unless that -- compliance

22  with that statute --

23          THE COURT:  Unless you certify as --

24          MS. MAYER:  -- is required for submission of claims

25  and submission of claims results.

1          Now, the anti-kickback statute was amended in 2010

2     and it says, if you fail to comply with it, you violate it,

3     and false claims on Government payer results, that can state

4     a False Claims Act claim.  So there can be a connection, but

5     you still have to plead both the entirety of an AKS

6     violation, which is a knowing and willful violation, because

7     this is a federal felony that for an individual could lead --

8          THE COURT:  But that's what I was going to say.

9     This is a criminal statute and you would expect there to be a

10    bright line so that individuals and companies would know

11    whether they are violating federal law or not violating

12    federal law, and that's why that's more concerning than

13    whether it's a False Claims Act.  The whole idea that you

14    could -- Medtronic could be violating a federal law, a

15    criminal statute without even knowing it, because there's not

16    a clear enough bright line about when it becomes criminal and

17    when it is good marketing and good product service, et

18    cetera.

19         MS. MAYER:  Well, we think that in this particular

20    case that is a particularly troubling and it has implications

21    both for whether a violation has been pled at all, let alone

22    with specificity, and also with respect to whether she has

23    pled under Rule 8 a knowing and willful violation of the

24    anti-kickback statute that then resulted in a knowing cause

25    to be submitted a False Claims Act violation.

1          Here, where we don't even know what conduct

2     actually, supposedly occurred.  And we see clear evidence in

3     the AdvaMed Code and in the pharma compliance guidance and in

4     OIG fraud alerts advising the industry that product support

5     services can occur as long as they are tied to a product

6     that's been sold, that the kickback statute, that felony is

7     implicated only if you're providing something that's

8     independent of support for your product.

9          I think the key there is that the only way to hold

10    someone -- that if you are going to then or argue that you've

11    pled that a company has engaged in a knowing and willful

12    violation of the anti-kickback statute by providing free

13    services, at a minimum you have to plead facts -- facts --

14    that demonstrate that the company knew it was doing something

15    unlawful when it was providing the services that you've

16    described in your complaint.  And there is nothing in this

17    complaint that gives rise to -- that either pleads it or

18    gives rise to any inference that the company knew it was

19    doing anything unlawful.

20         The codes that I think the relator points to in this

21    regard, we've gone through them.  They don't -- there are

22    general references to free services shouldn't be provided

23    that could implicate the anti-kickback statute, but you can't

24    read that without also reading the sections of those same

25    documents that talk about how product support services or

1   other support services are permissible, right?

2        So when you're a company and you're trying to say,

3   well, the company provided services, it knew it was

4   committing a felony, you can't get there from documents that

5   say don't provide -- you know, free services could implicate

6   the kickback statute, but providing product support is okay.

7        Second, the relator points to -- it's a very

8   convoluted argument in her opposition brief -- tries to argue

9   that because the company was committing a HIPAA violation --

10  this is her argument -- using a Google Docs calendar program

11  or Salesforce computer program, because the company at the

12  highest levels company-wide knew it was committing HIPAA

13  violations by using these software programs, well, that gets

14  you to mens rea; that shows they knew that the patient

15  information contained in that somehow represented kickbacks,

16  and the company knew that they were illegal kickbacks because

17  it knew it was engaged in a HIPAA violation.

18       So the logic here is so absent that I don't even

19  know where to begin, but let me point out I guess three steps

20  to why this doesn't get -- it doesn't provide any evidence of

21  that the company knew it was engaged in illegal conduct when

22  it supposedly provided the un-described free services.

23       First, the -- to the extent she is correct that the

24  securities disclosure that she relies on for this admits,

25  first of all, a HIPAA violation and, two, admits a HIPAA

1    violation related to Google Calendar and Salesforce.com.

2    Even if when you read the securities violation you saw that,

3    all that would be being admitted is a HIPAA violation, right?

4    HIPAA regulates privacy, it says -- what it prohibits is not

5    kickbacks, it prohibits the dissemination and inappropriately

6    secured treatment of protected health information.  So even

7    if the company was admitting in a securities filing that

8    Google Docs on some massive scale was violating HIPAA, it

9    wouldn't have any relation to the anti-kickback statute mens

10   rea that they need to plead here.

11          Second, in fact the securities violation that's

12   supposedly admitted doesn't address Google Docs or Google

13   Calendar at all.  And, third, maybe most importantly, the

14   admission of a HIPAA violation is not an admission of a HIPAA

15   violation.  I urge the Court to read the text of the

16   disclosure.  It actually says we think we're complying with

17   HIPAA, we think we have adequate processes, but maybe there

18   is risk and we're monitoring it, right?

19          Number one, this is a Medtronic-wide disclosure.  To

20   the extent they're saying anything about HIPAA, it could be

21   about any one of a number of business units and subsidiaries.

22   There is nothing that connects it even to the cardiac

23   business division at issue in this case.  There are other

24   products that Medtronic manufactures that it also supplies to

25   doctors and bills Medicare for itself.  Insulin pumps is an

24

1    example of one where Medtronic is both the manufacturer and

2    the durable medical equipment supplier.  And so they --

3    Medtronic has records in that division of the company,

4    patient medical records, the kind of stuff that's implicated

5    by HIPAA.

6         So when it says we recognize we have HIPAA

7    obligations, we think we're compliant, there's no basis for

8    inferring that they're talking about Google Calendar, that

9    they think there's anything wrong, and certainly not that

10   they think that they have violated the anti-kickback statute

11   by providing product support services in connection with the

12   implanted cardiac defibrillators that they aren't a durable

13   medical equipment supplier for.  They simply manufacture them

14   and sell them for doctors to implant and use in surgeries and

15   then monitor in their own home, in their own offices, you

16   know, as the label requires them to do subsequent to surgery.

17        So I think, you know, on the main -- I think we've

18   touched on the main arguments, the 9(b) and then the two main

19   Rule 8 arguments.  But I'll say on Rule 9(b), and I do think

20   it's important, the relator really tees up a strawman and

21   then shoots it down in the opposition.

22        And I don't want the Court to lose sight of this:

23   we never maintained in our brief and I don't maintain today

24   that under Third Circuit law the relator is required to plead

25   with specificity representative examples of false claims

1  submitted to Medicare in order to survive 9(b).  There are

2  circuits where you have to identify specific patient claims

3  and information on those claims, those very specific claims,

4  in order to survive a motion to dismiss.

5       The Third Circuit in <u>Folia</u> quite explicitly joined a

6  few other circuits, including the First Circuit, the Fifth

7  and the Ninth, that said that's one way of meeting 9(b), but

8  another way of meeting 9(b) is to plead the scheme with

9  particularity and to plead facts that demonstrate, that

10 provide reliable indicia that claims were actually submitted

11 that were false to the Medicaid/Medicare programs, to the

12 Federal payers.

13      So it doesn't -- that means they don't have to plead

14 details about representative examples, it also means that

15 there are different ways to satisfy that standard.  There's

16 no one, you know, algorithm, you know, plead -- check the

17 following six boxes to get past a motion to dismiss, but it

18 means you have to plead facts demonstrating reliable indicia.

19      So what does that mean and why hasn't she done it

20 here?  In terms of the place to start, I think <u>Folia</u> is the

21 right place to start.  In <u>Folia</u>, first of all, a simpler

22 theory of reliability.  The issue that was up on appeal, the

23 relator said vials of medicine, typically for a patient you

24 only use part of the vial in a dose.  If you bill as a single

25 use, Medicare allows you to bill for the whole contents of

1   the vial.  If you use it as a multi-use with multiple patient

2   doses, you only bill Medicare for the amount you actually

3   use.  The theory was you're using it in a multi-use way, but

4   you're billing it as if you're using it as a single-use vial.

5   So you're over-billing Medicare.

6        The defendant was the medical provider and biller

7   itself.  So this wasn't a pharmaceutical company or medical

8   device company engages in conduct that influences doctors'

9   behavior over some subset of their patients and then maybe

10   the doctor bills, this was -- the whole scheme was to over-

11   bill Medicare for the use of these vials.  And so the relator

12   who worked at the billing defendant said we treated some

13   Medicare patients, we do this across the board with them, and

14   the company bills for it.

15        And that's not all.  The relator also alleged based

16   on inventory logs that for a specific month in October of

17   2008, by way of example, was able to allege on each day in

18   that month how many vials were used, how many patients were

19   seen, and therefore to demonstrate based on a reasonable

20   inference you could draw from those facts that in fact the

21   multi-use was occurring.  That is way more specificity that

22   we see in any piece of this complaint.

23        And then the court said that alone itself wasn't

24   enough to deal with the reliable indicia problem, because

25   they said, you know, in theory, they could have billed

1  properly for the multi-use vials, I know relator alleged they

2  didn't, what else do I want to consider.

3        So then the court considered some additional

4  allegations in the case and said there's really two scenarios

5  that could occur here.  On the first, the relator is right,

6  Medicare is being billed, you know, for those multi-use

7  vials, because they've established facts that, if true,

8  plausibly demonstrate the multi-use, and that the bills were

9  going out.  Second, the court said the alternative theory is

10 that because if you use it multi-use, there's a bunch of

11 safety requirements you're supposed to follow, and the

12 relator had alleged that those were systematically not

13 followed.

14       So they said, so either they're over-billing

15 Medicare as if this was single use or they're billing it as a

16 multi-use and they're systematically not following the rules.

17 So either way, we've got false claims, and that was what was

18 enough in terms of reliable indicia.  And the court said,

19 wow, this is a close call; this is barely enough.

20       So here we have instead a situation where there is

21 no pleading, first of all, that describes the conduct of the

22 scheme.  The conduct at issue we can't even identify really.

23 You asked about what does surgical assistance mean.  Well,

24 surgical assistance, who knows what it means.  I think

25 critically, you know, as you said, if it's providing a nurse

1   to sit there and suture patients closed, that is not product

2   support, but if it's to provide a rep in there to help the

3   doctor program the device for the specific patient correctly,

4   letting the doctor make medical judgments, that's not only

5   product support, that's contemplated by the FDA approval for

6   the product.

7          So, you know, surgical support needs to be explained

8   in order to state a claim.  What they've pled is entirely

9   consistent with legal conduct and so there's none of the

10  indicia that we saw in Folia.

11         And then second, unlike Folia where the court barely

12  got comfortable because it saw only two alternative scenarios

13  here, both of which led to false claims, here we have a whole

14  panoply of scenarios open that clearly don't necessitate

15  false claims.  It's a more complicated case to plead in terms

16  of steps, because you've got an anti-kickback-based False

17  Claims Act claim that is a cause to be presented claims.  So

18  they've got to connect conduct by the manufacturer to

19  doctor's decision-making to particular patients who are

20  actually Medicare beneficiaries out in the world for whom

21  claims were submitted.  It doesn't mean you have to plead

22  those individual claims with specificity, but you've got to

23  connect those dots, and none of that happens.

24         And so is this fair?  Well, you know, the courts

25  recognize that this is a fair burden to require.  She may not

1    be able to plead the doctor's own billing practices, but at a

2    minimum she should be able to under the cases that we cite in

3    the complaint.

4           And Rollo, which is a Third Circuit case, not in the

5    False Claims Act context, that she cites as very consistent

6    with this.  We can talk about that, if it's helpful to the

7    Court.  But we've got a situation where, you know, under

8    Hagerty, under Duxbury in the First Circuit, consistent with

9    Folia in the Third Circuit, we're all doing the same

10   reliable-indicia idea.

