# Exhibit L

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   UNITED STATES OF AMERICA, CALIFORNIA,     )

5   COLORADO, CONNECTICUT, DELAWARE, DISTRICT )

6   OF COLUMBIA, FLORIDA, GEORGIA, HAWAII,    )

7   ILLINOIS, INDIANA, IOWA, LOUISIANA,       )

8   MARYLAND, MASSACHUSETTS, MICHIGAN,        )

9   MINNESOTA, MONTANA, NEVADA, NEW JERSEY,   )

10  NEW MEXICO, NEW YORK, NORTH CAROLINA,     )

11  OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, )

12  VIRGINA, WISCONSIN,                       )

13  Ex Rel.  CATHLEEN FORNEY                   )

14      Plaintiffs,                           ) Civil Action No.

15          -v-                               ) 5:15-cv-6264-EGS

16  MEDTRONIC INC.,                           )

17      Defendant.                            )

18  ------------------------------------------

19      VIDEOTAPED DEPOSITION OF CATHLEEN FORNEY

20           Lancaster, Pennsylvania

21          Tuesday, November 14, 2017

22

23  Reported by:

    Gail L. Inghram Verbano,

24  BA, CRR, CLR, RDR, CSR-CA (No. 8635)

    Job No. 133496

25

Page 2

1                    November 14, 2017

2                       9:08 a.m.

3

4

5

6

7             Videotaped deposition of CATHLEEN

8    FORNEY, held at the offices of BARLEY SNYDER,

9    LLC, 126 East King Street, Lancaster,

10   Pennsylvania, before GAIL INGHRAM VERBANO,

11   Registered Diplomate Reporter, Certified

12   Realtime Reporter, Certified Shorthand

13   Reporter-CA (No. 8635) and Notary Public in and

14   for the Commonwealth of Pennsylvania.

15

16

17

18

19

20

21

22

23

24

25

1

2

3    A P P E A R A N C E S:

4

5        Attorneys for Plaintiffs:

6        LAW OFFICES OF SUSAN L. BURKE

7              1611 Park Avenue

8              Baltimore, Maryland 21217

9        BY:   SUSAN BURKE, ESQ.

10

11

12

13

14        Attorneys for Defendants:

15        ROPES & GRAY

16              Prudential Tower

17              800 Boylston Street

18              Boston, Massachusetts, 02199

19        BY:   KIRSTEN MAYER, ESQ.

20              MITCHELL STROMBERG, ESQ.

21

22

23    ALSO PRESENT:

24              KATHRYN WOZNY, In-House Counsel, Medtronic

25              ADOLPH GREEN, Legal Videographer

1          CATHLEEN FORNEY

2          THE VIDEOGRAPHER:  This is the start

3     of tape labeled No. 1 of the videotaped

4     deposition of Cathleen Forney, in the

5     matter of Cathleen Forney V. Medtronic,

6     Inc. in the United States District Court

7     for the Eastern District of Pennsylvania,

8     Case No. 5:15-CV-6264-EGS.

9          This deposition is being held at 126

10    East King Street, Lancaster, Pennsylvania,

11    on November 14th, 2017, at approximately

12    9:08.

13         My name is Adolph Green from TSG

14    Reporting, Inc. and I am the legal video

15    specialist.  The court reporter is Gail

16    Verbano, in association with TSG

17    Reporting.

18         Will counsel please introduce

19    yourselves.

20         MS. MAYER:  Kirsten Mayer for

21    Medtronic.

22         MR. STROMBERG:  Mitchell Stromberg

23    for Medtronic.