11          It's perfectly fair for a rep who in the sales force

12   in particular at a medical device manufacturer who pleads

13   first-hand knowledge of the conduct at issue to be able to

14   say -- which included calling on doctors, right? -- to be

15   able to say, you know, here are examples not just -- and

16   here's what the conduct that clearly under the law and under

17   the guidance shows it was a kickback, that the doctors as a

18   result, they should be able to plead some facts that

19   demonstrate that the doctors as a result treated Medicare

20   patients, and then she needs to be able to allege that -- at

21   least have a basis under Rule 11 to allege that those doctors

22   then billed Medicare for those patients.  That is not

23   tantamount to pleading specific details about representative

24   example false claims.

25          I think Duxbury itself is a great example of how

1    that worked.  And the First Circuit agreed it was barely

2    adequate, but it was a kickback case, it was a pharmaceutical

3    company, and there you had the providers who received

4    kickbacks identified.  It was a monetary kickback in that

5    case, so there was no question about whether she had pled

6    remuneration or he had pled remuneration.  So it identifies

7    providers, it identifies the amounts of the kickbacks, the

8    dates, and it alleges that bills were subsequently submitted.

9          In Hagerty v. Cyberonics, which is a more recent

10   First Circuit case that has come out after Escobar -- and

11   Escobar was not a 9(b) case, but it reemphasized how

12   critical, you know, that the essence of a False Claims Act

13   case is the claim and the misrepresentations in the claim.

14   You know, in Escobar, you know, actual -- a lot of detail

15   about the claims was actually pled and the claims process,

16   and we don't have that here.

17         So ultimately, I think that clearly under Third

18   Circuit law we're good.  To the extent there are any District

19   Court cases like Underwood that she relies heavily on that

20   appear to be open to a more flexible pleading standard, I

21   submit Underwood came out before Folia, so to the extent it's

22   different from Folia, it's really not persuasive at this

23   point.

24         I think it's also important -- and again, I don't

25   want to overuse it, but I think it's important to recognize

1    Escobar was the Supreme Court speaking on an implied

2    certification theory of False Claims Act liability, the first

3    time they've addressed this ever.  And if you read the

4    decision, it's clear that 9(b) applies to every component of

5    it, including the materiality of the misrepresentation of the

6    claim, and you see the court very focused on the claim itself

7    and what in the claim is false or rendered false by the

8    noncompliance with the relevant statute.

9         And again, here we have the anti-kickback statute, I

10   recognize it -- if you don't comply with the anti-kickback

11   statute and that you're in violation of it and false claims

12   -- and claims result that there is an FCA action, I don't

13   think that's in dispute here, but the key is the claim is

14   what triggers liability in the False Claims Act case, not a

15   violation of the anti-kickback statute.  You could bribe a

16   doctor under the anti-kickback statute until the cows come

17   home and you could be thrown in prison for that, okay?  If

18   that fraud is directed at the Federal health care program.

19   But if that doctor doesn't actually submit claims to

20   Medicare, you don't have an FCA violation.

21        And again, you don't have to plead representative

22   examples of those claims, but you have to plead that

23   connection.  Otherwise, you just haven't pled FCA violation

24   with specificity.

25        And I would say that this screen, which could feel

1   unfair, is an important one, because I want to tell you a

2   little bit of the history of Duxbury, what happened

3   afterwards.

4           So Duxbury was sort of the, you know, earthquake in

5   pleading standards in the False Claims Act in the pharma and

6   device world because it made it easier, it provided an

7   alternative means to get to discovery, and the court allowed

8   it and that case went to discovery.  And it turned out that

9   the defendant ultimately won summary judgment, because the

10  plaintiff couldn't pony up evidence supporting the kickbacks

11  that had been pled specifically in the complaint.  So

12  discovery was stayed until the First Circuit said this goes

13  through.  The district court decided to limit discovery in

14  the first instance for the claims that had been pled with

15  specificity and it turns out the relator couldn't prove them

16  (indiscernible).

17          This -- yes, 9(b) serves an important purpose,

18  because 9(b) puts defendants on notice of the details of a

19  fraud scheme, but Rule 8 is about notice pleading.  The other

20  critical purpose of 9(b) is that it says that a fraud case

21  can't go forward unless you can plead enough details to plead

22  it with specificity; it serves as a screen.  And in cases

23  like this where the relators are whistleblowers, they're

24  suing on behalf of the Government, but they have not

25  themselves suffered any injury, right?  I mean, Ms. Forney,

1    you know, is not someone who paid out money and suffered

2    monetary loss herself because of the scheme alleged, she's

3    suing on behalf of the Federal Government.  Here,

4    whistleblowers absolutely have a right to pursue these cases

5    on behalf of the Federal Government, but there isn't the same

6    sort of natural limit to their ability to pursue claims and

7    try to pursue claims to incentive the Government to pursue

8    claims that you have when the relator themself or the

9    plaintiff themself has to suffer personal injury.

10           Now, the Government had a chance to look at this

11   case and chose to pass on it.  It does not give you a right

12   to infer anything on the merits of the case because the

13   Government can make that decision for any or no reason at

14   all.  However, I think the key is the relator is not the only

15   person -- was not personally injured and isn't the only

16   person that can go after this sort of stuff.

17           And so 9(b) in these kind of cases serves a really

18   important purpose, because it can be easy for an unhappy

19   employee to file a complaint based on supposition,

20   speculation of possible misconduct and hand it off to DOJ,

21   kind of like a tipster.  That's part of what the False Claims

22   Act wants to motivate people to do.  It doesn't mean they

23   actually have a good case, because, again, they weren't

24   injured.  What you have then is DOJ gets an opportunity to

25   try to kick the tires on it and see if they think this is

1    really a problem.  Or maybe they don't have -- like I said, I

2    don't want you to infer too much from that, but I'm just

3    saying that's structurally the way it works.

4         And so in these kinds of cases when the case comes

5    back into litigation, I think it's -- it does the structure

6    of the statute a disservice to take a particularly

7    liberalized view of 9(b), viewing it as only a notice

8    pleading statute, thinking that discovery is necessary to

9    vindicate the Government's interest.  Right?  The Government

10   has all sorts of tools that they could use to take discovery

11   of defendants based on claims and either avail themselves on

12   them or not, you know.

13        I'm not suggesting the False Claims Act here should

14   get a standard of review that's different from Folia and

15   Duxbury and Hagerty and what the courts have established the

16   9(b) standard is, but I think it's critical that you don't

17   adopt a weaker version of that and if you allow this

18   complaint to go through, you are diluting Folia, because they

19   don't plead what Folia required and said was barely there.

20        The last things, I will just tee it up for you if

21   you have questions on them.  Otherwise, I know I've been

22   talking a long time and Ms. Burke I'm sure has a hundred

23   things to say in response, but we move to dismiss to the

24   extent that there is any Stark issue here, because Medtronic

25   is just a manufacturer, it's not a Stark -- there's no Stark

1  case here.  We pointed out that the Stark law only applies in

2  certain circumstances and laid it out in the brief.

3        One type of entity to which Stark could apply is

4  something called a DME supplier and we pointed out that we're

5  not a DME supplier here, we're not -- that's not -- this

6  isn't DME.  These are implanted cardiac defibrillator

7  devices, it's not durable medical equipment under the

8  Medicare standard for that that is supplied.  Ms. Burke

9  hasn't cited any case or any coverage decision or any

10  authority establishing that these devices are DME, she has

11  simply pointed to the definition of DME and said, hey, sounds

12  like it applies.

13        The problem with that is the last critical piece to

14  the definition of what constitutes DME -- and this is what I

15  think most clearly takes this out of the realm -- is that

16  it's appropriate for use in the home.  So if you look at the

17  DME coverage, the typical durable medical equipment are

18  canes, wheelchairs, insulin pumps, bone growth stimulators,

19  you know, external devices that you strap onto your body,

20  that a patient can strap onto his body and then that a

21  patient can use in the home.  The only way these heart

22  rhythm-regulating, internally implanted devices are used in

23  the home is that a patient goes home and walks around and

24  it's implanted in their body.  That doesn't make it a for-

25  use-in-the-home device.  Otherwise, every medical device is

1   durable medical equipment and that's not the case.

2        And I think critically, you know, in the absence of

3   some sort of evidence demonstrating that these surgically

4   implanted devices that the patient never directly interacts

5   with, right, the patient has to go back to the doctor's

6   office to have it checked and investigated, that FDA is so

7   concerned is used correctly that it built into the approvals

8   that you need to get training and all that, it is not a for-

9   use-in-home device, it's not -- you know, other for-use-in-

10  home devices are, you know, Albuterol inhalers where the

11  medicine is the Albuterol and you have a nebulizer.  I have,

12  you know, a child who needed a nebulizer for a short period

13  of time.  That's a use-in-home device.  And a surgically

14  implanted cardiac defibrillator that you have to go to the

15  doctor's office to have the doctor interact with, check,

16  adjust is not for use in the home.

17       So I'll leave it with that.  I talked about the

18  with-prejudice dismissal and the HIPAA stuff and --

19       THE COURT:  And just the other thing about the state

20  False Claims Acts.  For the same reasons you believe the

21  federal False Claims Act fails, but also I think the only

22  allegation with respect to the state's is that it was a

23  nationwide marketing scheme.

24       MS. MAYER:  Yes.  And I think --

25       THE COURT:  I don't think there's any even mention

1    of the state.

2            MS. MAYER:  Yeah.  I think in the case with the

3    state False Claims Act, these are causes of action under

4    state law.  So there's certainly a federal False Claims Act

5    action under federal law, then there's -- you know, I'm just

6    picking -- I don't mean to pick out Ohio, but way of example

7    an Ohio False Claims Act count or a California False Claims

8    Act count, if you walk into a state court in California, you

9    have to plead conduct in California under 9(b) in order to

10   survive dismissal, okay?  If you're going to go into Ohio and

11   plead a cause of -- say that the Ohio False Claims Act was

12   violated, that only covers jurisdictionally conduct in Ohio

13   or claims submitted to Ohio if the conduct was, you know,

14   outside.

15           And so there needs to be some more pleading than

16   just this conclusory here's what was done in this section of

17   Pennsylvania and everybody did it the same way everywhere

18   else kind of conclusory statement.  And the cases support

19   that, I think we cite them in the brief and so I'll refer you

20   to the particular cases we cited.  And she doesn't cite

21   anything, any cases that hold otherwise, to the contrary.

22           Now, you know, are there cases out there that hold

23   that you don't have to plead with specificity, you know,

24   doctors and patients within Ohio in order for the Ohio False

25   Claims Act count to succeed?  Yes.  However, in those cases

38

1   what you have is a massively more extensive pleading of the

2   nationwide aspects of the scheme.

3          It can include things like, you know, relator went

4   to national sales trainings every year from 2007 to 2010 and

5   at those national sales trainings she was trained through

6   role-playing exercises to go to doctor's offices and say, hi,

7   I am here to offer to bring my nurse friend Susan to come in

8   and do all of your nurse duties so that you don't have to

9   hire an extra nurse for your routine patient care.  I was

10   trained to do that at all of my national sales meetings and

11   we were told that this was our national sales strategy.

12   Right?

13          If you have something like that and then you plead

14   specifics, you know, I think courts have generally allowed

15   those kind of state False Claims Act cases to come through.

16   But here where you have to the extent any facts are pled at

17   all with any specificity, they're all located only in

18   Pennsylvania, which incidentally does not have a state False

19   Claims Act, you don't get to then just say and it all

20   happened nationwide too without any factual basis for

21   concluding that this was a nationwide scheme.

22          She points to the use of her pleading in one

23   paragraph of spare sentencing Google Docs and Google Calendar

24   was used nationwide, but that doesn't do it.  First, because,

25   you know, it's so spare; second, because there's no

1    allegation that Google Docs and Google Calendar defined the

2    conduct, somehow that this -- that if you peek into Google

3    Docs we're going to see a description of the conduct.  What

4    it was was a patient calendaring program.