24         MS. WOZNY:  Kathryn Wozny on behalf

25    of Medtronic.

```
 1              CATHLEEN FORNEY
 2         MS. BURKE:  Susan Burke for relator.
 3         THE VIDEOGRAPHER:  Will the reporter
 4     please swear in the witness.
 5              CATHLEEN FORNEY
 6     called as a witness, having been duly sworn by
 7     a Notary Public, was examined and testified as
 8     follows:
 9 EXAMINATION
10 BY MS. MAYER:
11     Q.    Good morning, Ms. Forney.  Could you
12 please tell us your full name for the record.
13     A.    Cathleen Forney.
14     Q.    Where do you live?
15     A.    I live at 353 College Avenue,
16 Lancaster, Pennsylvania.
17     Q.    Have you ever been deposed before?
18     A.    I have not been deposed before.
19     Q.    A deposition is -- what we're going
20 to do today in the deposition is I'm going to
21 ask you questions, and you're going to give me
22 answers to the questions.  To make it easy for
23 the court reporter and the videographer, it's
24 going to be important for you to let me finish
25 my question before you answer the question.
```

1                    CATHLEEN FORNEY

2        A.    It was a reduction in force.

3        Q.    Were you still working between

4   November 2011 and January 2012?

5        A.    No.

6        Q.    Okay.  So your last day working at

7   Medtronic was at some point in November 2011?

8        A.    Yes.

9        Q.    Was it the beginning of the month or

10  toward the end of the month?

11       A.    I'm thinking --

12       Q.    Before or after Thanksgiving?

13       A.    -- it was before.  Yeah, earlier.

14       Q.    So earlier, first half of the month,

15  approximately.

16             And you didn't work for anyone in

17  between mid-November, roughly, 2011 and when

18  you started the research coordinator position

19  at LGH in February 2012?

20       A.    Correct.

21       Q.    So in your -- let's turn back to

22  January 2007 to June 2009.  I think you said

23  you were a continuum manager?

24       A.    Yes.

25       Q.    What is a -- what was a continuum

1                    CATHLEEN FORNEY

2        permitting the witness and her counsel to

3        have a lunch break at 1 o'clock.

4   BY MS. MAYER:

5        Q.    So in this case you've alleged that

6   when Medtronic performs a device check, they're

7   providing a kickback that violates a felony

8   federal law; correct?

9        A.    Correct.

10       Q.    And yet you yourself -- sorry,

11  strike that.

12             When was the first time you came to

13  believe that performing -- that having

14  Medtronic perform a device check was a

15  violation of law?

16       A.    It was a process.

17       Q.    When was the first time that you

18  came to the understanding that it was a

19  violation of law for Medtronic to provide a

20  device check?

21             MS. BURKE:  Objection; asked and

22        answered.

23             THE WITNESS:  After I left Medtronic

24        and took time to uncouple from 17 years --

25        almost 17 years of working for a company

1          CATHLEEN FORNEY

2      that I embarrassingly trusted everything

3      they told me to be accurate and

4      appropriate.  And I was able to step back

5      and not be in the weeds of day-to-day

6      exhausting work but look 30,000 feet and

7      see all the mutually dependent activities

8      that I had asked -- been asked to perform

9      or to be trained on so that I could serve

10      customers at a very high, engaged,

11      personal level; and experienced the

12      Medtronic compliance system not work and

13      that districts are given the freedom to

14      conduct business however they want to be

15      successful, I realized that the company I

16      worked for and the work that I performed,

17      that there was a large component that was

18      inappropriate and all conducted ultimately

19      to influence and to secure that

20      quarter's -- as Dave Roberts would say,

21      "the most important quarter ever," the

22      implant numbers that were required of us,

23      and relationships and service helped to

24      sustain business in a changing world.

25  BY MS. MAYER:

                    CATHLEEN FORNEY

1

2    Q.   So was it also after you left

3  Medtronic that you came to believe that

4  providing support for implants was also a

5  felony kickback violation and illegal through

6  this process that you've just described?

7    A.   There are some implant procedures

8  that are extremely mature, over 50 years where

9  things have not changed, and the technical

10  expertise to conduct them is not what we

11  provide.  It's just helping them belabor to get

12  their job done.

13        Occasionally there are new products

14  that come out that requires extra, additional

15  skill sets, that the FDA states when a

16  physician might have to do so many implants and

17  then they're signed off, but then they should

18  be technically competent; and it's a rare case

19  that technical expertise is needed to support a

20  successful implant with an experienced implant.

21        MS. MAYER:  Motion to strike the

22     answer as nonresponsive.