5         And the more fundamental problem with that is just

6    like everything else that's alleged in the case, there are a

7    host of reasons why a device manufacturer may want to have a

8    calendar of patient visits to customers that are entirely

9    innocuous and legal.  For example, to provide post-

10   implantation technical support or education or reimbursement

11   assistance, to go to the doctor and help interrogate the

12   device, to make sure that's being done correctly if the

13   doctor has questions, right?

14        So the fact that there allegedly was a calendaring

15   program that was used more broadly doesn't answer the

16   question about, A, whether any inappropriate conduct was

17   doing it, and it doesn't suggest that whatever the service

18   was that was supposedly provided to the patient that was

19   improper was nationwide, a nationwide scheme.  It just says,

20   nationwide they were keeping track of patients.  It could

21   easily, consistent with what's been pled, have a situation

22   where one rogue rep and one district was doing something

23   improper and everybody else was engaged in very innocuous

24   activity.

25        And so what is absent or what you see in cases that

40

1    allows strong nationwide pleading to retain state False

2    Claims Act counts in the absence of pleading conduct about in

3    this particular state is strong facts pled that there was

4    nationwide direction to engage in the precise misconduct

5    where the court concludes, you know, if true, would

6    constitute a violation of the False Claims Act.

7            THE COURT:  Very well.  Thank you very much.

8            Attorney Burke, I suspect you disagree.

9            MS. BURKE:  Yes, your Honor.  Do you mind if I

10   approach the podium?

11           THE COURT:  Not at all.

12           MS. BURKE:  Thank you.

13           THE COURT:  And would you agree that some of -- it

14   is possible to take all of the facts and the conclusions in

15   the complaint and still draw a conclusion that everything

16   that the defendant did complied with the law?

17           MS. BURKE:  No, your Honor, and really that is the

18   nub of the issue before the Court.  What the defendant has

19   posited is that any services provided as long as they're

20   connected to the product fall on the compliance side of the

21   anti-kickback statute, but we know that's not the case.

22           Your Honor identified properly the troubling nature

23   of the anti-kickback statute:  it's broad and it encompasses

24   a huge amount of conduct, and health care providers and

25   corporations that are operating in the health care industry

1    are in fact being required to comply with something that's

2    quite broad, but that is the reality of health care and those

3    who participate in it know that they are obliged to

4    scrutinize their own conduct and make sure that they do not

5    cross from permissible to impermissible.  And the crossover

6    can be subtle, but it's a matter of degree.

7              For example, it may be appropriate and completely

8    lawful for Medtronic to teach a doctor that's purchasing

9    their device how to use it, how to train.  The FDA

10   contemplates that.  Using sophisticated equipment, you need

11   to be taught.  Once that provider is taught, however, to

12   simply keep sending another set of hands constantly we allege

13   crosses over that line.

14             Similarly, there may be a time when the readouts,

15   the data that's coming back from a patient is unusual or

16   troubling, and a physician may have a need to pull in some

17   technical support and say help us interpret this data.

18   That's probably on the lawful side.  What happened here and

19   what we alleged in the complaint is -- crosses over into the

20   unlawful side and that is to repeatedly, routinely, for

21   regular-course-of-business readings have a Medtronic person

22   do that work rather than the doctor's office.

23             So the crossing of the line is a very fact-based

24   endeavor and determining the crossing of the line can't be

25   judged in the abstract.  What we've alleged, we say they've

42

1    crossed that line.  We gave you examples of providers of the

2    services, the dates that it was done.  We also gave you

3    examples of the rate it was being done, six, seven times a

4    day just in one provider's office.  So we've given you the

5    sense of the pace, the sense of the scope, we think that

6    crosses the line.

7         Now, obviously they have a right at trial to try to

8    persuade a jury that it was all on the lawful side of the

9    line and I don't begrudge them that, but that's a merits

10   defense, that's not a pleading issue.  What we're saying --

11   and our relator was in fact part of the company, she worked

12   with -- she was someone sending out these reps and she's

13   saying we sent them out for everything.  That's exactly what

14   the complaint spells out and it was done using Google

15   Calendar and using Salesforce.

16        So we've given you a clear pathway to very easily

17   and efficiently get your arms -- for us to get around and

18   then show you here's the scope of this nationwide scheme.

19   Here's the documents, they have the detail that is exactly

20   what's needed to prove it up.  They show the provider, they

21   show what service was provided by Medtronic, they give us the

22   patient name.  And so the sheer volume of these free services

23   being provided demonstrates the unlawful nature of it.

24        And I think that it's very important to understand

25   that that issue, whether or not the in-kind re -- I have

1   trouble saying the word remuneration, but anyway whether --

2           THE COURT:  It's funny you say that, because we were

3   having trouble with that word earlier.

4           (Laughter.)

5           MS. BURKE:  So I think that, you know, the nub of

6   the case is are these services lawful or not.  And the

7   relator was part and parcel of providing these services, she

8   was a participant in this unlawful scheme.  She has put forth

9   with personal knowledge and personal information the scope of

10  the scheme, she's given examples of the scheme.

11          THE COURT:  But when she would send people out, was

12  it always for work related to the product?

13          MS. BURKE:  Yes, yes.  There's always -- it's always

14  connected in some way to the Medtronic product, right?  They

15  are there because they are -- they sold the product or

16  they're selling the product, and the whole panoply of

17  services is in fact related to the product.  That does not,

18  however, give the bright line that it must be lawful.

19          And think of it in the same way as any other

20  kickback in the health care field.  For example, paying

21  people to provide educational sessions, that's actually a

22  lawful activity, but what happened in the health care field

23  is that it's viewed then as a loophole and they drive a truck

24  right through it.  So suddenly they're giving way too much

25  money consistently to physicians and then that is corrupting

44

1   their judgment and corrupting their purchasing patterns.

2   It's the same thing here.

3        There is in fact a lawful zone of activity.  It's

4   lawful to help with sophisticated products when needed, it's

5   lawful to provide some technical advice when there's trouble,

6   but they've driven a truck right through it.  What's not

7   lawful is to day in, day out give an extra set of hands to do

8   the task that the provider itself, that the physician's

9   office should be doing.

10       For example, interrogating the devices, reading the

11  data of people that have these, all of those are things that

12  provider -- that the physician's offices are supposed to be

13  doing as part of patient care.  They love getting the free

14  services, they love being able just to call up and say, hey,

15  can you send a Medtronic rep down here to sit in my clinic

16  for four hours?  It frees up their staff, it gives them a

17  real benefit.

18       So the question is not whether there's a permissible

19  way to do it, the question is whether Medtronic drove a truck

20  through that loophole -- not a loophole, drove through the

21  line and provided it at such a quantum and such a degree that

22  it's unlawful.  And that is what the complaint alleges with

23  specificity happened here.

24       Now, you know, obviously we would say the same thing

25  27 times.  I tend to be very succinct, and you'll notice I

1    will be succinct here, I say it once and set it out there.

2    It is complicated, but repeating it doesn't make it less

3    complicated.  So we're happy to answer any questions on it,

4    but I think that I have properly pled all the elements.

5            THE COURT:  I'll tell you where I have the problem,

6    it is this issue of the lack of a bright line.  So if there's

7    a product and we all agree that you can send assistance out,

8    technical assistance, et cetera, with respect to the product

9    and that's permissible -- and you're talking about the

10   quantity, but not just the quantity, but the quality of

11   what's being done now -- when do you draw the line as to what

12   -- and with specifics in this case, what was Medtronic doing

13   where you believe it crossed the line, when the technical

14   expert was doing something that didn't require a technical

15   expert to interpret data, that it could have been done by

16   someone else rather than a Medtronic employee?  Like with as

17   much specificity as you can tell me, when did they cross the

18   line?

19           MS. BURKE:  We think they crossed the line, as we

20   pled in the complaint, they set this up as a way to market to

21   providers, so they had the intent there to try to influence

22   purchasing behavior.  Okay?  And we pled that.  So they're

23   promoting to the purchasers and they're trying to impact the

24   purchasing decision by portraying themselves as this

25   wonderful partner who will always be there at your side to

1   provide service.  We think that shows the intent to cross the

2   line, because it shows the intent to influence the purchasing

3   decision.

4        In the world as it should be, the purchasing

5   decisions are made without any freebies being offered and

6   Medtronic only responds when asked to provide technical

7   support.  That's not what happened here.  It was pitched to

8   those who were making purchasing decisions, hey, listen,

9   Medtronic is going to be there by your side.  And the Google

10  Calendars and the Salesforce calendar bear that out.  We gave

11  you a snippet in Pennsylvania, but this is a daily -- they

12  created an entire network of people, of representatives out

13  there in physician offices every single day.  That whole

14  nationwide scheme is what crosses the line.

15       And so I understand the complexity and the

16  difficulty of looking at a case in which the law itself does

17  not provide a bright line, but unfortunately the anti-

18  kickback law does not.

19       THE COURT:  Now, if they were providing all of this

20  service and that had to be at some cost to Medtronics, hence

21  the benefit to the purchaser.  Were their products more

22  expensive than a competing manufacturer who would not provide

23  these services?

24       MS. BURKE:  Yes, for example, in Europe where the

25  products do not have this sales structure attached to it, the

47

1   Medtronic products are cheaper.  So, yes, it does in fact,

2   put into the cost of the product.

3            THE COURT:  Now, I guess this isn't a big issue, but

4   isn't it better for the patient to have this relationship

5   with the manufacturer of a device?

6            MS. BURKE:  No, your Honor.  You know, just as the

7   pharmaceutical manufacturers and others argued well, isn't it

8   great that these doctors are all giving us education and that

9   we're educating them?  No, the reality is benefits, the money

10  flow actually changes physicians' medical judgments.  The

11  OIG, in fact, the OIG sources that we've cited, point out

12  oddly enough, you wouldn't necessarily think this, but oddly

13  enough, even an inexpensive lunch will persuade a doctor to

14  use a drug or use a device based on a feeling of friendship

15  and the marketing works.  And so, the provision of the free

16  services has a negative effect on the health care industry

17  because it induces purchasing based on something other than

18  medical judgment about which is the best device.

19           THE COURT:  I can't help but think of the analogy to

20  buying some kind of technology with a computer.  I buy a

21  computer.  Now, the Eastern District for the Northern Tier to

22  have a computer person.

23           MS. BURKE:  Mm-hmm.

24           THE COURT:  But the manufacturer of the computer

25              device would also provide customer service and

1   they'd constantly be available.  So, when my computer's not

2   working, I don't know how to work it.  So, it's something

3   very technical and it's complex, so I call for these

4   assistance people and they're always available, always

5   available.  Now, does that save me having to have the

6   computer person on my own dime?  It does, but my own computer

7   person couldn't possibly be trained adequately on this

8   particular device unless he got training from my --

9          MS. BURKE:  Well, that's the point, your Honor.  The

10   FDA requires that the company provide the training.  So,

11   these are, as we alleged in the Complaint.  These are off-

12   the-shelf products.  We're not dealing with something new and

13   fancy that hasn't been on the market.  We're dealing with the

14   commodity products.  So, we're talking about physicians who

15   have done this year in and year out.  They've been trained.

16   And what I would analogize it, sir, is for example, take you

17   making a decision between using Lexus and using Westlaw.

18   Lexus says to you, okay, here's our product and if you get in

19   any trouble, you can call this number and we'll help you out.

20          Westlaw says, you know what, sir, we're going to

21   provide people, associates to do the research for you.

22   Please buy our product instead.  There's a difference there

23   and that's what we're dealing with.  We're dealing with a

24   promise and a provision of a level of service that influences

25   purchasing decisions.

1           THE COURT:  Of course, because that is very

2    attractive to have that.  That's a good thing.  I mean, when

3    you buy something, for a company to say we're going to give

4    you A-plus service, we will always be available to you,

5    except that that's a lot different than saying, we're going

6    to come put the device in though, which would suggest with

7    that research analogy.  It's, here what they're saying is,

8    we're going to be by your side.  That we stand by our product

9    and if there is a problem or you need technical assistance,

10   we will be there, correct?