23  BY MS. MAYER:

24    Q.   My question was:  It was after you

25  left Medtronic --

1                    CATHLEEN FORNEY

2            MS. BURKE:  Kirsten --

3   BY MS. MAYER:

4       Q.    -- that you went through this

5   process that you've described for us that you

6   came to understand in your mind that supporting

7   implants was illegal; correct?

8            MS. BURKE:  Kirsten, you cannot move

9        to strike an answer.  You're being

10       argumentative.  We object to you using --

11       even using that term, "motion to strike,"

12       to convey your dissatisfaction with the

13       answer.

14            And she's already answered the

15       question that you gave.

16            MS. MAYER:  No more speaking

17       objections.

18            MS. BURKE:  Then no more motions to

19       strike.

20            MS. MAYER:  Susan.

21   BY MS. MAYER:

22       Q.    Can you -- do you remember the

23   question?

24       A.    Correct.

25       Q.    Correct?  And it was after you left

1          CATHLEEN FORNEY

2   Medtronic and went through this process that

3   you've discussed that you came to have the

4   understanding that you now have, that providing

5   Lean Sigma advice was also illegal; correct?

6       A.    Correct.

7       Q.    And the other conduct that you

8   allege in your complaint, in your First Amended

9   Complaint and your Second Amended Complaint in

10  this case, that you allege was illegal, you

11  came to understand that the conduct was illegal

12  in your mind all after you left Medtronic;

13  correct?

14      A.    After I uncoupled from Medtronic;

15  correct.

16      Q.    Which was after you left Medtronic?

17      A.    Correct.

18          MS. MAYER:  We can take a lunch

19      break now.

20          MS. BURKE:  Hour?

21          THE VIDEOGRAPHER:  We are going off

22      the record at 1:07.

23          (Luncheon recess taken from 1:07

24      p.m. to 2:21 p.m.)

25

                    CATHLEEN FORNEY

1    the United States and the Plaintiff States

2    prior to filing suit under seal other than

3    those 10 or 12 documents that we just

4    discussed?

5         A.    Can you ask that question again,

6    please.

7         Q.    Sure.  Did you share any information

8    with the United States and the Plaintiff States

9    prior to filing suit in this case -- this

10   Complaint, Exhibit 2 -- other than the 10 or 12

11   documents that we just discussed?

12        A.    I did not share anything prior.

13        Q.    Okay.  So nothing was shared with

14   the government prior to filing suit; it came

15   after?

16        A.    Perhaps I'm not understanding the

17   question.  I think the documents probably came

18   with the case.

19        Q.    But you -- to the best of your

20   knowledge, you provided information to the

21   United States and Plaintiff States, the 10 to

22   12 documents, after the complaint was filed;

23   right?

24        A.    Yes.

1                    CATHLEEN FORNEY

2        Q.    Okay.  Did you -- when you shared

3   the 10 or 12 documents, did you provide any

4   other information to the United States and

5   Plaintiff States?

6        A.    Not to my knowledge.

7        Q.    Do you have reason to believe that

8   somebody provided additional information to the

9   government on your behalf after the Complaint,

10  Exhibit 2, was filed?

11       A.    No.

12       Q.    Did you -- do you know when you

13  provided the 10 or 12 documents to the

14  government?

15       A.    I believe it was submitted in June

16  of 2015.

17       Q.    And why do you believe it was

18  submitted in June of 2015?

19       A.    I -- that's when I recall Susan

20  telling me she was submitting it.

21       Q.    Okay.

22            MS. BURKE:  I would just caution the

23       witness not to reveal attorney-client

24       communications.

25  BY MS. MAYER:

```
 1                  CATHLEEN FORNEY
 2        Q.    Is that June of 2015 or June of
 3    2016?  Like last year?
 4        A.    2015.
 5        Q.    Okay.  Other than the 10 or 12
 6    documents that we've discussed, have you shared
 7    any additional information about this case with
 8    the government?
 9        A.    I was interviewed one day.
10        Q.    Do you know when that interview
11    occurred?
12        A.    I don't recall.  I think it was the
13    spring.
14        Q.    Of which year?
15        A.    2016.
16        Q.    How long was the interview?
17        A.    Part a day.  I don't recall how many
18    hours.
19        Q.    Was it one hour?
20        A.    My guess is half a day.
21        Q.    Who was present at that interview?
22        A.    I don't recall their names.
23        Q.    Was your counsel with you,
24    Ms. Burke?
25        A.    Yes.
```

1                   CATHLEEN FORNEY

2       Q.    Other than the interview and the 10

3  or 12 documents that you provided in support --

4  that you provided that we've already discussed,

5  have you had any other -- have you shared any

6  other information with the government about

7  this case?