11          MS. BURKE:  Well, no, it's more than that, your

12   Honor.  What it is saying to the doctor is, you know that

13   kind of mundane task of checking on all of your patients who

14   have these implantable devices that spit out all that data?

15   You know that tedious task that consumes some of your nurses'

16   time and your clinicians' time and is, you know, kind of

17   tedious, but you have to do it as good patient care?  Guess

18   what, you're not going to have to worry about that.  We'll

19   give you that for free.  Now, please buy our product rather

20   than a competing one.

21          That level of free service crosses the line and you

22   know, because it crosses the line, they shouldn't have done

23   it.  It was, in fact, a kickback and they knew, they knew

24   from their own involvement in the reimbursement process and

25   they knew from their familiarity with what the physicians had

1   to fill out on the CMS-1500.  They knew that the claims for

2   the purchases were being submitted and paid for by the

3   Government.  And because it's in this realm of health care

4   being paid by the Government, it takes it out of what you and

5   I would deal with and what we might think of as normal with

6   computer support.  So, promising, making promises to a

7   decisionmaker, who is spending Government money, is looked at

8   in a far different way than simply if you took the Government

9   money out of there and you're just making a straight bid to

10  try to persuade someone to buy your product.

11          THE COURT:  Now, these cases are very interesting

12  because of who the relator is and in this particular case,

13  the relator was the person that was sending these people out?

14          MS. BURKE:  That's correct.  She was in management

15  and she had worked there for almost 20 years.  She worked

16  across the country with all the other district managers.  She

17  became -- she was part of a task force that rolled out the

18  sales force.  She became upset with the company about the

19  patient confidentiality.  She was very concerned that this

20  whole process of scheduling all these procedures was being

21  done on a non-HIPAA compliant google tech.

22          THE COURT:  And the reason it was scheduled with

23  Medtronic was because Medtronic would send people out --

24          MS. BURKE:  Mm-hmm.

25          THE COURT:  -- with respect to each device.

1            MS. BURKE:  Right and these schedules, your Honor,

2    are the -- and they're voluminous, I mean, because each rep

3    has many doctors and I mean, they provided the -- the quantum

4    of services is voluminous.  And these Google documents and

5    these sales force documents, these calendars are going to be

6    the key.  This is going to be the evidence that proves to a

7    jury that this crossed that line.

8            THE COURT:  But what did they send us those photos

9    of Google entry, that were going to Easton, Pennsylvania, Dr.

10   Smith.  Who are you sending to Dr. Smith?

11           MS. BURKE:  Well, it's more specific than that and

12   if you look at paragraph 25, it will say and we didn't put

13   the patient names in the Complaint, obviously, for HIPAA

14   reasons.  But it will say who the patient is, what the

15   procedure is or what the device is that they had in them and

16   then what's going to be done.  So, it is a road map to the

17   free service that was provided.  And so it will show you and

18   we gave you that snippet of a few days in Pennsylvania, it

19   will show you exactly the level of Medtronic activity across

20   the nation.

21           THE COURT:  Does that schedule show me who went

22   there and what they did?

23           MS. BURKE:  Yes, yes.

24           THE COURT:  Because I did not see that.  So, if I

25   look at that Google, if I look at the Google spreadsheet and

1    that's what I'm supposed to draw from that, is what Medtronic

2    was providing as far as service, free services to the

3    physician?

4            MS. BURKE:  Yes and if you look in paragraph 25,

5    there's a listing there of what they did.  And there is a

6    complexity and we can certainly, if your Honor requires, we

7    can certainly provide additional information, background

8    information about what the service is.  But Medtronic

9    clearly, they're very familiar with these services.  So, the

10   way we've described it in the Complaint is meaningful to the

11   defendant.

12           THE COURT:  Now, what about the State Law claims?

13           MS. BURKE:  The same, your Honor.  This is not a

14   situation that this was somehow a discrete, small scheme that

15   was implemented just in Pennsylvania.  As pled in the

16   Complaint, the district that Ms. Forney worked in was doing

17   the same thing as every other district.  This is a nationwide

18   practice.

19           THE COURT:  Well, what I mean is if I pull up that

20   Google spreadsheet, would I see an Ohio --

21           MS. BURKE:  Yes, so basically, each district manager

22   such as Ms. Forney, has say between two and ten people that

23   work under them.  And so, the scheduling is done at the

24   district level.  It's a way that the reps communicated with

25   their management.  So, it is, in a sense, like it's much like

1    having a taxi dispatch calendar.  We know who was dispatched,

2    where they went and what they did.  So, those documents are

3    the evidence and the road map of the scheme.

4           THE COURT:  But, so I've got pacer check, I've got

5    interrogation of device and device check.  How does that tell

6    me that what they're sending out is not consistent with

7    product service?

8           MS. BURKE:  Your Honor, in any -- the reason is --

9           THE COURT:  Not to interrupt you, but --

10          MS. BURKE:  Yes.

11          THE COURT:  -- because I was looking at this, I was

12   thinking, all right, how do you save a doctor money?  And I

13   was thinking you give him somebody that he wouldn't otherwise

14   need.

15          MS. BURKE:  Yeah.

16          THE COURT:  Or you give him somebody that he

17   otherwise would need, so he doesn't have to pay that person.

18   Because then again, it is things about hospitals and who's

19   paying who and whatever.  How does the fact that Medtronics

20   did a pacer check help the doctor, other than the fact that

21   he's making sure the device works properly so his patient

22   doesn't die.

23          MS. BURKE:  It basically eliminates the doctor

24   needing to do the pacer check or the doctor's staff person

25   needing to do the pacer check, a clinician paid by the doctor

1    to do that check.  So, all of these services that are done

2    are things that need to be done, presumably.  So, the doctor

3    is, when a doctor implants a device, a doctor is supposed to

4    check on that device.  They're supposed to make -- they have

5    certain standards of practice where they routinely check in

6    on these devices.  But for the free people that Medtronic was

7    providing, the doctor would have to get that task covered in

8    some other way.  And so, all of the services that are being

9    provided, the quantum of services, is the proof that it

10   crosses the line.

11          Any single service in isolation, if this happened

12   just once, there might be an argument that it was

13   permissible.  So, you have to look at the totality of what

14   Medtronic was providing.  Because it is that totality of the

15   services and the marketing that goes along with it, that

16   demonstrates, that will serve as the evidence to demonstrate

17   to the jury that it crosses the line into illegality.

18          THE COURT:  Okay.

19          MS. BURKE:  Your Honor, I really think that the

20   question of whether or not it's a kickback, obviously, is the

21   key question.  I don't think it's appropriate for your Honor

22   to decide that without evidence and without discovery.  So,

23   we would ask that the case move forward.

24          From my perspective, we believe we've properly pled

25   anything.  If you disagree, obviously, I'm happy to plead any

1    other facts that you want, because this is a person who

2    worked for the company for almost 20 years and the full, you

3    know, the full quantum of her knowledge is, I mean, we can

4    provide additional details about what an interrogation is and

5    we can provide additional details about anything that your

6    Honor views as appropriate.  We do believe --

7         THE COURT:  Well, no, what would be interesting is

8    if somebody has technical knowledge.  Like if you say, they

9    sent out a salesperson to do a pacer check just so the doctor

10   didn't have to do it, that's a little different than we've

11   got a technician who is a specialist in our device and they

12   are sent out to do it and that would be somebody that a

13   doctor normally wouldn't have, an expert technician in this

14   particular device.  You've suggested it could just be a, I

15   think you've been suggesting that a lot of these jobs,

16   responsibilities, et cetera, could be done by anybody or just

17   a normal medical person, they don't need a technical

18   professional from Medtronics to do it.

19        MS. BURKE:  That's correct, your Honor.  And that's

20   why we specifically pled these are not new technologies.

21   These are off-the-shelf products.  There are devices that are

22   well used and well known.  So, we're not -- although they are

23   sophisticated devices, the routine interrogations, the

24   routine checking, it's not something that a clinician cannot

25   do.  In fact, the physicians -- the FDA tells Medtronic, make

56

1    sure you train other people to do that and they say train

2    them.  They don't say do it for them.  So, the FDA approval

3    itself makes sure that Medtronic doesn't keep a monopoly on

4    this type of ability to service these products.

5           THE COURT:  So, if I brought in the cardiologist

6    involved here and I said could you have done this, made this

7    device check on your own?  Did you need to use Medtronics,

8    the cardiologist would say yeah, I could have done it on my

9    own?

10          MS. BURKE:  Yeah, I know how to do it, correct.  Or

11   you now, Ms. Smith on my staff, yes.  You know, when we can't

12   get a Medtronic rep out here, Ms. Smith does those checks.

13          THE COURT:  Okay, so the question is to what extent

14   is this just good marketing and good support and to what

15   extent is it a bribe or a kickback?

16          MS. BURKE:  Well, bribes can be good marketing,

17   right?

18          THE COURT:  Absolutely.

19          MS. BURKE:  I mean, this was very effective

20   marketing.  So, it's effective marketing and it has a ring of

21   legitimacy that, you know, we care about our product, we're

22   going to educate you on your product.  But I would encourage

23   your Honor to remember we have to think about this not in a

24   normal business practice sense, but when you know the

25   purchasing decisionmaker is not spending their own money.

1    They are buying a product using Government money.  So, when

2    you are looking at why this type of free service had a

3    corrupting affect on the purchaser, it's because the Medicare

4    and the Medicaid program don't benefit by this benefit.  The

5    upside of all of that service doesn't flow to the Government.

6    It flows directly to the physician and the hospitals who can

7    keep their overheads lower.  And so, you know, those

8    overheads are not -- hospital reimbursement, obviously, is a

9    little more complex, but overhead in general, is not

10   reimbursed by Government money.  So, that's the area where

11   the physicians have the incentive to try to keep it low.

12   That's why an extra pair of hands, that's why a Medtronic

13   representative sitting in their clinic and entering, you

14   know, data check, data check, data check, eight, you know,

15   okay, they tick that box for all those patients.  That saves

16   the physicians overhead.

17          THE COURT:  Now, the people your client was sending

18   out, you use the term sales representatives, did she send out

19   people other than sales representatives to these different

20   doctors offices?  And were sales representatives doing these

21   pacer checks and interrogation of device checks?

22          MS. BURKE:  These were people that had undergone

23   training by Medtronic.  So, they were knowledgeable about the

24   devices and they were knowledgeable about the product.  So,

25   it's not akin to a sales rep who knows nothing about a

58

1  product.

2       THE COURT:  But was her official title sales rep?

3       MS. BURKE:  And I, I'm sorry, your Honor.  I believe

4  that they had a different, I think it was called service,

5  service representatives.  Although, your Honor, I apologize,

6  I want to make sure that I've got that terminology right.

7       THE COURT:  Oh, that's okay.

8       MS. BURKE:  So, I'll put that in, in paper, if you

9  don't mind.

10       THE COURT:  Did they both sell the device and

11  service the device?

12       MS. BURKE:  There were other organizations that just

13  sold the devices, so they would work king of hand in hand

14  together.  So, there was a whole service district management

15  -- district structure.  So, what Ms. Forney oversaw were

16  people who were just providing these services, not just the

17  initial sales of the device.

18       THE COURT:  Okay, so she actually oversaw that

19  people that were the service people?

20       MS. BURKE:  Exactly.

21       THE COURT:  Not the sales people?

22       MS. BURKE:  Correct.

23       THE COURT:  But what was her actual title, if you

24  recall?

25       MS. BURKE:  It was District Manager.

1          THE COURT:  Okay.  And I think it was actually for

2     the Eastern District of Pennsylvania, wasn't it?