8       A.    No.

9       Q.    What was the substance of the

10  interview with the government?  You can start

11  with, what were the topics that you discussed

12  with the government?

13            MS. BURKE:  Object and instruct the

14       witness not to answer.

15            MS. MAYER:  What's the basis?

16            MS. BURKE:  That the United States

17       has not been noticed in this deposition,

18       and I believe that the United States has

19       the investigative and deliberative process

20       privilege that attaches to those relator

21       interviews.

22            MS. MAYER:  Do you represent the

23       United States today, Ms. Burke?

24            MS. BURKE:  They are the real party

25       in interest, and they are not presently

CATHLEEN FORNEY

1
2   represented because they were not -- the
3   deposition notice was not sent to them.
4       I do not know what position they
5   would take, but given their absence and
6   given they're the real party in interest,
7   I instruct my witness and my client not to
8   answer that question.
9       MS. MAYER:  Are you claiming any
10  attorney-client privilege over that
11  communication?
12      MS. BURKE:  With my client?
13      MS. MAYER:  Yes.
14      MS. BURKE:  Yes.
15      MS. MAYER:  You're claiming that you
16  had an attorney-client privileged
17  communication with your client while the
18  United States was present?
19      MS. BURKE:  I am claiming that the
20  question that you asked seeks to elicit
21  information shared during a meeting with
22  counsel for the United States, and counsel
23  for the United States has the right to
24  assert a privilege to protect that
25  meeting, and I believe we have the right,

1                    CATHLEEN FORNEY

2        therefore, as well, to assert a privilege

3        to protect that meeting.

4              So I'm instructing my client not to

5        answer.

6              MS. MAYER:  So I'm trying to

7        understand what the privilege -- the

8        nature of the precise privilege is that

9        you're asserting.  I understand you're

10       asserting on behalf of the United States,

11       who is not your client, a deliberative

12       process privilege.

13             What I'd like to understand, Susan,

14       is whether you are asserting any other

15       privilege.

16             MS. BURKE:  I'm asserting all

17       potential privileges at this point.

18             MS. MAYER:  What's your --

19             MS. BURKE:  As you know, I was not

20       aware until this morning that the United

21       States has not been noticed for this

22       deposition.  The deposition notice, it

23       only came to my attention that it had not

24       been served on the United States, and so I

25       have not had time to -- so I have not had

1                    CATHLEEN FORNEY

2       time to research all of the potential

3       privileges.

4            Normally, what happens is the United

5       States is noticed, and when they don't

6       show up, you assume they've waived all

7       privileges.

8            We have already asserted a joint

9       prosecution privilege, and so -- so at

10      this point in time, I'm instructing her

11      not to answer, and I'm asserting all

12      potential privileges to cover that

13      meeting.

14           MS. MAYER:  So I understand your

15      position with respect to the United

16      States' invocation in theory of --

17           MS. BURKE:  Potential.  Potential

18      invocation.

19           MS. MAYER:  I understand your

20      position with respect to the United

21      States' potential invocation of a joint

22      prosecution privilege, and you've also

23      mentioned a deliberative process

24      privilege.

25           MS. BURKE:  And an investigative

Page 160

1                    CATHLEEN FORNEY
2          privilege.
3               MS. MAYER:  Are you asserting an
4          attorney-client privilege over the
5          communication?
6               MS. BURKE:  Yes.
7               MS. MAYER:  What's the basis for
8          asserting an attorney-client privilege
9          over that interview?
10              MS. BURKE:  The joint prosecution
11         privilege makes the communication a
12         privileged communication.
13              MS. MAYER:  Your position is that if
14         you have a joint prosecution agreement
15         with the United States, that creates an
16         attorney-client privilege over that
17         interview?
18              MS. BURKE:  Well, at this point, I'm
19         not sure what I would assert vis-a-vis --
20         if the United States had waived its
21         privileges had it been noticed and not
22         appeared and those privileges would have
23         been -- and they waived their privileges,
24         I'm not sure that I independently would
25         have asserted a privilege.