3          MS. BURKE:  That's correct, your Honor, yes.

4          THE COURT:  All right, thank you very much.

5          MS. BURKE:  Thank you.

6          THE COURT:  Counsel, would you like to respond and

7     what about this argument of the proof is in the quantum as

8     opposed to the specific quality of the service for the

9     specific service, that there's so much service -- so many

10    services being provided that the quantum demonstrates that

11    this is going above the pale and is actually an unacceptable

12    kickback in the form of staffing services?

13         MS. MAYER:  I think that and you know, I appreciate

14    her candor with the Court here.  I think first I'd like to

15    put the focus very clearly on something that she agreed with

16    and that appears no longer to be in dispute.  Which is that

17    the services that are at issue here, the free services and

18    the free staffing --

19         THE COURT:  Are related to the product.

20         MS. MAYER:  Are connected to the product and in and

21    of themselves, beside the quantum, perfectly legal, okay.

22    So, what Medtronics was sending its people out to do, we all

23    agree apparently and I didn't know exactly what she was

24    maintaining it was.  And now she is saying, yeah, it was on

25    its own, put aside the quantity offered, fine, legal.  That's

1    not an issue, so she allows them in to complain, to describe

2    in more detail what's going on.  She agrees she's not going

3    to be describing something that doesn't fall within

4    permissible product support services.

5              So, now she's saying what this case is really

6    hinging on is this entirely novel theory which is unanchored

7    in any case, guidance, industry standard, that somehow

8    providing product support services is permissible.  But only

9    up to some undefined account that can't be articulated and

10   the Court can't decide, we have to give it to a jury after

11   full discovery and a trial.

12             I submit you can't say that a line between felony

13   and perfectly legal conduct, when we all agree that the

14   conduct you saw as legal, is something that cannot be

15   ascertained as a matter of law.  And again, in order to say

16   that if the quantum of it is what makes it a kickback, you

17   have to be able to point to law that establishes that fact.

18             She analogizes to physicians with her program and

19   that's an inapposite analogy.  First of all, physician

20   speaker programs are something that companies have done.  It

21   is allowable under the anti-kickback.  This situation, this

22   is not product support.  This is where you enter -- a

23   physician is paid money or for time to teach and promote the

24   product, okay.  So, because paying a doctor to promote the

25   product is offering remuneration, something of value that's

1  recognized to not be product support, you could only do it if
2  you structure that relationship in a way that fits within the
3  safe harbour of the anti-kickback statute.

4        And so what companies do is they enter into a
5  contract.  They set out this compensation and stamps and get
6  fair market value opinions or analysis.  There's a whole
7  industry that generates fair market value analysis for the
8  physicians' time and effort in connection with those speaking
9  programs.  If  physician is paid a fair market value for
10  speaking under a contract, you can do that.  You can do it
11  for one physician and you can do it for 3,000 physicians.
12  There are pharmaceutical companies that have speaker bureaus
13  with 10,000 physicians and that's fine, as long as they're
14  paying them fair market value and there is a commercially
15  reasonable basis for doing that number of speaker parts.  If
16  you pay someone to speak over and over again to the same
17  three doctors on the same topic, right, you're going to have
18  some trouble.

19        But if you pay that same doctor over and over again
20  to speak to five people in different places around the
21  country who haven't heard it before, fine, that's kind of
22  common sense.  These are not complicated, long lines to drop
23  and most critically, there are cases, guidance and fraud
24  alerts and DOJ settlements that all layout the ground rules
25  in this area.  Here, there is nothing, other than Herrick

62

1    (ph), which is a case that we cite.  That's a District Court

2    decision in Pennsylvania that recognizes that it's not enough

3    to argue that free services are provided, you've got to go in

4    detail and prove there are actual remuneration.  Here, she

5    doesn't have an answer to how you decide how many times

6    Medtronics can be at a doctors office before it goes from

7    being a permissible level of product support to kickback.

8          I want to address just a couple of other things that

9    she said.  First of all, I think you asked her if, you know,

10   she emphasized that the proof that she would put in front of

11   a jury of the fact that this was a kickback is not, you know,

12   she wouldn't be able to ask you to write jury instruction

13   based on the law.  She's going to say that the proof is that

14   Medtronic marketed these product support services as

15   something that should be taken into account by doctors when

16   choosing Medtronic's product.  Well, of course, permissible

17   product support services are permissible to market, just like

18   if your device has a technical advantage, you can tout that

19   technical advantage when selling your device.  If you are

20   taking on the expense of providing stellar product support

21   that is legal, you can tout that to market it and it is not

22   evidence that you're trying to bribe doctors to buy product.

23   You're trying to convince them to buy your product by having

24   a permissible aspect of the product provided to them in this

25   case.  These are product support, which we agree all of us,

1    with what was being provided.

2           So, how do you get to the point where you're

3    providing too much product support is a kickback?  Well, you

4    don't, as long as the actual product support was for legal

5    purposes.  And I mean, she says that whereas Medtronic was

6    doing in product support is something that the doctor would

7    otherwise have had to pay someone to do.  Again, that's not

8    the question here on its own.  That establishes that there

9    was a value to the product support, but we -- that's not

10   really in dispute.  It's a valuable thing.

11          The question is, it has to have value and be

12   independent of the product before it's implicated in the

13   kickback statute.  So, for example, if you provide product

14   support in the physician's office, that's fine.  But if you

15   then offer a reimbursement guarantee, this is something we

16   see sometimes in the cases.  Product support is fine.

17   Reimbursement advice is fine, but if you then say, you know

18   what, if you try to bill for this to Medicare and they refuse

19   you, I'll refund the cost of the product.  That is not

20   product support.  That's something that's in addition.

21          There is case law.  If there was no case law on it,

22   it might be an open question.  There's no case law saying

23   that if you provide permissible product support, but too much

24   of it, it's a kickback.  And I think that the key here is

25   whether you issue a decision that finds that they haven't

64

1    pled adequately and can't fix this under the definition of

2    remuneration or not, what's crystal clear from this argument,

3    I think, is that she can't and she hasn't and she can't plead

4    knowledge.  Because and the requisite mens rea under the

5    anti-kickback statute, because when you look at the anti-

6    kickback statute, when you look at the guidance on it and you

7    look at the case law on it and there is nothing that suggests

8    that if you're otherwise providing permissible product

9    support services and staffing, that if you provide too much

10   of that, that that's when you cross the line.  The

11   discussions -- yes?

12           THE COURT:  Well, the analogy that she used was this

13   idea of there is the loophole and you referred to it as a

14   loophole, but this idea that this is legal, this is not

15   violating the anti-kickback and then drove a truck through

16   it.  Now, I can see -- I don't know that Attorney Burke is

17   fully conceding that all of this was product support.  But

18   let's assume that she is.  I could see issues where it could

19   be difficult to tell.  Like, suppose you have to have an

20   operation to have this put in and you have sutures and they

21   send somebody to check on your sutures.  That doesn't seem to

22   be really related to the product, even though the sutures

23   were a result of having to put the product in.  All of these

24   seem to go directly to the device.  I only have a list of

25   them here, but they're pacer check.  If it had been wound

65

1   check, that might be a little more questionable whether

2   that's truly product support.

3        Interrogation of the device, that seems clear from

4   what I can tell.  Interrogation of the device seems it's the

5   device.  Pacer check, device check.  But so, if Attorney

6   Burke is conceding that, any one of these standing alone

7   would be okay.  But they're going above and beyond providing

8   support that's really not necessary.  It's yes, it has

9   related to the product, but it's more support than you would

10  ever reasonably consider to be reasonable.  What if that was

11  the argument, that this is support that goes beyond the pale.

12       MS. MAYER:  So, I think the challenge there is if

13  that's the theory, you need first of all, if it's not for the

14  -- but even assuming that part of this exercise is to

15  evaluate whether she could, in theory, have a Complaint to

16  plead something that was viable.  I think the challenge there

17  is there's nothing -- no, what she has alleged is that for

18  any -- what she is saying in argument is that if you look at

19  the level of any individual patient, you know, what Medtronic

20  is doing is, you've got a schedule of the procedures that's

21  going to be done on the patient and then sending someone

22  there, okay.

23       You're saying well, surely for some of these

24  procedures for some of these patients, maybe it's

25  sufficiently routine that Medtronic wouldn't have needed to

66

1    do it.  Okay.  Assuming that's the case, what that means is

2    that you can't just pull six patients off of Google calendar

3    and say, these are examples that help to explain that the

4    legal procedures were being done because of these particular

5    patients, any procedure is, you know, this might have been an

6    incredibly -- even just buying into the theory for the moment

7    -- an incredibly complex procedure was appropriate.

8            I think more to the point, if this is permissible

9    product support, which we think they'll all generally be in

10   agreement on, the fact that a doctor maybe could have done it

11   as well or could have done it in tandem with the Medtronic

12   person, it's still permissible product support and you're

13   entitled to this.  It's an expense Medtronic can take on and

14   if allowed to market that as a reason to use its product.

15           I think one thing I wanted to address was the cost

16   issue because you raised it.  I think we need to keep and I'm

17   not sure if it's clear enough.  The doctors are not buying

18   these devices and then billing the device to Medicare.  When

19   the devices are acquired and implanted surgically at a

20   hospital, so the cost of the device itself is a cost that the

21   hospital incurs and that's not a cost that's capped on

22   directly or billed directly as a line item to Medicare.

23   Surgeries are reimbursed under a code, a diagnosis code that

24   encompasses the overall procedure.  So, whatever device is

25   used and some are more expensive than others, the Medicare

1    reimbursement is the same.  The hospital may incur more cost
2    if they got a more expensive device.  But I just want to make
3    clear that the cost went to Medicare, service is done later
4    in the physician office with respect to checking the device
5    and other things.  That doesn't mean you're buying the device
6    and billing for it at that outpatient setting.  There may be
7    service codes billed if the doctor performs a service that's
8    billable.  But there isn't the cost of the device.  I know
9    it's something that we've talked about a few times here, is
10   not something that's being passed on to Medicare.  It's not
11   like pharmaceutical products that, you know, Medicare might
12   reimburse for pharmaceutical products at average sale price
13   plus a percentage or something like that.  This is an
14   in-patient surgery.  The surgery is paid at the same rate
15   regardless of the plan.
16           THE COURT:  I keep thinking about this idea that we
17   have a relator who was in the middle of all of this.  So, she
18   knows what was going on and she believes wrongdoing occurred.
19   And she was actually the person sending out these service
20   technicians or service people, whatever it was.  And in her
21   mind, she was thinking, clearly if the doctor called up and
22   said hey, I want some, can you get me lunch.  And they sent
23   somebody out to get him lunch, I would think that would not
24   be product related, even if he was about to do surgery and he
25   was hungry.  It wouldn't be product related and that would be

1    -- violate the kickback statute.  It wouldn't be within this

2    what's referred to as a loophole.

3         She knows what was going on and she knows she was

4    sending these people out and she believes she was sending too

5    many people out or she wouldn't have brought this lawsuit.

6    And the question is why she believes that.  Because if it

7    were not related to the product, clearly we would understand

8    why she would believe that, just send somebody out to get

9    lunch.  If she's sending people out more than she believes

10   she should be, that this is padding the doctor somehow.  This

11   is giving a benefit to the doctor beyond what is reasonable

12   and I think as best it's been explained by Attorney Burke is

13   this idea that the nurse would have to do this check and if

14   we send this person in all the time, then the nurse doesn't

15   have to do this check.  I think that's the argument.

16        And so, I think from here standpoint, it was that

17   and now I'm just trying to put this together, is we were

18   sending too many people out for too many things beyond what

19   needed this technical expertise.  Is that how you read the

20   Complaint?

21        MS. MAYER:  That's how I read what Ms. Burke is

22   saying the theory of the case is.  The Complaint is nowhere

23   near that that clear and doesn't plead those facts. We've

24   gone way, just in the course of today, to be crystal clear,

25   we've gone way beyond what's actually alleged in the

1   Complaint.  The Complaint doesn't allege that these are even

2   services that Medtronic provides as opposed to simply a

3   calendar of procedures the patient was to have.  They do not

4   allege that no doctor was going to be present or that no

5   nurse was going to be present, if that's even true and if Ms.