1            CATHLEEN FORNEY

2        The complexity arises because of the

3    lack of notice to the United States that

4    then puts me in a position that I don't

5    know what the United States will do and/or

6    what it has done.

7        So at this point in time, all I can

8    say is that if they waive the privileges,

9    I would waive the privileges.

10       MS. MAYER:  But I guess I'm trying

11   to understand, do you believe that,

12   independent of the joint -- the potential

13   joint prosecution privilege, that you have

14   an attorney-client privilege in that

15   interview?

16       MS. BURKE:  It turns -- the

17   privilege -- any privilege that attaches

18   turns on the United States' -- and the

19   United States' invocation of the

20   privilege.  If they don't invoke a

21   privilege, then we won't invoke a

22   privilege.

23       MS. MAYER:  So we served this

24   request for production for all

25   communications with the government in

1          CATHLEEN FORNEY

2     September.  And you --

3          MS. BURKE:  You're now referring

4     back to Exhibit 1?

5          MS. MAYER:  I'm referring back to

6     Exhibit 1, and you responded that you

7     object because it calls for

8     attorney-client communications, work

9     product, joint prosecution, common

10    interest and other applicable privileges;

11    and you did not produce any communications

12    with the government; correct?

13         MS. BURKE:  No, that's not correct.

14    We produced documents that had been

15    provided to the -- to the government.

16         MS. MAYER:  Did you withhold any

17    communications to the government, Susan?

18         MS. BURKE:  The material disclosure

19    and another follow-up submission.

20         MS. MAYER:  And your basis for

21    withholding those was the government's

22    joint prosecution privilege?

23         MS. BURKE:  As you see here, these

24    are the -- with respect to the production

25    of documents, those are all of the

1                    CATHLEEN FORNEY

2        privileges that we invoked.

3             MS. MAYER:  Well, but I'm asking you

4        today whether the joint prosecution and

5        common interest privilege was the reason

6        why you didn't produce those.

7             MS. BURKE:  All the reasons that we

8        have here are the reasons that we didn't

9        produce.

10            MS. MAYER:  So your position is that

11       the material --

12            MS. BURKE:  Attorney-client, work

13       product, joint prosecution, common

14       interest privilege and any other

15       applicable privilege, doctrine, immunity,

16       statute, regulation, rule or restriction.

17            MS. MAYER:  And do you believe that

18       anything other than the joint prosecution

19       and common interest privilege protects

20       those communications?

21            MS. BURKE:  I do.

22            MS. MAYER:  Which privileges,

23       independent of those, protect the

24       communications?

25            MS. BURKE:  With all due respect, I

1                CATHLEEN FORNEY

2        have not prepared on this issue, and so

3        there's a lot of case law that speaks to

4        what has to be turned over and what

5        doesn't have to be turned over.

6            I did not review that in

7        preparation.  This is not an oral

8        argument.  This is not something where I

9        came ready to brief our legal position.

10           I'm happy to brief our legal

11       position.  If you want to move to compel,

12       we can brief the legal position.  I'm not

13       prepared today.  I don't have the case law

14       at the ready, and I didn't come prepared

15       to do this.

16           This is a deposition of a witness.

17       We're making the witness available.  If

18       you have any questions to her, I suggest

19       you use your time to question the witness,

20       and we can brief these issues later.

21           MS. MAYER:  Did you check -- after

22       receiving this request for production of

23       documents, Susan, did you reach out to

24       attorneys for the United States and the

25       states to check whether they were invoking

                    CATHLEEN FORNEY

1

2       a common interest or joint prosecution

3       privilege to protect those disclosures?

4            MS. BURKE:  Ms. Mayer, I'm not the

5       witness.  I'm not the witness.  I don't

6       have to answer your questions on record.