6   Forney even knows, which she might not for these specific

7   procedure.  There is no allegation there as to any of what

8   Ms. Burke has now framed as the theory that's driving the

9   Complaint.

10          I think, but again, she has asked for leave to

11   amend, so I think it's productive to have this discussion to

12   probe what she would plead if she were allowed leave to amend

13   to try to fix the Complaint.  And I think the problem is, we

14   still get back to this, under Bell Atlantic v. Twombley &

15   Iqbal, it is crystal clear that the Court is not to defer, in

16   any way, to legal conclusions alleged in a Complaint.

17          You ask me, well, Ms. Forney believed that she was

18   sending out an unreasonable number of people.  She is drawing

19   a legal conclusion.  If she reframed her Complaint to allege

20   that it violated the anti-kickback statute to send out too

21   many people, that would clarify the Complaint that that is a

22   classic legal conclusion that is entitled to zero deference.

23   And that must be supported by law, regulation, guidance, some

24   authority other than Ms. Burke or Ms. Forney's say-so.  It's

25   not a factual question whether too much product support turns

1    permissible conduct into a felony that can subject

2    individuals to 20 years in prison.  That can subject a

3    manufacturer to permanent exclusion from federal health care

4    programs.  This is not a technical football that we're

5    talking about here and there is no authority that Ms. Burke

6    has offered in her opposition whatsoever that supports this

7    notion that if you provide permissible product support, but

8    do too much of it, whatever that too much of it might be,

9    which she cannot articulate, that you violate the

10   anti-kickback statute.

11         And the complete legal support for this proposition

12   connected with the fact that there's guidance that says

13   product support is fine, as long as it falls into this type

14   of category.  And those categories and describers in the

15   guidance documents do not say but be careful you don't

16   provide too much of it.  There is, again, if you're not

17   inclined to rule on the question of whether her theory is

18   based on remuneration, it's crystal clear that there is no

19   basis for something that Medtronic somehow knew that after

20   providing x-amount of product support, it had crossed the

21   line into product support.

22         And we haven't talked about this yet and I do want

23   to mention this one thing that she sort of flagged in her

24   opposition and it's important.  Is she said in argument that,

25   well, the anti-kickback statute can be confusing, but gosh

71

1  darn it, you know, health care companies know they need to be
2  careful in this area and in parsing.  Okay, great.  So, she
3  suggests Medtronic should have gotten an opinion from OIG,
4  giving them an answer to what they're to do here.  First of
5  all, we'd cite the case, it is 100 percent inadmissible to
6  use the failure to get an OIG opinion as evidence to support
7  a theory that you violated the anti-kickback statute.  So,
8  that argument is out.

9       But then let's take a step back and say, well, if
10 Medtronic was supposed to ask itself the question, since
11 Forney had raised the issue with her supervisor and said, I
12 think we're providing too much product support.  You know,
13 some is fine, but we're crossing the line.  How would
14 Medtronic have evaluated what that line should be, right?
15 They'd be looking at the exact same stuff that we've put
16 before the Court and there is no answer in it that says
17 here's how much -- here's what too much product support would
18 be.

19      And again, what Ms. Burke should continually come
20 back and I think it's been part of the discussion, is oh,
21 well, one way to conceptualize it is, is the doctor getting a
22 benefit here.  Is this a service that their nurse would have
23 done?  And again, what is so critical here is that you can't
24 have that discussion until after you've determined that this
25 falls outside of product support.  Because product support,

1    by its nature, saves the person receiving the benefit of it,

2    money, time, effort, staff, whatever.  That just comes with

3    the territory.  If I give a doctor reimbursement advice, he

4    doesn't have to have his nurse spend ten minutes for every

5    claim looking up that reimbursement advice.  That's money in

6    the doctor's pocket, but it doesn't implicate the anti-

7    kickback statute.  That's not the test because it's product

8    support.  If I help the patient with prior authorization and

9    dealing with the reimbursement services, that saves the

10    doctor a lot of time and effort because they don't have to

11    have someone in the office walking the patients through that

12    process.  But a manufacturer can do that as product support.

13         I can collaborate with the doctor and provide form

14    letters and help the doctor advocate for coverage for my

15    products.  If I don't do that, the doctor would have to do

16    that himself.  That saves him or her time, money, effort.  It

17    doesn't matter.  That is not the test for whether product

18    support turns into a kickback.  Because first, if it's

19    product support, it has a value.  You can market product

20    support as a valuable benefit because it's not remuneration

21    under the anti-kickback laws.

22         THE COURT:  Now, is it fair to assume that Medtronic

23    still provides this product support at the same level that it

24    always have?

25         MS. MAYER:  I have not inquired of my client of that

73

1    in particular, so I can't speak to that.

2            THE COURT:  And what do you think if they filed

3    requesting an OIG advisory opinion as to there marketing

4    plan?  What would happen?

5            MS. MAYER:  So, again, I think it's a fine question.

6    I think one thing that needs to bearing in mind is the OIG is

7    not obliged to respond and provide an advisory opinion one

8    way or the other or at all.  And there are plenty -- it is

9    outside the scope of the Complaint and the briefing, but you

10   know, many health care colleagues periodically do seek

11   advisory opinions on behalf of clients and sometimes, you

12   just don't get an answer.  You don't get an answer for five

13   or six years.  It's not as though this is a process where any

14   health care provider or company can issue a request or an

15   opinion and within 30 days they get a clear response back.

16   There are host of reasons why we might or might not and

17   that's why it's critical that there is no and then not a case

18   that directly holds, there was just in the statute itself

19   provides.  This is a voluntary process that you're counting

20   your patients.  But it is, you can't draw any negative

21   inferences from it or abuse it in any way to suggest that

22   there's been a violation if you fail to follow that there are

23   relative to the number of questions that are out there in the

24   full scope of the health care industry.  The OIG advisory

25   opinions, volume, is like Supreme Court decisions compared to

74

1    District Court cases.  It's a limited resources that OIG have

2    and they don't, you know, not everybody asks and they don't

3    respond to everything and it is, you know, it is perfectly

4    acceptable and normal.  If everybody has to ask for an

5    opinion to bless a marketing issue, you now, OIG wouldn't be

6    able to handle the volume.

7            THE COURT:  Okay.  And Attorney Burke, if the --

8    first of all, are you satisfied that the focus of your claim

9    and of Ms. Forney's claim is not the type of support that was

10   being provided, but the volume of the support?

11           MS. BURKE:  Your Honor, it's a bit more than that.

12   Counsel acts as if there is permissible product support that

13   is legally supported.  That's actually not the case.  There's

14   no a safe harbor.  If you look at the text of the anti-

15   kickback statute on page 12, it's clear that this is, in

16   fact, an in kind payment to induce a purchase.  So,

17   definitionally, it appears to be a kickback.  Now, because

18   the kickback statute is broad, the OIG and Congress have

19   carved out safe harbors.  If this practice was, in fact, a

20   commonplace and nationally accepted practice, it would be

21   protected by a safe harbor.  There's no safe harbor that

22   protects this.  Nor is there any OIG advisory opinion that

23   protects this.  And in fact, the only thing that defense

24   counsel was able to point to was an industry code.  And even

25   that code has some language that helps us.  So, it's an

1   exaggeration to act as if we have some kind of legal safe

2   ground for product support.  We don't.

3          Now, personally, I believe that one could argue and

4   I was a defense attorney for the health care industries for

5   years.  So, it may be kind of that bias and in fact, I was

6   counsel -- defense counsel in the Dacksberry (ph) case.  I

7   believe it's probably -- there's probably an argument to be

8   made that a certain amount of support is necessary at the

9   initial purchase of a new product.  And there, you get into

10  the FDA approval saying, go ahead and train the physicians.

11  So, we're not going to take the position that any and all,

12  even you know, one visit would be illegal.  We think there's

13  probably some small amount of training, some initial for new

14  product that's coming out, there's going to be a period where

15  it's more appropriate.

16         So, but it shouldn't be flipped as if somehow we're

17  not proving that there's case law to prove it's illegal.  The

18  statute itself makes it illegal.  And then I would also cite,

19  your Honor, to the very important Berber (ph) case, which

20  says okay, we're going to have to look at motivation.  Why

21  are they doing this?  And that's where, as we've pled, it was

22  a marketing scheme.  And if one purpose is to impact the

23  decisionmakers, then you've crossed over into anti-kickbacks.

24  So, I think it's clear from the Complaint and from what we've

25  pled, that we're dealing with a situation where there are a

76

1   series of de facto kickbacks.  And so, I think that this

2   notion that somehow we haven't come forward with law or case

3   law is simply wrong.

4         I would also suggest in the health care industry,

5   every single one of the things that has been found to be a

6   prohibited kickback was initially argued by industry not to

7   be.  So, you know, if you go back 15 years, you'll see it's

8   always a developmental thing.  And in this particular area,

9   Medtronic has a lot of experience because in Massachusetts,

10  in the Witkin case, on very similar facts, they're already

11  under discovery and the case is already proceeding on a very

12  similar theory to here, albeit, in their diabetes product.

13        So, it is simply wrong to suggest that we don't have

14  the law on our side.  We have the law on our side.  The only

15  thing at issue for you and for the jury, are what are the

16  facts?  Was it as we say, a widespread scheme that went out

17  and provided all these services.  We have to prove that up,

18  obviously.  So, I think that -- and your Honor, just to

19  clarify, I'm only asking for leave to amend if you find

20  deficiencies.  I'm not, in the abstract, asking for leave to

21  amend.  I was very careful and think I hit every mark.  I

22  gave specific examples.  We pled that it was for off-the-

23  shelf commodity products.  We expressly pled that the

24  marketing was aimed to change to impact the purchasers.  And

25  we made it clear that hospitals are one of the purchasing

1  categories.

2       So, I think when you go through the Complaint and we

3  laid it all out in the opposition brief, that we have hit

4  everything that needs to be alleged and we're alleging it

5  with personal knowledge of Ms. Forney, who was an executive

6  for Medtronic.

7       THE COURT:  Thank you.

8       MS. BURKE:  Thank you.

9       THE COURT:  Counselor?

10      MS. MAYER:  Your Honor --

11      THE COURT:  This is all very, very interesting I

12  find.

13      MS. MAYER:  I find it wonderful that you're so

14  engaged and happy that you have questions that helps us make

15  sure we're addressing what is on your mind.

16      In terms of this argument that product support is a

17  kickback, because it plainly falls within the anti-kickback

18  statute.  The anti-kickback statute prohibits offering

19  remuneration in order to induce a purchase.  So, first you

20  have to show that this is remuneration.  In-kind gifts can be

21  remuneration.  The purpose of the HHS OIG, the people that

22  wrote the safe harbors.  The HHS OIG pharmaceutical

23  compliance guidance, which says that product support services

24  are fine as long as what they are, are tied to the product

25  and they're not providing an independent -- substantial

1    independent value.

2         And the Advamed (ph) code, the reason why the

3    Advamed code, you know, these are documents from 1994, from

4    2003 through 2009, that neither DOJ nor HHS OIG or anybody

5    has ever jumped up and down and said you're wrong.  Client

6    support services are absolutely a kickback under the anti-

7    kickback statute.  You have to fit within a safe harbor.  You

8    have to go get in it.  Nobody has ever said that.  She points

9    to no authority that suggested anyone's ever pushed back

10   against this advice from the pertinent regulators saying it's

11   not remuneration if it's product support.

12        So, the reason why this doesn't fall within the

13   anti-kickback statute is you don't even get into this gate,

14   because product support services don't provide a substantial

15   independent value that would then potentially trigger.  What

16   would be an example of an in-kind kickback, I think you've

17   given some today.  Medtronic was sending reps, not for pacer

18   checks, but for wound care cleaning, right?  That would be an

19   in-kind service that's of value and independent of the

20   product, right?