7            You're here -- if you want to ask

8       Ms. Forney any questions, let's proceed.

9       Otherwise, let's take a brief break if you

10      don't have any more questions for the

11      witness -- actually, I would like a bio

12      break at this point.

13           MS. MAYER:  Yes, we can take a

14      break.

15           THE VIDEOGRAPHER:  We are going off

16      the record at 3:07.

17           (Recess taken from 3:07 p.m. to

18      4:01 p.m.)

19           (Whereupon, a discussion was held

20      between counsel, off the video record, and

21      outside the presence of the witness.)

22           MS. MAYER:  We have discussed the

23      matter of the privilege over Ms. Forney's

24      oral communications with the government in

25      this case, and the agreement we've reached

                        CATHLEEN FORNEY

1

2        Q.    You think it's Chuck.

3        A.    Yeah.

4        Q.    Okay.  So it's -- Kay Brotzman says,

5    "Good morning, Chuck.  We have a pacer check in

6    the office on November 22 on Delores Neifert,

7    who is having a general change done.  Can you

8    please make sure someone can be here to help us

9    out?"

10             Right?  Do you see that?

11       A.    Yeah.

12       Q.    So is this the source of the

13   information in the chart that says patient --

14   in Exhibit 7 on page 19, that says, "Patient

15   DN, Lehigh Valley Cardiology Associates, Pacer

16   check, November 22, 2011"?

17       A.    Say that again.

18       Q.    Sure.  Does -- is the Kay Brotzman

19   to Chuck Mertz email that is screenshotted in

20   Exhibit 88, page 01421 the source for your

21   allegation on page 19 of the Second Amended

22   Complaint, Exhibit 7, that patient DN at Lehigh

23   Valley Cardiology Associates had a Pacer check

24   on November 22, 2011?

25       A.    No, these are two different items.

1                    CATHLEEN FORNEY

2      Q.    Okay.  So what -- you said the

3  source for the --

4      A.    So --

5      Q.    -- information in this chart is

6  not --

7      A.    -- this is the Pacer chart.  This

8  would have come off the Google Calendaring

9  system, where this is the email.

10     Q.    Okay.

11     A.    So this individual -- oh, wait,

12  maybe it is.  Hold on.  She had a gen change.

13  So maybe in this case, it initiated with an

14  email, and then it got put on the calendar --

15  calendaring system, and this here looks like

16  it's more off the calendaring system.  But this

17  would have been the request.

18     Q.    Do you remember --

19          MS. BURKE:  And let the record

20      reflect that "this here" the witness is

21      referring to Exhibit 7, page 19.

22  BY MS. MAYER:

23     Q.    Okay.  So turn to page 01422 of

24  Exhibit 8.

25     A.    Wait, which is Exhibit 8?

1                    CATHLEEN FORNEY

2        Q.    The --

3        A.    Email?

4        Q.    -- Gmail account document.

5        A.    01428?

6        Q.    01422.  It's the next page.

7        A.    Oh, the next page, okay.

8        Q.    This -- and the screenshot, the top

9    screenshot email, is an email from Cathy Jo

10   Leiby to me.  Do you see that?

11       A.    Yeah.

12       Q.    And it says in the body of the

13   email, "I know Dave spoke to you regarding

14   Elsie Hilbert; they've decided they would like

15   her device interrogated sometime today.  She is

16   in room 450 at St. Luke's Allentown."

17       A.    Uh-huh.

18       Q.    And the date of this email is a

19   little hard to see, but it looks like it's

20   11/16.

21       A.    Yes.

22       Q.    And if you look on Exhibit 7, the

23   Second Amended Complaint, right below the line

24   about patient DN is a line about patient EH,

25   St. Luke's Allentown, interrogation of device,

```
 1                 CATHLEEN FORNEY
 2   November 16h, 2011.
 3        A.    Uh-huh.
 4        Q.    But this email wasn't the source of
 5   your information on this?
 6        A.    This email could be the source.  And
 7   like I shared, then it would be put on the
 8   calendar.  So there's two places you can pull a
 9   source from.
10        Q.    And do you remember which you pulled
11   this from or --
12        A.    I don't recall exactly which one.
13        Q.    Okay.  Okay.
14        A.    But it's double-sourced.
15        Q.    Okay.  Do you know for sure it's in
16   both, or you just recall that?
17        A.    We can look at some of the other
18   documents or pictures of the calendars, and
19   that would confirm.
20        Q.    Okay.  If you turn to the next page
21   in Exhibit 8 which is REL-01423, do you see
22   that?
23        A.    Yep.
24        Q.    It's a "Google Voice, to me."  And
25   it's a voicemail that makes reference to Lehigh
```