21        So, then that's also in the ambit of the

22   in-kind, you know, product that falls within the anti-

23   kickback statute, because you first determine that it's not

24   product support that falls outside of remuneration according

25   to the guidance.  And again, I can't emphasize enough and I

1    don't think she has an answer to it, even if you are

2    intrigued by her idea or hesitant to rule definitively one

3    way or the other that product support services, especially on

4    those first allegations here, do not constitute a kickback.

5    I think we've given you more than enough to rule that she

6    hasn't pled enough and that her burden here to establish that

7    there's been a violation there.

8         From a knowledge perspective, there is no way, based

9    on the guidance that we talked about today and they were

10   cited in these briefs, that Medtronic would have any basis

11   for believing that it should disregard what OIG -- HHS-OIG

12   and Advamed are saying is entirely permissible conduct when

13   it's connected to the product you're selling, which we all

14   can see is what's been going on here.

15        In terms of the Massachusetts case that she cited,

16   where she says Medtronic, of course, knew that product

17   support services were a problem.  There are two things that

18   I'd like to cite on that and I'm intimately familiar with the

19   case and I am defense counsel for Medtronic in that, as well,

20   for full disclosure.

21        First, the motion to dismiss in that case which

22   allowed a portion of the Complaint to go through, found it

23   was sufficiently pled, came down in 2016.  So, for purposes

24   of the conduct at issue here, it's not as though Medtronic

25   had a judicial decision, first of all, even assuming that the

1   decision is pertinent here.  There was no judicial decision

2   endorsing anything like the notion that product support

3   services could be kickbacks, that was in place during the

4   time period that's at issue here in this case, because of

5   it's relevance here for knowledge for any account.

6          Second, in terms of arguing that what was pled in

7   Witkin is the same both in level of detail and in theory as

8   what's been pled here, that's simply not true.  The critical

9   difference is Witkin was several pages of pleadings

10  generating detail of alleging that, in that case, that sales

11  reps were going into doctors' offices and having doctors line

12  up patients where Medtronic would put on a medical device

13  that was a clinical thing to do.  And then send the patient

14  off and the doctors would bill for this medical service to

15  the federal health care program.

16         So, first of all, we don't have an allegation here

17  that Medtronic did so and so and it is beyond product support

18  and it was replacing medical care.  What the argument there

19  and that Medtronic was instructing doctors to bill for the

20  work Medtronic did and that Medtronic full well knew doctors

21  were billing for the work that Medtronic did.  And so -- and

22  so that's just a theory, which is very different from what we

23  talked about here.  And then second, what is critically

24  different is that the degree of specificity with which that

25  theory was pled is not just three dozen paragraphs providing

81

1    details providing examples of doctors, but the relator also

2    appended, as an exhibit, examples of actual false claims.

3    And so, the notion that because this case got through the

4    motion to dismiss on those theories has either teaches

5    Medtronic that what she alleges was going on, on the cardiac

6    side, was a kickback in any way that's relevant to this case,

7    doesn't work from a timing perspective and it also, it is

8    materially different from a level of pleading perspective.

9    And she has not suggested that she would be able satisfy the

10   pleading standard that the Court held of the plaintiff in the

11   Witkin case.

12          THE COURT:  Now, would it make a difference to you

13   if, let's just use the instance on page 8, would it make a

14   difference to you if each one of these things, the pacer

15   check, device check, the interrogation of device, if each one

16   of those was done by somebody by Medtronic, that the doctor

17   then billed Medicare for it?

18          MS. MAYER:  Yes, if that's what she alleged, I think

19   that might make a difference here.  It's not what's alleged

20   and that isn't the theory that she's articulating here and I

21   would also like to point out that they don't even allege in

22   the Complaint that these examples were billed to Medicare or

23   that these were Medicare beneficiaries.

24          THE COURT:  Right.

25          MS. MAYER:  So, just for purposes of this.  But if

1  the device and the general principles, the device company

2  performs a clinical service, you know, if you're not a

3  clinician, that's its own issue.  But -- and the doctor bills

4  for it, if the device company caught the doctor bill for it,

5  I mean, right?  Then the device, that would be a problem.  I

6  would say, you know, doctors are allowed now to understand

7  doctors might be able to bill for -- if they exercise a

8  supervisory or in the billings complex.  This is why -- I

9  don't mean to be hedging in a bad way, but I'm just saying

10  doctors are allowed to bill provided they exercise

11  sufficient, often supervision over somebody else performing

12  the service.  If that person was a nurse, that's great.  If

13  that person was Medtronic, that's fine, as long as the doctor

14  provided the appropriate supervisory role and met the

15  requirements for billing.  It doesn't necessarily matter who

16  the lower-level person is, as long as they have a relevant

17  clinical, you know, bonafide.

18       I think the key here is that the whole -- that is

19  not at issue, so I just --

20       THE COURT:  But isn't that more of the issue of

21  Massachusetts, the idea that Medtronic provided this clinic

22  that provided the services that really had very little to do

23  with the doctor and the doctor had billed for?

24       MS. MAYER:  So, at the pleading stage, that was what

25  was pled.  You will not be shocked to hear that, you know, we

1    have a very different view of the facts of the case and are

2    looking forward to an opportunity to vindicate ourselves.

3         THE COURT:  But here, if it's not pled that any of

4    these services provided by the representatives were actually

5    billed by the doctor when the doctor had nothing to do with

6    them.

7         MS. MAYER:  That's not the theory here.  The theory

8    here is that the provision of the services themselves,

9    product support services, was not acceptable when they were

10   doing too much of it.  And that's what's novel here, not

11   grounded in the law.  And again and I want to be clear, it's

12   because the guidance and I do recognize the Advamed code is

13   not long.  We started with that concept, but it is industry

14   guidance that neither OIG, nor DOJ, nor any court has ever

15   suggested misstates the law or should be withdrawn and

16   therefore, it is something that the industry generally

17   follows as appropriate guidance and code.

18        You know, saying that the OIG as we talked about the

19   provision of the phlebotomist or the laboratory, which is

20   left by OIG, as long as the phlebotomist provides services

21   that are consistent and related to the work that the outside

22   laboratory is going to do with the specimens.  I mean,

23   there's nothing in that that says, oh, but if you do that on

24   a routine basis for who you contract with, that's a problem.

25   Or there's nothing in there that says you can't offer to

1    provide that, you have to wait for them to call you, right?

2          I mean, these are lines that Ms. Burke is creating

3    to generate a case here being a good advocate for her client,

4    but they're just not located in the law and then we're

5    talking about where we draw the line both on what constitutes

6    criminal conduct and what is sufficiently clear that you can

7    infer that a defendant knew.  Not just should have known,

8    it's not a should have known standard, but actually knew he

9    was engaged in illegal conduct when it went out and provided

10   those product services.  You need a lot more than is here and

11   I submit the legal piece of this is very important, because

12   you know, I'm not actually hearing that Ms. Burke can add a

13   lot of details to the current Complaint and I think that's

14   consistent with the fact that the amended Complaint didn't

15   add a lot to the original Complaint.  And you know, she did

16   amend it and is acting in good faith here, I think.  And she

17   has said several times she believes her Complaint meets the

18   pleading standards.  There's been no change in the law.

19   There's no cases for citing that have come down from the

20   Amended Complaint that would suggest she wasn't on notice of

21   some of the pleading standards.

22          I think the fact that there's no legal basis for

23   this distinction between appropriate level of product

24   services and too much product services shows that this is

25   really incurable.  Whether it's viewed either as a knowledge

1  failing and pleading that can't be cured or as just a

2  straight up you can't enter in the law your theory

3  sufficiently for it to be received.  You can't, because that

4  legal problem isn't going to change with discovery.  You

5  know, there isn't going to be law that you can cite to that

6  was, you know -- that says here's what enough product support

7  is, but here's what too much product support is for the

8  purposes of this felony statute.  And there's nothing that's

9  going to change history in terms of what Medtronic knew about

10  the ads, when it was deciding how much product support to

11  provide.

12          THE COURT:  Very well.  Attorney Burke, final word?

13          MS. BURKE:  Yes, your Honor, thank you.  In essence,

14  what defense counsel is asking you to do is make a

15  determination akin to an OIG advisory opinion determination.

16  But do so without the benefit of the adversarial process and

17  the fact development.  This is clearly an incidence in which

18  the conduct itself fits within the rubric of the anti-

19  kickback statute and there is a valid argument that we're

20  dealing with kickbacks here.

21          Now, where they have to have gone into the OIG, they

22  would have had to -- it's a case-by-case analysis and that's

23  what the OIG does.  And so, you are, in fact, you are the

24  first decisionmaker on this, rather than the OIG.  That's

25  obviously Medtronic's -- a result of Medtronic strategically

1   deciding not to get an OIG advisory opinion.  And you know,

2   many times, companies don't want to be told no, so they'd

3   rather take their chances.  But in taking their chances, it

4   then places you in the role of calling the balls and strikes

5   on whether or not this is a kickback or not.  Perfectly

6   appropriate for you to do it, but it's not appropriate for

7   you to do it based on a motion do dismiss and legal

8   argumentation.  It would benefit you in making that important

9   call as to whether this is a kickback to have a factual

10  record before you.

11          So, I would ask your Honor that you deny their

12  motion that we move forward efficiently with discovery.

13  Clearly there will be a summary judgment motion coming from

14  Medtronic.  We likely will put one forward on this legal

15  issue, the facts to law issue that's before you, as well and

16  get that ruled on sooner rather than later in the case.  So,

17  your Honor, we very much ask that you deny the motion.

18          THE COURT:  Thank you very much.  Anything else?

19          MS. MAYER:  Yeah --

20          THE COURT:  Sure.

21          MS. MAYER:  -- all I want to say, because this is,

22  it is a court case.  You are not being asked to issue

23  anything like an advisory opinion or an abstract, you know,

24  regulation.  You're not being asked to legislate what a line

25  should be in this area critically -- action that's really

1    important here.

2          The burden of Ms. Burke, it's her burden, is to

3    plead facts that demonstrate that a violation has occurred.

4    Not that it might have occurred or it theoretically could

5    have occurred or that -- and maybe let's take discovery and

6    then we can all plan this really interesting factual

7    playground and come up with a regulation or a regulatory

8    decision that helps clarify this area.  In order to sue in

9    court, if she wants to do that, she has to go down to OIG and

10   make a proposal that they issue a regulation clarifying that

11   this kind of stuff, you know, is not okay if you do it beyond

12   a certain level.  There are lots of ways to get OIG to draw

13   the line that she's wants the Court, through a jury trial, to

14   draw here.

15         That is not appropriate use of the court and the

16   fact that she's even suggesting that what she needs here is

17   some sort of regulatory advice, I think proves that she

18   hasn't stated a claim or can't state a claim here.  That is

19   her burden under Ashcroft and Iqbal and under all the 9(b)

20   stuff.  She has to be able to prove with facts, facts that

21   Medtronic knew that it was providing an illegal bribe to

22   doctors when it provided whatever "the more product support

23   services" is than it should have provided.  And you do not

24   need to draw the line as to what is enough and what is too

25   much here or even endorse the notion that that's a meaningful

88

1    distinction.  What you are equipped to do here and it is

2    appropriate here to do, is to ask has she met the burden of

3    proving -- I'm sorry -- of pleading acts that, if true,

4    demonstrate that Medtronic violated the anti-kickback

5    statute, that it knew it was doing something illegal and it

6    did so and that all claims resulted -- on a federal program,

7    resulted from that conduct and it knew that that was the

8    result.  And she hasn't done it here and that's all that this

9    Court has to do here with this case.

10        THE COURT:  I think you're suggesting that the OIG

11   existing advice to medical device providers, et cetera, it

12   can't really be used as a shield by the defendants at this

13   stage.  It's not evidence of record and is not law, so even

14   if it says that providing services that are related to the

15   product, it is okay.  That doesn't matter, because that's not

16   the law we're looking at in trying to determine whether a

17   claim's been made out.