1                    CATHLEEN FORNEY

2    Valley Heart Specialists and a patient called

3    Michael Boyle?

4         A.    Correct.

5         Q.    And then you see the line below,

6    patient EH on page 19 of Exhibit 7 refers to a

7    patient MB and Lehigh Valley Cardiology

8    Associates.

9              Is this voicemail the source of that

10   allegation in the complaint?

11        A.    Per my prior response, it could be

12   this email.  Also it could be confirmed on a

13   calendar.

14             MS. MAYER:  Okay.  Can we mark

15        another exhibit?  This is Exhibit 9.

16             (Forney Exhibit 9, Pictures of

17        Patient Information Posted to Google

18        Calendaring 11.11.11, Bates REL-1666 TO

19        1772, was marked for identification.)

20   BY MS. MAYER:

21        Q.    I'm showing you what has been marked

22   as Exhibit 9.  Do you recognize this?

23        A.    Yes.

24        Q.    What is it?

25        A.    These are pictures from Google

1                    CATHLEEN FORNEY

2   Calendar system.

3        Q.    And did you produce this to the

4   government?

5        A.    Yes.

6        Q.    Do you -- how would I look through

7   this printout to try to find reference to the

8   events that you listed on page 19 of the second

9   amended complaint, Exhibit 7?

10       A.    I'm not sure if --

11       Q.    I will tell you, I haven't been able

12  to find them.

13       A.    -- they all got copied.

14             But I would say a sample could be

15  here where I would open up an event and then

16  the details would populate.  So you may not be

17  able to see it from this higher level, but if

18  there's a picture of an event that's open,

19  that's how you could read the details.

20       Q.    So if I wanted to try to find

21  "Patient DN, Pacer check with Lehigh Valley

22  Cardiology Associates on November 22, 2011,"

23  should I be looking for these opened windows

24  like we see on REL-01667 of Exhibit 9 that has

25  notes about an ICD reprogramming for a

1                    CATHLEEN FORNEY

2   G. Witmer?  I should be looking for something

3   like that for a patient DN?

4        A.    Yeah, it's hard to read the details.

5             My intent was to open each one of

6   these to provide the details from the calendar

7   view, and it may not all have copied.

8        Q.    When you prepared this information

9   for your complaint in this case, did you still

10  have electronic -- when you were drafting that

11  original complaint to the case, did you still

12  have access to the electronic Google Calendar

13  records that -- some of which you printed off

14  here?

15       A.    My access to the Google Calendar

16  ended in February of 2012, I believe.

17       Q.    Okay.  So did you prepare for the

18  Complaint the list of patient and device check

19  events that we see in the complaint after

20  February 2012?

21       A.    Yes.

22       Q.    So you relied on something other

23  than the electronic Google Calendar in order to

24  make the chart that we see on page 19 of

25  Exhibit 7; right?

Page 240

CATHLEEN FORNEY

1

2     A.     I relied on the pictures I took.

3     Q.     Okay.  Which are in Exhibit 9?

4     A.     These are samples of them, yes.

5     Q.     Are there more of these that you

6  have that are not included in Exhibit 9?

7     A.     I don't know.

8          MS. MAYER:  Susan, do you know

9          whether you produced all of the Google

10         Calendars that Ms. Forney collected?

11         MS. BURKE:  I believe we did, both

12         in hard copy and electronic, but I can

13         double-check.

14              THE WITNESS:  Yeah.

15         MS. MAYER:  By "electronic," you

16         mean, like, a .pdf of this paper printout;

17         right?