18        MS. BURKE:  It's slightly different.  There's two

19   different points.  One is that Advamed, which is what counsel

20   was relying on, is just an industry code that doesn't have

21   any force of law.

22        The second is that the OIG, itself, has said that

23   in-kind services can constitute kickbacks and there, they

24   look at whether or not they're providing a substantial

25   independent value.  That's what we've alleged.  We've alleged

1   that the services are being provided, they're giving a

2   benefit to the doctor and it rises to the level of a

3   kickback.

4           THE COURT:  I mean, well, let me, because this is an

5   important point for me.  It may not seem so to the two of

6   you, but so we're all relying on this whole idea of

7   substantial, independent value to purchaser.  That's

8   independent of the product support, correct?

9           MS. BURKE:  No, it's not independent -- the word

10  independent does not mean independent of the product support,

11  it means are you giving a benefit to the -- a bribe, are you

12  giving a bribe to the -- so it can be in the form.  It can be

13  linked to the product and still be an independent benefit to

14  the provider.

15          THE COURT:  Okay.

16          MS. BURKE:  And so, for that reason, that's what

17  we've alleged.  And defense counsel is saying, well, we can't

18  cite to any case where these have been found to be kickbacks.

19          THE COURT:  But are you conceding that there is

20  this, what you refer to as this loophole that there is this,

21  that Medtronic has the right to provide product services?

22          MS. BURKE:  No, no, your Honor.  We don't concede

23  that because it doesn't exist.  What I'm saying is that the

24  state of the law now, is that there is the kickback statute

25  itself, which sweeps in a broad array of conduct, including

1   the conduct at issue here.  So, it is facially kickbacks.

2   There are then --

3          THE COURT:  So, then that's, so you're saying even

4   the type of service is a kickback?

5          MS. BURKE:  Exactly.

6          THE COURT:  Because that's got a bearing 404, it's

7   not just the amount, the quantum of services.

8          MS. BURKE:  Right.

9          THE COURT:  But now the type of service, even if

10  it's related to the pacemaker or to the defibrillator, that

11  is still, in and of itself or just that one time, that could

12  be a violation of the anti-kickback statute?

13         MS. BURKE:  Exactly.  There is facially it all meets

14  the kickback test of the statute.  So --

15         THE COURT:  If you just read that simple language.

16         MS. BURKE:  Exactly.

17         THE COURT:  In-kind service, because that was

18  remuneration.

19         MS. BURKE:  And so, your Honor, so the kickback,

20  because it is a broad statute, then there are different ways

21  to out from under its scope.  And there you have the

22  delineated safe harbors.  This conduct doesn't fit into any

23  of those delineated safe harbors.  Even the OIG has said,

24  however, that even if there's not a safe harbor that covers

25  you, you may be able to prove it's not a kickback because it

1   has no intent to corrupt and no corrupting influence on the

2   doctors.  So, it becomes a case-by-case analysis as to

3   whether or not it's the kickback.

4          And so, your Honor, that it's caught by the law and

5   it's not insulated from liability.  So, what we've alleged is

6   there's a pattern, there's a scheme, it's happening all over

7   the country and it's all caught by the terms of the kickback

8   law.  They're arguing obviously, no, we should -- you know,

9   it's permissible.  And what I'm saying is that just as you

10  can't rule as a matter of law right now, well,

11  definitionally, it fits within the rubric, so therefore,

12  clearly there's liability.  You also can't do the reverse and

13  say, oh, you know, well, they think it's permissible product

14  support and therefore, you know, they're home free.  So, I'm

15  just suggesting, your Honor, that that is the issue, the

16  central issue of this lawsuit.  We do not know in advance how

17  it will come out because it is, in fact, an issue of first

18  impression.

19         THE COURT:  Okay.  Oh, I knew you had to respond to

20  that.  I was just taken us back.  We went forward so many

21  steps and I just took us back many.

22         MS. MAYER:  It's a little bit like I became a moving

23  target here.  But I want to make sure we understand the

24  averred position that she has just stated with respect to

25  what the way the anti-kickback statute versus what we've had

1   today.

2          She is saying that all product support, because it

3   is in-kind services, all product support is a kickback unless

4   it falls within a safe harbor.  What that means is the FDA

5   approvals require the company to provide technical support

6   and training for the product.  That violates the anti-

7   kickback statute, it doesn't fall within a safe harbor.  So,

8   that means the company gets to choose whether it complies

9   with FDA or commits a felony on Ms. Burke's theory of how

10  this stuff works.

11         Number two, having even a helpline for doctors to

12  ask questions is an in-kind service, because if they didn't

13  ask the company, they'd have to go pay some expert to be able

14  to provide them the answers.  So, that also violates the

15  anti-kickback statute, providing truthful and accurate

16  information without reimbursement violates the anti-kickback

17  statute because otherwise it's an in-kind service and in-kind

18  assistance in patient support that is disallowed under the

19  plain language of the anti-kickback statute and you have to

20  get an OIG opinion or find a way to get a safe harbor to

21  protect it.

22         You know, the scheme that she's articulating, all of

23  these things which OIG has said it's fine to do, which

24  Advamed has said from 2009, is fine to do.  It turns out

25  everybody have been running around committing felonies, okay?

1    She wants to litigate a novel issue here because there's no

2    case otherwise, because it's -- and it's absurd, because the

3    notion that a medical device manufacturer, once it

4    manufactures its product, has to do this.  Even the FDA tells

5    them they have to train and support it.  Even when the

6    industry has given us a litany of things that are permissible

7    to do, even when OIG, since 1994, which is many years ago,

8    it's saying you can provide services in connection with your

9    services, as long as they're confined to that same purchase.

10   So, all of that is non-binding which means that as a Court,

11   you're obliged to apply the anti-kickback statute to say that

12   this stuff was a felony.  I mean, it is -- it boggles the

13   mind.  And the legal reasons why she's wrong is because OIG

14   drafted the safe harbor regulations is entitled to go out

15   with guidance that has been uncontradicted.  There's no

16   evidence in any of the record in front of the Court, that

17   contradicts any of this, has said more than once, product

18   support is outside the scope if it's connected to the

19   product.  You have remuneration and therefore, fall within

20   the ambit of the anti-kickback statute only when you're

21   giving in-kind service that provides a substantial value and

22   is independent of the product itself.

23          So, when OIG says that and I want to talk a little

24   bit about, I mean, it's not just the Advamed code, I want to

25   talk a little bit about the 2003 Compliance Act.  This was a

1   document that OIG put out for the entire pharmaceuticals.

2   There isn't the medical device one and so, as a practical

3   matter, device companies look to their pharma guide for, you

4   know, where applicable for assistance as it applies here.  So

5   and this is for pharmaceutical companies and they're selling

6   pills which are much less complex from an administration

7   perspective, a technological medical device, right, that is

8   implanted and all that kind of stuff.  It has to be

9   programmed individually for the patient when it's implanted.

10  And might have to be adjusted with different computer

11  software and algorithm at these check-up visits that she

12  insists are routine.

13          I think the key here is that basic to OIG, who

14  defined the safe harbors, who enforces the statute in the

15  first instance and the regulatory safe harbors, is saying

16  product support is fine, you can give product support.  You

17  know, that's not what we are talking about with respect to

18  remuneration.  And that interpretation of the anti-kickback

19  statute is entitled to that.  Especially, when it's in a

20  formal document like the OIG Compliance Act.  We haven't

21  briefed that law -- if we need to do supplemental briefing on

22  this, we can do it, I think, because I understand your Honor

23  is, you know, looking at applying the law.

24          I think the key here is that all the evidence is

25  that what Medtronic knew going into this, is that product

1   support has been blessed by the relevant regulators and by

2   the industry expert and nobody was kicking up a fuss about

3   those blessings.  I mean, the anti-kickback statute.  Under

4   those circumstances, when we're evaluating whether, again,

5   whether anything, any remuneration has been provided, whether

6   we're trying to interpret whether it's permissible or

7   appropriate for a court to interpret the statute and conclude

8   product support services as remuneration, I think it would be

9   a, you know, a judge can interpret the law, it would be a

10  novel interpretation that runs contrary to what the

11  regulators and others said how it should be interpreted to do

12  that.

13          The Court has the ability to do that if it wants to.

14  I think if the Court were inclined to do that or hesitant to

15  make a definitive ruling, I fall back again on knowledge.  It

16  is clear regardless that nobody has interpreted the anti-

17  kickback statute in case law or otherwise, to take the

18  position that Ms. Burke is taking here today, that all

19  product support services, by definition, are in-kind services

20  that fall within the anti-kickback statute absent no going

21  and meaning a safe harbor or getting an OIG opinion.  And so,

22  at the most basic level, she has to plead facts demonstrating

23  she can prevail on every element of the anti-kickback statute

24  as well as the subsequent False Claims Act violation.  She

25  cannot plead it and prove and critically, the motion to

1  dismiss, she cannot plead that Medtronic knew that it was

2  acting illegally when it provided product support services it

3  has given, which OIG has said, Advamed has said and the fact

4  that nobody has kicked up a fuss about it in 20 years.

5  Medtronic is entitled to have an expectation that what they

6  say is okay to do, is okay to do.  So, if they don't say you

7  can only do so much of it and not more, is Medtronic entitled

8  to believe that you could do what you wanted to do with this

9  product and not prohibited.

10        THE COURT:  Okay, anything else?

11        MS. BURKE:  Your Honor, just a final word?

12        THE COURT:  Sure.

13        MS. BURKE:  Again this notion that somehow because

14 it's novel, you can't let the case go forward.  That's not

15 the way it works.  In the health care industry, every single

16 practice that has been deemed to be a kickback was subject to

17 the very same defense argument.  Every single time that the

18 argument is always, well, you know, no one stopped us yet, so

19 therefore, it must be permissible.  You know, that happened

20 with the lunches to the doctors, it happened on the speakers

21 bureaus, it happened in the pharmaceutical industry.  So,

22 that argument simply is basically and admission that they're

23 doing it and no one was blowing the whistle on them.  Well,

24 the whistle's now been blown on them and the conduct, whether

25 or not it fits within the rubric of the kickback statute,

1    turns in part on the intent.  Whether they intended to induce

2    the purchasers of the device, whether they intended to impact

3    their purchasing.  We've pled that they have.  We've pled the

4    facts of how they did that, of what they provided, that it

5    was frequent and the like.

6          So, we have pled all the requirements and merely

7    saying, well, gee, we thought we were doing something that

8    was okay is not a legal defense.  So, again, your Honor, we

9    ask that you deny the motion, thank you.

10         THE COURT:  Okay, thank you.  Counsel, thank you

11   very much.  This has been very helpful.  I know you have

12   distances to travel and I hope you have safe travels, but if

13   you are looking for lunch, here in Easton, we have some

14   fantastic restaurants, including if you just exit the

15   courthouse, the building and go to the left, there is

16   Italian, then there's seafood.  Right next to that it's

17   Mexican, all within a very short walking distance, especially

18   on such a nice day.  In fact, if you have any questions about

19   them, I'm sure Jamie Kulick, my criminal deputy here would be

20   glad to guide you to an appropriate restaurant.  But have a

21   great rest of the day and thank you for the argument.

22         ALL:  Thank you, your Honor.

23         THE DEPUTY CLERK:  All rise.

24         (Proceeding adjourned 12:45 o'clock p.m.)

25                          *  *  *

CERTIFICATION


        I hereby certify that the foregoing is a correct
transcript from the electronic sound recording of the
proceedings in the above-entitled matter.


S:/Geraldine C. Laws, CET          Date 7/17/17
Laws Transcription Service