18         MS. BURKE:  I need to -- I cannot --

19         I cannot, as I sit here today, recall what

20         the format --

21  BY MS. MAYER:

22     Q.     Okay.  And so the -- so, Ms. Forney,

23  the information that we see in the chart on

24  page 19 in Exhibit 7 either came from the email

25  printouts that we discussed from Exhibit 8 or

1                    CATHLEEN FORNEY

2     insurer?

3          A.    No.

4          Q.    So have we now covered all of the

5     information you have about -- in support of

6     your allegation that these providers in the

7     chart on page 19 of Exhibit 7 submitted claims

8     for the patients listed there to the Medicare

9     program?

10               MS. BURKE:  Object to form.

11               THE WITNESS:  Yes.

12    BY MS. MAYER:

13         Q.    And so you don't -- you don't

14    actually know that patient AJ was a Medicare

15    beneficiary; right?  AJ could have been a

16    private health insurance beneficiary; right?

17               MS. BURKE:  Object to form.

18               THE WITNESS:  The majority of

19         patients with pacemakers and medical

20         devices, high, high probability it's

21         Medicare, just due to the age of the

22         population that's implanted.

23    BY MS. MAYER:

24         Q.    Right.

25         A.    I can't say specifically if that

CATHLEEN FORNEY

1

2 patient was 50 years old and private insurance

3 or Medicaid or Medicare.

4     Q.    Right.  And the same is true for all

5 the patients listed on page 19 in that chart;

6 right?

7     A.    Correct.

8     Q.    Okay.  Turning to paragraph 50 of

9 the Second Amended Complaint, Exhibit 7, on

10 page 20, is the source of the information that

11 we see about Palmerton and Quakertown and

12 Wind Gap, also the snapshotted emails and

13 records that we see in Exhibit 8 that we've

14 already discussed?  And I can direct your

15 attention, for example, to page 01448 of

16 Exhibit 8.

17     A.    Yes.

18     Q.    So these -- do you have any

19 information about who these patients were or

20 what was done in Palmerton or Quakertown or

21 Wind Gap on these dates other than what appears

22 in Exhibit 8 on page 01448?  Or elsewhere in

23 Exhibit 8?

24     A.    So the device clinic at Palmerton on

25 11/30, a Medtronic individual would show up and

1                     CATHLEEN FORNEY

2    do six device checks.

3         Q.    Right.  But other than what you see

4    here, you weren't at that clinic; right?

5         A.    Correct.

6         Q.    And you haven't talked to anybody

7    about what did or didn't happen at that clinic;

8    right?

9         A.    On this date, no.

10        Q.    Right.  And so, hypothetically, all

11   six device checks could have canceled that day;

12   right?

13        A.    Correct.

14        Q.    And there's no information here

15   about insurance; correct?  So, hypothetically,

16   all of these patients could have been self-pay;

17   correct?

18        A.    Correct.

19        Q.    I'd like to turn your attention to

20   paragraph 52 on page -- starts on page 21 of

21   the Second Amended Complaint.  It's Exhibit 7.

22             Paragraph 52 on page 21 starts

23   listing names and addresses.  Do you see that,

24   where the first one says, "California," there's

25   a colon, "James T. Heywood"?  Do you see that?

1              CATHLEEN FORNEY

2    Complaint in this case?

3        A.    Yes.

4        Q.    Have you provided any documents to

5    the government in addition to the documents

6    referenced in either the original Complaint,

7    the First Amended Complaint or the Second

8    Amended Complaint?

9        A.    Not to my knowledge.

10            MS. MAYER:  I'd like to mark this as

11       Exhibit -- what are we up to now, 10?

12            (Forney Exhibit 10, Email

13       communication, 5-4-10, with attachment,

14       Bates MDTEPA-92769 to 778, was marked for

15       identification.)

16   BY MS. MAYER:

17       Q.    Ms. Forney, I'm showing you what's

18   been marked as Exhibit 10.  It's a document

19   that begins with Bates number MDTEDPA00092769.

20            Do you see this?

21       A.    Uh-huh.

22       Q.    It's an email from Brian Dye to

23   Patricia Meyer, copying you.  Do you see that?

24       A.    Yes.

25       Q.    And the subject is -- and it's