**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VIRGINIA, WISCONSIN | **Civil Action No. 15-cv-6264**<br><br>**JURY TRIAL DEMANDED** |

*ex rel.* Cathleen Forney

　　　　　　　　　　　　*Plaintiffs*

　　v.

MEDTRONIC, INC.

　　　　　　　　　　　　*Defendant.*

# EXHIBIT #1

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA

3

4   UNITED STATES OF AMERICA, CALIFORNIA,    )

5   COLORADO, CONNECTICUT, DELAWARE, DISTRICT )

6   OF COLUMBIA, FLORIDA, GEORGIA, HAWAII,    )

7   ILLINOIS, INDIANA, IOWA, LOUISIANA,    )

8   MARYLAND, MASSACHUSETTS, MICHIGAN,    )

9   MINNESOTA, MONTANA, NEVADA, NEW JERSEY,   )

10  NEW MEXICO, NEW YORK, NORTH CAROLINA,    )

11  OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, )

12  VIRGINA, WISCONSIN,    )

13  Ex Rel.  CATHLEEN FORNEY    )

14      Plaintiffs,    ) Civil Action No.

15        -v-    ) 5:15-cv-6264-EGS

16  MEDTRONIC INC.,    )

17      Defendant.    )

18  -----------------------------------------

19      VIDEOTAPED DEPOSITION OF CATHLEEN FORNEY

20          Lancaster, Pennsylvania

21          Tuesday, November 14, 2017

22

23  Reported by:

    Gail L. Inghram Verbano,

24  BA, CRR, CLR, RDR, CSR-CA (No. 8635)

    Job No. 133496

25

Page 2

1     November 14, 2017
2        9:08 a.m.
3
4
5
6
7        Videotaped deposition of CATHLEEN
8     FORNEY, held at the offices of BARLEY SNYDER,
9     LLC, 126 East King Street, Lancaster,
10    Pennsylvania, before GAIL INGHRAM VERBANO,
11    Registered Diplomate Reporter, Certified
12    Realtime Reporter, Certified Shorthand
13    Reporter-CA (No. 8635) and Notary Public in and
14    for the Commonwealth of Pennsylvania.
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2
3     A P P E A R A N C E S :
4
5     Attorneys for Plaintiffs:
6     LAW OFFICES OF SUSAN L. BURKE
7        1611 Park Avenue
8        Baltimore, Maryland 21217
9     BY:  SUSAN BURKE, ESQ.
10
11
12
13
14    Attorneys for Defendants:
15    ROPES & GRAY
16       Prudential Tower
17       800 Boylston Street
18       Boston, Massachusetts, 02199
19    BY:  KIRSTEN MAYER, ESQ.
20       MITCHELL STROMBERG, ESQ.
21
22
23    ALSO PRESENT:
24       KATHRYN WOZNY, In-House Counsel, Medtronic
25       ADOLPH GREEN, Legal Videographer

Page 4

1        CATHLEEN FORNEY
2        THE VIDEOGRAPHER:  This is the start
3     of tape labeled No. 1 of the videotaped
4     deposition of Cathleen Forney, in the
5     matter of Cathleen Forney V. Medtronic,
6     Inc. in the United States District Court
7     for the Eastern District of Pennsylvania,
8     Case No. 5:15-CV-6264-EGS.
9        This deposition is being held at 126
10    East King Street, Lancaster, Pennsylvania,
11    on November 14th, 2017, at approximately
12    9:08.
13       My name is Adolph Green from TSG
14    Reporting, Inc. and I am the legal video
15    specialist.  The court reporter is Gail
16    Verbano, in association with TSG
17    Reporting.
18       Will counsel please introduce
19    yourselves.
20       MS. MAYER:  Kirsten Mayer for
21    Medtronic.
22       MR. STROMBERG:  Mitchell Stromberg
23    for Medtronic.
24       MS. WOZNY:  Kathryn Wozny on behalf
25    of Medtronic.

Page 5

1        CATHLEEN FORNEY
2        MS. BURKE:  Susan Burke for relator.
3        THE VIDEOGRAPHER:  Will the reporter
4     please swear in the witness.
5        CATHLEEN FORNEY
6     called as a witness, having been duly sworn by
7     a Notary Public, was examined and testified as
8     follows:
9     EXAMINATION
10    BY MS. MAYER:
11       Q.   Good morning, Ms. Forney.  Could you
12    please tell us your full name for the record.
13       A.   Cathleen Forney.
14       Q.   Where do you live?
15       A.   I live at 353 College Avenue,
16    Lancaster, Pennsylvania.
17       Q.   Have you ever been deposed before?
18       A.   I have not been deposed before.
19       Q.   A deposition is -- what we're going
20    to do today in the deposition is I'm going to
21    ask you questions, and you're going to give me
22    answers to the questions.  To make it easy for
23    the court reporter and the videographer, it's
24    going to be important for you to let me finish
25    my question before you answer the question.

CATHLEEN FORNEY

1
2        Can you do that?
3        A.   Yes.
4        Q.   Occasionally, I'll ask a question --
5   hopefully occasionally -- that doesn't make
6   sense to you.  If I ask you a question and
7   there's something in it that you don't
8   understand, will you tell me that?
9        A.   Yes.
10       Q.   If you need to take a break at any
11  time during the day, as long as a question
12  isn't pending, you can have a break.  Would you
13  just please let us know if you need to take a
14  break?
15       A.   Yes.
16       Q.   If a question is pending, we'll need
17  you to answer the question first, but then we
18  can take a break.
19       A.   Okay.
20       Q.   Where do you currently work?
21       A.   I currently work at Lancaster
22  General Hospital in Lancaster, Pennsylvania.
23       Q.   How long have you worked there?
24       A.   I have worked there since February
25  of 2012.

CATHLEEN FORNEY

1
2        Q.   What is your title?
3        A.   I am the director of research
4   operations.
5        Q.   What are your responsibilities as
6   director of research operations?
7        A.   I manage the execution of the
8   research clinical trials that are run at
9   Lancaster General Hospital, so the staff that
10  runs them.
11       Q.   What's your salary?
12       A.   My salary is -- it's probably
13  between 115- and 120,000.
14       Q.   Is there any commission or bonus or
15  incentive opportunity?
16       A.   No.
17       Q.   Have you held the position of
18  director of research operations the entire time
19  you've been with Lancaster General Hospital?
20       A.   Yes.
21       Q.   Was that the first position you took
22  after you were terminated from Medtronic?
23       A.   Yes.
24       Q.   In your position as director of
25  research operations, do you have occasion to

CATHLEEN FORNEY

1
2   interact with representatives from medical
3   device companies?
4        A.   Yes.
5        Q.   From Medtronic?
6        A.   Yes.
7        Q.   What's the nature of your
8   interactions with representatives from
9   Medtronic?
10       A.   Medtronic supports some of the
11  research clinical trials we run.  So the
12  relationship would be around executing the
13  trial.
14       Q.   Is there one person at Medtronic
15  that you coordinate with, or is it different
16  people depending on the circumstances?
17       MS. BURKE:  Object to form.
18       THE WITNESS:  Joann Tuzi is our
19  field representative from Medtronic.
20  BY MS. MAYER:
21       Q.   Do you coordinate or interact with
22  anyone from Medtronic other than Joann Tuzi?
23       A.   Yes.
24       Q.   Who?
25       A.   Members of study teams inside.

CATHLEEN FORNEY

1
2        Q.   Inside what?
3        A.   Inside Medtronic.
4        Q.   Other than members of study teams
5   inside Medtronic and Joann Tuzi, is there
6   anyone else from Medtronic that you interact
7   with?
8        A.   Occasional field personnel that
9   support the trial.
10       Q.   Anyone else from Medtronic?
11       A.   Occasional scientists whose study it
12  is.
13       Q.   Anyone else from Medtronic?
14       A.   Monitors that monitor our work.
15       Q.   Anyone else from Medtronic?
16       A.   No.
17       Q.   What's Joann Tuzi's role in terms of
18  her interactions with you?
19       A.   Field clinical engineer.
20       Q.   What does that mean?
21       A.   She supports sites in the field that
22  conduct Medtronic research.
23       Q.   Are there particular -- does she do
24  that for all Medtronic products or just a
25  particular type of Medtronic product?

Page 10

CATHLEEN FORNEY

1
2     A.   She does that for all Medtronic
3   research studies.
4     Q.   Have -- since you've been in your
5   role as director of research ops, how many
6   Medtronic research studies have been conducted
7   at Lancaster General?
8         MS. BURKE:  Objection; foundation.
9         THE WITNESS:  I'm making a guess, in
10   five years, maybe five to seven.
11   BY MS. MAYER:
12     Q.   Are there research studies that
13   Medtronic conducts at Lancaster General that
14   you would not be aware of?
15         MS. BURKE:  Object.
16         THE WITNESS:  No.
17   BY MS. MAYER:
18     Q.   So if Medtronic is conducting a
19   research study at Lancaster General, while
20   you've been in the role of director of research
21   ops, you know about it; right?
22     A.   Yes.
23     Q.   And you estimate five to seven --
24     A.   Yes.
25     Q.   -- since 2012?

Page 11

CATHLEEN FORNEY

1
2     Q.   Have any of those research trials
3   involved cardiac rhythm devices?
4     A.   Yes.
5     Q.   How many of the trials involve
6   cardiac rhythm devices?
7     A.   All.
8     Q.   What were the trials studying?  We
9   can start with the first trial that you
10   remember back in 2012 -- since 2012.
11     A.   Heart failure in an implantable
12   reveal device, pilot.  And then that rolled
13   into a study.  A pilot rolled into a study.
14     Q.   What was the study looking at?
15     A.   Medtronic device diagnostics in the
16   management of heart failure patients.
17     Q.   What about the next study?
18         MS. BURKE:  Object to form.
19         THE WITNESS:  AF ablation.
20   BY MS. MAYER:
21     Q.   Was that a pilot or a regular study?
22     A.   Regular study.
23     Q.   What was it looking at with respect
24   to AF ablation?
25     A.   Medtronic's long-term post-approval

Page 12

CATHLEEN FORNEY

1
2   study for AF ablation tools.
3     Q.   What was the third Medtronic study
4   that you recall at Lancaster General between
5   2012 and now?
6     A.   REVAMP is looking at diastolic heart
7   failure patients with Medtronic devices.
8     Q.   What is REVAMP?
9     A.   It's the name of the clinical trial.
10   It's a scientist study.
11     Q.   What is the study examining?
12     A.   Diastolic heart failure and patients
13   with Medtronic device and a therapy
14   intervention.
15     Q.   What about the fourth study that you
16   recall involving Medtronic devices between 2012
17   and -- and the present at Lancaster General?
18     A.   That would be the fourth that I just
19   stated.
20     Q.   Okay.
21     A.   Respond.
22     Q.   So Respond is the fifth?
23     A.   Uh-huh.
24     Q.   Okay.  And what does Respond
25   involve?

Page 13

CATHLEEN FORNEY

1
2     A.   Diastolic heart failure patients and
3   patients with Medtronic pacemakers.
4     Q.   And is it also looking at a
5   therapeutic intervention involving the
6   pacemakers and heart failure patients?
7     A.   Yes.
8     Q.   And just to clarify, you, I think,
9   started by talking about the pilot that rolled
10   into a study.
11     A.   Uh-huh.
12     Q.   Were you thinking of those as two
13   separate studies of the five to seven?
14     A.   Yes.
15     Q.   Okay.  So after Respond, do you
16   recall an additional Medtronic study at
17   Lancaster General Hospital?
18     A.   There were studies ongoing with
19   Medtronic when I arrived.
20     Q.   Involving cardiac rhythm devices?
21     A.   Yes.
22     Q.   And did you take over coordinating
23   with Medtronic on those studies when you became
24   director of research ops?
25     A.   Yes.

4 (Pages 10 to 13)

Page 14

CATHLEEN FORNEY

1
2      Q.   And were those part of the five to
3  seven studies that you recalled?
4      A.   Yes.
5      Q.   So there's about two of those?
6      A.   Block HF.
7      Q.   What's that?
8      A.   A research study.
9      Q.   Involving -- looking at what
10  question?
11      A.   CRT implant in patients with heart
12  block.
13      Q.   And is that the only study that was
14  ongoing when you arrived involving Medtronic
15  cardiac rhythm devices, or was there another
16  one?
17      A.   I can't recall in the moment.
18      Q.   Other than the studies that we've
19  just gone through -- I think there's six -- do
20  you recall any other Medtronic studies that you
21  have been involved in coordinating as director
22  of research ops at Lancaster General?
23      A.   No.
24      Q.   Are any of those studies still
25  ongoing?

Page 15

CATHLEEN FORNEY

1
2      A.   Yes.
3      Q.   Which ones?
4      A.   REVAMP, Respond and Reveal HF.
5      Q.   Have you spoken or otherwise
6  communicated with Joann Tuzi about this case or
7  the issues involved in this case?
8      A.   No.
9      Q.   Have you spoken or otherwise
10  communicated with any of the other Medtronic
11  personnel that you described about this case or
12  the issues in this case?
13      A.   No.
14      Q.   I want to just turn to your
15  background before Medtronic a little bit.
16  Where did you attend college, Ms. Forney?
17      A.   I attended at Geneva College and
18  University of Pittsburgh.
19      Q.   And did you graduate with a degree?
20      A.   I have a degree in biology.
21      Q.   Bachelor's, master's?
22      A.   Bachelor's.
23      Q.   So you started at Geneva, finished
24  at Pittsburgh?
25      A.   Ask that again, please.

Page 16

CATHLEEN FORNEY

1
2      Q.   Sorry.  You said you attended
3  college at Geneva and at the University of
4  Pittsburgh.
5      A.   Correct.
6      Q.   Which college did you graduate from?
7      A.   Geneva.
8      Q.   Did you start college at Pittsburgh?
9      A.   At Geneva.
10      Q.   What was the college -- did you --
11  what schooling did you do at the University of
12  Pittsburgh?
13      A.   An independent major.
14      Q.   And what was the major?
15      A.   Child development.
16      Q.   Did you get a degree from the
17  University of Pittsburgh?
18      A.   No.
19      Q.   What year did you get your
20  bachelor's in biology?
21      A.   1980.
22      Q.   What did you do after graduating
23  from college, for work?
24      A.   I worked at the Medical Center of
25  Beaver County.

Page 17

CATHLEEN FORNEY

1
2      Q.   And what did you do for the Medical
3  Center of Beaver County?
4      A.   I ran their child life department.
5      Q.   How long did you work for the
6  Medical Center of Beaver County?
7      A.   Two years.
8      Q.   What did you do for work after that?
9      A.   In 1991 I worked for St. Joe's
10  Hospital in Tampa, Florida.
11      Q.   So you graduated from Geneva in
12  1980, and you worked at the Medical Center of
13  Beaver County for about two years.  Was that
14  immediately after college?
15      A.   Yes.
16      Q.   So you were at the Medical Center of
17  Beaver County until about 1982?
18      A.   Yes.
19      Q.   Was the next job that you held
20  working at St. Joe's Hospital in Tampa,
21  Florida?
22      A.   Yes.
23      Q.   What did you do in between 1982 and
24  1991?
25      A.   I had a family.

5 (Pages 14 to 17)

Page 18

CATHLEEN FORNEY

1
2    Q.   What was your position at St. Joe's
3  Hospital in Florida?
4    A.   Research coordinator.
5    Q.   And what, in a general matter,
6  general sense, were your duties as a research
7  coordinator there?
8    A.   I ran clinical trials for the
9  hospital.
10    Q.   How long did you work at St. Joe's
11  Hospital in Tampa as a research coordinator?
12    A.   Until 1996.
13    Q.   Where did you go for work at that
14  time?
15    A.   Medtronic.
16    Q.   Why did you leave St. Joe's for
17  Medtronic?
18    A.   Growth opportunity.
19    Q.   What do you mean by that?
20    A.   An opportunity to take my skills in
21  electrophysiology and partner with a company
22  that ran research EP studies and the technology
23  behind those studies, the technology involved
24  in those studies, the product technology.
25    Q.   Where -- when you say that it was an

Page 19

CATHLEEN FORNEY

1
2  opportunity to take your skills in
3  electrophysiology and partner with a company,
4  what skills in electrophysiology had you
5  developed by 1996?
6    A.   I attended the Pacer School of
7  Technology, 1990 to 1991, and five years
8  working clinically in a hospital with medical
9  devices.
10    Q.   So what was the education you did at
11  the Pacer School of Technology between 1990 and
12  1991?
13    A.   It was learning about medical
14  devices and the electric components of a heart.
15    Q.   Why did you pursue that?
16    A.   Interest.
17    Q.   Did you get a degree from Pacer?
18    A.   Certificate.
19    Q.   What's the certificate?
20    A.   In -- I don't know the exact
21  verbiage, a certificate from the school.
22    Q.   Do you remember what the course was
23  called?
24    A.   No.
25    Q.   And you said that you had five years

Page 20

CATHLEEN FORNEY

1
2  working clinically with devices in the
3  hospital.  Was that your work at St. Joe's?
4    A.   Yes.
5    Q.   What clinical work did you do at
6  St. Joe's in that five years?
7    A.   Research studies for multiple
8  manufacturers.
9    Q.   Were you conducting the research, or
10  did you play a different role?
11    A.   Executed the protocols.
12    Q.   What did that mean?
13    A.   A sponsor, a company, brings a
14  protocol to a site, and we execute it
15  accurately, according to how it's written and
16  conducted.
17    Q.   Were you providing clinical care?
18    A.   Yes.
19    Q.   What clinical care were you
20  providing?
21    A.   Device programming.
22    Q.   Anything else?
23    A.   A conduit for research subjects'
24  concerns to providers.
25    Q.   What do you mean by "a conduit for

Page 21

CATHLEEN FORNEY

1
2  research subject concerns to providers"?
3    A.   Communicate patient concerns to a
4  physician.
5    Q.   And what do you mean by "device
6  programming"?
7    A.   A device has programming options,
8  which are therapy, and the protocol would state
9  how a device should be programmed in that
10  patient in the clinical trial.
11    Q.   Was it always the same kind of
12  device that you were programming in the work
13  you did in the five years at St. Joe's?
14    A.   No.
15    Q.   So when you say you were programming
16  devices, was that different devices or always
17  the same device?
18    A.   Different devices.
19    Q.   Did the studies that you coordinated
20  for St. Joe's include Medtronic studies?
21    A.   Yes.
22    Q.   And so were you programming
23  Medtronic devices in connection with your work
24  at St. Joe's Hospital as a research
25  coordinator?

6 (Pages 18 to 21)

Page 22

CATHLEEN FORNEY

1
2    A.   Yes.
3    Q.   For the clinical trials?
4    A.   Yes.
5    Q.   Aside from device programming for
6    the clinical trials being run at St. Joe's
7    Hospital, did you provide any other clinical
8    care?
9    A.   No.
10   Q.   Did you do any work at St. Joe's
11   that was not on the research studies?
12   A.   No.
13   Q.   Aside from your undergraduate degree
14   from Geneva and your certificate from the Pacer
15   School of Technology, have you had any other
16   post-high school education?
17   A.   Yes.
18   Q.   What additional post-high school
19   education?
20   A.   A master's in business
21   administration.
22   Q.   Where did you get your master's in
23   business administration?
24   A.   Penn State.
25   Q.   When did you -- get that degree?

Page 23

CATHLEEN FORNEY

1
2    A.   2005.
3    Q.   Was that a full-time program?
4    A.   No.
5    Q.   Why did you get a master's in
6    business administration?
7    A.   To increase my skill sets.
8    Q.   What skill set in particular were
9    you trying to increase?
10   A.   Business.
11   Q.   Any particular type of business?
12   A.   General business.
13   Q.   Did you pay for the MBA program or
14   did you receive assistance?
15   A.   I received assistance.
16   Q.   From whom or what?
17   A.   Medtronic.
18   Q.   So Medtronic paid for the cost of
19   the MBA?
20   A.   Partial.
21   Q.   How much?  What part?
22   A.   Medtronic stipend per year.
23   Q.   How much of the tuition and fees of
24   the MBA did that stipend cover?
25   A.   I don't recall.

Page 24

CATHLEEN FORNEY

1
2    Q.   Was it half?
3         MS. BURKE:  Object to foundation.
4         THE WITNESS:  I don't recall.
5    BY MS. MAYER:
6    Q.   Do you recall that it was most?
7         MS. BURKE:  Object to foundation.
8         THE WITNESS:  No.
9    BY MS. MAYER:
10   Q.   Did you continue to work at
11   Medtronic while you were pursuing the MBA?
12   A.   Yes.
13   Q.   Part-time or full-time at Medtronic
14   while you were pursuing the MBA?
15   A.   Full-time.
16   Q.   How many years did it take to
17   complete your MBA at Penn State?
18   A.   Four years.
19   Q.   So from about 2001 to 2005 you were
20   pursuing the MBA at Penn State?
21   A.   Yes.
22   Q.   You said you started at Medtronic in
23   1996.  What was your position at Medtronic when
24   you began?
25   A.   Technical field engineer.

Page 25

CATHLEEN FORNEY

1
2    Q.   And how long did you hold that
3    position at Medtronic?
4    A.   Eleven, 12 years.
5    Q.   So until about 2007 or 2008?
6    A.   Until January of 2007.
7    Q.   During the time that you were
8    technical field engineer, did you work in one
9    geography, or did you move around?
10   A.   One geography.
11   Q.   Which geography?
12   A.   Central Pennsylvania district.
13   Q.   And what division or part of
14   Medtronic did you work for during that period?
15   1996 to January 2007?
16   A.   Cardiac rhythm management.
17   Q.   What were your responsibilities as a
18   technical field engineer?
19   A.   Support research.
20   Q.   Is that the same role that Joann
21   Tuzi plays for Medtronic with you at Lancaster?
22   A.   No.
23   Q.   What did you do in support of
24   research as a technical field engineer?
25   A.   Supported Medtronic studies

7  (Pages 22 to 25)

CATHLEEN FORNEY

1
2  conducted within the Central Pennsylvania
3  district.
4      Q.   When you say you "supported
5  Medtronic studies," what do you mean by
6  "supported"?
7      A.   Supported research coordinators at
8  centers that held the studies.
9      Q.   And when you say you "supported,"
10  what do you mean the word "supported"?
11      A.   Answered questions, supported
12  implants, supported device follow-up in
13  research subjects.
14      Q.   So by "answered questions," you mean
15  answered questions of research coordinators at
16  the centers that held the studies?
17      A.   Answered protocol questions.
18      Q.   Can you give me an example of what
19  that would be and was in practice during that
20  12 years?
21          MS. BURKE:  Object to form.
22          THE WITNESS:  Importance of
23      follow-up within study-specified windows,
24      as an example.
25  BY MS. MAYER:

CATHLEEN FORNEY

1
2      Q.   How is that an example of answering
3  a protocol question but from a research
4  coordinator?
5          MS. BURKE:  Object to form.
6          THE WITNESS:  A protocol dictates
7      windows in which a research subject must
8      be seen.  If not seen in the windows, it's
9      a protocol deviation.
10  BY MS. MAYER:
11      Q.   And so a research coordinator might
12  reach out to you to ask questions about those
13  windows?
14      A.   Correct.
15      Q.   Did you answer questions about
16  anything other than the protocols for research
17  coordinators at centers that held the studies?
18      A.   Yes.
19      Q.   What else?
20          MS. BURKE:  Object to form.
21          THE WITNESS:  An example might be a
22      new device algorithm and how that worked.
23  BY MS. MAYER:
24      Q.   Were there other types of questions
25  that you would answer -- get asked and answer

CATHLEEN FORNEY

1
2  for research coordinators during this time that
3  you were a technical field engineer?
4      A.   Yes.
5      Q.   Would it be fair to say that you
6  answered any questions that the research
7  coordinator at the center would have about the
8  study?
9      A.   If I knew the answer.
10      Q.   If you didn't know the answer, what
11  did you do?
12      A.   Contact a study team member inside
13  Medtronic.
14      Q.   And what would happen -- what would
15  you do after contacting the study team member
16  inside Medtronic?
17          MS. BURKE:  Object to form.
18          THE WITNESS:  Convey the information
19      to the site.
20  BY MS. MAYER:
21      Q.   You said that, in your role for 11
22  to 12 years as a technical field engineer, you
23  also supported implants; is that correct?
24      A.   Yes.
25      Q.   What do you mean down by saying you

CATHLEEN FORNEY

1
2  "supported implants" during this time?
3      A.   I supported Medtronic's new ICD
4  technology implants.
5      Q.   What do you mean by "supported"?
6      A.   I attended the implant.
7      Q.   Other than attending the implant,
8  did your support include anything else?
9      A.   Ran Medtronic programmer during
10  implant.
11      Q.   And what's the Medtronic programmer
12  that you ran during the implant?
13      A.   A programmer is a computer that
14  communicates with the implantable devices that
15  a manufacturer makes.
16      Q.   Other than attending the implant and
17  running the Medtronic programmer during the
18  implant, did you do anything else in support of
19  implants while you were a technical field
20  engineer?
21      A.   Coached physicians.
22      Q.   What do you mean by "coached
23  physicians" in this context?
24      A.   Coach questions they have during the
25  implant procedure.

8 (Pages 26 to 29)

Page 30

CATHLEEN FORNEY

1
2      Q.   What do you mean by saying "coached
3  questions during the implant procedure"?
4      A.   An example might be if they had a
5  lead-handling question, I would answer the
6  question.
7      Q.   So other than attending the implant,
8  running the Medtronic programming during the
9  implant and answering physicians' questions
10  about the device, was there anything else you
11  did in support of the implant?
12      A.   Reported the implant to Medtronic.
13      Q.   Was there anything else?
14          MS. BURKE:  Object to form.
15          THE WITNESS:  Completed device
16  registration paperwork.
17  BY MS. MAYER:
18      Q.   Anything else?
19          MS. BURKE:  Object to form.
20          THE WITNESS:  Printed a report for
21  the physicians' implant dictation.
22  BY MS. MAYER:
23      Q.   Anything else?
24          MS. BURKE:  Object to form.
25          THE WITNESS:  Printed device

Page 31

CATHLEEN FORNEY

1
2  settings for clinic.
3  BY MS. MAYER:
4      Q.   Anything else in support of implants
5  during this time as a tech field engineer?
6      A.   Not that I recall.  Provide implant
7  paperwork to the research coordinator.
8      Q.   So during this 11 to 12 years that
9  you were a tech field engineer for Medtronic in
10  the cardiac rhythm management group, you
11  supported Medtronic implants in research
12  studies by attending the implant, running
13  Medtronic programming during the implant,
14  answering physician questions about the device
15  that was being implanted, reporting the implant
16  to Medtronic, completing device registration
17  paperwork, printing a report for the
18  physician's implant dictation, printing the
19  device settings for the clinic and providing
20  implant paperwork to the research coordinator.
21  Is that correct?
22      A.   Yes.
23      Q.   Anything else?
24          MS. BURKE:  Object to form.
25          THE WITNESS:  I supported

Page 32

CATHLEEN FORNEY

1
2  nonresearch study implants.
3  BY MS. MAYER:
4      Q.   So I think we said earlier that as a
5  tech field engineer, 1996 to 2007,
6  January 2007, your responsibility was to
7  support research.  Is that correct?
8      A.   Correct.
9      Q.   Did you have other responsibilities
10  in addition to supporting research?
11      A.   Yes.
12      Q.   What other responsibilities?
13      A.   Supporting nonresearch ICD implants.
14      Q.   Any other responsibilities?
15      A.   Supporting Medtronic's new product
16  launches.
17      Q.   Any other responsibilities?
18      A.   Educating customers to new products.
19      Q.   Any other responsibilities?
20      A.   Educating Medtronic Central PA
21  district, staff, education to new products.
22      Q.   Any other responsibilities?
23      A.   Support their learning.
24      Q.   Is that different from educating
25  Medtronic Central PA district staff?

Page 33

CATHLEEN FORNEY

1
2      A.   Yes.
3      Q.   What do you mean by "support their
4  learning"?
5      A.   Attend an implant with them.
6      Q.   And by "them," who do you mean?
7      A.   Medtronic staff.
8      Q.   And who is -- who are you referring
9  to when you say "Medtronic staff"?
10      A.   Sales reps and clinical specialists.
11      Q.   In addition to supporting or
12  nonresearch ICD implants, supporting Medtronic
13  new product launches, educating customers to
14  new products, educating Medtronic Central
15  Pennsylvania district staff about new products
16  and supporting their learning by attending
17  implants with the sales reps and clinical
18  specialists and supporting research, did you
19  have any other responsibilities as a technical
20  field engineer?
21      A.   Troubleshoot difficult cases.
22      Q.   Anything else?
23          MS. BURKE:  Object to form.
24          THE WITNESS:  Support customer
25  clinics.

9 (Pages 30 to 33)

Page 34

CATHLEEN FORNEY

1
2  BY MS. MAYER:
3      Q.   Anything else?
4          MS. BURKE:  Object to form.
5          THE WITNESS:  Not that I recall.
6  BY MS. MAYER:
7      Q.   You said you supported nonresearch
8  ICD implants as one of your responsibilities as
9  a tech field engineer.
10     A.   Yes.
11     Q.   When you say you supported these
12 implants, those nonresearch implants, did you
13 do anything different than what you did when
14 you supported Medtronic's new ICD tech implants
15 in research studies?  Or was it essentially the
16 same?
17     A.   The difference is, in research, the
18 product is not commercially available; versus a
19 product being commercially available.
20     Q.   Other than that difference, was the
21 work that you were doing essentially the same?
22     A.   Correct.
23     Q.   I think you said that one of your
24 responsibilities as a tech field engineer was
25 to support customer clinics.  What do you mean

Page 35

CATHLEEN FORNEY

1
2  by "support customer clinics"?
3      A.   Attend a clinic, perform device
4  follow-up.
5      Q.   When you say "attend a clinic," what
6  do you mean by "a clinic?"
7      A.   Every implanting center has a clinic
8  in which they follow the patients with
9  implantable devices.
10     Q.   Is a clinic, in the way in which
11 you're using the word, a place or an event?
12     A.   It's a place where device follow-up
13 patients -- a place where patients with devices
14 are followed.
15     Q.   You said you performed device
16 follow-up.  What do you mean by "perform device
17 follow-up"?
18     A.   Perform device interrogation.
19     Q.   Anything else?
20     A.   Review data.
21     Q.   Anything else?
22     A.   Make recommendations.
23     Q.   Anything else?
24     A.   Document findings.
25     Q.   Anything else?

Page 36

CATHLEEN FORNEY

1
2      A.   Complete clinics' worksheets.
3      Q.   Anything else?
4      A.   Greet the patient.
5      Q.   Anything else?
6      A.   Say good-bye to the patient.  Maybe
7  answer clinic staff questions with unique
8  findings.
9      Q.   So what you mean by performing
10 device follow-up is interrogation of the
11 device, reviewing data, making recommendations.
12 What do you mean by "making recommendations"?
13         MS. BURKE:  Object to form.
14 BY MS. MAYER:
15     Q.   When you said you made
16 recommendations when you performed device
17 follow-up, what did mean by "making
18 recommendations"?
19     A.   When asked, as the sponsor expert in
20 the room, how might best to program the device
21 to the patient, we would make recommendations
22 based upon our knowledge of an algorithm.
23     Q.   And the algorithm that you just
24 referred to, was that a Medtronic algorithm?
25     A.   Correct.

Page 37

CATHLEEN FORNEY

1
2      Q.   And was there more than one
3  algorithm for a device?
4      A.   Yes.
5      Q.   And did different Medtronic devices
6  have different algorithms?
7      A.   Yes.
8      Q.   Were there more than five algorithms
9  that could be used for a device?
10         MS. BURKE:  Object to form.
11         THE WITNESS:  Yeah.
12 BY MS. MAYER:
13     Q.   How many algorithms would typically
14 be available for use with a Medtronic device
15 during this time frame?
16     A.   I don't know.
17     Q.   More than ten?
18         MS. BURKE:  Object to foundation.
19         THE WITNESS:  Probably not.
20 BY MS. MAYER:
21     Q.   So somewhere between five and ten
22 would be a reasonable estimate?
23     A.   Yes.
24     Q.   And why was it important to have
25 knowledge of these five or ten algorithms when

10  (Pages 34 to 37)

Page 38

CATHLEEN FORNEY

1
2  programming a device to the patient?
3      MS. BURKE:  Object to foundation.
4      THE WITNESS:  To understand
5  device/patient interaction.
6  BY MS. MAYER:
7      Q.   What do you mean by "to understand
8  device/patient interaction"?
9      A.   A device is implanted to conduct
10 therapy in a patient; and interpreting device
11 reports to therapy delivery.
12     Q.   So is it fair to say it was
13 important to have knowledge of these five or
14 ten algorithms when programming a device
15 because that information was important into
16 ensuring that the device could provide therapy
17 to the patient?
18     MS. BURKE:  Object to form.
19     THE WITNESS:  To ensure normal
20 device function in a patient.
21 BY MS. MAYER:
22     Q.   So when figuring out how to best
23 program a Medtronic device to the patient at
24 this time, it was important to understand the
25 five to ten different algorithms for that

Page 39

CATHLEEN FORNEY

1
2  device to ensure -- so that the device could be
3  programmed to ensure normal device function in
4  the patient?
5      MS. BURKE:  Object to form.
6      THE WITNESS:  Yes.
7  BY MS. MAYER:
8      Q.   And that was information that you
9  had as a technical field expert; correct?
10     A.   Yes.
11     Q.   So I think we were talking about
12 what you meant by "performing device
13 follow-up"; and we talked about interrogating
14 the device, reviewing data, making
15 recommendations, documenting findings,
16 completing clinic worksheets, saying hello and
17 saying good-bye to a patient and answering
18 clinic or staff questions if unique findings.
19     Was there anything else that you did
20 as performing device follow-up?
21     A.   Not that I recall.
22     Q.   When you said that you "reviewed
23 data," what did you mean by that?
24     A.   Device data.
25     Q.   What was the source of the device

Page 40

CATHLEEN FORNEY

1
2  data?
3      A.   The implantable device.
4      Q.   And how did you get the data from
5  the implantable device?
6      A.   Programmer.
7      Q.   Can you explain what you mean by
8  that, please.
9      A.   So the programmer interrogates the
10 patient's device and prints out a report.
11     MS. BURKE:  Can we take a break when
12 you get to a good time, Kirsten?
13     MS. MAYER:  Sure.  Let me just see
14 if I can close out a few questions on
15 this.
16 BY MS. MAYER:
17     Q.   So when you said that you
18 interrogated the device, you meant you used the
19 programmer to interrogate the device and
20 produce the report?
21     A.   I ran the programmer.
22     Q.   So what you mean by "interrogating a
23 device" is that you run the programmer?
24     A.   If I'm interrogating the device, I'm
25 running a programmer that's interrogating the

Page 41

CATHLEEN FORNEY

1
2  device.
3      Q.   And the programmer produces a
4  report, which is data that you reviewed; is
5  that correct?
6      A.   Correct.
7      Q.   What did your review of the data
8  consist of?
9      A.   Looking for normal device function.
10     Q.   Did it include anything else?
11     A.   Looking for episode information.
12     Q.   Anything else?
13     A.   Conversing with patient.
14     Q.   What do you mean by "conversing with
15 patient" as a part of the review of data?
16     A.   Asking if they were aware of an
17 episode the device recorded.
18     Q.   Anything else?
19     A.   Not that I recall.
20     Q.   So when you reviewed the data that
21 was printed out by the programmer, you looked
22 for normal device function, you looked for
23 episode information, and you would sometimes
24 converse with a patient if you saw an episode?
25     MS. BURKE:  Objection to form.

11 (Pages 38 to 41)

CATHLEEN FORNEY

1
2  THE WITNESS:  Yes.
3  BY MS. MAYER:
4      Q.   Is there anything that you did as a
5  field engineer, a tech field engineer, that we
6  haven't already discussed today?
7      A.   Another detail to follow-up is
8  perform testing manually when device not
9  automated.
10     Q.   What do you mean by "perform testing
11 manually when device not automated"?
12     A.   An example is test a lead threshold.
13     Q.   So -- but could you -- instead of
14 just giving me an example, could you explain,
15 please, what you mean by "perform testing
16 manually when a device is not automated."
17     A.   So conduct a threshold test altering
18 voltage or milliseconds to determine loss of
19 capture or sensing on a lead.
20     Q.   Let me try coming at this a
21 different way.
22         What do you mean by saying that a
23 device is not -- might not be automated?  I
24 think you spoke earlier that you would
25 interrogate a device using a programmer.

CATHLEEN FORNEY

1
2  MS. BURKE:  Object.
3  BY MS. MAYER:
4      Q.   What are you talking about here when
5  you say when a device is not automated, you
6  needed to perform testing manually?
7          MS. BURKE:  Object to form.  Could
8      you read that question back for me,
9      please.
10         (Record read.)
11         MS. BURKE:  Okay.  Object to form.
12         THE WITNESS:  An example of a device
13     algorithm might be to conduct that
14     automatically.  Older devices didn't have
15     that algorithm.
16 BY MS. MAYER:
17     Q.   So when you say "when a device is
18 not automated," what you mean is that there may
19 be newer algorithms that are not programmed
20 into the device that you have to run manually;
21 is that correct?
22     A.   State that again, please.
23     Q.   So I don't want to be trying to be
24 tricky here.  I'm really just trying to
25 understand what you mean by saying that when a

CATHLEEN FORNEY

1
2  device isn't automated, you might perform
3  testing manually.
4          And so I think you've given me an
5  example of a device algorithm that might be
6  conducted automatically but that older devices
7  maybe didn't have the algorithm.
8          And so I don't think -- I don't
9  understand how your answer connects to my
10 question, and so I'm trying to see if I can
11 help make that connection, because I've asked
12 you to explain it and you're not explaining it.
13 So can you explain --
14         MS. BURKE:  What's the question?
15 BY MS. MAYER:
16     Q.   So my question is, when you say that
17 "when a device is not automated," what do you
18 mean by that statement?
19     A.   An older device may not have an auto
20 feature where it conducts the test on its own
21 without a human conducting it.
22     Q.   When did devices stop -- you
23 mentioned these were older devices.  During the
24 time period relevant to this case, which is
25 November 2009 forward, were there devices being

CATHLEEN FORNEY

1
2  used that were not automated for which manual
3  testing might need to be performed?
4      A.   Yes.
5      Q.   Okay.  So I think you were saying
6  that these older devices -- which -- I'm sorry.
7  Strike that.
8          Which devices are you thinking of
9  when you say older devices were not automated
10 and might have required manual testing that
11 were being used after November 2009?
12     A.   I don't recall certain device names
13 with certain features exactly.  But some
14 patients in clinic could have a device
15 implanted ten years prior to the time in
16 question that did not have automated features.
17     Q.   And for such a device, when you say
18 you needed to perform testing manually, what
19 kind of testing do you mean when you made that
20 statement?
21     A.   A lead pacing threshold test would
22 require me to lower either voltage or
23 milliseconds until I visually saw loss of
24 capture with that lead.
25     Q.   And is that just one example of what

12 (Pages 42 to 45)

CATHLEEN FORNEY

1
2  you mean by "performing testing manually"?
3      A.   Yes.
4      Q.   So there's lots of other examples
5  which -- is that fair to say, for these older
6  devices?
7      A.   Not lots.
8      Q.   A handful?  Five?
9      A.   Yeah.
10     Q.   Is that testing that you're talking
11 about what it means to interrogate these older
12 devices, or is it a different type of testing?
13     A.   "Interrogate" means communicate
14 between device and programmer.
15     Q.   So would the manual testing we were
16 talking about be different from interrogating a
17 device?
18     A.   It's part of the device follow-up.
19     Q.   That's different from interrogating
20 the device?
21     A.   Yes.
22     Q.   And would the type of manual testing
23 that needed to be performed when a device
24 wasn't automated be different depending on the
25 type of older device that you're dealing with?

CATHLEEN FORNEY

1
2      A.   Yes.
3      Q.   Is there anything else that you did
4  as a tech field engineer between 1996 and
5  January '07 that we haven't talked about yet
6  this morning?
7      A.   Support district needs.
8      Q.   What do you mean by "support
9  district needs"?
10     A.   A ninth-hour request to, perhaps,
11 see a patient in a hospital environment is an
12 example.
13     Q.   What do you mean by a "ninth-hour
14 request"?
15     A.   We are not aware of it the day
16 before.
17     Q.   So unscheduled?
18     A.   Unscheduled.
19     Q.   Is there anything else that we
20 haven't talked about this morning that you did
21 as a tech field engineer between 1996 and
22 January 2007?
23     A.   Not that I recall.
24          MS. MAYER:  Why don't we take a
25 break.

CATHLEEN FORNEY

1
2          THE VIDEOGRAPHER:  We are going off
3  the record at 10:20.
4          (Recess taken from 10:20 a.m. to
5  10:34 a.m.)
6          THE VIDEOGRAPHER:  We are back on
7  record at 10:34.
8  BY MS. MAYER:
9      Q.   Ms. Forney, in January 2007, your
10 position at Medtronic changed?
11     A.   Correct.
12     Q.   What was your new position?
13     A.   Continuum manager.
14     Q.   And how long did you hold that
15 position at Medtronic?
16     A.   From 2007 until 2009.
17     Q.   Do you know about when in 2009?
18     A.   June 2009.
19     Q.   And was the position of continuum
20 manager a position with the cardiac rhythm
21 management division?
22     A.   Yes.
23     Q.   And just so we clear out the rest of
24 your time at Medtronic, what position did you
25 move to in June of 2009?

CATHLEEN FORNEY

1
2      A.   District service manager.
3      Q.   Also in cardiac rhythm management?
4      A.   Yes.
5      Q.   And did your -- how long were you a
6  district service manager in cardiac rhythm
7  management?  Until when?
8      A.   Until November of 2011.
9      Q.   And what position did you move to in
10 November of 2011?
11     A.   So I moved to the research
12 coordinator position at Lancaster General
13 Hospital in February 2012.
14     Q.   So your role as the district service
15 manager at Medtronic in cardiac rhythm
16 management ended in November 2011?
17     A.   Yes.
18     Q.   And did you hold any other positions
19 at Medtronic after that?
20     A.   No.
21     Q.   So did your employment -- when did
22 your employment terminate with Medtronic?
23     A.   January 2012.
24     Q.   What was your role at Medtronic
25 between November 2011 and January 2012?

Page 50

CATHLEEN FORNEY

1
2       A.   It was a reduction in force.
3       Q.   Were you still working between
4    November 2011 and January 2012?
5       A.   No.
6       Q.   Okay.  So your last day working at
7    Medtronic was at some point in November 2011?
8       A.   Yes.
9       Q.   Was it the beginning of the month or
10   toward the end of the month?
11      A.   I'm thinking --
12      Q.   Before or after Thanksgiving?
13      A.   -- it was before.  Yeah, earlier.
14      Q.   So earlier, first half of the month,
15   approximately.
16           And you didn't work for anyone in
17   between mid-November, roughly, 2011 and when
18   you started the research coordinator position
19   at LGH in February 2012?
20      A.   Correct.
21      Q.   So in your -- let's turn back to
22   January 2007 to June 2009.  I think you said
23   you were a continuum manager?
24      A.   Yes.
25      Q.   What is a -- what was a continuum

Page 51

CATHLEEN FORNEY

1
2    manager?
3       A.   I created -- I collaborated with
4    in-house or corporate Medtronic education
5    department to improve CRM field education,
6    workflow.
7       Q.   Is that everything that you did as a
8    continuum manager?
9       A.   Yes.
10      Q.   Who did -- I'm sorry.  Let me take a
11   step back.  Who did you -- strike that.
12           Who did you coordinate with at
13   in-house corporate Medtronic education during
14   your time as a continuum manager?
15      A.   The education department employees.
16      Q.   Was there one or two people who were
17   your principal collaborators in the education
18   department?
19      A.   I'd say team.
20      Q.   Who was on that team?
21      A.   Mary, Scott, Andrus, Rich, Diane,
22   Kelly.
23      Q.   What was Mary's last name?
24      A.   I can't recall.
25      Q.   Do you recall the last names for

Page 52

CATHLEEN FORNEY

1
2    Scott, Andrew, Rich, Diane or Kelly?
3       A.   Scott Andrus, I think, was his last
4    name.  Kelly Idle.
5           It will come to me.
6       Q.   And that's everybody that you
7    remember from the education department team,
8    Mary, Scott Andrus, Rich, Diane and Kelly Idle?
9       A.   Angie Bents; Diane's last name is
10   Depp.  That's the bulk of them.
11      Q.   Did you interact with anybody else
12   at corporate Medtronic other than the team from
13   the education department while you were
14   continuum manager?
15      A.   Probably.
16      Q.   Would it have just been in passing,
17   or was there anybody else at corporate
18   Medtronic, aside from the education department
19   team, that you worked with regularly on your
20   collaboration to improve CRM field education
21   and workflow?
22      A.   I'd say informally, I'd interface
23   with other departments.
24      Q.   What other departments?
25      A.   Marketing.

Page 53

CATHLEEN FORNEY

1
2       Q.   Was there a principal point of
3    contact for your interface with marketing?
4       A.   Her name was Liz.
5       Q.   Did you informally interface with
6    departments other than marketing?
7       A.   A component of marketing would be
8    branding.
9       Q.   Was Liz your point of contact for
10   that as well?
11      A.   I don't remember.
12      Q.   Any other informal interface with
13   departments at Medtronic corporate?
14      A.   Field -- I'm not sure of the name.
15   They would manage the field communications.
16      Q.   Did you have a primary point of
17   contact for that group within Medtronic
18   corporate?
19      A.   Don O'Hearn was the head.
20      Q.   Is that male, D-O-N, or a woman?
21      A.   Male.  Don O'Hearn was the head of
22   it.  I don't recall a specific person.
23      Q.   What -- was there anyone else that
24   you worked with in CRDM or in cardiac rhythm
25   management, on this collaboration that you were

Page 54

CATHLEEN FORNEY

1
2  doing as a continuum manager?  Or were you
3  really working just with corporate people?
4      A.  Field, technical field engineers.
5      Q.  Any other positions within cardiac
6  rhythm management?  And, you know, if you want
7  to just give me a list of all of the types of
8  positions that you worked with on this
9  collaboration.
10      MS. BURKE:  Object to form.
11      THE WITNESS:  District service
12  managers.
13  BY MS. MAYER:
14      Q.  Is that everyone?
15      A.  Maybe an occasional clinical
16  specialist.
17      Q.  So when you say that, you know, the
18  project was to improve CRM field education and
19  workflow, what does that mean?  Could you
20  explain it, please.
21      A.  I taught devices in the field from
22  an integrative approach versus a siloed
23  approach, siloed product approach.
24      Q.  What do you -- is that everything
25  that your work entailed during this time?

Page 55

CATHLEEN FORNEY

1
2      A.  Educating the field to the new
3  education approach.
4          Another person I worked with was
5  Krista Sandstrom in organizational development.
6      Q.  Is that organizational development
7  within cardiac rhythm?
8      A.  Yes.  And an education consultant,
9  Karen Steinhilber.
10      Q.  Was she outside Medtronic?
11      A.  Yes.
12      Q.  And Liz in marketing and Don O'Hearn
13  in field and the branding folks, that was
14  marketing, branding and managing field
15  communications within CRDM?
16      A.  Yes.
17      Q.  And the education department was the
18  education department, Mary, Scott Andrus,
19  Andrew, Rich, Diane, Kelly, Angie, those were
20  the education department within CRDM; right?
21      A.  Yes.
22      Q.  So you taught devices in the field
23  from what you described as an integrative
24  approach rather than a siloed product approach
25  and educated the field to this new education

Page 56

CATHLEEN FORNEY

1
2  approach.  And that was -- that was your job?
3  That was everything for those two years, 2007
4  to 2009?
5      MS. BURKE:  Object to form.
6      THE WITNESS:  State that again,
7  please.
8  BY MS. MAYER:
9      Q.  So you taught devices in the field,
10  from, you said, an integrative approach, rather
11  than a siloed product approach, and educated
12  the field to the new education approach?
13      A.  I created the program, contributed
14  to the creation of the program that executed
15  those things.
16      Q.  Okay.  Sometimes within a company,
17  if you create a new program, the company puts a
18  brand name on it, for lack of a better word.
19          Did the program that you contributed
20  to creating during this time have a name at
21  Medtronic or within CRDM?
22      A.  I recall a brand picture.  I don't
23  recall the brand verbiage.
24      Q.  Okay.  When you say that you created
25  a program that taught devices in the field from

Page 57

CATHLEEN FORNEY

1
2  an integrative approach rather than a siloed
3  product approach, could you explain what you
4  mean by that, please.
5      MS. BURKE:  Object to form.  I
6  believe her testimony was slightly
7  different than what you just said.  I
8  believe she said she contributed to.
9      THE WITNESS:  Historically, as
10  Medtronic launched its major products,
11  major product types, it was pacemakers,
12  implantable cardiac defibrillators and
13  cardiac resynchronization therapy devices.
14          So training historically was
15  conducted in each of those three silos
16  separately.
17      MS. BURKE:  Is there a question
18  pending?
19  BY MS. MAYER:
20      Q.  Is that your -- are you done
21  answering?
22      A.  I believe so.
23      Q.  Okay.  Sorry, I wasn't sure.
24      A.  Oh.
25      Q.  So what was the integrated approach

15  (Pages 54 to 57)

Page 58

CATHLEEN FORNEY

1
2  that you contributed to creating?
3      A.   Taking the common elements in those
4  three silos and teaching first to the
5  commonness of products, similarity of products.
6      Q.   Who were -- sorry, strike that.
7           What was the -- sorry, strike that.
8           What are some examples of the common
9  elements between pacemakers, ICD devices and
10  cardiac resynchronization therapy devices that
11  you taught first through the program you
12  contributed to creating?
13      A.   An example is each of those products
14  have a lead.
15      Q.   And what were you teaching the field
16  to do with respect to the devices in these
17  education programs?
18      A.   I collaborated on creating materials
19  which was then used to teach the field.
20      Q.   So did you teach the field yourself
21  or just collaborate on the materials used to
22  teach the field?
23      A.   For those materials, I just
24  collaborated on creating them.
25      Q.   And by "those materials," you mean

Page 59

CATHLEEN FORNEY

1
2  materials that -- well, what do you mean by
3  "those materials"?
4      A.   Materials to product education.
5      Q.   Okay.  And so I think you said you
6  taught devices in the field from an integrative
7  approach.
8      A.   When I was in the district as a TFE,
9  I taught an integrative approach.
10      Q.   But as a continuum manager, you did
11  not teach devices in the field?
12      A.   Correct.
13      Q.   Okay.  You developed materials for
14  others -- you contributed to the development of
15  materials for others to use in teaching the
16  field using this integrated approach?
17      A.   Yes.
18      Q.   Okay.  And you said this was, I
19  think, product education?  Is that correct?
20      A.   Yes.
21      Q.   And by "product education," what do
22  you mean?  Is that just, here's what our
23  products are and how they work, or is it
24  something different than that?
25      A.   It's the education a field employee

Page 60

CATHLEEN FORNEY

1
2  must complete to be certified to conduct
3  implants and follow-ups in the field.
4      Q.   And I think we spoke earlier about
5  what it meant to conduct an implant and what it
6  meant to conduct follow-up in the field.  Is
7  that right?
8      A.   Yes.
9      Q.   And you mean the same thing here;
10  correct?
11      A.   Yes.
12      Q.   So what was the education that a
13  field employee was required to complete in
14  order to be certified to conduct implants and
15  follow-up use in the field at the time that you
16  were a continuum manager?
17      A.   Initially it was a course for each
18  of the three products I mentioned prior.
19      Q.   And then?
20      MS. BURKE:  Object to form.
21  BY MS. MAYER:
22      Q.   After -- after it -- at some point
23  did it change from being a course for each of
24  the three products?
25      A.   Yes.

Page 61

CATHLEEN FORNEY

1
2      Q.   And what did it change to?
3      A.   A device function course, an implant
4  course and a follow-up course.
5      Q.   And you were -- you contributed to
6  the creation of the new -- of the content for
7  the new courses?
8      A.   Yes.
9      Q.   What was your role as a contributor
10  to the content of those courses?
11      A.   The integrative approach and the
12  field materials, prestudy -- prestudy
13  materials, learning-support materials.
14      Q.   In the device function course,
15  how -- what was covered in the device function
16  course, the content of the course?
17      A.   Device function, device algorithms,
18  from the perspective of what was common across
19  all three product lines.
20      Q.   Was there anything else that was
21  covered in the device function course?
22      A.   I didn't teach the class.  I'm
23  thinking there was a practicum.
24      Q.   Why do you think there was a
25  practicum?

Page 62

CATHLEEN FORNEY

1
2    A.   Just for hands-on experience.
3    Q.   So in the design -- the device
4  function course for all three categories of
5  devices, the function of the devices was
6  covered and the algorithms from the perspective
7  of what was common across the three product
8  lines, and there was a practicum.
9         Was there instruction in the design
10 function course on, for example, the device
11 algorithms from the perspective of what was not
12 common across all three product reasons?
13   A.   Yes.
14   Q.   And have we covered everything that
15 was covered in the design function course at
16 this point?
17   A.   I assume so.  I didn't teach the
18 class.
19   Q.   Based on your role collaborating
20 with the development of the materials for the
21 class, are you aware of anything in the
22 materials that we haven't covered for the
23 design function course?
24   A.   So the materials I created and
25 contributed to were more of the prework that

Page 63

CATHLEEN FORNEY

1
2  was conducted leading up to the class.
3    Q.   So when you said that your role as a
4  contributor included the field materials, the
5  prestudy materials and the learning supplement
6  materials, the bulk of your work was on the
7  prestudy materials?
8    A.   Yes.
9    Q.   Do you have an understanding about
10 what was covered in the implant course?
11   A.   I can speak to the generalities, as
12 I did not teach the class.
13   Q.   What's your general understanding of
14 what was covered in the content of the implant
15 course?
16   A.   How leads are implanted, testing of
17 leads, device connectology, documentation of
18 case, and there's probably a practicum,
19 practicing.
20   Q.   And do you have a general
21 understanding of the content of the follow-up
22 course?
23   A.   Yes.
24   Q.   And what's your general
25 understanding of the content of the follow-up

Page 64

CATHLEEN FORNEY

1
2  course?
3    A.   Device interrogation, review of
4  data, interpretation of data, troubleshooting
5  data, device programming, probably patient
6  interaction skills.
7    Q.   And does that cover everything that
8  is within your general understanding of the
9  content of the follow-up course?
10   A.   Yes.
11   Q.   And what we just discussed prior to
12 that -- how leads were implanted, testing
13 leads, device connectology, documentation of
14 the case and a practicum -- is that everything
15 that you understand generally was the content
16 of the implant course?
17       MS. BURKE:  Objection to form.  The
18   testimony speaks for itself, and I think
19   you omitted one item.
20       You may answer.
21       THE WITNESS:  After connecting the
22   device, there's also device testing.
23 BY MS. MAYER:
24   Q.   And that covers everything that you
25 generally understand was the content of the

Page 65

CATHLEEN FORNEY

1
2  implant course?
3    A.   Yes.
4    Q.   For the prestudy materials that you
5  were primarily involved in developing, was the
6  content of the prestudy materials for each of
7  the three courses consistent with your
8  understanding of the content of the courses?
9    A.   It also include -- included
10 additional items.
11   Q.   What kind of additional items did
12 the prestudy materials include?
13   A.   A coaching course for district
14 service managers and performance-based
15 activities to guide the new employee to a
16 variety of experiences, to a variety of field
17 experiences.
18   Q.   So the coaching course for DSMs and
19 the performance-based activities for new
20 employees were part of the prestudy materials?
21   A.   Yes.
22   Q.   And other than those two things, the
23 content of the prestudy materials was
24 consistent with your general understanding of
25 the content of the three courses?

17 (Pages 62 to 65)

Page 66

CATHLEEN FORNEY

A.   Yes.
Q.   Have we covered everything that you
did as a continuum manager from January 2007 to
June 2009?
A.   I was involved in teaching the
district service manager courses across the US,
collaborated in teaching those courses.
Q.   What do you mean by "collaborated in
teaching"?
A.   HR also taught components of the
coaching class.
Q.   When you say you taught DSM courses
or collaborated in teaching DSM courses, are
you referring to the coaching class that you
just mentioned?
A.   Yes.
Q.   What was, generally speaking, the
content of the coaching class that you taught
with HR?
A.   Coaching new learners, components
that make a good coach, to encourage learning,
practice coaching with new materials.
Q.   So it sounds like this is a class
for DSMs to teach DSMs how to coach the people

Page 67

CATHLEEN FORNEY

they manage.  Is that fair to say?
A.   Yes.
Q.   So it was focused on how to teach
and mentor rather than how to perform technical
functions on Medtronic products?
A.   How to wrap coaching around the
entire learning process for the new hire in the
field.
Q.   And can you explain for me generally
what you mean by "coaching" in this context?
A.   Engaging the new hire to their
assigned activities versus a learner learning
on their own.
Q.   Is there anything that you did as a
continuum manager between January 2007 and
June 2009 that we haven't talked about yet?
A.   Not that I recall.
Q.   So in June 2009, you became a
district service manager in cardiac rhythm and
management?
A.   I transitioned from that to district
service manager.
Q.   Okay.  Was that a promotion?
A.   I don't know if it was seen as a

Page 68

CATHLEEN FORNEY

promotion.
Q.   Did your compensation increase?
A.   Slight increase.
Q.   What do you mean by "slight,"
approximately?
A.   When you work in corporate, you
don't have bonus structures.  When you work in
the field, you have bonus compensation
structures, which increases salary.
Q.   Other than that difference, was your
compensation the same?
A.   In the ballpark.
Q.   When you moved from the tech field
engineer position to the continuum manager in
January of 2007, did your compensation change?
A.   Yeah, I think it might have even
gone down.
Q.   Why did you take the position as a
continuum manager after being a field engineer
for 12 years?
A.   Growth opportunity.
Q.   What was the growth opportunity with
the lower paycheck?
A.   Impact how learning was done across

Page 69

CATHLEEN FORNEY

all of Medtronic.
Q.   And why did you make the change from
continuum manager to DSM, district service
manager, in June of 2009?
A.   There was a reduction in force, and
the project was done.
Q.   So the continuum manager position
ended?
A.   Uh-huh.
MS. MAYER:  Can you read back her
answer.
(Record read.)
MS. BURKE:  Thank you.
THE WITNESS:  Yes.
BY MS. MAYER:
Q.   I think you said that as a continuum
manager it was more of a corporate position;
correct?
A.   Yes.
Q.   Were you still working out of
Pennsylvania, or did becoming the continuum
manager involve a relocation for you?
A.   I lived in Pennsylvania.
Q.   Was it a remote position, or was

18  (Pages 66 to 69)

Page 70

CATHLEEN FORNEY

there a workplace in Pennsylvania that you were
based out of?

A.   I -- it was a hybrid.

Q.   A hybrid of what and what?

A.   Working out of my home and spending
time in Minneapolis.

Q.   And when you became a district
service manager, was that a district service
manager for a particular geography?

A.   Eastern Pennsylvania.

Q.   Did that require relocation, or were
you able to stay in your same location in
Pennsylvania?

A.   I stayed in my same location in
Pennsylvania.

Q.   During the time that you were
district service manager, is that -- were you a
field employee or --

A.   Yes.

Q.   -- were you a different kind of
employee?  Field employee.  Okay.

What other types of field employees,
during the time you were district service
manager were in the cardiac rhythm unit?

---

Page 71

CATHLEEN FORNEY

A.   Within the district?

Q.   Sure.

A.   A district manager, sales reps,
district service manager, clinical specialist,
technical field engineer.

Q.   What was the difference in role
between, for starters, a clinical specialist
and a technical field engineer?

A.   Clinical specialist provided service
only.  A technical field engineer, I think
their title might have changed to technical
field educator and continued to provide
education and support on new products.

Q.   So at the time that you were a
district service manager, the clinical
specialists provided service only; and the
technical field engineers or educators provided
education and support on new products?

A.   Yes.

Q.   Did clinical -- did both clinical
specialists and the technical field engineers
or educators support implants?

A.   Yes.

Q.   And did both support post-implant

---

Page 72

CATHLEEN FORNEY

follow-up?

A.   Yes.

Q.   Did the position of technical field
engineer or educator -- was it the same role
and responsibilities while you were a DSM as it
had been when you were a technical field
engineer?

A.   Yes.

Q.   And in terms of the clinical
specialist, you said that they provided service
only.  What, other than supporting implants and
providing follow-up to implants, were the
services that clinical specialists provided?

A.   Those were primary ones.

Q.   And what was your role as a district
service manager?

A.   I managed the clinical specialists.

Q.   Did you manage the technical field
engineers or educators?

A.   Informally.

Q.   What do you mean by "informally"?

A.   I think their reporting structure
changed, and they reported to the district
manager.

---

Page 73

CATHLEEN FORNEY

Q.   And did the sales reps report in to
the district manager?

A.   Yes.

Q.   And who did you report in to?

A.   The district manager.

Q.   Who was the district manager when
you became a DSM?

A.   Brian Dye.

Q.   And did your district manager change
during your tenure as the district service
manager, or was it always Brian Dye?

A.   Just Brian Dye.

Q.   How many clinical specialists did
you manage during your time as a DSM?

A.   I'd say six to seven.

Q.   Was that six to seven at one time or
six to seven because clinical specialists came
and went over that two-year period?

A.   At one time.

Q.   And how many technical field
engineers or educators were in your district
during the time that you were a DSM, at one
time in your district?

A.   One.

---

19  (Pages 70 to 73)

CATHLEEN FORNEY

1
2    Q.   Just one?  Okay.
3         And how many sales reps were in your
4    district at one time while you were a DSM?
5    A.   Seven.
6    Q.   Were the same six or seven clinical
7    specialists, clinical specialists during your
8    tenure as a district service manager, or was
9    there a turnover?
10   A.   Can you ask that again, please.
11   Q.   Sure.  I think you said there were
12   six to seven clinical specialists at one time
13   in your district while you were a district
14   service manager; correct?
15   A.   Yes.
16   Q.   Was it the same six to seven people,
17   individuals, during the --
18   A.   Yes.
19   Q.   -- time that you were district
20   service manager?
21   A.   Yes.
22   Q.   Okay.  Who were they?  What are
23   their names, first and last, all of them,
24   please.
25   A.   Dick Conklin, Paul Rafferty, Frank

CATHLEEN FORNEY

1
2    Ammarell, Bobbie Ewing, Beth Coyle, Rachel --
3    her last name started with an S -- and Marla --
4    her last name will come to me -- Lyons.
5    Q.   And who was the -- was it always the
6    same single technical field engineer or
7    educator while you were a DSM?
8    A.   Norm Spotts.
9    Q.   And he was there the whole time that
10   you were a district service manager as the
11   technical field engineer or educator?
12   A.   He became one during my time there.
13   Q.   And was there someone different in
14   that role when you started as the district
15   service manager?
16   A.   I don't think there was.
17   Q.   So maybe you didn't -- so you didn't
18   have a technical field engineer or educator
19   when you first started as a DSM and got Norm
20   along the way?
21   A.   Yes.
22   Q.   Okay.  What were your
23   responsibilities as a district service manager?
24   A.   Managing the clinical specialists.
25   Q.   Was there anything else, or was that

CATHLEEN FORNEY

1
2    the entirety of your responsibility as a
3    district service manager?
4    A.   Support district initiatives.
5    Q.   Is that everything?
6    A.   Filled in clinics as needed, hiring,
7    encouraging learning, supporting corporate
8    initiatives to increase sales.
9    Q.   Is increase sales a separate one, or
10   is that just part of supporting corporate
11   initiatives?
12   A.   Corporate initiatives.
13   Q.   So that's everything?
14   A.   That I can recall.
15   Q.   Okay.  You said "filled in clinics
16   as needed."  Filled in for whom?
17   A.   If no one was available.
18   Q.   And by "no one," do you mean a
19   clinical specialist or someone else?
20   A.   Entire district staff are tied up.
21   Q.   So when you said filled in at a
22   clinic, what type of Medtronic position would
23   you be filling in for?
24        MS. BURKE:  Asked and answered.
25   Object to form.

CATHLEEN FORNEY

1
2        THE WITNESS:  All field employees
3    are trained to the same skill sets.
4        MS. MAYER:  So motion to strike as
5    nonresponsive.
6    BY MS. MAYER:
7    Q.   When you say you're filling in for
8    clinics as needed, what type of employee at
9    Medtronic would you be filling in for?
10       MS. BURKE:  Object.  You may
11   proceed.
12       THE WITNESS:  Any field employee.
13   BY MS. MAYER:
14   Q.   So it could be a sales
15   representative?
16   A.   Uh-huh.
17       MS. BURKE:  Can you read that answer
18   back, please.
19       (Record read.)
20       THE WITNESS:  Yes.
21   BY MS. MAYER:
22   Q.   When you filled in at a clinic for a
23   sales representative when you were a district
24   service manager, what -- did that happen while
25   you were a district service manager, first of

20  (Pages 74 to 77)

Page 78

CATHLEEN FORNEY

1
2 all?
3          MS. BURKE:  Can you read that
4 question to me?
5          (Record read.)
6          THE WITNESS:  Yes.
7 BY MS. MAYER:
8     Q.   How often?
9     A.   I don't know.
10     Q.   More than one?
11     A.   Yes.
12     Q.   More than three times?
13     A.   I filled in as the schedule needed
14 an extra person to accomplish the district
15 work.
16          MS. MAYER:  So objection; move to
17 strike the answer as nonresponsive.
18 BY MS. MAYER:
19     Q.   Did you fill in for sales
20 representative more than three times?
21          MS. BURKE:  Objection.
22          THE WITNESS:  Yes.
23 BY MS. MAYER:
24     Q.   When you filled in -- did you fill
25 in for a sales representative more than 100

Page 79

CATHLEEN FORNEY

1
2 times?
3     A.   Clinical specialists did the
4 majority of device checks.  If they're busy, a
5 sales rep could step in, or I could step in.
6 We stepped in for each other.
7     Q.   So when you filled in at clinics,
8 you were filling in for clinical specialists --
9          MS. BURKE:  Objection.
10 BY MS. MAYER:
11     Q.   -- correct?
12          MS. BURKE:  Object to form.
13          THE WITNESS:  No.
14 BY MS. MAYER:
15     Q.   Did sales reps do device checks --
16 sorry, strike that.
17          Did sales reps do device checks
18 unless -- sorry, strike that.
19          Did sales reps do device checks
20 without doing it to fill in for a clinical
21 specialist?
22     A.   Yes.
23     Q.   So was it part of the role of a
24 sales representatives to do device checks?
25     A.   Yes.

Page 80

CATHLEEN FORNEY

1
2     Q.   And they went -- I think you said
3 all field employees were trained to the same
4 skill sets; correct?
5     A.   Yes.
6     Q.   So they went through the same
7 training and certification process as clinical
8 specialists?
9     A.   Yes.
10     Q.   And when you said "filled in at
11 clinics as needed," were you referring to doing
12 anything at the clinics other than device
13 checks?
14          MS. BURKE:  Objection to form.
15          THE WITNESS:  No.
16 BY MS. MAYER:
17     Q.   You said your responsibilities as a
18 DSM included supporting district initiatives?
19     A.   Yes.
20     Q.   What were the leading district
21 initiatives during your -- that you supported
22 during your time as a DSM?
23     A.   Tracking programmers, using product
24 before expiration, activities as such that
25 corporate would ask us to do.

Page 81

CATHLEEN FORNEY

1
2     Q.   Do you recall any significant
3 district initiatives during your time as a DSM
4 other than the two you've mentioned, tracking
5 programmers and using product before
6 expiration?
7          MS. BURKE:  Object to form;
8 mischaracterizes the record.
9          THE WITNESS:  Using Salesforce as a
10 new calendaring system.
11 BY MS. MAYER:
12     Q.   Any other significant district
13 initiatives that you supported as a DSM?
14     A.   Product management.
15     Q.   What do you mean by "product
16 management"?
17     A.   Carrying only the product needed.
18     Q.   And by "carrying," do you mean
19 physically carrying with you only the product
20 needed?
21     A.   Yes.
22     Q.   Did product management include
23 anything other than making sure that you carry
24 only the product needed?
25     A.   Using product before expire date is

Page 82

CATHLEEN FORNEY

1  a component of that.
2
3      Q.   Okay.  And anything else involved in
4  product management, other than using product
5  before expiration date and making sure you're
6  carrying only product needed?
7      A.   Tracking programmer serial numbers
8  would be a component of that.
9      Q.   All right.  And now have we covered
10 everything that was part of the product
11 management initiative that you supported when
12 you were district?
13     A.   That I can recall.
14     Q.   Okay.  So we have the product
15 management district initiatives and the use of
16 Salesforce as a new calendaring system district
17 initiative.
18          Were there any other significant
19 district initiatives that you supported as a
20 DSM?
21          MS. BURKE:  Object to form.
22          THE WITNESS:  New product sales.
23 BY MS. MAYER:
24     Q.   What was the district initiative for
25 new products sales?

Page 83

CATHLEEN FORNEY

1
2      A.   It would be a corporate initiative
3  that district would execute.
4      Q.   And so when you said that you
5  supported district initiatives and you also
6  supported corporate initiatives to increase
7  sales, is the new product sales a corporate
8  initiative to increase sales that you also
9  supported in your district?
10     A.   Yes.
11     Q.   Okay.  So putting aside corporate
12 initiative to increase sales, have we talked
13 about the district initiatives that you
14 supported as a DSM?
15     A.   We are supported -- I guess
16 corporate initiatives might be customized at a
17 district level.  So I see them as similar but a
18 little bit different.
19     Q.   Okay.  Why don't -- I'm going to
20 turn to corporate initiatives, and we'll talk
21 about whether -- what they were and whether any
22 of them were customized at the district level
23 that we haven't talked about yet.
24     A.   Okay.
25     Q.   So I think you mentioned new product

Page 84

CATHLEEN FORNEY

1
2  sales was a corporate initiative that the
3  district would execute.  What other corporate
4  initiatives did you support as a district
5  service manager?
6      A.   I supported Lean Sigma events.
7      Q.   What other corporate initiatives did
8  you support as a district service manager?  And
9  please tell me what all of them were.
10         MS. BURKE:  Object to form.
11         THE WITNESS:  I completed Lean Sigma
12 training.  I conducted A3s with clinics.
13 That's an example of corporate initiative.
14 BY MS. MAYER:
15     Q.   Okay.  So other than new product
16 sales, supporting Lean Sigma events, completing
17 Lean Sigma training and conducting A3s with
18 clinics, were there other corporate initiatives
19 that you supported as a DSM between June of
20 2009 and November of 2011?
21     A.   Product management.
22     Q.   Any others?
23     A.   I supported a corporate individual
24 that might come to the district to educate or
25 be a resource for the field team or customers.

Page 85

CATHLEEN FORNEY

1
2      Q.   And that's everything in terms of
3  corporate initiatives that you supported as a
4  DSM?
5      A.   That I can recall.
6      Q.   Okay.  In terms of the product
7  management corporate initiatives, is that
8  different from the product management district
9  initiative that we discussed?  Or are they the
10 same initiative that was customized a little
11 bit in your district?
12     A.   Correct.
13     Q.   Okay.  So it was -- the corporate
14 initiatives with respect to project management
15 was focused on carrying the product needed,
16 using product before expiration and tracking
17 programmer serial numbers?
18     A.   Correct.
19     Q.   And you implemented that in your
20 district?
21     A.   Correct.
22     Q.   Okay.  You said you supported a
23 corporate individual that might come to the
24 district.
25          Who was the corporate individual?

22  (Pages 82 to 85)

CATHLEEN FORNEY

1  
2      A.   I don't recall, but it wasn't  
3  unusual to have -- or to invite a corporate  
4  resource to the field so a -- so the field  
5  staff or a customer could learn.  
6      Q.   And during the time that you were  
7  DSM, did corporate individuals come to talk to  
8  the field staff or customers about a particular  
9  topic, or was it just generally that this is a  
10 resource that was available as needed?  
11     MS. BURKE:  Object to form.  
12     THE WITNESS:  It was more the  
13     latter, as needed.  
14 BY MS. MAYER:  
15     Q.   So someone from corporate that  
16 needed to be brought out to talk to the field  
17 staff or a customer about a particular defined  
18 topic?  
19     A.   Yes.  
20     Q.   And that was a corporate initiative  
21 that you supported while you were a DSM?  
22     A.   Yes.  
23     Q.   Do you recall any particular  
24 examples of a corporate individual coming and  
25 educating field staff or a customer on a  

CATHLEEN FORNEY

1  
2  particular topic during your time as a DSM?  
3      A.   A field scientist, Ellen Rubin,  
4  worked with my -- or worked with clinical  
5  specialists on how to read a journal article.  
6      Q.   Do you remember other examples of  
7  bringing a corporate individual into the  
8  district to talk to the field staff or a  
9  customer about a particular topic or issue?  
10     A.   Lean Sigma is an example of that.  
11     Q.   Any other examples?  
12     A.   Not that I can recall at the moment.  
13     Q.   So I think you said you conducted  
14 A3s with clinics as part of a corporate --  
15 providing support to a corporate initiative.  
16 What is -- what is conducting an A3?  
17     A.   An A3 is problem solving -- let me  
18 restate that.  
19         A3 is the Lean approach to problem  
20 solve a problem, a more complex problem.  
21     Q.   Does A3 refer to something in  
22 particular?  
23     A.   It's a Lean Sigma term.  
24     Q.   Does it have a meaning, or is it  
25 just a term?  

CATHLEEN FORNEY

1  
2      A.   It's just a term.  The A3 is the size of  
3  paper, like the A3 is -- that the problem is  
4  documented on.  
5      Q.   When did you complete Lean Sigma  
6  training?  
7      A.   I don't recall.  
8      Q.   Was it in -- close to the end of  
9  your time as a DSM, or was it earlier?  
10     A.   I was working on my second belt at  
11 the time of my leaving.  
12     Q.   Is that a green belt, a yellow belt?  
13     A.   It's a green belt.  
14     Q.   And what's the first belt?  
15     A.   Yellow.  
16     Q.   So did you have to do just one Lean  
17 Sigma training to get a yellow belt, or was it  
18 more than one?  
19     A.   There was -- I believe it was one  
20 for a yellow belt.  
21     Q.   Was it more for a green?  
22     A.   Yes.  
23     Q.   So with your Lean Sigma yellow belt,  
24 you were able to conduct A3s in clinics?  
25     A.   No.  

CATHLEEN FORNEY

1  
2      Q.   Did you need any Lean Sigma training  
3  to conduct A3s with clinics?  
4      A.   Green belt training.  
5      Q.   You needed green belt training.  
6  Okay.  
7         So even though you didn't have your  
8  green belt, you had enough green belt training  
9  by the time you were conducting A3s with  
10 clinics to do the A3s?  
11     A.   You have -- one attends green belt  
12 training, then one -- then one conducts A3s.  
13     Q.   And then once you've attended green  
14 belt training and conduct the A3s, are you then  
15 able to get your green belt?  
16     A.   Yes.  
17     Q.   So had you completed the  
18 requirements for the green belt when you were  
19 terminated from Medtronic, or were you still  
20 working on conducting A3s and fulfilling that  
21 requirement?  
22     A.   It was conducted, just not handed  
23 in.  
24     Q.   Okay.  How many A3s did you need to  
25 conduct for your green belt?

CATHLEEN FORNEY

1
2   A.   One.
3   Q.   How many A3s did you conduct?
4   A.   One.
5   Q.   Which clinic did you do the A3 with?
6   A.   I don't recall.
7   Q.   What -- can you describe to me what
8   you do when you conducted the A3 with the
9   clinic.
10   A.   It was a clinic problem that they're
11   willing to collaborate with Medtronic, or
12   myself as a representative of Medtronic, to
13   help solve.
14   Q.   And so the A3 is just identifying
15   the problem and agreeing to collaborate, or is
16   it more than that?
17   A.   Devising a solution, implementing a
18   solution, measuring the solution.
19   Q.   What was the clinic's problem for
20   the clinic you did the A3 with?
21   A.   I don't recall.
22   Q.   Did the clinic define the problem,
23   or did you define the problem for the clinic?
24   MS. BURKE:  Objection; lack of
25   foundation.

CATHLEEN FORNEY

1
2   THE WITNESS:  The clinic defined the
3   problem.
4   BY MS. MAYER:
5   Q.   And did they come to you for help,
6   or did -- how did it come to your attention
7   that the clinic had this problem?
8   A.   Likely because we served the clinic.
9   Q.   But you don't recall?
10   A.   It might be St. Luke's.  I don't
11   recall specifically.
12   Q.   Do you believe it's St. Luke's, or
13   do you not know?
14   A.   I don't know.
15   Q.   Does the clinic in an A3 devise the
16   solution itself?  How does the -- who
17   devises -- strike that.
18   In an A3 for a clinic, who devises
19   the solution?
20   A.   It's often collaborative.
21   Q.   So the clinic and the Medtronic
22   representative working together?
23   A.   Yes.
24   Q.   And then the clinic implements the
25   solution; correct?

CATHLEEN FORNEY

1
2   A.   Yes.
3   Q.   And the clinic measures the
4   solution?
5   A.   Yes.
6   Q.   Okay.  I think you said A3 is the
7   Lean Sigma approach to problem solving a
8   complex problem.  Can you describe for me what
9   that approach is?
10   A.   It's a standard Lean Sigma approach.
11   Q.   Which is what?
12   A.   You identify the problem, explore
13   solutions, finalize a solution, implement and
14   measure.
15   Q.   So I think you talked about your --
16   you had yellow belt training for Lean Sigma,
17   and you had green belt training for Lean Sigma.
18   Did you do any other Lean Sigma training while
19   you were a DSM?
20   A.   No.
21   Q.   Did you do any other Lean Sigma
22   training while you were employed by Medtronic
23   in any capacity?
24   A.   No.
25   Q.   You conducted the A3 with this one

CATHLEEN FORNEY

1
2   clinic as part of your work on a green belt.
3   Was there any work for a clinic or customer of
4   Medtronic in connection with your getting the
5   yellow belt?
6   MS. BURKE:  Object to form.
7   THE WITNESS:  Yes.
8   BY MS. MAYER:
9   Q.   What was that work?
10   A.   I believe it was helping a clinic
11   become more efficient, supporting the Lean
12   Sigma events in your area.
13   Q.   Were those separate things --
14   helping a clinic become more efficient and
15   supporting a Lean Sigma event in your area --
16   or were they the same thing?
17   A.   Both.
18   Q.   They were both different and the
19   same?  Sorry.  Strike that.
20   Was the Lean Sigma event your
21   providing help to a clinic to become more
22   efficient?
23   A.   Supporting -- ask that again,
24   please.
25   Q.   Sure.  Let me strike that.  Let me

Page 94

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2  start all over again here.
3       I think you said that to get your
4  yellow belt, you helped a clinic become more
5  efficient.
6       A.   Uh-huh.
7       Q.   Okay.  Let's just start there.
8       First of all, what clinic did you
9  help?
10      A.   Reading Hospital.
11      Q.   How did you select Reading Hospital
12  for this project?
13      A.   They had a change in physician
14  staff, and new physicians wanted to run their
15  clinic more efficiently.
16      Q.   And when you say "the new physicians
17  wanted to run the clinic more efficiently,"
18  what did you understand that to mean?
19      A.   Firstly, for them, understanding the
20  practice they walked into, how many patients,
21  and creating consistent workflows, creating
22  consistent follow-up workflows within their
23  clinic.
24      Q.   Okay.  And by "creating consistent
25  workflows and consistent follow-up workflow,"

Page 95

1  CATHLEEN FORNEY
2  what does that mean?
3       A.   So I helped draft worksheets for
4  their clinics.
5       Q.   And what -- was that a worksheet --
6  how did the worksheet that you drafted help
7  create consistent workflow?
8       A.   If one completed the worksheet and
9  all the elements of the worksheet, it created a
10  consistent approach.
11      Q.   A consistent approach to?
12      A.   Device clinic follow-up.
13      Q.   And how would having this consistent
14  approach help make the clinic run more
15  efficiently?
16      A.   If a worksheet was used and all the
17  elements of the worksheet completed by internal
18  staff or field representatives that would come
19  in from manufacturers, their data set at the
20  end of the follow-up would be thorough and
21  complete.
22      Q.   And did Reading identify the
23  problem, or did you identify the problem?
24           MS. BURKE:  Asked and answered.
25           THE WITNESS:  It was identified

Page 96

1  CATHLEEN FORNEY
2  probably with sales reps that had that
3  account, clinical specialists that served
4  the account and the customers in the
5  account.
6  BY MS. MAYER:
7       Q.   And how did you -- let me take a
8  step back.
9       How did you explore solutions with
10  this account?
11      A.   We looked at their Paceart data and
12  probably would have a sense of data that's
13  missing and sat down and explored with
14  physicians and clinic staff.  It's a
15  collaborative approach.
16      Q.   And if data is missing from a clinic
17  day, does the clinic have to bring patients
18  back?  What's the consequence for the clinic if
19  data is missing at the end of a clinic day?
20           MS. BURKE:  Object to foundation.
21           THE WITNESS:  It possibly could mean
22  a patient might come back.  It means when
23  a database report is run that there's
24  blank spots in there.
25  BY MS. MAYER:

Page 97

1  CATHLEEN FORNEY
2       Q.   What's the consequence if there's
3  blank spots in the data?
4       A.   Your analysis of the data isn't
5  accurate.
6       Q.   And if you observe gaps in the data,
7  what's -- what does the physician/practice have
8  to do to address that?
9       A.   There's often nothing they can do.
10      Q.   So why does it improve the
11  efficiency of the clinic to design a process
12  that avoids data gaps?
13      A.   It improves efficiency and accuracy
14  because everyone is doing the same thing in the
15  same way.  Decreased variables.
16      Q.   Are they able to reduce the time
17  spent during the clinics by using the
18  worksheets?
19      A.   Possibly.
20      Q.   So device checks kind of get done
21  faster and more accurately?
22      A.   Conducted more accurately and
23  documented more accurately.  So a worksheet
24  promotes thoroughness, assures something is not
25  missed.

Page 98

CATHLEEN FORNEY

1
2  Q.   How much time did you spend drafting
3  the worksheet?
4     A.   I drafted for numerous clinics.
5     Q.   So for Reading, did you already have
6  a template you could adapt for them?
7     A.   I customized to what customers
8  wanted for their specific clinics.
9     Q.   How many pages is the worksheet?  Is
10 it just one page?
11       MS. BURKE:  Object to form.
12 BY MS. MAYER:
13    Q.   How many pages is the worksheet?
14       MS. BURKE:  Object to form.  Which
15    worksheet, the Reading worksheet?
16       MS. MAYER:  She said she customized
17    worksheets for specific clients.
18       THE WITNESS:  One or two.
19 BY MS. MAYER:
20    Q.   And did you have a form worksheet
21 that you customized, or did you just adapt, or
22 did you do -- follow a different process?
23    A.   A created a form and customized to
24 each account.
25    Q.   And how much time did it take you,

Page 99

CATHLEEN FORNEY

1
2  approximately, to customize your form to one
3  account?
4     A.   I don't recall.
5     Q.   An hour or two or more, do you
6  think?
7     A.   Well, there's conversations with the
8  customer to know how they wanted the sheet,
9  also part of that exploring process.  The
10 actual adjusting the sheet takes an hour or
11 two.
12    Q.   So other than Reading Hospital, what
13 customers do you recall creating a customized
14 worksheet for during your time as a DSM?
15    A.   There were some small accounts in
16 Upstate Pennsylvania.  I believe Honesdale
17 might have been one of those clinics.
18    Q.   Who are some of the others?
19    A.   I supported St. Luke's, Reading.  I
20 don't recall who all I helped with those.
21    Q.   Do you have a sense of how many you
22 helped with these?  Was it -- I think you've
23 listed three.  Was it five?
24    A.   Perhaps three to five.
25    Q.   Three to five.  And this was --

Page 100

CATHLEEN FORNEY

1
2  these three to five clinics that you customized
3  the worksheet for, that was work you did to get
4  your yellow belt?
5     A.   A portion of that would have been
6  for the yellow belt.
7     Q.   How much -- how many of those would
8  have been for the yellow belt?
9     A.   I don't recall.
10    Q.   But you recall doing a couple of
11 these outside the scope of getting the yellow
12 belt?
13    A.   Yes.
14    Q.   I think you said you supported Lean
15 Sigma events.  What did you mean by "Lean Sigma
16 events"?
17    A.   Medtronic sent the Lean Sigma team
18 in to conduct a Lean Sigma event at St. Luke's.
19    Q.   And what was that event?
20    A.   I'd say their Lean Sigma team did a
21 follow-up clinic.  "Event" is what my informal
22 name of it would be.
23    Q.   When you said they did a follow-up
24 clinic, what do you mean by they did -- a --
25 what do you mean by "did"?  Did they analyze

Page 101

CATHLEEN FORNEY

1
2  the clinic?  Did they perform device checks
3  themselves?  Just what do you mean by "did a
4  follow-up clinic"?
5     A.   They did a Lean Sigma event, which
6  included analyzing clinic workflows, making
7  change recommendations.  Metrics would be
8  decided upon.
9        A clinic cleanup happened.  Metrics
10 were collected, and metrics were analyzed and
11 reported back to the customer.
12    Q.   Was this a one-day event, or did it
13 take place over a longer period of time?
14    A.   The team would have come out more
15 than once.
16    Q.   And who was the Lean Sigma team that
17 went to St. Luke's?
18    A.   I don't recall their name.
19    Q.   How many people are on the -- were
20 on the Lean Sigma team that Medtronic sent to
21 St. Luke's?
22    A.   I believe there were two.
23    Q.   Were you a part of the Lean Sigma
24 team that conducted the event at St. Luke's?
25    A.   I supported the event.

26 (Pages 98 to 101)

CATHLEEN FORNEY

Q.  What was your role with respect to this event?

A.  I would just support components of whatever they needed me in, or asked.  So it could be helping with data collection.  I was a part of the clinic cleanup.  I was a part of the brainstorming.

MS. BURKE:  Counsel, can we take a brief break to change tape?  I don't want to have her testifying when the tape is out.

MS. MAYER:  How much time do we have?

THE VIDEOGRAPHER:  About two minutes.

MS. MAYER:  Yeah, we can change the tape.

THE VIDEOGRAPHER:  We are going off the record at 12:12.

(Recess taken from 12:12 p.m. to 12:23 p.m.)

THE VIDEOGRAPHER:  We are back on record at 12:23.

BY MS. MAYER:

CATHLEEN FORNEY

Q.  Ms. Forney, I forgot to ask you earlier today, are you on any medications, or is there any reason why you might not be able to testify truthfully today?

A.  No.

Q.  So, no, not on any medications?
And there's no reason why you wouldn't be able to testify truthfully today; correct?

A.  I'm on medication for my thyroid, but it does not affect my ability to witness truthfully here today.

Q.  And it doesn't affect your memory; correct?

A.  No.

Q.  Thank you.
And there are no other medications that you're on today; correct?

A.  No cold medications.

Q.  No other medications; correct?

A.  Correct.

Q.  The Medtronic Lean Sigma event at St. Luke's, I'm going to just ask a few more questions about that.

CATHLEEN FORNEY

You said you supported the event, but you weren't the team that conducted the event; correct?

A.  Correct.

Q.  So do you know what -- do you have knowledge of what the particular problem was that the team was solving?

A.  An inefficient clinic, and they had change in staff, change in physicians and wanted to run it differently.

Q.  Do you know when this Lean Sigma event happened, roughly?

A.  It was summer months.

Q.  Summer of 2011?

A.  No -- maybe.  I'm guessing '10.

Q.  When you said that the physicians wanted to run St. Luke's differently, what do you mean by that?

A.  Run the device clinic differently.  The Lean Sigma is an objective way to partner with them to find a great way forward.

Q.  But you don't remember specifically how they wanted to run the clinic differently; right?

CATHLEEN FORNEY

A.  I think workflows were just disheveled in general, change of staff, no one to think similarly and wanted to revamp how it was run.

Q.  And did that revamp include doing more remote monitoring?

A.  Increasing remote monitoring for less patients in the clinic.

Q.  And how does remote monitoring reduce the number of patients in the clinic?

A.  Patients' devices are interrogated remotely, and the data is sent overnight to the clinic to be evaluated the next day; versus the patient coming into the office and having staff conduct the interrogation or a Medtronic field representative to conduct the interrogation.

Q.  So if the device is interrogated remotely, a Medtronic field representative isn't interrogating the device anymore; right?

A.  Correct.

Q.  And did your projects for Reading Hospital and St. Luke's and the third clinic that you remember also involve increasing remote monitoring?

CATHLEEN FORNEY

1
2    MS. BURKE:  Object to form.
3    THE WITNESS:  Increased remote
4    monitoring with all devices.  And another
5    corporate initiative just came to mind and
6    that would be, like, heart failure,
7    CareLink.
8  BY MS. MAYER:
9    Q.   And is CareLink a reference to
10 remote monitoring?
11   A.   Yes.
12   Q.   So for -- I think we covered Reading
13 and St. Luke's and the small account in Upstate
14 Pennsylvania.  But let me just ask more
15 generally:  For all of the three to five
16 clinics that you mentioned working with
17 earlier, in addition to creating and providing
18 a worksheet to help with workflows, you also
19 worked with them to increase remote monitoring?
20   MS. BURKE:  Object to form.
21   THE WITNESS:  Yes.
22 BY MS. MAYER:
23   Q.   Which allowed interrogations to be
24 done without a staff person doing it or a
25 Medtronic field rep doing it; correct?

CATHLEEN FORNEY

1
2    A.   Correct.
3    Q.   I want to go back to the training
4  initiatives or the corporate initiatives.  I
5  think you mentioned that one initiative was to
6  use Salesforce.com?
7    A.   Yes.
8    Q.   Was that a district initiative, or
9  was that a corporate initiative?
10   A.   That was a corporate initiative.
11   Q.   What was the initiative to use
12 Salesforce.com?
13   A.   I don't recall corporate's game plan
14 or strategy around it initially.  But
15 ultimately it was clear that district offices
16 were going away, and this was a tool to keep a
17 district connected without a district office.
18   Q.   What do you mean that "ultimately it
19 was clear that district offices were going
20 away"?
21   A.   Medtronic announced that they were
22 closing.
23   Q.   Are these physical brick and mortar
24 offices?
25   A.   Brick and mortar offices across the

CATHLEEN FORNEY

1
2  United States.
3    Q.   Was there a brick and mortar office
4  in your district that was being closed?
5    A.   Yes.
6    Q.   Were there people that were being
7  laid off as a result?
8    A.   We had an admin who was laid off.
9    Q.   Do you know about when this
10 happened?  Was this 2011?
11   A.   April 2011.
12   Q.   And so how was Salesforce going to
13 replace admins in these brick and mortar
14 offices?
15   A.   The admin kept our schedule.  As
16 implants or cases were added on, they would
17 call the admin, and the admin was responsible
18 for finding somebody free to cover it if
19 everyone else was tied up.
20      She was also responsible for sending
21 out the schedule the night before the next day,
22 which was just a reporting mechanism.  She just
23 reported what she was told.
24   Q.   So the way it worked with the admin,
25 she was a central person for physicians and

CATHLEEN FORNEY

1
2  physician offices to reach out to, to say, "I
3  need someone from Medtronic to come out"?
4    A.   Uh-huh.
5    MS. BURKE:  Can you read that answer
6    back, please.
7    (Record read.)
8    THE WITNESS:  Yes.
9  BY MS. MAYER:
10   Q.   So how was Salesforce going to
11 replace the central scheduler?  What was the
12 plan?
13   A.   The schedule could be put on
14 Salesforce.com, which is a web-based
15 application that field staff could have on
16 their phones.
17   Q.   Would there be an admin somewhere at
18 Medtronic who would still receive calls from
19 customers and enter data into Salesforce?  Or
20 how would that work?
21   MS. BURKE:  Object to form.
22   THE WITNESS:  Much of that shifted
23   to the field to do.
24 BY MS. MAYER:
25   Q.   What did that mean for the field

28 (Pages 106 to 109)

CATHLEEN FORNEY

1
2 personnel in terms of what they had to do now
3 for the first time?
4     A.   Added responsibility.
5     Q.   So instead of calling the admin,
6 what would a customer do when they had a need
7 for a Medtronic --
8     A.   They would call --
9     Q.   -- field person?  I'm sorry.
10     A.   They would call their local sales
11 rep or tell the clinical specialists, whoever
12 was in the clinic or the implant arena that
13 day.
14     Q.   Did they -- you said they'd call a
15 sales rep or they'd tell the CS or whoever was
16 in the implant arena that day.
17         Did they use other forms of
18 communication to tell reps or CSs that they
19 needed someone for a device check or an
20 implant?
21     A.   Probably.
22     Q.   Are you aware of any other ways in
23 which customers communicated with sales reps or
24 CSs other than by calling or tell them in
25 person when they were needed?

CATHLEEN FORNEY

1
2     A.   Could be by email.
3     Q.   And Medtronic field representatives
4 had an electronic email account?
5     A.   Yes.
6     Q.   Okay.  So if a customer calls a
7 sales rep or emails a sales rep or a CS and
8 says, you know, "I need to schedule a device
9 check or an implant," what was the next step
10 under Salesforce.com?
11     A.   To enter the data into Salesforce
12 for the day and time and which clinic it was
13 and maybe approximately how many patients.
14     Q.   And then was it the responsibility
15 of the CS or the sales rep who had taken the
16 call to find someone to cover that, or did they
17 cover it themselves?  How did that work?
18     A.   The night before, sales reps would
19 divide -- decide how to divide the workload the
20 next day and communicate that to their team.
21     Q.   Did this transition from the admin
22 holding that responsibility to the
23 Salesforce -- the field sales organization
24 having to do it themselves go smoothly in your
25 district?

CATHLEEN FORNEY

1
2     A.   No.
3     Q.   What happened?
4     A.   They were not a fan of Salesforce as
5 a tool; and they shifted calendaring system to
6 Google Calendars.
7     Q.   Do you know whose idea it was to try
8 Google Calendar?
9         MS. BURKE:  Object to form.
10         THE WITNESS:  It's my understanding
11     it was sales reps within my district, and
12     also other divisions of Medtronic had gone
13     that way.
14 BY MS. MAYER:
15     Q.   When you say your understanding is
16 that there were reps within your district that
17 tried Google Calendar, how did you learn that
18 reps within your district were using Google
19 Calendar?
20     A.   Initially, my clinical specialists
21 told me, but I could also see there was a lack
22 of the schedule on Salesforce.
23     Q.   How did it come to your attention
24 that other districts at Medtronic were also
25 potentially using Google Calendar?

CATHLEEN FORNEY

1
2         MS. BURKE:  Object to form.
3         THE WITNESS:  Brian Dye told me that
4     AF Solutions was using it.  And Thacher
5     Paine told me that he heard that other
6     districts were also transitioning to it.
7 BY MS. MAYER:
8     Q.   Did he tell you what districts he
9 had heard were transitioning to it?
10     A.   No.
11     Q.   And AF Solutions, is that part of
12 cardiac rhythm disease management, or is that a
13 different part of Medtronic?
14     A.   I don't know.
15     Q.   Do you know what AF Solutions is?
16     A.   AF Solutions is the -- it's either
17 under CRM or it's a different component of
18 Medtronic that deals with all their AF products
19 and ablation, catheters, and that -- that sales
20 organization was separate from ours.
21     Q.   Okay.  What did you do -- did you
22 hear first from your CSs that reps within the
23 district were using Google Calendar, or did you
24 hear it first from Brian Dye or Thacher Paine?
25     A.   I don't recall exactly who I learned

CATHLEEN FORNEY

1
2  it from first, but I heard it.
3      Q.   And was this after April 2011?
4      A.   Yes.
5      Q.   And what did you do when you heard
6  it, that reps in your district were using
7  Google Calendar?
8      A.   So I inquired with Brian.
9      Q.   What did you say to him in that
10  conversation?
11     A.   We had been a part of the Salesforce
12  pilot from November of 2010, which was
13  continuing.  We were an early district that
14  onboarded to it.  And so the question was,
15  "What's not working?"
16     Q.   And what was the substance of his
17  response?
18     A.   The sales reps didn't like the
19  web-based approach; and it was also more
20  helpful for some of the sales rep's wives to be
21  able to see their spouses' schedules.
22     Q.   And so what did you do after this
23  discussion with Brian Dye?
24     A.   I talked to him about the lack of
25  HIPAA security around it.

CATHLEEN FORNEY

1
2      Q.   And what was his response?
3      A.   He wasn't concerned.
4      Q.   What was your concern with respect
5  to HIPAA?
6      A.   Medtronic did not have a contract
7  with Google.  They were just setting up patient
8  information on the Google Calendaring system.
9  I had a clinical specialist that was asked to
10  create portals for customers to place their own
11  patient information out there and to contact
12  the district through Gmail that's associated
13  with Google, with their needs.
14          So there was email and calendaring
15  system that was combined together, which
16  certainly made it easier for staff in the field
17  that's busy doing cases all day and follow-ups
18  and to manage communications.
19     Q.   So it's easier for the field, but
20  you had concerns that this violated HIPAA; is
21  that fair to say?
22     A.   Yes.
23     Q.   And I think you said Brian didn't
24  share your concerns?
25     A.   No.

CATHLEEN FORNEY

1
2      Q.   Did you explain the HIPAA issue to
3  him when you talked to him?
4      A.   I explained the issue.  I recall him
5  telling me not to be a martyr and to get
6  onboard with the rest of the district.
7      Q.   And did you drop the issue at that
8  point, or did you take it to someone else?
9      A.   So I had been in conversation with
10  IT just to confirm my concerns that they were
11  not unfounded, that they were actually
12  corporate concerns.  And I had conversations
13  with Rui Gregorio, who was IT compliance.
14     Q.   How did you know to reach out to IT
15  on this issue?
16     A.   I think that's probably just a
17  common exploration.  If you're not sure, you
18  reach out and ask questions.
19     Q.   And you spoke with IT both for the
20  technical questions and also IT compliance?
21     A.   Yes.
22     Q.   Why did you talk to IT compliance?
23     A.   So I don't know if it's -- I don't
24  recall the titles of some of the individuals I
25  talked to, so I don't know if it's IT

CATHLEEN FORNEY

1
2  compliance or if it's just compliance.
3          But when Rui Gregorio shared with me
4  that he called Tom Lynn, a sales rep, and Tom
5  Lynn was very specific with him on how it was
6  being used and the value that it added, and I
7  recall Rui reaching out to me after our initial
8  conversation and confirming that it was
9  inappropriate use.
10     Q.   Did you follow up with Brian Dye
11  after these conversations?
12     A.   Yes.
13     Q.   And what was -- what did you -- what
14  was the subject of that conversation?
15     A.   I want to say Brian's conversations
16  with me really became minimal in the fall of --
17  you know, August 2011.  I don't know if he
18  responded to me.
19     Q.   When he had told you in the earlier
20  conversation not to be a martyr and to get
21  onboard with the rest of the district, did you
22  have an understanding about what he was trying
23  to convey to you?
24     A.   I interpreted that I should not get
25  in the way and be a part of the Google

30 (Pages 114 to 117)

CATHLEEN FORNEY

1
2   Calendaring system that was being built out.
3   So my name was added to the team on the Google
4   Calendaring system so I could see what was
5   going on.
6       Q.   And you followed up on that by
7   talking with IT and ultimately the conversation
8   with IT compliance or compliance?
9       A.   Yes.  So Rui Gregorio reached out to
10  my district and to -- I believe it would have
11  been Jim Vogl, who was the corporate contact
12  for the field; and Tom McSteen, who was a
13  lawyer that was probably CRM compliance, my
14  guess is.  And they had a phone call with Brian
15  and myself and asked that it be stopped.
16          And Rui also shared with me that he
17  reached out to the RVP at the time in
18  Medtronic -- I don't recall his name -- during
19  that time frame.
20      Q.   And did the use of Google Calendar
21  stop at that point?
22      A.   It did not.
23      Q.   How did you learn that it hadn't
24  stopped?
25      A.   One could go in and look at the

CATHLEEN FORNEY

1
2   calendar being populated every day.
3       Q.   And you were still on the
4   communication list for Google Calendar?
5       A.   Yes.
6       Q.   Did you -- did you do anything when
7   you saw that it was still going on?
8       A.   I want to say that Rui had stayed in
9   touch with me along the way, and he encouraged
10  me to call corporate Medtronic's compliance hot
11  number.
12      Q.   And did you call the -- is that the
13  Voice Your Concern hotline?
14      A.   Yes.
15      Q.   Did you call Voice Your Concern?
16      A.   I called Voice Your Concern.
17      Q.   And was there a response?
18      A.   Not to me personally.
19      Q.   Was it -- did you identify yourself
20  on the call, or was it an anonymous call?
21      A.   Anonymous call.
22      Q.   Okay.
23          MS. BURKE:  How much longer before
24  the lunch break?
25          MS. MAYER:  It's 12:51.  I just want

CATHLEEN FORNEY

1
2   to --
3           MS. BURKE:  No, I'm just getting a
4   sense of how much longer are we going
5   before lunch?  My stomach is starting to
6   growl.
7           MS. MAYER:  Well, I'd like to finish
8   this topic.  So we're at 12:51.  I don't
9   think it's going to be --
10          MS. BURKE:  Another half hour?
11          MS. MAYER:  Something like that.
12          MS. BURKE:  Okay.
13  BY MS. MAYER:
14      Q.   So after you made the anonymous call
15  to Voice Your Concern hotline, did the use of
16  Google Calendar stop?
17      A.   No.
18      Q.   What did you do at that point?
19      A.   I know Tom McSteen was also in
20  contact with me.  I asked him if he wanted to
21  see evidence of it, like pictures; and he
22  stated, no.  He stated that he would reach out
23  to Brian again.
24      Q.   When he said "no," did you take him
25  to be saying, "No, I'm not interested in your

CATHLEEN FORNEY

1
2   evidence," or something different?
3       A.   I interpreted it as, no, he didn't
4   want pictures, that he just trusted my words,
5   that it was still ongoing.
6       Q.   And do you know whether he had a
7   conversation with Brian Dye?
8       A.   He did.
9       Q.   And did the use of Google Calendar
10  stop after that?
11      A.   No.
12      Q.   And what did you do at that point?
13      A.   I believe I was laid off the next
14  day.
15      Q.   You've alleged in this case that you
16  believe you were terminated because you raised
17  questions about the Google Calendars.  Why do
18  you believe that you were terminated because
19  you raised questions about Google Calendars?
20      A.   District managers are given a lot of
21  freedom to conduct their business how they
22  want; and this was causing a clear divide in my
23  district because I was encouraging clinical
24  specialists not to participate, and they were
25  being asked to develop -- help build it out.

Page 122

CATHLEEN FORNEY

1
2    And if they chose that to be a
3    primary tool to facilitate their business, and
4    I was getting in the way of them getting their
5    business done, their follow-ups done, their
6    implants done, then I'm a barrier.
7        And I also believe that to be true
8    because Tom McSteen told me I was being
9    retaliated against.
10    Q.   Did he say by whom?
11    A.   I think he probably stated Brian
12    Dye.
13    Q.   Were you given a reason for why you
14    were terminated when you were terminated?
15    A.   Reduction in force.
16    Q.   Was there a reduction in force at
17    that time?
18    A.   I believe there was under 50 people
19    across the field that was let go.
20    Q.   Was there anyone else in your
21    district that was let go?
22    A.   One clinical specialist.
23    Q.   Did someone replace you in your
24    position as a DSM?
25    A.   Yes.

Page 123

CATHLEEN FORNEY

1
2    Q.   Who is that?
3    A.   Mike Jones.
4    Q.   Is he a DSM over the same territory
5    that you had?
6    A.   Yes.
7    Q.   Does he have other territories as
8    well?
9    A.   Since that time there's been
10    consolidation of districts, so he now manages
11    two districts, what would have been two
12    districts in 2011.
13    Q.   And when did that consolidation
14    happen?
15    A.   I don't recall.
16    Q.   After you left?
17    A.   Yes.
18    Q.   Was he a DSM in another district
19    before he took -- became a DSM after you were
20    terminated, for your Pennsylvania district?
21    A.   Yes.  He was a DSM in Central PA.
22    Q.   So did somebody else become a DSM in
23    Central PA, or was that position terminated?
24    A.   He -- he took over both districts.
25    Q.   So when you were terminated, he

Page 124

CATHLEEN FORNEY

1
2    stayed DSM of Central Pennsylvania and took
3    over your district?
4    A.   Correct.
5    Q.   And later at some point those two
6    districts were consolidated, or maybe even --
7    A.   My understanding is.
8    Q.   Your understanding, because you
9    weren't there anymore?
10    A.   Right.
11    Q.   Got it.
12        So in this case, your -- it includes
13    a number of allegations, one of which is that
14    performing device checks, that having Medtronic
15    perform device checks, is a felony, is a --
16    criminal kickback violation; is that correct?
17    A.   Correct.
18        MS. BURKE:  Kirsten, if we're going
19    to move to a new topic, can we have a
20    lunch break?
21        MS. MAYER:  No, I'd like to finish
22    this out quickly.
23        MS. BURKE:  This isn't the same
24    topic, and we've been going since 9:00.
25    It's 1:00.

Page 125

CATHLEEN FORNEY

1
2        MS. MAYER:  We've had a couple of
3    breaks, Susan.  I'd like to finish this
4    topic.
5        MS. BURKE:  You want to finish the
6    entire topic of kickbacks before lunch?
7        MS. MAYER:  I'm going to -- I
8    estimated 15 minutes ago we'd give a half
9    hour to lunch.  I'm going to go to lunch.
10        MS. BURKE:  To 1:30?
11        MS. MAYER:  Yes, and I don't
12    appreciate you're objecting and asking for
13    a break while a question is pending.
14        MS. BURKE:  No, a question was not
15    pending.  I waited until an answer had
16    been given.
17        I'm getting tired and hungry.  I
18    would like to have a lunch break.  I think
19    a 1:00 lunch break is pretty standard, and
20    it appears you're going into a new topic.
21    You had previously said you just wanted
22    to --
23        MS. MAYER:  Susan, I've given you my
24    answer.  We're going.
25        MS. BURKE:  I object to not

32 (Pages 122 to 125)

CATHLEEN FORNEY

1
2    permitting the witness and her counsel to
3    have a lunch break at 1 o'clock.
4    BY MS. MAYER:
5        Q.   So in this case you've alleged that
6    when Medtronic performs a device check, they're
7    providing a kickback that violates a felony
8    federal law; correct?
9        A.   Correct.
10       Q.   And yet you yourself -- sorry,
11   strike that.
12           When was the first time you came to
13   believe that performing -- that having
14   Medtronic perform a device check was a
15   violation of law?
16       A.   It was a process.
17       Q.   When was the first time that you
18   came to the understanding that it was a
19   violation of law for Medtronic to provide a
20   device check?
21           MS. BURKE:  Objection; asked and
22   answered.
23           THE WITNESS:  After I left Medtronic
24   and took time to uncouple from 17 years --
25   almost 17 years of working for a company

CATHLEEN FORNEY

1
2    that I embarrassingly trusted everything
3    they told me to be accurate and
4    appropriate.  And I was able to step back
5    and not be in the weeds of day-to-day
6    exhausting work but look 30,000 feet and
7    see all the mutually dependent activities
8    that I had asked -- been asked to perform
9    or to be trained on so that I could serve
10   customers at a very high, engaged,
11   personal level; and experienced the
12   Medtronic compliance system not work and
13   that districts are given the freedom to
14   conduct business however they want to be
15   successful, I realized that the company I
16   worked for and the work that I performed,
17   that there was a large component that was
18   inappropriate and all conducted ultimately
19   to influence and to secure that
20   quarter's -- as Dave Roberts would say,
21   "the most important quarter ever," the
22   implant numbers that were required of us,
23   and relationships and service helped to
24   sustain business in a changing world.
25   BY MS. MAYER:

CATHLEEN FORNEY

1
2        Q.   So was it also after you left
3    Medtronic that you came to believe that
4    providing support for implants was also a
5    felony kickback violation and illegal through
6    this process that you've just described?
7        A.   There are some implant procedures
8    that are extremely mature, over 50 years where
9    things have not changed, and the technical
10   expertise to conduct them is not what we
11   provide.  It's just helping them belabor to get
12   their job done.
13           Occasionally there are new products
14   that come out that requires extra, additional
15   skill sets, that the FDA states when a
16   physician might have to do so many implants and
17   then they're signed off, but then they should
18   be technically competent; and it's a rare case
19   that technical expertise is needed to support a
20   successful implant with an experienced implant.
21           MS. MAYER:  Motion to strike the
22   answer as nonresponsive.
23   BY MS. MAYER:
24       Q.   My question was:  It was after you
25   left Medtronic --

CATHLEEN FORNEY

1
2           MS. BURKE:  Kirsten --
3    BY MS. MAYER:
4        Q.   -- that you went through this
5    process that you've described for us that you
6    came to understand in your mind that supporting
7    implants was illegal; correct?
8           MS. BURKE:  Kirsten, you cannot move
9    to strike an answer.  You're being
10   argumentative.  We object to you using --
11   even using that term, "motion to strike,"
12   to convey your dissatisfaction with the
13   answer.
14           And she's already answered the
15   question that you gave.
16           MS. MAYER:  No more speaking
17   objections.
18           MS. BURKE:  Then no more motions to
19   strike.
20           MS. MAYER:  Susan.
21   BY MS. MAYER:
22       Q.   Can you -- do you remember the
23   question?
24       A.   Correct.
25       Q.   Correct?  And it was after you left

Page 130

CATHLEEN FORNEY

1
2  Medtronic and went through this process that
3  you've discussed that you came to have the
4  understanding that you now have, that providing
5  Lean Sigma advice was also illegal; correct?
6      A.   Correct.
7      Q.   And the other conduct that you
8  allege in your complaint, in your First Amended
9  Complaint and your Second Amended Complaint in
10 this case, that you allege was illegal, you
11 came to understand that the conduct was illegal
12 in your mind all after you left Medtronic;
13 correct?
14     A.   After I uncoupled from Medtronic;
15 correct.
16     Q.   Which was after you left Medtronic?
17     A.   Correct.
18         MS. MAYER:  We can take a lunch
19 break now.
20         MS. BURKE:  Hour?
21         THE VIDEOGRAPHER:  We are going off
22 the record at 1:07.
23         (Luncheon recess taken from 1:07
24 p.m. to 2:21 p.m.)
25

Page 131

CATHLEEN FORNEY

1
2      THE VIDEOGRAPHER:  We are back on
3  record at 2:21.
4  BY MS. MAYER:
5      Q.   Ms. Forney, did you talk to your
6  attorney, Ms. Burke, over lunch about the
7  deposition today?
8      A.   No.
9      Q.   Did you talk to her about the
10 substance of your testimony at all?
11     A.   No.
12     Q.   Did you talk to her about testimony
13 you might give in the afternoon?
14     A.   No.
15     Q.   Or anything related to the case?
16     A.   No.
17     Q.   Ms. Forney, what did you do to
18 prepare for today's deposition?
19     A.   I reviewed my notes from -- that I
20 took along the way at Medtronic.  I reread my
21 CV to try to remember dates.  I sort of
22 mentally went through the list of people I used
23 to work with; and I did remember Mary's last
24 name is Erickson.  And reviewed some documents.
25     Q.   Did you review any deposition

Page 132

CATHLEEN FORNEY

1
2  transcripts or in preparation for today?
3      A.   I did review some deposition
4  transcripts.
5      Q.   Which deposition transcripts did you
6  review?
7      A.   Dave Roberts.  And I forget the name
8  of the compliance person.
9      Q.   Did you review any documents that
10 haven't been produced to Medtronic in this
11 case?
12     A.   Ask that again, please.
13     Q.   Did you review any documents that
14 have not been produced to Medtronic in this
15 case?
16     A.   No.
17     Q.   You said you reviewed your notes
18 that you took along the way at Medtronic.
19     A.   Just some items I had jotted down.
20     Q.   During your time at Medtronic or
21 since you left?
22     A.   There might have been a portion of
23 it that was before I left but mostly after I
24 left.
25     Q.   Have those notes been produced to

Page 133

CATHLEEN FORNEY

1
2  Medtronic?
3      A.   I don't know.
4         MS. MAYER:  Susan, do you know?
5         MS. BURKE:  I don't know exactly
6  what she's referring to.  I know there
7  were some attorney-client privileged notes
8  that weren't produced, so the only thing
9  that's been withheld is something that's
10 privileged.
11         I'm not sure -- I'm not sure what
12 she's referring to, whether it's the same
13 notes or different notes.
14 BY MS. MAYER:
15     Q.   Are the notes that you're referring
16 to notes that you've previous provided to
17 Ms. Burke?
18     A.   They're personal notes.
19     Q.   So not previously provided to
20 Ms. Burke?
21     A.   Not previously provided.
22     Q.   Were those notes reflecting
23 communications with Ms. Burke?
24     A.   No.
25     Q.   Were they prepared at Ms. Burke's

34 (Pages 130 to 133)

CATHLEEN FORNEY

1 
2 request?
3     A.   No.
4     Q.   Do you have them with you today?
5     A.   No.
6          MS. MAYER:  We can talk about them
7     offline at another time.
8 BY MS. MAYER:
9     Q.   Has any of your testimony today been
10 refreshed by your review of those notes, so
11 far?
12     A.   Ask that again, please.
13     Q.   Has any of your testimony today been
14 based, in part or in whole, on your review of
15 those notes?
16     A.   No.
17     Q.   Did you meet with your counsel in
18 preparation for today's deposition?
19     A.   Yes.
20     Q.   For how long?
21     A.   Maybe three hours.
22     Q.   I wanted to ask you a couple
23 questions about some individuals that have been
24 identified as witnesses in this case.
25          Are you familiar with someone named

CATHLEEN FORNEY

1 
2 Beth Coyle?
3     A.   I am, yes.
4     Q.   How do you know Beth Coyle?
5     A.   Beth Coyle is a clinical specialist
6 who reported in to me.
7     Q.   Have you spoken with Beth Coyle
8 about this case?
9     A.   Yes.
10     Q.   When did you first speak with Beth
11 Coyle about this case?
12     A.   Perhaps about 18 months ago.
13     Q.   And why did you reach out to her 18
14 months ago about this case?
15     A.   I asked if I could put her name on a
16 witness list.
17     Q.   And what did she say?
18     A.   She said she'd consider it.
19     Q.   What information do you believe she
20 has that is relevant to the case?
21          MS. BURKE:  And I would simply
22     caution the witness not to reveal
23     attorney-client communications.
24 BY MS. MAYER:
25     A.   Beth has worked inside of industry

CATHLEEN FORNEY

1 
2 and has experience performing responsibilities
3 asked of her as an employee of a district.
4     Q.   Have you had conversations with Beth
5 about what she might -- what information she
6 might have that would be relevant to the case
7 yourself personally?
8     A.   No.
9     Q.   So 18 months ago you first reached
10 out to Beth Coyle, and she said she might be
11 willing to participate; is that right?
12     A.   She would consider it.
13     Q.   Okay.  At some point did you have a
14 subsequent conversation with Beth Coyle about
15 this case?
16     A.   I would say yes.
17     Q.   When was your next conversation with
18 Beth Coyle about this case?
19     A.   Last summer.
20     Q.   And what was the substance of that
21 conversation?
22     A.   Telling her that it was moving
23 forward and asking again if she would consider
24 being a witness.
25     Q.   What did she say?

CATHLEEN FORNEY

1 
2     A.   And I don't recall if I got an
3 affirmative yes, but she would be open to Susan
4 Burke calling her.
5     Q.   And did you have any -- a subsequent
6 conversation with Beth Coyle about her
7 participation in the case?
8     A.   No.
9     Q.   And have you talked to Beth Coyle
10 since last summer?
11     A.   I talked to Beth Coyle on a job
12 interview question she had for me, and that was
13 all.
14     Q.   Is Beth Coyle still with Medtronic?
15     A.   No.
16     Q.   Where -- when did she leave
17 Medtronic?
18     A.   I believe she left in 2012.
19     Q.   And do you know where she's worked
20 since she left Medtronic?
21     A.   No.  I don't know every place she's
22 worked.  Most recently she had worked at
23 Hahnemann Hospital.
24     Q.   Do you know Doug Willwerth?
25     A.   Yes.

CATHLEEN FORNEY

1
2    Q.    Who is Doug Willwerth?
3    A.    He's a clinical specialist that I
4    worked with when I was a technical field
5    engineer.
6    Q.    So in 1996 to 2007 he was a clinical
7    specialist that you worked with?
8    A.    Yes.
9    Q.    When you were a DSM between
10   June 2009 and November of 2011, was he still a
11   clinical specialist?
12   A.    He was still a clinical specialist
13   inside Medtronic.
14   Q.    Did he work in a different place or
15   a different capacity than when you had
16   previously worked with him?
17   A.    He worked in the same district, but
18   I worked in a different district.  So he did
19   not work underneath me.
20   Q.    When's the first time you spoke with
21   him about this case?
22   A.    About 18 months ago.
23   Q.    And what was the substance of that
24   conversation?
25   A.    If he would consider being open to

CATHLEEN FORNEY

1
2    Susan Burke talking to him and if he would
3    consider being a witness.
4    Q.    And what did he say at that time?
5    A.    I think he was open to Susan having
6    a conversation with him.
7    Q.    And did you speak with him again
8    about the case?
9    A.    No.
10   Q.    And does he still work at Medtronic?
11   A.    No.
12   Q.    When did he leave?
13   A.    I don't know.
14   Q.    Why did you think Beth Coyle or Doug
15   Willwerth might be interested in helping you
16   with this case?
17   A.    I approached people that were
18   outside of Medtronic and didn't have to
19   jeopardize their position or current role with
20   Medtronic.
21   Q.    Who -- do you know somebody named
22   Chris Taylor?
23   A.    Yes.
24   Q.    Who is Chris Taylor?
25   A.    Chris Taylor is a former TFE and

CATHLEEN FORNEY

1
2    sales rep.
3    Q.    How do you know him?
4    A.    I trained him as a TFE.
5    Q.    And when's the first time you spoke
6    with him about participating in this case?
7    A.    About 18 months ago.
8    Q.    And what was the substance of that
9    conversation?
10   A.    If he would be open to having a
11   conversation with Susan Burke and consider
12   being a witness.
13   Q.    And what was his response?
14   A.    He would be open to the
15   conversation.
16   Q.    Did you speak with him again after
17   that point about this case?
18   A.    Yes.
19   Q.    When was that, the next time?
20   A.    I spoke to him last -- about a year
21   ago.
22   Q.    And what was the substance of that
23   conversation?
24   A.    I'm -- I don't recall the details.
25   Q.    Do you recall generally what was the

CATHLEEN FORNEY

1
2    substance of the conversation?
3    MS. BURKE:  I'm going to just
4    caution the witness not to reveal any
5    attorney-client communications.
6    MS. MAYER:  In her conversation with
7    Chris Taylor?  What would be the
8    attorney-client?
9    MS. BURKE:  He's a client as well,
10   so if I was on the line, that would be an
11   attorney-client communication.
12   MS. MAYER:  Was he a client 12
13   months ago of yours?
14   MS. BURKE:  I have to check my
15   records as to when he first became a
16   client.
17   BY MS. MAYER:
18   Q.    You may answer the question.
19   A.    I don't recall the details.
20   Q.    Do you recall generally what the
21   substance of the conversation was?
22   A.    I probably shared the case was going
23   before the Department of Justice and asked him
24   if he would be open to conversation.
25   Q.    With who?

CATHLEEN FORNEY

1
2      A.   Susan Burke.
3      Q.   And what was his response?
4      A.   He would be open to Susan calling if
5   she -- if she did.
6      Q.   Okay.  And did you speak with him
7   again about this case?
8      A.   I spoke to him again this summer.
9      Q.   What was the substance of that
10  conversation?
11     A.   I don't recall the details.
12     Q.   What was the substance generally?
13     A.   I'm thinking it was the summer; I
14  don't know exactly.  But I asked him if he
15  would consider Susan calling and being involved
16  in the case.
17     Q.   And what was his response?
18     A.   He would be open to Susan calling.
19     Q.   And did you have a subsequent
20  conversation with Chris Taylor about this case?
21     A.   I had a conversation on Sunday with
22  him.
23     Q.   Sunday, less than a week ago?
24     A.   Of this week.
25     Q.   Two days ago?

CATHLEEN FORNEY

1
2      A.   Yes.
3      Q.   And what was the substance of that
4   conversation?
5      A.   I think just conversing about how we
6   remembered our jobs in the field during the
7   time frame that we've been discussing.
8      Q.   And was Chris Taylor employed by
9   Medtronic during the time frame that's at issue
10  in this case, November 2009 through -- you
11  know, ongoing forward?
12     A.   He left Medtronic.  I don't recall
13  when he left.
14     Q.   During that time period or prior?
15     A.   I'm thinking it was 2009.
16     Q.   So he was -- was he a sales rep or a
17  TFE when he left Medtronic in 2009?
18     A.   He took a corporate job inside of
19  Medtronic and was a director in education.
20     Q.   When did he -- during what time
21  period did he hold that job?
22     A.   I don't know.
23     Q.   But he was in that job when he left
24  Medtronic?
25     A.   Yes.

CATHLEEN FORNEY

1
2      Q.   Do you know whether he held any
3   other jobs within Medtronic other than a
4   form -- being a TFE, a sales rep and the
5   director of education in corporate?
6      A.   I don't know.
7      Q.   And that corporate job, that was in
8   Minneapolis or somewhere else?
9      A.   It was based in Minneapolis.
10     Q.   Do you know someone named Dan
11  DeBlass?
12     A.   Yes.
13     Q.   Who is he?
14     A.   Dan was a clinical specialist that
15  worked under me.
16     Q.   When did you first talk to him about
17  participating in this case?
18         MS. BURKE:  Objection; foundation.
19         THE WITNESS:  I think I ran into him
20     this summer.
21  BY MS. MAYER:
22     Q.   And at that time did you talk to him
23  about this case?
24     A.   I asked him if he would be open to
25  Susan Burke calling him and considering being a

CATHLEEN FORNEY

1
2   witness.
3      Q.   And what did he say?
4      A.   He would be open.
5      Q.   Did he tell you why?
6      A.   No.
7      Q.   Why did you think Dan DeBlass would
8   be someone who would be a witness with relevant
9   information in this case?
10     A.   He was employed by Medtronic,
11  performed clinics and implants; and it would be
12  safer for him to talk because he was no longer
13  with Medtronic.
14     Q.   Do you know why he was no longer
15  with Medtronic?
16     A.   No.
17     Q.   Do you know if he was terminated
18  from Medtronic?
19     A.   No -- wait.  Ask that again.
20     Q.   Do you know whether he was
21  terminated from Medtronic?
22     A.   No.
23     Q.   Are you aware of whether he ever had
24  any performance issues while at Medtronic?
25     A.   I don't know all -- you know, I

CATHLEEN FORNEY

1  think he left Medtronic before I came to the
2  district, so he was not under me.  I don't know
3  if he had performance issues.
4      Q.    You're not aware of any performance
5  issues?
6      A.    I wouldn't have access to that.  No.
7      Q.    Okay.  Did you reach out to anyone
8  other than Beth Coyle, Doug Willwerth, Dan
9  DeBlass and Chris Taylor about participating in
10  this case?
11      A.    Yes.
12      Q.    Who else did you reach out to?
13      A.    I reached out to employee an Boston
14  Scientific.
15      Q.    Who was that?
16      A.    Karen Wright.
17      Q.    When did you reach out?
18      A.    I think it was this fall.
19      Q.    And what -- what was the substance
20  of the conversation?
21      A.    She would be open to Susan Burke
22  calling her and talking to her about the case.
23      Q.    Have you talked with her since then
24  about this?

CATHLEEN FORNEY

1      A.    No.
2      Q.    Why did you reach out -- why Karen
3  Wright?  Why did you think she was a good
4  person to reach out to on this?
5      A.    She worked for Medtronic marketing
6  and education and worked closely with the
7  fields.
8      Q.    And what does she do for Boston
9  Scientific?
10      A.    She works in heart failure.
11      Q.    Doing what?
12      A.    I don't know.
13      Q.    What was her position at Medtronic?
14      A.    I knew her when she worked in
15  marketing and was involved in virtual training
16  on a truck.
17      Q.    Have you reached out to anyone else?
18      A.    I don't believe so.
19      Q.    Have you identified any additional
20  people that you believe might be a witness that
21  might be interested in participating in this
22  case?
23      MS. BURKE:  Object to form.
24      THE WITNESS:  I don't recall anyone

CATHLEEN FORNEY

1  outside of the list I already provided.
2  BY MS. MAYER:
3      Q.    The list you've just provided to me
4  today, or are you referring to a different
5  list?
6      A.    The verbal list I just provided you
7  right now.
8      MS. MAYER:  I'm going to.
9      (Forney Exhibit 1, Relator's
10      Objections and Responses to Defendant
11      Medtronic's First Set of Requests for
12      Production, was marked for identification
13      and attached to the transcript.)
14  BY MS. MAYER:
15      Q.    I'm showing you what's been marked
16  as Exhibit 1 to this deposition.
17      Do you see Document Request No. 1 on
18  this page?
19      A.    Yes.
20      Q.    Have you seen this document before
21  today?
22      A.    Yes.
23      Q.    The first request asks for all
24  communications with the government, including

CATHLEEN FORNEY

1  but not limited to all documents produced or
2  provided to the government in connection with
3  or relating to the qui tam litigation or its
4  allegations.
5      Have you provided or produced
6  documents to the government in connection with
7  this case?
8      A.    Yes.
9      Q.    What documents have you provided to
10  the government in connection with this case?
11      A.    They were documents that Susan gave
12  to the government.
13      Q.    Were they Medtronic documents?
14      A.    Yes.
15      Q.    Were there any documents other than
16  Medtronic documents that you provided to the
17  government?
18      A.    Not that I recall.
19      Q.    Which Medtronic documents did you
20  provide to the government?
21      A.    I provided documentation of
22  Medtronic's compliance policy.  I provided
23  documentation of some training items.  I
24  provided documentation of HIPAA violations.

CATHLEEN FORNEY

1                 CATHLEEN FORNEY
2         I probably had a document to
3  AvroMed.  I don't recall all the documents.
4  They were Medtronic-related.
5       Q.   You've identified four -- you've
6  identified the compliance policy, training
7  items, HIPAA violations and a document to
8  AvroMed, and you said you don't recall the rest
9  of the Medtronic documents that you provided to
10 the government.
11      Do you recall whether it was just
12 two or three more documents or whether it was
13 more than that?
14      A.   A training document would have
15 been -- an example of that would have been a --
16 I forget the name of the course, but it's a
17 needs-based question approach, course for sales
18 rep and for clinical specialists, teaching
19 field staff how to ask explicit questions in
20 order to understand customers' explicit needs
21 in order for us to better meet the customers'
22 needs.
23      Q.   So do you recall overall whether you
24 provided 10 or 12 documents to the government?
25 Is that about the right number?

1                 CATHLEEN FORNEY
2       MS. BURKE:  Object to form.
3  BY MS. MAYER:
4       Q.   Or was it less?
5       MS. BURKE:  Object to form.
6       THE WITNESS:  It was probably around
7  a dozen.  There was likely a marketing
8  item in there also.
9  BY MS. MAYER:
10      Q.   Aside from the dozen or so Medtronic
11 documents that you've described, did you
12 provide any other written materials to the
13 government in connection with this case?
14      A.   No.
15      MS. MAYER:  Mark this as Exhibit 2.
16      (Forney Exhibit 2, Civil Complaint,
17      was marked for identification.)
18 BY MS. MAYER:
19      Q.   I'd like to show you what has been
20 marked as Exhibit 2 to today's deposition.
21      Have you seen this document before,
22 Ms. Forney?
23      A.   I haven't seen this front page.
24      Q.   Have you seen the document attached
25 to the front page that is titled "Complaint"?

1                 CATHLEEN FORNEY
2  Next page down, I believe.
3       A.   (Witness reviews document.)
4       Q.   Do you need some time to review this
5  to recall whether you've seen it before,
6  Ms. Forney?
7       A.   I'm just reviewing the entire stack.
8       Q.   I'm happy to give you whatever time
9  you need.  We can go off the record if you need
10 a little bit of time.  Just please let me know.
11      A.   Yes, I've seen this document.
12      Q.   What is it?
13      A.   This is the Complaint.
14      Q.   In this case; correct?
15      A.   Yes.
16      Q.   I'd like to turn your attention to
17 paragraph 6 on page 3.
18      In that paragraph, the second
19 sentence says, "Relator Forney shared all
20 information with the United States and
21 Plaintiff States prior to filing suit under
22 seal."
23      Do you see that?
24      A.   Yes.
25      Q.   Did you share any information with

1                 CATHLEEN FORNEY
2  the United States and the Plaintiff States
3  prior to filing suit under seal other than
4  those 10 or 12 documents that we just
5  discussed?
6       A.   Can you ask that question again,
7  please.
8       Q.   Sure.  Did you share any information
9  with the United States and the Plaintiff States
10 prior to filing suit in this case -- this
11 Complaint, Exhibit 2 -- other than the 10 or 12
12 documents that we just discussed?
13      A.   I did not share anything prior.
14      Q.   Okay.  So nothing was shared with
15 the government prior to filing suit; it came
16 after?
17      A.   Perhaps I'm not understanding the
18 question.  I think the documents probably came
19 with the case.
20      Q.   But you -- to the best of your
21 knowledge, you provided information to the
22 United States and Plaintiff States, the 10 to
23 12 documents, after the complaint was filed;
24 right?
25      A.   Yes.

CATHLEEN FORNEY

Q.   Okay.  Did you -- when you shared the 10 or 12 documents, did you provide any other information to the United States and Plaintiff States?

A.   Not to my knowledge.

Q.   Do you have reason to believe that somebody provided additional information to the government on your behalf after the Complaint, Exhibit 2, was filed?

A.   No.

Q.   Did you -- do you know when you provided the 10 or 12 documents to the government?

A.   I believe it was submitted in June of 2015.

Q.   And why do you believe it was submitted in June of 2015?

A.   I -- that's when I recall Susan telling me she was submitting it.

Q.   Okay.

MS. BURKE:  I would just caution the witness not to reveal attorney-client communications.

BY MS. MAYER:

CATHLEEN FORNEY

Q.   Is that June of 2015 or June of 2016?  Like last year?

A.   2015.

Q.   Okay.  Other than the 10 or 12 documents that we've discussed, have you shared any additional information about this case with the government?

A.   I was interviewed one day.

Q.   Do you know when that interview occurred?

A.   I don't recall.  I think it was the spring.

Q.   Of which year?

A.   2016.

Q.   How long was the interview?

A.   Part a day.  I don't recall how many hours.

Q.   Was it one hour?

A.   My guess is half a day.

Q.   Who was present at that interview?

A.   I don't recall their names.

Q.   Was your counsel with you, Ms. Burke?

A.   Yes.

CATHLEEN FORNEY

Q.   Other than the interview and the 10 or 12 documents that you provided in support -- that you provided that we've already discussed, have you had any other -- have you shared any other information with the government about this case?

A.   No.

Q.   What was the substance of the interview with the government?  You can start with, what were the topics that you discussed with the government?

MS. BURKE:  Object and instruct the witness not to answer.

MS. MAYER:  What's the basis?

MS. BURKE:  That the United States has not been noticed in this deposition, and I believe that the United States has the investigative and deliberative process privilege that attaches to those relator interviews.

MS. MAYER:  Do you represent the United States today, Ms. Burke?

MS. BURKE:  They are the real party in interest, and they are not presently

CATHLEEN FORNEY

represented because they were not -- the deposition notice was not sent to them.

I do not know what position they would take, but given their absence and given they're the real party in interest, I instruct my witness and my client not to answer that question.

MS. MAYER:  Are you claiming any attorney-client privilege over that communication?

MS. BURKE:  With my client?

MS. MAYER:  Yes.

MS. BURKE:  Yes.

MS. MAYER:  You're claiming that you had an attorney-client privileged communication with your client while the United States was present?

MS. BURKE:  I am claiming that the question that you asked seeks to elicit information shared during a meeting with counsel for the United States, and counsel for the United States has the right to assert a privilege to protect that meeting, and I believe we have the right,

Page 158

CATHLEEN FORNEY

1
2  therefore, as well, to assert a privilege
3  to protect that meeting.
4       So I'm instructing my client not to
5  answer.
6       MS. MAYER:  So I'm trying to
7  understand what the privilege -- the
8  nature of the precise privilege is that
9  you're asserting.  I understand you're
10 asserting on behalf of the United States,
11 who is not your client, a deliberative
12 process privilege.
13      What I'd like to understand, Susan,
14 is whether you are asserting any other
15 privilege.
16      MS. BURKE:  I'm asserting all
17 potential privileges at this point.
18      MS. MAYER:  What's your --
19      MS. BURKE:  As you know, I was not
20 aware until this morning that the United
21 States has not been noticed for this
22 deposition.  The deposition notice, it
23 only came to my attention that it had not
24 been served on the United States, and so I
25 have not had time to -- so I have not had

Page 159

CATHLEEN FORNEY

1
2  time to research all of the potential
3  privileges.
4       Normally, what happens is the United
5  States is noticed, and when they don't
6  show up, you assume they've waived all
7  privileges.
8       We have already asserted a joint
9  prosecution privilege, and so -- so at
10 this point in time, I'm instructing her
11 not to answer, and I'm asserting all
12 potential privileges to cover that
13 meeting.
14      MS. MAYER:  So I understand your
15 position with respect to the United
16 States' invocation in theory of --
17      MS. BURKE:  Potential.  Potential
18 invocation.
19      MS. MAYER:  I understand your
20 position with respect to the United
21 States' potential invocation of a joint
22 prosecution privilege, and you've also
23 mentioned a deliberative process
24 privilege.
25      MS. BURKE:  And an investigative

Page 160

CATHLEEN FORNEY

1
2  privilege.
3       MS. MAYER:  Are you asserting an
4  attorney-client privilege over the
5  communication?
6       MS. BURKE:  Yes.
7       MS. MAYER:  What's the basis for
8  asserting an attorney-client privilege
9  over that interview?
10      MS. BURKE:  The joint prosecution
11 privilege makes the communication a
12 privileged communication.
13      MS. MAYER:  Your position is that if
14 you have a joint prosecution agreement
15 with the United States, that creates an
16 attorney-client privilege over that
17 interview?
18      MS. BURKE:  Well, at this point, I'm
19 not sure what I would assert vis-a-vis --
20 if the United States had waived its
21 privileges had it been noticed and not
22 appeared and those privileges would have
23 been -- and they waived their privileges,
24 I'm not sure that I independently would
25 have asserted a privilege.

Page 161

CATHLEEN FORNEY

1
2  The complexity arises because of the
3  lack of notice to the United States that
4  then puts me in a position that I don't
5  know what the United States will do and/or
6  what it has done.
7       So at this point in time, all I can
8  say is that if they waive the privileges,
9  I would waive the privileges.
10      MS. MAYER:  But I guess I'm trying
11 to understand, do you believe that,
12 independent of the joint -- the potential
13 joint prosecution privilege, that you have
14 an attorney-client privilege in that
15 interview?
16      MS. BURKE:  It turns -- the
17 privilege -- any privilege that attaches
18 turns on the United States' -- and the
19 United States' invocation of the
20 privilege.  If they don't invoke a
21 privilege, then we won't invoke a
22 privilege.
23      MS. MAYER:  So we served this
24 request for production for all
25 communications with the government in

41 (Pages 158 to 161)

Page 162

CATHLEEN FORNEY

1
2   September.  And you --
3       MS. BURKE:  You're now referring
4   back to Exhibit 1?
5       MS. MAYER:  I'm referring back to
6   Exhibit 1, and you responded that you
7   object because it calls for
8   attorney-client communications, work
9   product, joint prosecution, common
10  interest and other applicable privileges;
11  and you did not produce any communications
12  with the government; correct?
13      MS. BURKE:  No, that's not correct.
14  We produced documents that had been
15  provided to the -- to the government.
16      MS. MAYER:  Did you withhold any
17  communications to the government, Susan?
18      MS. BURKE:  The material disclosure
19  and another follow-up submission.
20      MS. MAYER:  And your basis for
21  withholding those was the government's
22  joint prosecution privilege?
23      MS. BURKE:  As you see here, these
24  are the -- with respect to the production
25  of documents, those are all of the

Page 163

CATHLEEN FORNEY

1
2   privileges that we invoked.
3       MS. MAYER:  Well, but I'm asking you
4   today whether the joint prosecution and
5   common interest privilege was the reason
6   why you didn't produce those.
7       MS. BURKE:  All the reasons that we
8   have here are the reasons that we didn't
9   produce.
10      MS. MAYER:  So your position is that
11  the material --
12      MS. BURKE:  Attorney-client, work
13  product, joint prosecution, common
14  interest privilege and any other
15  applicable privilege, doctrine, immunity,
16  statute, regulation, rule or restriction.
17      MS. MAYER:  And do you believe that
18  anything other than the joint prosecution
19  and common interest privilege protects
20  those communications?
21      MS. BURKE:  I do.
22      MS. MAYER:  Which privileges,
23  independent of those, protect the
24  communications?
25      MS. BURKE:  With all due respect, I

Page 164

CATHLEEN FORNEY

1
2   have not prepared on this issue, and so
3   there's a lot of case law that speaks to
4   what has to be turned over and what
5   doesn't have to be turned over.
6       I did not review that in
7   preparation.  This is not an oral
8   argument.  This is not something where I
9   came ready to brief our legal position.
10      I'm happy to brief our legal
11  position.  If you want to move to compel,
12  we can brief the legal position.  I'm not
13  prepared today.  I don't have the case law
14  at the ready, and I didn't come prepared
15  to do this.
16      This is a deposition of a witness.
17  We're making the witness available.  If
18  you have any questions to her, I suggest
19  you use your time to question the witness,
20  and we can brief these issues later.
21      MS. MAYER:  Did you check -- after
22  receiving this request for production of
23  documents, Susan, did you reach out to
24  attorneys for the United States and the
25  states to check whether they were invoking

Page 165

CATHLEEN FORNEY

1
2   a common interest or joint prosecution
3   privilege to protect those disclosures?
4       MS. BURKE:  Ms. Mayer, I'm not the
5   witness.  I'm not the witness.  I don't
6   have to answer your questions on record.
7       You're here -- if you want to ask
8   Ms. Forney any questions, let's proceed.
9   Otherwise, let's take a brief break if you
10  don't have any more questions for the
11  witness -- actually, I would like a bio
12  break at this point.
13      MS. MAYER:  Yes, we can take a
14  break.
15      THE VIDEOGRAPHER:  We are going off
16  the record at 3:07.
17      (Recess taken from 3:07 p.m. to
18  4:01 p.m.)
19      (Whereupon, a discussion was held
20  between counsel, off the video record, and
21  outside the presence of the witness.)
22      MS. MAYER:  We have discussed the
23  matter of the privilege over Ms. Forney's
24  oral communications with the government in
25  this case, and the agreement we've reached

42 (Pages 162 to 165)

CATHLEEN FORNEY

1
2  is that Ms. Burke is going to stand on the
3  privileges she's already asserted over
4  those communications today.
5      We will continue the deposition
6  today on other topics.  Ms. Burke has
7  agreed that if the deposition is allowed
8  to close today, she will and her client
9  will do two things:  First, they will
10 allow her client to be deposed again on
11 those oral communications with the
12 government; and to the extent there are
13 written communications that are produced
14 to the government that defendant wants to
15 depose her client on, deposition on those
16 as well.
17     That -- it is anticipated that
18 Ms. Burke will be able to present her
19 client for that limited deposition if it's
20 going to happen, either in New York on
21 November 30th or December 1st or in
22 Philadelphia on December 5, which are
23 dates when depositions of other witnesses
24 in this case are already scheduled, so
25 that the attorneys for all the parties

CATHLEEN FORNEY

1
2  will already be present, and that will be
3  more cost-effective than trying to
4  schedule a separate date.
5      Finally, the other agreement that
6  Ms. Burke has made on behalf of her and
7  her client is that, notwithstanding the
8  fact that the deposition today will close,
9  she and her client will not discuss her
10 client's communications with the
11 government at all in advance of any
12 subsequent deposition on that topic.
13     MS. BURKE:  Agreed.  And I will go
14 get the witness, and we'll be back at it.
15     (Forney Exhibit 3, Cardiology
16 Associates of West Reading Medtronic
17 documents, Bates REL-00471 to 512, was
18 marked for identification.)
19     THE VIDEOGRAPHER:  We are back on
20 record at 4:05.
21 BY MS. MAYER:
22     Q.  Ms. Forney, I'm showing you what's
23 been marked as Exhibit 3 to this deposition.
24 Do you recognize this document?
25     A.  Yes.

CATHLEEN FORNEY

1
2      Q.  Is this a document that you've
3  produced in this case?
4      A.  It looks like something I would
5  produce, yes.
6      Q.  Okay.  Ask you to turn to -- first
7  of all, what is it?
8      A.  So this would be, I guess what it
9  states, "Patient Guidelines for Remote
10 Monitoring" in the Reading Clinic, and it's a
11 patient guideline.
12     Q.  Okay.  Is that a document that you
13 created, or did someone else create it?
14     A.  I believe I created it, in
15 partnering with physicians at Cardiology
16 Associates of West Reading.
17     Q.  And I'd ask you to turn to, if you
18 flip through it, the 11th page of this
19 document.  It's the document Bates-numbered
20 REL-00481.
21     A.  Yes.
22     Q.  Do you see at the top that says,
23 "St. Luke's OptiVol and Cardiac Compass
24 Worksheet"?
25     A.  Yes.

CATHLEEN FORNEY

1
2      Q.  Is this the same document as the
3  Cardiology Associates of West Reading
4  guidelines that we were just talking about, or
5  is this a different document that's just now
6  attached?
7      A.  Can you ask that question again,
8  please.
9      Q.  Sure.  REL-00481, this OptiVol and
10 Cardiac Compass worksheet that appears to have
11 St. Luke's at the top --
12     A.  Uh-huh.
13     Q.  -- is this page, 00481, part of the
14 Cardiology Associates of West Reading patient
15 guidelines, or does this look like maybe a
16 different document that somehow got attached to
17 the Cardiology Associates of West Reading
18 patient guidelines?
19     A.  I want to say that this looks like
20 it's in draft form and might have been
21 something that I created for St. Luke's.  I see
22 in the footprint, I put "Cardiology of West
23 Reading," so, you know, I might have shown it
24 to them and they might have decided that they
25 thought it was a document that they would, you

CATHLEEN FORNEY

1
2 know, like to adopt in their clinic, that
3 something similar might be good.
4     Q.   So we talked earlier about some
5 worksheets that you developed --
6     A.   Uh-huh.
7     Q.   -- for workflow.  Do you remember
8 that?
9     A.   Yes.
10     Q.   Is this St. Luke's OptiVol and
11 Cardiac Compass worksheet an example of that
12 kind of a worksheet?
13     A.   Yes.
14     Q.   If you turn the page to REL-00482,
15 is this part of the St. Luke's worksheet, or is
16 this a separate thing?
17     A.   It just has CAWR on it, which is
18 West Reading.  So I would tend to think that
19 that might be separate.
20     Q.   Where do you see CAWR on this?
21     A.   It's in the verbiage:  "Device
22 patient to call CAWR for guidance."
23     Q.   Is this document, 00482 to
24 REL-00483, another example of the kind of
25 workflow worksheet you were talking about

CATHLEEN FORNEY

1
2 earlier?
3     A.   Yes.
4     Q.   Could you take a look at REL-00484?
5     A.   Yes.
6     Q.   What is this page?
7     A.   This has "ICD Interrogation" at the
8 top.  This would be a worksheet for that type
9 of a device check.
10     Q.   And do you -- there's some
11 handwriting on it.  Do you see that?
12     A.   Yeah, that's my writing.
13     Q.   Why is this document, this ICD
14 interrogation checklist, in this series of
15 pages?
16     A.   This is -- all of these are in
17 reference to device follow-up.  So they all
18 have a common theme that way.
19     Q.   Do you remember putting this packet
20 of pages together at some point?
21     A.   I remember working on it, and this
22 page would have been a draft that, in meeting
23 with physicians, they would have made some
24 additional suggestions to.
25          MS. BURKE:  And let the record

CATHLEEN FORNEY

1
2     reflect the witness was referring to
3     REL-00484.
4 BY MS. MAYER:
5     Q.   Looking at REL-00485 through 491,
6 what are these pages?
7     A.   These are pages that likely one of
8 the sales reps put together maybe data out
9 of Paceart on the clinic at Reading.  It tells
10 you how many different devices that they have.
11 It talks about the types of follow-up and how
12 the follow-ups have increased over time, so
13 their service -- their service burden.
14     Q.   Let's start with REL-00485.  This
15 document says, "CAWR Active Patients," has
16 numbers for Pacers, ICDs and Total.  What -- do
17 you know what that means and what it's
18 referring to?
19     A.   I believe this refers to the number
20 of patients that the device clinic sees.
21     Q.   Is this the data that you believe
22 was pulled from Paceart?
23     A.   Yes.
24     Q.   And what's Paceart?
25     A.   Paceart is a database that Medtronic

CATHLEEN FORNEY

1
2 owns but clinics use to enter data from their
3 device checks -- implants and device checks.
4     Q.   And do they only enter data for
5 Medtronic products into Paceart?
6     A.   The clinic would enter data from
7 every manufacturer into Paceart.
8     Q.   Why would the sales rep have pulled
9 this information, if you know?
10     A.   To partner -- part of what we were
11 encouraged to do is to partner very -- at a
12 very high level with physicians and to know as
13 much about their clinics and so that we could
14 help the solutions -- help provide solutions
15 for their clinics.
16          So without pulling data, one doesn't
17 really know the work that they're doing.
18     Q.   Turning to the next page, REL-00486,
19 CAWR device clinic trends, is this information
20 that you requested from the sales reps?
21     A.   No, this is information that they
22 would have pulled as part of the same
23 initiative that informs the physicians about
24 their clinic.  I did not have access to Paceart
25 at West Reading, but the sales reps did.

CATHLEEN FORNEY

1  
2      Q.   So these pages -- patients with no
3  CL -- the pages we're talking about here,
4  REL-00485, 486, 487, 488 through 491, are not
5  pages that you used with West Reading, the West
6  Reading clinic; correct?
7      A.   I did not personally use them in
8  conversations with physicians, no.
9      Q.   Turning to REL-00492 to 493, do you
10 know what this document is?
11     A.   So this is a document I would have
12 supported St. Luke's with.  Once again, they're
13 device clinic guidelines for remote device
14 monitoring.
15     Q.   And then starting on page 00494
16 through 00503, are these again clinic -- it
17 starts with a page called "Clinic Analysis."
18 Is this something that you would have been
19 involved in, or is this the sales rep?
20     A.   This would have been the sales rep
21 pulling it and presenting to the clinic, and
22 some of the worksheets that I created might
23 have been part of the solutions.  You can see
24 on page 00495 the center had clinics at
25 multiple locations.

CATHLEEN FORNEY

1  
2      Q.   And what does that tell you, that
3  they had clinics at multiple locations?
4      A.   West Reading would have been one
5  location that they did all their work in.  I
6  think when you have multiple locations and have
7  device checks spread out, that just means more
8  work to get the job done.  And some of those
9  would have been satellite offices to their main
10 office.
11     Q.   We talked about these pages, 00494
12 through 00503, those are not your work; that's
13 sales rep work; correct?
14     A.   Can you please repeat the numbers.
15     Q.   Sure.  00494 through 00503.
16     A.   Correct.
17     Q.   Okay.
18     A.   The considerations component of this
19 slide set, I might have been involved with some
20 of the conversations on suggestions to improve.
21 But at the end of the day, I didn't create the
22 slide set.
23     Q.   Okay.  And in looking at 00502,
24 which is the slide that you just mentioned
25 stating considerations, has a bullet

CATHLEEN FORNEY

1  
2  "Efficiency."  Under "In-office time
3  saturation," there are a few bullets, one of
4  which is what we already discussed, which is
5  increase remote usage; right?
6      A.   Uh-huh.
7      Q.   It also lists shortening the device
8  check window; right?  And then another -- is
9  that another way to reduce in-office time?
10     A.   I'm not familiar with that verbiage.
11     Q.   Okay.  Are you familiar with the
12 first bullet, "Eliminate threshold testing for
13 auto devices"?
14     A.   Yes.
15     Q.   That's another way to reduce
16 in-office time?
17     A.   Yes.  So I talked about that this
18 morning a little bit, that if a device is older
19 and you have to do a manual check, that takes
20 longer time, and when new devices came on the
21 market and did an auto check, the practice of
22 habit was -- I've done manual threshold testing
23 for a long time, and so they continue to do it
24 to trust the auto check.
25     The recommendation here is to

CATHLEEN FORNEY

1  
2  eliminate the auto device check -- or the
3  manual check.
4      Q.   And those manual checks would be
5  done by whoever was doing the device check?
6      A.   Correct.
7      Q.   So this would reduce the number of
8  device checks or the time spent on device
9  checks?  Or both?
10     A.   Time spent on device checks.
11     Q.   Okay.  Turning to 00504 and to 505,
12 is this another example of a workflow
13 worksheet?
14     A.   Yes, this is another hospital.
15     Q.   Are Lehigh Valley and St. Luke's and
16 Cardiology Associates of West Reading all
17 affiliated, or are these just different
18 examples from different places?
19     A.   Separate, competitive practices.
20     Q.   Can you turn to REL-00506 through
21 00508.  Do you know what those three pages are?
22     A.   This is a job aid --
23     Q.   Is this another workflow worksheet?
24     A.   -- that I created to help our staff.
25     Q.   So this is a workflow worksheet for

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2  use by --
3      A.   Medtronic employees.
4      Q.   -- Medtronic staff?  Okay.
5      A.   So that we are consistent and
6  seamless when we are serving various hospitals.
7      Q.   Okay.  And what activity is
8  described in these sheets?
9      A.   When we support -- this specifically
10 is for hospital implant data into Paceart and
11 CareLink and hospital device follow-up checks
12 into Paceart, that whoever was covering the
13 case, as I discussed earlier, were
14 interchangeable, that we would be consistent in
15 our approach.
16     Q.   And turning to 00509, is it part of
17 00510 and 00511, or is it different?
18     A.   0059 would have been a Medtronic
19 initiative and their strategic framework for
20 us.
21     Q.   Is this just a standalone one-page
22 document as far as you can tell, or are the two
23 pages that come after it somehow associated
24 with it, if you know?
25     A.   I want to say that this would be

1  CATHLEEN FORNEY
2  Medtronic support in growing the cardiac
3  ablation side of the clinic.
4      Q.   Okay.  If you look at -- do you know
5  whether these few pages -- 00509, 00510 and
6  00511 -- go together or whether they're
7  separate?
8      A.   They look to me like they go
9  together.
10     Q.   Okay.  But you don't know; right?
11     A.   Right.
12     Q.   If you turn to 000510, if you look
13 at the footer, do you see that a copyright 2015
14 Medtronic, Inc.
15         Do you see that?
16     A.   Zero zero --
17     Q.   00510 is the document.  It's the AF
18 PRO patient referral optimization.  If you go
19 to the left side of the page, sort of the
20 bottom chunk of text, you can see a little
21 copyright 2015 Medtronic, Inc. on it.
22         Do you see that?
23     A.   Uh-huh.
24     Q.   How did you get a copy of a 2015
25 Medtronic document, if you recall?

1  CATHLEEN FORNEY
2      A.   I don't recall how I got this
3  specific one.
4      Q.   Have you received Medtronic
5  documents since you left Medtronic?
6      A.   Not as a rule of thumb.
7      Q.   But you have received some?
8      A.   I don't recall if this was laying
9  around and I picked it up, or if this was part
10 of two other studies that I recall while I was
11 in the room that we do.  One is AF -- I already
12 shared with you -- is stock AF, which is AF
13 ablations, that this might have been something
14 that came with the clinical study.  I don't
15 recall.
16     Q.   So have you, to your knowledge,
17 received Medtronic documents from another
18 person while -- since you left Medtronic?
19         MS. BURKE:  And I would simply
20     caution the witness not to reveal the
21     attorney-client communications.  But you
22     may answer excluding that category.
23         THE WITNESS:  No.
24 BY MS. MAYER:
25     Q.   I'm sorry.  Are there documents that

1  CATHLEEN FORNEY
2  you received from persons -- Medtronic
3  documents that you received from people since
4  you left Medtronic that you -- I'm sorry.  Let
5  me take that back.  Strike that.
6          MS. MAYER:  What's the basis for
7      claiming privilege over her response to my
8      question?
9          MS. BURKE:  If -- because there may
10     be documents that I sent her.
11 BY MS. MAYER:
12     Q.   Are there documents in your
13 production to us that you received -- that are
14 Medtronic documents that you received from your
15 client that you did not possess until your --
16 I'm sorry.  Strike that.
17         Are there documents in the
18 production you made to Medtronic that you
19 received from your counsel and that you did not
20 possess until your counsel gave them to you?
21         MS. BURKE:  Object; instruct her not
22     to answer.
23         MS. MAYER:  What's the basis?
24         MS. BURKE:  Attorney-client
25     communication and attorney work product.

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2      MS. MAYER:  I think I'm first asking
3  whether she received any, which I don't
4  think reveals the content of an
5  attorney-client communication or reveals
6  work product.
7      MS. BURKE:  I think it reveals both.
8      MS. MAYER:  I think it would just
9  reveal whether she received documents --
10      MS. BURKE:  From her counsel.
11      MS. MAYER:  -- from her counsel; but
12  not what the documents were or what the
13  content of the documents were at this
14  point.
15      MS. BURKE:  But it's -- but it --
16  revealing whether or not she received them
17  is work product, and then it also reveals
18  an attorney-client communication.
19      But let me simply put on the record
20  that there are Medtronic documents that
21  are available in the public domain.
22  BY MS. MAYER:
23      Q.  Ms. Forney, you mentioned that this
24  document, REL-00510, might be something that
25  you picked up that was laying around.  What did

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2  you mean by that?
3      A.  Possibly in the current business
4  that I'm in, in doing clinical trials, there
5  might have been some documents with all the
6  study materials.
7      Q.  And so this might be something that
8  Medtronic had provided to your current employer
9  in connection with the clinical trials that
10  you're coordinating for Lancaster?
11      A.  Could have been a conversation with
12  a physician.  I don't know.
13      Q.  So you don't have any idea how you
14  came to have this document?
15      A.  No.
16      Q.  And looking at 00511 at the very top
17  you'll see a date, 9/11/2014.
18      Do you see that?
19      A.  I do.
20      Q.  And same answer:  You don't have any
21  idea how you got a copy of that page as well?
22      MS. BURKE:  Object to form.
23  BY MS. MAYER:
24      Q.  Do you know how that page came to be
25  in your possession?

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2      A.  No.
3      Q.  Is it fair to say that -- I think
4  when we first started talking about REL-00471,
5  you said this is a document with patient
6  guidelines for remote monitoring, and there's a
7  bunch of materials attached that related to
8  Cardiology Associates of West Reading; correct;
9  correct?
10      A.  Correct.
11      Q.  Is it fair to say that, at least
12  document 00509 through 512 are not related to
13  your work for Cardiology Associates of West
14  Reading?
15      A.  Correct.
16      Q.  Do you know how they came to be
17  attached to this document?
18      A.  No.
19      I'd like to add, when I estimated
20  number of documents submitted to the
21  government, all of this could have been
22  submitted as one or they could have been
23  submitted as five.  I don't know specifically
24  if that could affect the number of documents
25  that -- that I estimated.

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2      Q.  Did you submit the document or
3  documents that are reflected by REL-00471
4  through 00512 to the government?
5      A.  Yes.
6      Q.  Do you recall submitting 9 or 10
7  additional documents to this or only a few more
8  in addition to this?
9      MS. BURKE:  Object to form.
10      THE WITNESS:  I recall submitting
11  Medtronic compliance documents, probably
12  HRS documents, AvroMed documents, samples
13  of high-level partnering with customers to
14  ensure efficient clinic and implant
15  workflows, which -- this is three
16  different centers, but it's sort of like
17  one document.
18      I recall submitting samples of HIPAA
19  violations.  I recall submitting training
20  materials.  I recall submitting a handful
21  of marketing materials.
22      I don't know -- I do not recall what
23  was scanned together in a group and sent
24  versus independent scanned copy.
25      But these follow-up papers were

47 (Pages 182 to 185)

CATHLEEN FORNEY

1  certainly expectations on a DSM to partner
2  at a high level with physicians and clinic
3  staff to make their job easier, and to
4  encourage utilization of our devices.
5      In answer to a question you asked
6  earlier today regarding number of clinical
7  trials performed at Lancaster General
8  Health, as a district service -- or as a
9  research operations -- I thought of two
10 additional studies that are ongoing with
11 Medtronic: AdaptResponse and also Stroke
12 AF. I think that makes up the complete
13 list.
14 BY MS. MAYER:
15     Q.   Thank you.
16         MS. MAYER: Can you mark the next
17 exhibit as 4.
18         (Forney Exhibit 4, Presentation,
19 "Geisinger, Medtronic Healthcare Systems
20 Strategic Partnership Discussion,"
21 12-1-09, Bates numbers obscured, was
22 marked for identification.)
23 BY MS. MAYER:
24     Q.   I'm showing you what's been marked

CATHLEEN FORNEY

1  as Exhibit 4, Ms. Forney, REL-0239, the only
2  Bates No. on this document -- sorry -- because
3  the Bates numbers have been cut off.
4      It looks like it goes REL-0239 is
5  the starting Bates number, goes through
6  REL-0240. They've been slightly cut off. I
7  will say it is a SlideDeck with Medtronic, and
8  it says, "Geisinger/Medtronic Healthcare
9  Systems Strategic Partnership Discussion,"
10 December 1, 2009.
11     Do you see that?
12     A.   I do.
13     Q.   Do you recognize this document?
14     A.   Yes.
15     Q.   What is it?
16     A.   This would have been a presentation
17 that our field organization, district manager
18 and sales reps would have made to the center.
19     Q.   You said "would have made." Did you
20 make this presentation to Geisinger?
21     A.   No.
22     Q.   How did you come to have this
23 document?
24     A.   Items are shared across the

CATHLEEN FORNEY

1  district. I'm a manager.
2      Q.   So it just came to you in your role
3  as -- it just was provided to you?
4      A.   Yes.
5      Q.   But you didn't create this document?
6      A.   No.
7      Q.   And you didn't give this
8  presentation?
9      A.   No.
10     Q.   Do you know who did?
11     A.   No. This is a sales document.
12     Q.   Is this a document that you provided
13 to the United States and the states? Do you
14 know?
15     A.   I don't recall.
16         This also is reflective of very high
17 level of partnering with customers across
18 multiple divisions to demonstrate how we can
19 meet their needs in ways that other companies
20 cannot.
21         MS. MAYER: Motion to strike
22 everything after "I don't recall" as
23 nonresponsive.
24         MS. BURKE: Objection. It's

CATHLEEN FORNEY

1  inappropriate to move to strike in
2  depositions.
3      (Forney Exhibit 5, Email
4  communication ending 1-13-10;
5  MDTEDPA-47212 to 4730, was marked for
6  identification.)
7  BY MS. MAYER:
8      Q.   I'm showing you, Ms. Forney, what's
9  been marked as Exhibit 5. It's a document
10 MDTEDPA00004721 is the beginning; and the last
11 page is 004730.
12     Do you recognize this?
13     A.   What is the last page?
14     Q.   00004730.
15     A.   I recognize this.
16     Q.   What is it?
17     A.   This would have been an updated
18 Medtronic technical support policy and a
19 clarifying question between myself and Brian,
20 the district manager.
21     Q.   And that -- the first email on
22 00004721, this is an email from Thursday,
23 January 7th, 2010, from you to Brian Dye. Is
24 that correct?

CATHLEEN FORNEY

1
2   A.   Correct.
3   Q.   And in it you say, "I had a question
4   today regarding if a physician on numerous
5   occasions is not present for a clinic.  What do
6   you constitute frequent?"
7       Do you see that?
8   A.   Yes.
9   Q.   Is that a question that had come up
10  before?  That you --
11  A.   With -- this is a question that came
12  up in light of the new guidelines, which came
13  out the 24th of October, 2008.
14  Q.   And his response is at the top;
15  correct?
16  A.   Correct.
17      January 13th, 2010, Brian Dye to
18  Cathleen Forney.  And he says [reading]: My
19  hope is that the CS notified the reps and they
20  discussed a plan to move forward.  My guidance
21  to the team has always been to make me aware of
22  the situation and continue with business as
23  usual until we work out a new plan with the
24  doc.  Field personnel should seek guidance from
25  their local management or CRDM compliance and

CATHLEEN FORNEY

1
2   ethics officer in those situations.
3       Do you see that?
4   A.   Yes, yes.
5       MS. BURKE:  Objection.  It's --
6   you're leaving out sentences.  You're
7   purporting to read the document.  You
8   haven't read it all.
9       MS. MAYER:  Susan, can you avoid
10  speaking objections, please?  I think I
11  have been fairly lenient today.
12      MS. BURKE:  Well, object, and I
13  would ask that you read in the missing
14  parts into the record.
15  BY MS. MAYER:
16  Q.   I think the document speaks for
17  itself.  I'm asking you and pointing, do you
18  see those things; correct?  Do you see where
19  those --
20  A.   Yes.
21  Q.   -- sentences that I read were
22  written?
23      And it says at the bottom, "Let's
24  discuss"?
25  A.   Yes.

CATHLEEN FORNEY

1
2   Q.   Did you have a discussion with Brian
3   in response to his email?
4   A.   Yes.
5   Q.   What was the substance of that
6   discussion?
7   A.   As I recall the discussion, the rule
8   of thumb was just to continue as business as
9   usual.  Our district covered many remote
10  clinics where physicians were often not
11  present, and the desire was to not get a
12  physician upset and for us to continue to
13  deliver our business as needed when asked.
14  Q.   And so did you respond to the person
15  who asked the question to you, that's reflected
16  in that Thursday, January 7 email at the
17  bottom of 00004721?
18  A.   I responded to that person that
19  Brian and the sales reps and they would work
20  out a plan.
21  Q.   And did that person come to you with
22  any follow-up after that?
23  A.   I don't recall.
24  Q.   Who was the person who raised the
25  question?

CATHLEEN FORNEY

1
2   A.   I don't recall.
3   Q.   Are you aware of any -- I'm sorry.
4   Step back.
5       Do you know whether the sales reps
6   worked out a plan with the person who raised
7   the question in this instance?
8       MS. BURKE:  Can you read that
9   question back to me, please.
10      (Record read.)
11      THE WITNESS:  My understanding, the
12  plan was for the clinical specialists to
13  continue to execute and conduct the
14  clinics as they had been doing, whether a
15  physician was present or not.
16  BY MS. MAYER:
17  Q.   Is that the direction that you gave
18  to the clinical specialists?
19  A.   That would have been the direction
20  that the sales rep and the district manager
21  gave and I was put in a position of supporting.
22  Q.   So did you give that advice?
23  A.   No.
24  Q.   So the CS was not told that they
25  needed to continue providing the device checks

CATHLEEN FORNEY

1
2 under those circumstances; correct?
3          MS. BURKE:  Object to form.
4          THE WITNESS:  Please state that
5     question again.
6     BY MS. MAYER:
7     Q.   So the CS was not told that they
8 needed to continue providing the device checks
9 under those circumstances; correct?
10         MS. BURKE:  Object to form.
11         THE WITNESS:  No, my response is the
12    sales rep and the district manager would
13    have guided the individual to continue
14    conducting clinics with the physician, as
15    business as usual.
16    BY MS. MAYER:
17    Q.   And were you present for that
18 conversation between the sales rep and the
19 district manager and the person who raised this
20 question?
21    A.   No.
22    Q.   Turning to the attachment to that
23 email at 00004723, is this a copy of the
24 Medtronic CRDM field technical support policy
25 as of October 7th, 2008?

CATHLEEN FORNEY

1
2     A.   Yes.
3     Q.   Are you familiar with this policy?
4     A.   I'm familiar with this policy, yes.
5     Q.   And did you follow this policy?
6     A.   My intent was to follow the policy.
7     Q.   Are you aware of -- well, strike
8 that.
9          Did you follow the policy?
10    A.   No. 2, reimbursement, field
11 personnel should; most clinics that were
12 supported by a clinical specialist, Medtronic
13 or others, did have either a super bill or
14 clinical paperwork that contained reimbursement
15 information, and it was our expectation to
16 complete what it is that we performed.
17    Q.   So when you say "it was our
18 expectation," is that -- are you saying that
19 policy Section 2, reimbursement field personnel
20 should not fill out super bills or any other
21 clinic paperwork that contains reimbursement
22 information, that you fulfilled that
23 expectation?
24    A.   No.
25    Q.   So when you say that "there was an

CATHLEEN FORNEY

1
2 expectation to complete what it is that we
3 performed," why do you say that there was an
4 expectation to do that?
5     A.   So if anyone from Medtronic is
6 performing a clinic, one of the last things on
7 a worksheet is -- describes what it is that you
8 did:  Did you do a device check with
9 programming, a device check without
10 programming?  What type of device was it?
11         And often we would just put a
12 checkmark on what it was that we did next to
13 the code.
14    Q.   And so that's what you did.  But
15 what was the source -- why did you believe that
16 it was expected that you do that?  Were you
17 told to do that?  Or was your expectation
18 derived from something else?
19    A.   Practice of habit over many years.
20 We had always done it.
21    Q.   So nobody told you to do that; it
22 was just something you did?
23    A.   It was part of the follow-up clinic
24 process, and we did it.
25         I don't recall any clinics that did

CATHLEEN FORNEY

1
2 not ask us to do that.
3     Q.   Did anyone at Medtronic tell you you
4 needed to do that?
5     A.   I don't recall.
6     Q.   Did you tell anyone at Medtronic
7 that they needed to do that?
8     A.   Not to my knowledge.
9     Q.   How do you know that it was done?
10    A.   These clinics are being performed
11 before I entered into the district, and the
12 clinics are being performed after I left the
13 district.  I saw what came before me.
14    Q.   Saw people's conduct or -- saw what?
15    A.   I saw worksheets completed.
16    Q.   And how do you know that Medtronic
17 completed that worksheet?
18    A.   I recognized the name signed on the
19 worksheet as a district employee.
20    Q.   And you filled out -- did you fill
21 out and sign worksheets with those check boxes
22 on them, checkmarks?
23    A.   I completed whatever document the
24 clinic asked me to complete.
25         I'm not saying it was right.  I'm

CATHLEEN FORNEY

1
2  saying our primary goal was always to make the
3  customer happy, and this was what was expected
4  of us and I did it.
5      Q.   But nobody at Medtronic directed you
6  to do that; correct?
7      A.   I don't recall.
8      Q.   You don't recall anybody at
9  Medtronic ever directing you to do that;
10  correct?
11     A.   I don't recall a conversation with
12  an in-house corporate person telling me to do
13  or not to do. I think it's highly likely there
14  were field conversations about providing
15  quality follow-up and the expectations of what
16  we're doing in a clinic.
17     Q.   But you don't recall anybody in
18  corporate or from the field telling you to
19  complete whatever the clinic asked you to
20  complete on the worksheet; correct?
21     A.   Only corporate, I stated.
22     Q.   So who -- do you recall someone in
23  the field telling you to fill out whatever
24  paperwork the clinic asked you to complete?
25     A.   Those are conversations that had

CATHLEEN FORNEY

1
2  high probability of happening. I don't recall
3  a specific incidence many years later. But I
4  would have been coached when I entered the
5  district what the culture of that district was
6  and how clinics were performed and my
7  expectation to be consistent and seamless as a
8  Medtronic employee in continuing to conduct
9  those clinics. And that would have been
10  completing the worksheets that were provided by
11  the clinic to me.
12     Q.   And you say there was a high
13  probability that such a conversation existed,
14  but you don't recall a conversation?
15     A.   I don't recall the specific day, the
16  specific time; but in onboarding somebody new
17  to a district, those kind of conversations
18  always happen.
19     Q.   Well, did you participate in those
20  conversations involving other people's
21  onboarding?
22     A.   Yes.
23     Q.   And did you tell those folks in
24  those onboarding discussions that they needed
25  to fill out whatever paperwork the doctor and

CATHLEEN FORNEY

1
2  clinic asked them to fill out?
3      A.   That's more of a sales rep,
4  management of his territory, and those
5  conversations would have come more from the
6  sales rep organization within a district. I
7  don't personally recall telling somebody. I
8  might have; I don't recall.
9      Q.   But you do recall being a part of
10  those conversations?
11     A.   I do recall that those types of
12  conversations unfold whenever somebody enters
13  into the district.
14     Q.   Well, pick one of them that you
15  recall. Who was at it?
16     A.   I would state that Chuck Mertz, the
17  sales rep, in reviewing his clinics and how
18  follow-ups are done at his many clinics, that
19  this is how we do it at this clinic. This is
20  how we do it at this clinic.
21          And I would have just followed suit
22  and been consistent with what came before me.
23     Q.   So do you specifically remember
24  Chuck Mertz telling you that?
25     A.   I don't remember the day or time we

CATHLEEN FORNEY

1
2  would have had a conversation, but that would
3  have been something I would have been guided
4  towards. And as I shared prior, it's a
5  practice that went on as long as I can remember
6  working for Medtronic. So it doesn't matter
7  which district I'm in; this document here
8  refers to the time that I'm in Eastern
9  Pennsylvania. Chuck had many clinics.
10     Q.   Was Chuck a sales rep in Eastern
11  Pennsylvania?
12     A.   Yes. And Tom Lynn was a sales rep
13  at West Reading, and he would have told me how
14  they do things there.
15     Q.   Did he tell you, or when you say "he
16  would have," you're speculating that he told
17  you?
18     A.   He told me how things were done
19  there.
20     Q.   Okay. And in terms of telling you
21  how things were done at West Reading, did he
22  tell you you had to complete whatever paperwork
23  the clinic asked you to complete?
24     A.   If there was a remote clinic that
25  had it, I would have done it, yes.

CATHLEEN FORNEY

1
2      Q.   Because Tom told you to do it or
3  because it was your practice and habit to do it
4  of your own initiative?
5      A.   Because it was the practice and
6  habit of all that had worked with Medtronic for
7  a long time.
8      Q.   So are there other pieces to the
9  CRDM field technical support policy that you
10  didn't follow, or did you follow the policy?
11      MS. BURKE:  Object to form and
12  foundation.
13      MS. MAYER:  Okay.  Well, then strike
14  the question.
15  BY MS. MAYER:
16      Q.   We talked about the second bullet
17  point under No. 2 on 00004723, the CRDM field
18  technical support policy already.
19      Putting that one aside, did you
20  follow the rest of the technical support policy
21  in your time at Medtronic that this policy was
22  in effect?
23      A.   Yes, I -- I tried to follow this,
24  although on No. 3, first bullet point, I would
25  say that the Google Calendaring violated that.

CATHLEEN FORNEY

1
2      Q.   Other than what we just discussed
3  about the second bullet point under No. 2 and
4  what we just discussed about the first bullet
5  under No. 3, patient data, though, you followed
6  the rest of the technical support policy;
7  correct?
8      A.   Yes.
9      Q.   Are there any limits in the
10  technical support policy on the number of
11  device checks that you can provide to a
12  customer?
13      A.   No.
14      Q.   I think earlier -- again, I just
15  want to make sure I understand how it worked.
16      If a doctor determined that a
17  patient should be implanted with a Medtronic
18  device, would someone from that practice or
19  that hospital call Medtronic to schedule the
20  implantation?
21      A.   Yes.
22      Q.   And request that Medtronic come to
23  the implantation?
24      A.   Yes.
25      Q.   And if a Medtronic device was being

CATHLEEN FORNEY

1
2  implanted, Medtronic would provide someone to
3  be at the implantation; correct?
4      A.   Yes.
5      Q.   And then after the implantation, the
6  Medtronic devices required follow-up checks?
7      A.   Yes.
8      Q.   And did the frequency and type of
9  follow-up vary device to device over the years,
10  or was it the same?
11      A.   So the next service of item that we
12  offered at no cost to physicians was a check
13  before the patient would go home from the
14  hospital.
15      Q.   And so would the physician request
16  that Medtronic be present at that check?
17      A.   Yes.
18      Q.   The predischarge check?  And then if
19  the physician requested that Medtronic be
20  present at that predischarge check, would
21  Medtronic provide a field person to do that?
22      A.   It was the expectation that we did
23  those on all of our implants.  And the
24  expectation derived because it's a service we
25  offered, and then once they became used to it,

CATHLEEN FORNEY

1
2  then we had to do it on everybody.  And it was
3  a competitive advantage initially over
4  competitors that did not offer it.
5      Q.   And after the patient was discharged
6  from the hospital, there were follow-up
7  appointments to check the device; correct?
8      A.   Correct.
9      Q.   And did the number of follow-ups and
10  frequency of follow-ups depend on the device
11  over the years, or were they the same
12  regardless of the device?
13      A.   The number of follow-ups that a
14  patient would undergo is set by Medicare
15  guidelines.
16      Q.   Does it vary device to device, and
17  has it varied over time, or is it all the same?
18      A.   It's not all the same.  It increases
19  in frequency as the device gets older.
20      Q.   And if the physician practice or
21  hospital had a patient who needed a device
22  check, they would call Medtronic?
23      A.   Yes.
24      Q.   If it was a Medtronic device they
25  would call Medtronic; correct?

CATHLEEN FORNEY

1
2    A.   Yes.
3    Q.   And if they asked for -- if the
4  physician practice asked for someone from
5  Medtronic to be present for the follow-up
6  check, Medtronic would provide someone?
7    A.   Yes.
8    Q.   And that was for the lifetime of the
9  device as implanted in the patient?
10   A.   That is a frequent saying that
11 Medtronic would offer customers, that we're
12 here to support the device in the patient for
13 the lifetime of that device.
14   Q.   And this that we've just discussed
15 applied to -- sorry.  Strike that question.
16     So if you had a physician practice
17 and they only implanted one Medtronic device in
18 one patient, they would be able to get these
19 services; correct?
20   A.   Correct.
21   Q.   And if it was a physician practice
22 that implanted a thousand implants in a year,
23 they would get this service for each of those
24 thousand implants; correct?
25   A.   Yes.

CATHLEEN FORNEY

1
2    Q.   And if the patient moved across the
3  country during the time that she had a
4  Medtronic device implanted, Medtronic would be
5  available to do those checks in her new
6  geography?
7    A.   Yes.
8    Q.   Where she's getting the checks from
9  a different physician practice?
10   A.   Yes.
11   Q.   This is what you got when you
12 implanted a Medtronic device, correct, for the
13 lifetime of the device?
14     MS. BURKE:  Object to form.
15 BY MS. MAYER:
16   Q.   Is this what you got when you
17 implanted a Medtronic device for the lifetime
18 of the device?
19     MS. BURKE:  Object to form.
20     THE WITNESS:  Yes.  Not all clinics
21   required that level of service; some
22   clinics did.
23 BY MS. MAYER:
24   Q.   But if a clinic asked for Medtronic
25 to be present for a check on a Medtronic

CATHLEEN FORNEY

1
2  device, Medtronic would provide it; correct?
3    A.   Yes.
4    Q.   Although some clinics and for some
5  circumstances may have chosen not to ask;
6  correct?
7    A.   Correct.
8      MS. BURKE:  Are we at a good break
9    point?
10     MS. MAYER:  How long have we been
11   going?
12     THE VIDEOGRAPHER:  We've been going
13   for a little over an hour, hour and 2
14   minutes.
15     MS. MAYER:  Yes, we can take a short
16   break, sure.
17     THE VIDEOGRAPHER:  We are going off
18   the record at 5:06.
19     (Recess taken from 5:06 p.m. to
20   5:23 p.m.)
21     (Forney Exhibit 6, Email
22   communication ending 8-1-11, Bates
23   MDTEPA-92253, was marked for
24   identification.)
25     THE VIDEOGRAPHER:  We are back on

CATHLEEN FORNEY

1
2  record at 5:23.
3  BY MS. MAYER:
4    Q.   Ms. Forney, I'm showing you what
5  we've marked as Exhibit 6 for this deposition.
6  It's an email Bates-numbered MDTEDPA00092253.
7      Do you see that?
8    A.   Yes.
9    Q.   At the top it says -- it's an email
10 from Andrea Riefenstahl to Cathleen Forney,
11 August 1st, 2011.
12     Do you see that?
13   A.   Yes.
14   Q.   Do you recognize the -- this email?
15   A.   It's one I sent.  I didn't recall
16 off the top of my head.
17   Q.   Who is Andrea Riefenstahl?
18   A.   Andrea Riefenstahl is the manager of
19 the Lancaster lab.
20   Q.   Do you know what LG Health
21 signifies?
22   A.   It's Lancaster General Hospital.
23   Q.   Is that your current employer?
24   A.   That is.
25   Q.   And what role does she have at the

CATHLEEN FORNEY

1           CATHLEEN FORNEY
2 lab?
3     A.   She's manager of the
4 electrophysiology lab.
5     Q.   Underneath her response to you is
6 your email to her, and it copies Letitia
7 Esbenshade-Smith.
8     Do you see that?
9     A.   Yes.
10    Q.   Who is Letitia Esbenshade-Smith?
11    A.   She runs the electrophysiology
12 school in Lancaster.
13    Q.   What do you mean, the
14 electrophysiology school in Lancaster?
15    A.   There is a school to become
16 electrophysiology techs that's certified here
17 in Lancaster; and Letitia is the manager of
18 that school.
19    Q.   So Letitia, is she a Medtronic
20 employee?  No; right?
21    A.   No.
22    Q.   And she's not an employee of
23 Lancaster General either; correct?
24    A.   She is an employee of Lancaster
25 General.

CATHLEEN FORNEY

1           CATHLEEN FORNEY
2     Q.   So Lancaster General runs the EP
3 school?
4     A.   Yes, at this time, in 2011.
5     Q.   It no longer runs the EP school?
6     A.   I think they've separated out the
7 entity to a Pennsylvania College of Health
8 Sciences, something like that.
9     Q.   But at the time in 2011, LGH,
10 Lancaster General, ran the EP school?
11    A.   Yes.
12    Q.   So in your email to Andrea
13 Riefenstahl, you say that "Letia referred me to
14 you regarding the following exploring
15 conversation."
16    And the paragraph that follows
17 raises a question about whether the cost of
18 devices would decrease if manufacturer rep
19 support would not be required in EP lab arena.
20    Do you see that?
21    A.   Yes.
22    Q.   Why were you raising this with Andi
23 Riefenstahl at this time, if you remember?
24    A.   So this would have been reaching out
25 to somebody outside of my district.  We did not

CATHLEEN FORNEY

1           CATHLEEN FORNEY
2 serve -- the district I was in did not serve
3 this hospital.  So I'm trying to just think
4 back.
5    My guess is that we were, in our
6 district, trying to understand better the cost
7 of a hospital doing business if we weren't
8 there.
9    Q.   You said "my guess is."  Are you
10 just filling in the blanks today where you
11 don't recall based on what you see here, or do
12 you remember why you were reaching out to Andi
13 at this time?
14    A.   I don't remember specifically why I
15 reached out to her, but it's obvious what the
16 question is.
17    Q.   Because it's on the face of the
18 document?
19    A.   Correct.
20    Q.   Okay.  The beginning of the second
21 paragraph of your email states that "Hospital
22 administration at large converses with us about
23 the cost of doing business with device
24 manufacturers."
25    Do you see that?

CATHLEEN FORNEY

1           CATHLEEN FORNEY
2     A.   Yes.
3     Q.   What did you mean by "hospital
4 administration at large"?
5     A.   It's a question that comes up often,
6 that the cost of Medtronic devices are
7 expensive, and I assume that they're exploring
8 what would it look like if their lab staff
9 performed some of the performances in the
10 implant arena.
11    EP lab is where the implants occur,
12 and --
13    Q.   You say in the -- I'm sorry.  Go
14 ahead.
15    A.   I did not talk to hospital
16 administration specifically, so I'm assuming
17 that this would have been conversations with
18 sales reps within my district and the district
19 manager.
20    Q.   But you weren't having conversations
21 about cost of doing business with hospital
22 administration; correct?
23    A.   That was not my role as the district
24 service manager; but I was aware that those
25 conversations were a concern and were being

CATHLEEN FORNEY

1 conducted.
2     Q.   And how were you aware that those
3 conversations were occurring and were being
4 conducted?
5     A.   Just conversations amongst sales rep
6 and the district manager.
7     Q.   It says, "Given" -- the third
8 paragraph, "Given LGH experience with EP
9 school," and then that sentence continues,
10 you're asking, it looks like, Andi for a
11 ballpark figure estimate.
12        Do you see that?
13     A.   Correct.
14     Q.   Why did you think that the LGH
15 experience with EP school was relevant here?
16     A.   Lancaster trains their
17 electrophysiology staff, I think it's like five
18 different levels, with the top level being that
19 they're functioning as a fellow and inserting
20 catheters; and they need minimal support by
21 industry -- let me rephrase that last sentence.
22        I would say that, given the training
23 to their staff and also that they would cycle
24 electrophysiology students through from the

CATHLEEN FORNEY

1 school that they had a good sense of what it
2 costs to train an EP lab tech, not only a new
3 one but one that had been there for a few
4 years.
5     Q.   And at the top of the email, Andi
6 Riefenstahl says she needs to talk to HR.
7        Did she get back to you, other than
8 with this email, on your questions?
9     A.   I don't recall ever hearing back
10 from her.
11     Q.   Did you have any more conversations
12 or emails with others about your -- these
13 questions that you raised in this August 1,
14 2011, email with Andrea Riefenstahl?
15     A.   No.
16     Q.   Do you recall why you were reaching
17 out on this -- on these questions at this time?
18     A.   Given I live in Lancaster and had
19 relationships with individuals at this
20 hospital, I was probably asked by the sales
21 team or district manager if I would explore
22 what the cost of -- of what this paragraph
23 states.
24     Q.   But you don't recall specifically?

CATHLEEN FORNEY

1     A.   No.
2        MS. MAYER:  Can we grab the Second
3 Amended Complaint?
4        THE WITNESS:  Can I add a lingering
5 thought?
6 BY MS. MAYER:
7     Q.   Which question do you have a
8 supplemental answer to?
9     A.   The last -- I believe it's the last
10 one.
11     Q.   I said you don't -- I asked, you
12 don't recall specifically?  And you said, no.
13        You do recall --
14     A.   I do recall general conversations at
15 this time around the Europe implant model where
16 no support was afforded during the implant
17 arena.  You heard rumors of that model coming
18 to the United States; and it could be that
19 combined with hospital administration
20 conversations that I was prompted to ask and
21 inquire.
22     Q.   You said you heard -- you recall
23 general conversations around the Europe implant
24 model and rumors of that model coming to the

CATHLEEN FORNEY

1 United States.
2        Who were these general conversations
3 with?
4     A.   Probably coworkers.
5     Q.   Probably, but you're not sure?
6     A.   Correct.
7     Q.   So it could have been someone other
8 than coworkers.
9     A.   Could have been someone from
10 corporate Medtronic.  I don't recall.  But
11 there was knowledge by the US field that Europe
12 did not provide the same support that was
13 provided in the US, and there was pricing
14 structure differences across the continents.
15     Q.   So do you remember the names of any
16 coworkers or corporate individuals that you
17 spoke about this with at that time?
18     A.   No.
19     Q.   Do you remember the dates of any of
20 those conversations?
21     A.   No.
22     Q.   Or where those conversations
23 occurred?
24     A.   Could have been a regional meeting,

CATHLEEN FORNEY

1
2  where there's more individuals together.  I'm
3  just assuming it's a high probability.
4          I do recall the conversations --
5  hearing conversations.  I was more of a passive
6  participant and listening.  I don't have
7  knowledge -- specific knowledge of what's done
8  outside of the US.
9      Q.   And you don't know if they were
10  regional meetings.  You're just --
11     A.   I'm making an assumption.
12     Q.   -- making an assumption.
13          And it was in those same general
14  conversations that you recall rumors of the
15  European implant model coming to the US?
16     A.   Something to that end.
17     Q.   But nothing specific and you're not
18  sure exactly what was said; right?
19     A.   Correct.
20          MS. MAYER:  Can you mark the Second
21  Amended Complaint.
22          (Forney Exhibit 7, Second Amended
23  Complaint, was marked for identification.)
24  BY MS. MAYER:
25     Q.   I'm putting before you what has been

CATHLEEN FORNEY

1
2  marked as Exhibit 7.  Do you see Exhibit 7?
3      A.   Yes.
4      Q.   And do you know what this document
5  is?
6      A.   The second amendment -- amended
7  complaint.
8      Q.   And you've seen this document
9  before; correct?
10     A.   Yes.
11     Q.   I'd like to turn your attention to
12  paragraph 48 on page 18.  At the beginning of
13  paragraph 48 that says, "To date Medtronic
14  continues to provide kickbacks in the form of
15  free surgical support" -- and we've talked
16  about that today; right?
17     A.   Yes.
18     Q.   -- "and post-implant device
19  interrogation and analysis" -- and we talked
20  about that; right?
21     A.   Yes.
22     Q.   -- "consulting services,
23  reimbursement services and various other
24  services of value to healthcare providers such
25  as data entry and practice management

CATHLEEN FORNEY

1
2  worksheets and the like."
3          Did I read that correctly?
4      A.   Yes.
5      Q.   Is there anything -- I believe we've
6  talked about a number of things today.  Is
7  there anything that you're referring to here
8  that we haven't talked about today?
9          MS. BURKE:  Object to form.
10         THE WITNESS:  Medtronic was --
11  encouraged the field to be experts in
12  partnering at high levels in many ways or
13  have resources we could call on to support
14  their learning so that -- it's almost like
15  we were seamless like one of their staff,
16  and it would be very, very painful for
17  them to change the contract and not
18  partner with us.
19         And I would say in addition to these
20  items that are listed, you know, we went
21  through extensive training on ask and
22  exploring questions to better understand
23  customers' explicit needs.
24  BY MS. MAYER:
25     Q.   Anything else?

CATHLEEN FORNEY

1
2      A.   And we would also try to provide
3  solutions to what those explicit needs, once
4  they became known.
5      Q.   What customer needs that we haven't
6  already discussed today -- excuse me.  Strike
7  that.
8          What solutions are you aware that
9  Medtronic provided to address specific customer
10  needs that we haven't addressed today?
11         MS. BURKE:  Object to form.
12         THE WITNESS:  Sue Heilman was a
13  reimbursement specialist that would come
14  to districts and talk to customers about
15  specific reimbursement strategies.
16  BY MS. MAYER:
17     Q.   Is there anything else?  The -- any
18  other solution that you're aware of that
19  Medtronic provided to address specific customer
20  needs that we haven't addressed today?
21     A.   We had a truck that physician and
22  staff, hospital or implant staff or office
23  staff could visit and experience virtual
24  implants, conduct virtual implants on a variety
25  of anatomy, that no other competitor was able

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2  to offer.  If --
3       Q.   Are there any other solutions that
4  Medtronic provided to address specific customer
5  needs that we haven't addressed?
6           MS. BURKE:  Counsel, I'd just ask
7       that you refrain from interrupting the
8       witness.
9           THE WITNESS:  If they lost an
10      employee, we would stand in the gap while
11      a new employee was hired and trained.
12  BY MS. MAYER:
13      Q.   Who did you do that for?  What
14  specific doctors or practices did you stand in
15  the gap for?
16      A.   I don't recall every clinic that we
17  provided that service for in Eastern
18  Pennsylvania.  I do recall we did that for
19  St. Luke's.
20      Q.   When?
21      A.   When they had change in staff.
22      Q.   And so if they lost an employee, you
23  would stand in and do the device checks that
24  the staff person was doing?
25      A.   Correct.

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2       I provided a lot of education to
3  heart failure clinics on interpreting
4  implantable device heart failure diagnostics,
5  which was a new arena Medtronic was working in.
6       I encouraged the integration of
7  device diagnostics into the heart failure
8  clinic workflow, so it could be used in the
9  management of heart failure patients and
10  setting up those workflows, customized
11  different clinics.
12       Some of the items we've talked about
13  already are Lean Sigma type events, creating
14  worksheets.
15      Q.   Yes, we don't -- other than -- right
16  now, just to clarify with my question, I'm
17  interested only in what we haven't already
18  covered today.
19      A.   Okay.
20      Q.   And your counsel has encouraged me
21  to end the deposition efficiently.
22       So I think you've identified a
23  number of additional items -- Sue Heilman
24  talking about reimbursement strategies; the
25  truck that offered virtual implants; that a

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2  Medtronic field employee could do device checks
3  if St. Luke's or another clinic was
4  short-staffed; that you provided a lot of
5  education to heart failure clinics on
6  interpreting heart failure diagnostics; and you
7  encouraged the integration of device
8  diagnostics into heart failure clinic workflow.
9       Does that wrap up the various other
10  services of value that -- or solutions that
11  Medtronic provided to respond to specifically
12  identified customer needs --
13          MS. BURKE:  Object.
14  BY MS. MAYER:
15      Q.   -- that you recall?
16          MS. BURKE:  Object to form.
17          THE WITNESS:  No.
18  BY MS. MAYER:
19      Q.   What other solutions that were
20  designed to respond to specifically identify
21  customer needs --
22      A.   Medtronic --
23      Q.   -- did you do?
24      A.   My apologies.
25       Medtronic provided courses for

CATHLEEN FORNEY

1  CATHLEEN FORNEY
2  clinicians and physicians to attend.  They
3  partnered to provide referral dinners to help
4  increase the business.
5       We also provided education on a
6  local level, courses for clinical staffs to
7  increase their comfort level with managing
8  patients with devices -- and those were
9  numerous -- to advance their knowledge, skills
10  and abilities.
11       We did whatever it took to be the
12  leader in education and service, to be the best
13  at all that we did.
14      Q.   Is there anything else?
15          MS. BURKE:  Object to form.
16          THE WITNESS:  Not in the moment.
17  BY MS. MAYER:
18      Q.   And other than the staffing support
19  that we've already discussed today, is there
20  any other type of staffing support that you
21  maintain is a kickback in this case?  Or have
22  we covered it today?
23          MS. BURKE:  Object to form.
24          THE WITNESS:  If we were called, we
25  went, supporting ICD support groups,

CATHLEEN FORNEY

1
2  supporting physicians during recalls,
3  navigating through Paceart to find the
4  patients with that model number to assist
5  the physician in understanding the
6  significance of a recall on his clinic,
7  facilitating a scientist conversation with
8  a physician around a potential research
9  question.
10 BY MS. MAYER:
11     Q.   About a Medtronic product; right?
12     A.   It could entail a Medtronic product.
13 The research question could be general across
14 the board.
15     Q.   Not device-specific?
16     A.   Yeah.
17         But we had education grants that
18 potential investigators could apply for for
19 research.
20     Q.   Sorry.  The educational grants are a
21 staffing kickback?  How is that a staffing
22 kickback?
23     A.   That's a service, a consulting
24 service that we supplied if an implicit need
25 came or rose up.

CATHLEEN FORNEY

1
2     Q.   But we've covered any staffing --
3         MS. BURKE:  Object to --
4  BY MS. MAYER:
5     Q.   -- that you believe -- today already
6  that you believe was a kickback; correct?
7         MS. BURKE:  Object to form.
8         THE WITNESS:  Yes, I believe we've
9  covered the main ones.
10 BY MS. MAYER:
11     Q.   Well, we've covered any of the ones
12 that you're asserting is a part this case;
13 right?
14     A.   To the best of my knowledge, yes.
15     Q.   Could you turn to page 19 of
16 Exhibit 7.
17         Do you see -- it's a chart that's
18 part of paragraph 49 to the Second Amended
19 Complaint that there is a chart here on page
20 19.  Do you see that?
21     A.   Yes.
22     Q.   Where did you -- I'm sorry.  Scratch
23 that.
24         What is your basis for alleging
25 that, on November 9th, 2011, Dr. Gulotta was

CATHLEEN FORNEY

1
2  involved in a single ICD check with patient AJ?
3     A.   I took these off of our Google
4  Calendar.
5     Q.   So were you involved in any of these
6  events that are listed here, yourself
7  personally?
8     A.   No, because I was gone from
9  Medtronic.
10    Q.   Do you know -- sorry, strike that.
11        Right above the chart it says, "Each
12 of these health care providers participates in
13 Medicare."
14        Do you see that?
15    A.   Uh-huh.
16    Q.   What's your basis for saying that
17 each of these providers participates in
18 Medicare?
19    A.   Because they get paid for the work
20 that they do.
21    Q.   But do you know that Dr. Gulotta
22 participates in Medicare, or are you just
23 assuming he participates in Medicare?
24    A.   If you're involved in running a
25 clinic or if you're a cardiologist that runs a

CATHLEEN FORNEY

1
2  clinic, you participate in Medicare.
3     Q.   But whether that's a reasonable
4  inference or not, I'm asking, you know, have
5  you had a conversation with Dr. Gulotta
6  where you talked about his Medicare participation?
7     A.   No.
8     Q.   And would St. Luke's Allentown be
9  the biller for patient EH on November 16th,
10 2011?
11        MS. BURKE:  Object to form.
12 BY MS. MAYER:
13    Q.   Or would somebody else bill for
14 that, a doctor?
15    A.   The office typically conducted the
16 billing.
17    Q.   Who would be the -- the billing
18 would be on behalf of the doctor or on behalf
19 of a hospital or on behalf of something else?
20        MS. BURKE:  Object to form.
21 BY MS. MAYER:
22    Q.   Do you know?
23    A.   St. Luke's Allentown could have been
24 at a hospital or a clinic, so where the device
25 interrogation occurred.

58 (Pages 226 to 229)

CATHLEEN FORNEY

1
2    Q.   And you don't know where it occurred
3   because this is all the information you have;
4   right?
5    A.   At this one, yes.
6    Q.   Okay.  What about the Lehigh Valley
7   Cardiology Associates?
8    A.   That's an office.
9    Q.   So would the Pacer check for patient
10  RF on December 13t, 2011 -- do you know
11  whether it would have been billed by Lehigh
12  Valley Cardiology Associates or by a doctor who
13  was a part of the practice?
14    A.   It would have been billed on behalf
15  of the doctor that performed the professional
16  component.
17    Q.   And we don't know what doctor
18  performed the professional component; right?
19    A.   I don't personally, no.
20    Q.   Okay.  And it says that -- and so --
21  well --
22    MS. BURKE:  Are you done with
23  Exhibit 7?
24    MS. MAYER:  No.  Mark this as
25  Exhibit 8.

CATHLEEN FORNEY

1
2    (Forney Exhibit 8, Pictures of
3  Patient Information Posted to Lehigh
4  Valley Gmail Account Associated with
5  Google Voice, Bates Rel-1418 to 1458, was
6  marked for identification.)
7  BY MS. MAYER:
8    Q.   I'm showing you what's been marked
9  as Exhibit 8, Ms. Forney.
10    Do you recognize this?
11    A.   Yes.
12    Q.   What is this?
13    A.   These are pictures that I took from
14  Gmail associated with a Google Calendaring
15  system for Eastern Pennsylvania.
16    Q.   And did you provide this to the
17  United States and the states?
18    A.   Yes.
19    Q.   Can you turn to the Bates number --
20  it's about -- it's two pieces of paper in,
21  about three pages in, REL-01421.  Do you see
22  that page?
23    A.   421, yeah.
24    Q.   Okay.  So this looks like a snapshot
25  of what -- what is this?  An email?

CATHLEEN FORNEY

1
2    A.   Yes.
3    Q.   It says, "Kay Brotzman, to me."
4  Does the "me" refer to you?
5    A.   I was no longer with Medtronic at
6  the time this was taken.
7    Q.   But you still had access to the
8  Google Calendar?
9    A.   Yes.
10    Q.   So do you know who the "me" refers
11  to?
12    A.   Which are you looking at, this one
13  here, Kay Brotzman?
14    Q.   Yep, the one that's blown up on the
15  screen.
16    A.   Where is -- oh, Kay Brotzman.  It
17  looks like it's directed to Chuck Seighman.
18    Q.   I'm sorry.  What was the last name?
19    A.   Or not Chuck Seighman.  Chuck Mertz.
20    Q.   Okay.
21    A.   Yeah.  Chuck set up the Google
22  Calendaring system and the Google portal for
23  customers.  So probably, since this is directed
24  at Chuck, because he created it, is -- that's
25  probably who "me" refers to.

CATHLEEN FORNEY

1
2    Q.   You think it's Chuck.
3    A.   Yeah.
4    Q.   Okay.  So it's -- Kay Brotzman says,
5  "Good morning, Chuck.  We have a pacer check in
6  the office on November 22 on Delores Neifert,
7  who is having a general change done.  Can you
8  please make sure someone can be here to help us
9  out?"
10    Right?  Do you see that?
11    A.   Yeah.
12    Q.   So is this the source of the
13  information in the chart that says patient --
14  in Exhibit 7 on page 19, that says, "Patient
15  DN, Lehigh Valley Cardiology Associates, Pacer
16  check, November 22, 2011"?
17    A.   Say that again.
18    Q.   Sure.  Does -- is the Kay Brotzman
19  to Chuck Mertz email that is screenshotted in
20  Exhibit 88, page 01421 the source for your
21  allegation on page 19 of the Second Amended
22  Complaint, Exhibit 7, that patient DN at Lehigh
23  Valley Cardiology Associates had a Pacer check
24  on November 22, 2011?
25    A.   No, these are two different items.

CATHLEEN FORNEY

1
2    Q.   Okay.  So what -- you said the
3    source for the --
4        A.   So --
5        Q.   -- information in this chart is
6    not --
7        A.   -- this is the Pacer chart.  This
8    would have come off the Google Calendaring
9    system, where this is the email.
10       Q.   Okay.
11       A.   So this individual -- oh, wait,
12   maybe it is.  Hold on.  She had a gen change.
13   So maybe in this case, it initiated with an
14   email, and then it got put on the calendar --
15   calendaring system, and this here looks like
16   it's more off the calendaring system.  But this
17   would have been the request.
18       Q.   Do you remember --
19           MS. BURKE:  And let the record
20       reflect that "this here" the witness is
21       referring to Exhibit 7, page 19.
22   BY MS. MAYER:
23       Q.   Okay.  So turn to page 01422 of
24   Exhibit 8.
25       A.   Wait, which is Exhibit 8?

CATHLEEN FORNEY

1
2    Q.   The --
3    A.   Email?
4    Q.   -- Gmail account document.
5    A.   01428?
6    Q.   01422.  It's the next page.
7    A.   Oh, the next page, okay.
8    Q.   This -- and the screenshot, the top
9    screenshot email, is an email from Cathy Jo
10   Leiby to me.  Do you see that?
11       A.   Yeah.
12       Q.   And it says in the body of the
13   email, "I know Dave spoke to you regarding
14   Elsie Hilbert; they've decided they would like
15   her device interrogated sometime today.  She is
16   in room 450 at St. Luke's Allentown."
17       A.   Uh-huh.
18       Q.   And the date of this email is a
19   little hard to see, but it looks like it's
20   11/16.
21       A.   Yes.
22       Q.   And if you look on Exhibit 7, the
23   Second Amended Complaint, right below the line
24   about patient DN is a line about patient EH,
25   St. Luke's Allentown, interrogation of device,

CATHLEEN FORNEY

1
2    November 16th, 2011.
3    A.   Uh-huh.
4    Q.   But this email wasn't the source of
5    your information on this?
6        A.   This email could be the source.  And
7    like I shared, then it would be put on the
8    calendar.  So there's two places you can pull a
9    source from.
10       Q.   And do you remember which you pulled
11   this from or --
12       A.   I don't recall exactly which one.
13       Q.   Okay.  Okay.
14       A.   But it's double-sourced.
15       Q.   Okay.  Do you know for sure it's in
16   both, or you just recall that?
17       A.   We can look at some of the other
18   documents or pictures of the calendars, and
19   that would confirm.
20       Q.   Okay.  If you turn to the next page
21   in Exhibit 8 which is REL-01423, do you see
22   that?
23       A.   Yep.
24       Q.   It's a "Google Voice, to me."  And
25   it's a voicemail that makes reference to Lehigh

CATHLEEN FORNEY

1
2    Valley Heart Specialists and a patient called
3    Michael Boyle?
4        A.   Correct.
5        Q.   And then you see the line below,
6    patient EH on page 19 of Exhibit 7 refers to a
7    patient MB and Lehigh Valley Cardiology
8    Associates.
9            Is this voicemail the source of that
10   allegation in the complaint?
11       A.   Per my prior response, it could be
12   this email.  Also it could be confirmed on a
13   calendar.
14           MS. MAYER:  Okay.  Can we mark
15       another exhibit?  This is Exhibit 9.
16           (Forney Exhibit 9, Pictures of
17       Patient Information Posted to Google
18       Calendaring 11.11.11, Bates REL-1666 TO
19       1772, was marked for identification.)
20   BY MS. MAYER:
21       Q.   I'm showing you what has been marked
22   as Exhibit 9.  Do you recognize this?
23       A.   Yes.
24       Q.   What is it?
25       A.   These are pictures from Google

Page 238

CATHLEEN FORNEY

Calendar system.

Q.   And did you produce this to the government?

A.   Yes.

Q.   Do you -- how would I look through this printout to try to find reference to the events that you listed on page 19 of the second amended complaint, Exhibit 7?

A.   I'm not sure if --

Q.   I will tell you, I haven't been able to find them.

A.   -- they all got copied.

But I would say a sample could be here where I would open up an event and then the details would populate.  So you may not be able to see it from this higher level, but if there's a picture of an event that's open, that's how you could read the details.

Q.   So if I wanted to try to find "Patient DN, Pacer check with Lehigh Valley Cardiology Associates on November 22, 2011," should I be looking for these opened windows like we see on REL-01667 of Exhibit 9 that has notes about an ICD reprogramming for a

Page 239

CATHLEEN FORNEY

G. Witmer?  I should be looking for something like that for a patient DN?

A.   Yeah, it's hard to read the details.

My intent was to open each one of these to provide the details from the calendar view, and it may not all have copied.

Q.   When you prepared this information for your complaint in this case, did you still have electronic -- when you were drafting that original complaint to the case, did you still have access to the electronic Google Calendar records that -- some of which you printed off here?

A.   My access to the Google Calendar ended in February of 2012, I believe.

Q.   Okay.  So did you prepare for the Complaint the list of patient and device check events that we see in the complaint after February 2012?

A.   Yes.

Q.   So you relied on something other than the electronic Google Calendar in order to make the chart that we see on page 19 of Exhibit 7; right?

Page 240

CATHLEEN FORNEY

A.   I relied on the pictures I took.

Q.   Okay.  Which are in Exhibit 9?

A.   These are samples of them, yes.

Q.   Are there more of these that you have that are not included in Exhibit 9?

A.   I don't know.

MS. MAYER:  Susan, do you know whether you produced all of the Google Calendars that Ms. Forney collected?

MS. BURKE:  I believe we did, both in hard copy and electronic, but I can double-check.

THE WITNESS:  Yeah.

MS. MAYER:  By "electronic," you mean, like, a .pdf of this paper printout; right?

MS. BURKE:  I need to -- I cannot -- I cannot, as I sit here today, recall what the format --

BY MS. MAYER:

Q.   Okay.  And so the -- so, Ms. Forney, the information that we see in the chart on page 19 in Exhibit 7 either came from the email printouts that we discussed from Exhibit 8 or

Page 241

CATHLEEN FORNEY

from your printouts from the Google Calendar that are in Exhibit 9 --

A.   Correct.

Q.   -- and that may be the end of it, and I can follow up with Ms. Burke separately to see whether there are any additional Google Calendars that were printed out that could be a source of this information.

A.   Yeah.

Q.   But there wouldn't be any other potential source of that information; correct?

A.   My recollection was I printed out more samples like this, so the details could be seen.

Q.   Okay.  And in the Second Amended Complaint right above the chart on page 19, it says that each of the providers listed in the chart submitted claims for the patients listed in the chart to the Medicare program.

Is that pleading also based on the information in Exhibit 8 and information from the Google Calendars in Exhibit 9?

A.   Each healthcare provider that performs ICD or Pacer or CRT checks has

CATHLEEN FORNEY

1
2  mechanisms in place to bill for the work that's
3  performed.
4      Q.   And so other than what you've just
5  said, which is your general understanding, that
6  any -- each -- that each healthcare provider
7  that performs ICD or Pacer or CRT checks has
8  mechanisms in place to bill for work that's
9  performed, do you have any other -- are you
10 relying on any other information in support of
11 your allegation that each of these providers
12 submitted claims for each of these patients to
13 Medicare?
14         MS. BURKE:  Object to the
15     characterization of the testimony.
16 BY MS. MAYER:
17     Q.   Did I misrepresent your testimony,
18 Ms. Forney?
19     A.   In addition, when we performed
20 follow-ups, we completed worksheets and
21 submitted them to the clinic.
22     Q.   Did you -- so do you have
23 worksheets -- well, strike that.
24         Do the worksheets show that a claim
25 for a patient was submitted to a particular

CATHLEEN FORNEY

1
2  insurer?
3      A.   No.
4      Q.   So have we now covered all of the
5  information you have about -- in support of
6  your allegation that these providers in the
7  chart on page 19 of Exhibit 7 submitted claims
8  for the patients listed there to the Medicare
9  program?
10         MS. BURKE:  Object to form.
11         THE WITNESS:  Yes.
12 BY MS. MAYER:
13     Q.   And so you don't -- you don't
14 actually know that patient AJ was a Medicare
15 beneficiary; right?  AJ could have been a
16 private health insurance beneficiary; right?
17         MS. BURKE:  Object to form.
18         THE WITNESS:  The majority of
19     patients with pacemakers and medical
20     devices, high, high probability it's
21     Medicare, just due to the age of the
22     population that's implanted.
23 BY MS. MAYER:
24     Q.   Right.
25     A.   I can't say specifically if that

CATHLEEN FORNEY

1
2  patient was 50 years old and private insurance
3  or Medicaid or Medicare.
4      Q.   Right.  And the same is true for all
5  the patients listed on page 19 in that chart;
6  right?
7      A.   Correct.
8      Q.   Okay.  Turning to paragraph 50 of
9  the Second Amended Complaint, Exhibit 7, on
10 page 20, is the source of the information that
11 we see about Palmerton and Quakertown and
12 Wind Gap, also the snapshotted emails and
13 records that we see in Exhibit 8 that we've
14 already discussed?  And I can direct your
15 attention, for example, to page 01448 of
16 Exhibit 8.
17     A.   Yes.
18     Q.   So these -- do you have any
19 information about who these patients were or
20 what was done in Palmerton or Quakertown or
21 Wind Gap on these dates other than what appears
22 in Exhibit 8 on page 01448?  Or elsewhere in
23 Exhibit 8?
24     A.   So the device clinic at Palmerton on
25 11/30, a Medtronic individual would show up and

CATHLEEN FORNEY

1
2  do six device checks.
3      Q.   Right.  But other than what you see
4  here, you weren't at that clinic; right?
5      A.   Correct.
6      Q.   And you haven't talked to anybody
7  about what did or didn't happen at that clinic;
8  right?
9      A.   On this date, no.
10     Q.   Right.  And so, hypothetically, all
11 six device checks could have canceled that day;
12 right?
13     A.   Correct.
14     Q.   And there's no information here
15 about insurance; correct?  So, hypothetically,
16 all of these patients could have been self-pay;
17 correct?
18     A.   Correct.
19     Q.   I'd like to turn your attention to
20 paragraph 52 on page -- starts on page 21 of
21 the Second Amended Complaint.  It's Exhibit 7.
22         Paragraph 52 on page 21 starts
23 listing names and addresses.  Do you see that,
24 where the first one says, "California," there's
25 a colon, "James T. Heywood"?  Do you see that?

CATHLEEN FORNEY

1
2  It's Exhibit 7, page 21, paragraph 52.
3      A.   Page 21?
4      Q.   Yeah, sorry.  I do that myself.
5      A.   Oh, I'm on page 52.
6      Q.   Yeah.  So page 21, paragraph 52.  Do
7  you see how it starts with "California:  James
8  T. Heywood"?
9      A.   Uh-huh.
10     Q.   And then after that, the paragraph
11  52 lists names continuing on until page 27,
12  correct, of Exhibit 7?
13          Did you supply these names for the
14  Complaint?
15     A.   I don't recall.
16     Q.   Do you have any information --
17  sorry.  Strike that.
18          Sitting here today, do you know a
19  James T. Heywood in La Jolla, California?
20     A.   I know of him.
21     Q.   How do you know of him?
22     A.   He's well-known.
23     Q.   For what?
24     A.   As an electrophysiologist.
25     Q.   Okay.  Do you know whether Medtronic

CATHLEEN FORNEY

1
2  provided free device checks to him in the time
3  period relevant to this case?  Or is that
4  outside your personal knowledge?
5      A.   That's outside my personal
6  knowledge.
7      Q.   Do you know who Gregory Engel is?
8      A.   No.
9      Q.   And so you don't know, obviously,
10  whether Medtronic provided any free services to
11  Gregory Engel; right?  It's outside your
12  personal knowledge?
13     A.   It's outside my personal knowledge.
14     Q.   Do you -- what about any of the --
15  take a moment -- any of the other names that
16  appear in paragraph 52?  Do you have personal
17  knowledge of any services that Medtronic
18  provided to any of these people?
19          MS. BURKE:  Object to form.
20          THE WITNESS:  I don't recall if I
21  ran a report out of Salesforce and got
22  these names.  I just don't recall back
23  that far.
24  BY MS. MAYER:
25     Q.   When was your access to Salesforce

CATHLEEN FORNEY

1
2  cut off?
3      A.   The day I left Medtronic.
4      Q.   Did you print out a report of -- off
5  of Salesforce that would contain these names?
6      A.   I don't recall.
7      Q.   You don't recall running any such
8  report; right?
9      A.   I don't recall in this moment if I
10  ran a report of physician names and addresses
11  in Salesforce.
12     Q.   Well, why would you have run a
13  report of physician names and addresses in
14  Salesforce before you left the company?
15     A.   I could document who was being
16  utilized within Salesforce.  It wasn't rolled
17  out to the entire field yet, but it was
18  partially rolled out.
19          There was many districts that were
20  left without a calendaring system during this
21  time by Medtronic.
22     Q.   And do you recall -- and since you
23  don't recall even running such a report, you
24  don't recall taking a copy of such a report
25  with you when you left Medtronic; right?

CATHLEEN FORNEY

1
2          MS. BURKE:  Object to form.
3          THE WITNESS:  I don't recall.
4  BY MS. MAYER:
5      Q.   Did you take a -- you don't recall.
6          You don't recall taking a copy of a
7  Salesforce report listing doctor names with you
8  when you left Medtronic; right?
9      A.   I don't recall.
10     Q.   And so you don't have any basis for
11  believing that Ghassan Adnan Mohsen from
12  Ridgecrest, California, received kickbacks from
13  Medtronic and billed Medicare; right?
14     A.   If their name was in Salesforce,
15  they received services from Medtronic.
16     Q.   But you don't know whether Ghassan
17  Adnan Mohsen is in Salesforce; right?
18     A.   I don't recall.
19     Q.   Well, you don't know.
20          MS. BURKE:  Object to form.  Can you
21  read the question back?
22          (Record read.)
23          THE WITNESS:  I don't recall.
24  BY MS. MAYER:
25     Q.   Did you once know whether Ghassan

63 (Pages 246 to 249)

CATHLEEN FORNEY

1
2 Adnan Mohsen was in Salesforce?  Was that
3 knowledge that you had?
4     A.   I don't recall.
5     Q.   Paragraph 53 of the Exhibit 7,
6 Second Amended Complaint, the second sentence
7 says, "The physicians and hospitals being paid
8 kickbacks by Medtronic, including those
9 specific physicians named above, and in the
10 examples given in the Eastern District of
11 Pennsylvania region, submitted claims for
12 reimbursement to Medicare without revealing
13 they had received kickbacks from Medtronic."
14         Do you see that?
15     A.   Yes.
16         Do you have any information about
17 what claims any of the physicians in paragraph
18 52 did or did not bill to Medicare?
19         MS. BURKE:  Object to form.
20         THE WITNESS:  I don't recall.
21 BY MS. MAYER:
22     Q.   Did you ever have that information
23 in your knowledge?
24     A.   I don't recall.
25     Q.   These doctor names were put in the

CATHLEEN FORNEY

1
2 Second Amended Complaint sometime this -- this
3 year.  I just want to make sure you have no
4 recollection of identifying these doctors for
5 adding to the Second Amended Complaint.
6         Is it correct that you have no
7 recollection of, this year, identifying these
8 doctors to add to the Second Amended Complaint?
9     A.   I don't recall.
10     Q.   Did you take a summer vacation this
11 year, Ms. Forney?
12     A.   A short one.
13     Q.   Where did you go?
14     A.   I went to the beach.
15     Q.   When did you go to the beach?
16     A.   In July.
17     Q.   What did you do at the beach in
18 July?  Swim?
19     A.   I spent time with family.
20     Q.   And you remember your vacation at
21 the beach; right?  In July?
22     A.   I do.
23     Q.   But you don't remember whether you
24 added these names to the Complaint --
25         MS. BURKE:  Objection; asked --

CATHLEEN FORNEY

1
2 BY MS. MAYER:
3     Q.   -- this year?
4         MS. BURKE:  Objection; asked and
5 answered.
6         THE WITNESS:  Correct.
7         MS. BURKE:  Can we take a brief
8 break?
9         MS. MAYER:  Sure.
10        THE VIDEOGRAPHER:  We are going off
11 the record at 6:29.
12        (Recess taken from 6:29 p.m. to
13 6:38 p.m.)
14        THE VIDEOGRAPHER:  We are back on
15 record at 6:38.
16 BY MS. MAYER:
17     Q.   Ms. Forney, turning again to
18 Exhibit 7, the Second Amended Complaint, if you
19 wouldn't mind turning to paragraph 24 of the
20 Complaint -- paragraph 24 -- I'd like to direct
21 your attention to the fourth line up from the
22 bottom.
23        The line begins with "device
24 implantation" then says, "The FY 2010."Do you
25 see that?

CATHLEEN FORNEY

1
2     A.   Uh-huh.
3     Q.   What --
4         MS. BURKE:  Can you read the answer
5 back, please.
6         (Record read.)
7         THE WITNESS:  Yes.
8 BY MS. MAYER:
9     Q.   What document are you referring to
10 when you say, "The FY 2010 shows the New York
11 district with an average number of calls by
12 clinical specialists and sales representatives
13 at 3,048 calls per device"?
14     A.   This was a document that a district
15 service manager in that district provided for
16 me.
17     Q.   Did you provide a copy of that to
18 your counsel in this case?
19     A.   Yes.
20         MS. MAYER:  Susan, I'll represent to
21 you, we haven't been able to find that
22 document in the production, so I don't
23 know if it was inadvertently left out.
24         MS. BURKE:  I'm fairly confident we
25 did produce it, but I'll run the Bates

CATHLEEN FORNEY

1
2  number down for you.
3       MS. MAYER:  Okay, great.
4  BY MS. MAYER:
5       Q.   Can you turn to paragraph 36,
6  please.
7            Do you see reference in this
8  paragraph to advertisements for full-time
9  device clinic technicians by the Heart Center
10 of North Texas and the Okaloosa Heart &
11 Vascular Center in Crestview, Florida?
12      A.   Uh-huh.
13      Q.   Do you have those -- the documents
14 that reflect those ads, those advertisements?
15      A.   I believe so.
16      Q.   Did you provide them to Ms. Burke?
17      A.   I believe so.
18           MS. MAYER:  We don't have those
19 either.
20           MS. BURKE:  And we'll again
21 represent that we produced them.  I'll
22 track down a Bates number for you.
23           MS. MAYER:  Okay.
24 BY MS. MAYER:
25      Q.   Could you turn to paragraph 39,

CATHLEEN FORNEY

1
2  please.  In the middle of this paragraph,
3  there's reference to "this particular
4  November 2008 briefing by Medtronic CRDM
5  healthcare economics division."
6            Do you see that?
7       A.   Yes.
8       Q.   Is that a document that you're
9  referring to there?
10      A.   I believe so.
11      Q.   Is that a document that you provided
12 to counsel?
13      A.   I believe so.
14           MS. MAYER:  And we haven't been able
15 to find that one either, Susan.
16           MS. BURKE:  Again, we'll represent
17 that we produced that, and I will track
18 down a Bates number for you.
19 BY MS. MAYER:
20      Q.   Great.  There are lots of other
21 documents referenced in the Second Amended
22 Complaint.  Have you provided to the government
23 all of the documents that you refer to in
24 either the original Complaint, the First
25 Amended Complaint or the Second Amended

CATHLEEN FORNEY

1
2  Complaint in this case?
3       A.   Yes.
4       Q.   Have you provided any documents to
5  the government in addition to the documents
6  referenced in either the original Complaint,
7  the First Amended Complaint or the Second
8  Amended Complaint?
9       A.   Not to my knowledge.
10           MS. MAYER:  I'd like to mark this as
11 Exhibit -- what are we up to now, 10?
12           (Forney Exhibit 10, Email
13 communication, 5-4-10, with attachment,
14 Bates MDTEPA-92769 to 778, was marked for
15 identification.)
16 BY MS. MAYER:
17      Q.   Ms. Forney, I'm showing you what's
18 been marked as Exhibit 10.  It's a document
19 that begins with Bates number MDTEDPA00092769.
20           Do you see this?
21      A.   Uh-huh.
22      Q.   It's an email from Brian Dye to
23 Patricia Meyer, copying you.  Do you see that?
24      A.   Yes.
25      Q.   And the subject is -- and it's

CATHLEEN FORNEY

1
2  May 4th, 2010; and the subject is the Dan
3  DeBlass file?
4       A.   Yes.
5       Q.   If you look at the first paragraph
6  of this email -- well, first of all, who is
7  Patricia Meyer?
8       A.   I'm assuming she's HR.
9       Q.   Do you know who Patricia Meyer is?
10      A.   I don't recall.
11      Q.   It says, "Attached are three
12 documents that have detailed documentation on
13 Dan's performance."  This is an email from
14 Brian.  It says, "Chuck Mertz, Cath Forney and
15 myself have also had many face-to-face meetings
16 with Dan to discuss his poor performance."
17           Do you see that?
18      A.   Yes.
19      Q.   Do you recall your many face-to-face
20 meetings with Dan to discuss his poor
21 performance?
22      A.   I did not have these conversations.
23      Q.   If you turn to the second attachment
24 at MDTEDPA00092776.
25           Do you see that?  It's an

CATHLEEN FORNEY

1
2  interoffice memo to Dan DeBlass from Chuck
3  Mertz copying Lily Chang and Patricia Meyer.
4      A.   Uh-huh.
5      Q.   Who's Lily Chang?
6      A.   This was dated before I was in the
7  district.
8      Q.   Do you see, as you move down,
9  May 29th, 2008, there's an entry, and it
10 says -- this is a memo to Dan DeBlass -- "You
11 were asked not to return to the hospital to
12 work with Dr. Tejada after a near physical
13 altercation during a case."
14      Do you see that?
15      A.   Uh-huh.
16      MS. BURKE:  Can you read that answer
17 back, please.
18      THE WITNESS:  Yes.
19 BY MS. MAYER:
20      Q.   Were you aware that Dan DeBlass had
21 gotten into a near physical altercation during
22 a case with Dr. Tejada?
23      A.   I was not.
24      Q.   At least until you received the
25 email on May 4th, 2010; right?

CATHLEEN FORNEY

1
2      A.   I don't recall the details of this
3  document.
4      Q.   Can you turn to the last piece of
5  paper in this exhibit, it's MDTEDPA00092774.
6      Direct your attention to the bolded
7  January 14th, 2010.  Do you see that?
8      A.   Uh-huh.
9      Q.   It says, "Email sent from Dan to
10 Chuck, Robert and Cath."
11      And Cath is you; right?
12      A.   Yes.
13      Q.   "Dan sent this email as a result of
14 Cath" -- that's you -- "giving him guidance on
15 how he might elevate his performance.  Cath" --
16 you -- "met with him to discuss his poor
17 performance in early January."
18      So do you remember meeting with him
19 to discuss his poor performance in early
20 January?
21      A.   I do not.
22      Q.   And then on January 26th, 2010, on
23 this document, it says there's an email from
24 Cath Forney to Brian Dye documenting Dan's
25 performance in the field.

CATHLEEN FORNEY

1
2      And you were highlighting problems
3  with Dan's performance, it looks like; correct?
4      A.   Are you on 92775?
5      Q.   92774 right now.  It goes over to
6  92775.
7      A.   Yeah.
8      Q.   I want to draw your attention to the
9  third bullet of your email of January 26th,
10 2010.  It says, "The LVH RNs overheard Levin
11 ranting about Dan.  On a recent post-implant
12 check where IPG R wave diminished to 2mV he
13 switched from bipolar to unipolar but didn't
14 call Levin to advise him of the diminished
15 R-wave."
16      What was wrong with what he did
17 there?
18      A.   He didn't communicate.
19      Q.   Why was it important that he
20 communicate that he had switched from bipolar
21 to unipolar to Levin?
22      A.   It's a clinical change on a lead,
23 and typically we would advise and we filled out
24 a worksheet.  We would have -- have that
25 documented.  And it occurs that Dan did not do

CATHLEEN FORNEY

1
2  that.
3      MS. MAYER:  I have nothing further.
4      MS. BURKE:  We have no questions.
5      THE VIDEOGRAPHER:  We are going off
6  the record at 6:49.
7      (Time noted:  6:49 p.m.)
8
9
10
11  _____
12         CATHLEEN FORNEY
13
14
15 Subscribed and sworn to before me
16 this _____ day of _____, 20 ____.
17
18 _____
19
20
21
22
23
24
25

Page 262

1
2        CERTIFICATE OF SHORTHAND REPORTER
3
4        I, Gail Inghram Verbano, Registered
5   Diplomate Reporter, Certified Realtime
6   Reporter, Certified Shorthand Reporter (CA),
7   and Notary Public In and for STATE OF
8   PENNSYLVANIA, the officer before whom the
9   foregoing proceedings were taken, do hereby
10  certify:
11        That CATHLEEN FORNEY, the witness
12  whose deposition is hereinbefore set forth, was
13  duly sworn by me and that such deposition is a
14  true record of the testimony given by such
15  witness.
16        I further certify that I am not
17  related to any of the parties to this action by
18  blood or marriage; and that I am in no way
19  interested in the outcome of this matter.
20        IN WITNESS WHEREOF, I have hereunto
21  set my hand this 16th day of November, 2017.
22
23  _____
24  Gail Inghram Verbano, RDR, CRR, CLR
25  CA-CSR No. 8635

Page 263

1
2   ------------------I N D E X------------------
3   WITNESS        EXAMINATION BY        PAGE
4   CATHLEEN FORNEY
5     By Ms. Mayer            5
6   ----------------E X H I B I T S----------------
7   FORNEY                PAGE LINE
8   Forney Exhibit 1        148  10
9     Relator's Objections and Responses
10    to Defendant Medtronic's First Set
11    of Requests for Production
12  Forney Exhibit 2.......................151  16
13    Civil Complaint
14  Forney Exhibit 3.......................167  15
15    Cardiology Associates of West
16    Reading Medtronic documents, Bates
17    REL-00471 to 512
18  Forney Exhibit 4.......................186  19
19    Presentation, "Geisinger, Medtronic
20    Healthcare Systems Strategic
21    Partnership Disucssion," 12-1-09,
22    Bates numbers obscured
23  Forney Exhibit 5.......................189   4
24    Email communication ending 1-13-10;
25    MDTEDPA-47212 to 4730

Page 264

1
2   FORNEY                PAGE  LINE
3   Forney Exhibit 6.......................208  21
4     Email communication ending 8-1-11,
5     Bates MDTEPA-92253
6   Exhibit 7..........................   218  22
7     Second Amended Complaint
8   Forney Exhibit 8.......................231   2
9     Pictures of Patient Information
10    Posted to Lehigh Valley Gmail
11    Accoount Associated with Google
12    Voice, Bates Rel-1418 to1458
13  Forney Exhibit 9.......................237  16
14    Pictures of Patient Information
15    Posted to Google Calendaring
16    11.11.11, Bates REL-1666 to 1772
17  Forney Exhibit 10....................256  12
18    Email communication, 5-4-10, with
19    attachment, Bates MDTEPA-92769 to
20    778
21  QUESTIONS INSTRUCTED NOT TO ANSWER:
22    PAGE  LINE
23    156    9
24    181   12
25

Page 265

1              ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg. No. Now Reads   Should Read  Reason
6   ___ ___ _____  _____ _____
7   ___ ___ _____  _____ _____
8   ___ ___ _____  _____ _____
9   ___ ___ _____  _____ _____
10  ___ ___ _____  _____ _____
11  ___ ___ _____  _____ _____
12  ___ ___ _____  _____ _____
13  ___ ___ _____  _____ _____
14  ___ ___ _____  _____ _____
15  ___ ___ _____  _____ _____
16  ___ ___ _____  _____ _____
17  ___ ___ _____  _____ _____
18  ___ ___ _____  _____ _____
19  ___ ___ _____  _____ _____
20
21         _____
22           Signature of Deponent
22
23  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2017.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____

67 (Pages 262 to 265)

**A**

**a.m (3)**
2:2 48:4,5
**A3 (14)**
87:16,17,19,21 88:2,3
90:5,8,14,20 91:15
91:18 92:6,25
**A3s (12)**
84:12,17 87:14 88:24
89:3,9,10,12,14,20
89:24 90:3
**abilities (1)**
225:10
**ability (1)**
103:12
**ablation (5)**
11:19,24 12:2 113:19
179:3
**ablations (1)**
180:13
**able (15)**
70:13 88:24 89:15
97:16 103:4,9
114:21 127:4
166:18 206:18
221:25 238:11,17
253:21 255:14
**absence (1)**
157:5
**access (6)**
146:7 173:24 232:7
239:12,15 247:25
**accomplish (1)**
78:14
**Account (1)**
264:11
**account (10)**
96:3,4,5,10 98:24
99:3 106:13 111:4
231:4 235:4
**accounts (1)**
99:15
**accuracy (1)**
97:13
**accurate (2)**
97:5 127:3
**accurately (1)**
20:15 97:21,22,23
**action (2)**
1:14 262:17
**Active (1)**
172:15
**activities (5)**
65:15,19 67:13 80:24
127:7
**activity (1)**

178:7
**actual (1)**
99:10
**adapt (2)**
98:6,21
**AdaptResponse (1)**
186:12
**add (3)**
184:19 216:5 251:8
**added (5)**
108:16 110:4 117:6
118:3 251:24
**adding (1)**
251:5
**addition (7)**
32:10 33:11 106:17
185:8 220:19
242:19 256:5
**additional (13)**
13:16 22:18 65:10,11
128:14 147:20
154:8 155:7 171:24
185:7 186:11
223:23 241:7
**address (4)**
97:8 221:9,19 222:4
**addressed (3)**
221:10,20 222:5
**addresses (3)**
245:23 248:10,13
**adjusting (1)**
99:10
**admin (8)**
108:8,15,17,17,24
109:17 110:5
111:21
**administration (8)**
22:21,23 23:6 212:22
213:4,16,22 216:20
**admins (1)**
108:13
**Adnan (3)**
249:11,17 250:2
**Adolph (2)**
3:25 4:13
**adopt (1)**
170:2
**ads (1)**
254:14
**advance (2)**
167:11 225:9
**advantage (1)**
205:3
**advertisements (2)**
254:8,14
**advice (2)**

130:5 193:22
**advise (2)**
260:14,23
**AF (13)**
11:19,24 12:2 113:4
113:11,15,16,18
179:17 180:11,12
180:12 186:13
**affect (3)**
103:12,14 184:24
**affiliated (1)**
177:17
**affirmative (1)**
137:3
**afforded (1)**
216:17
**afternoon (1)**
131:13
**age (1)**
243:21
**ago (10)**
125:8 135:12,14
136:9 138:22 140:7
140:21 141:13
142:23,25
**agreed (2)**
166:7 167:13
**agreeing (1)**
90:15
**agreement (3)**
160:14 165:25 167:5
**ahead (1)**
213:14
**aid (1)**
177:22
**AJ (3)**
228:2 243:14,15
**algorithm (9)**
27:22 36:22,23,24
37:3 43:13,15 44:5
44:7
**algorithms (10)**
37:6,8,13,25 38:14,25
43:19 61:17 62:6,11
**allegation (4)**
233:21 237:10 242:11
243:6
**allegations (2)**
124:13 149:5
**allege (2)**
130:8,10
**alleged (2)**
121:15 126:5
**alleging (1)**
227:24
**Allentown (4)**

229:8,23 235:16,25
**allow (1)**
166:10
**allowed (2)**
106:23 166:7
**altercation (2)**
258:13,21
**altering (1)**
42:17
**amended (24)**
130:8,9 216:4 218:21
218:22 219:6
227:18 233:21
235:23 238:9
241:16 244:9
245:21 250:6 251:2
251:5,8 252:18
255:21,25,25 256:7
256:8 264:7
**amendment (1)**
219:6
**AMERICA (1)**
1:4
**Ammarell (1)**
75:2
**analysis (3)**
97:4 174:17 219:19
**analyze (1)**
100:25
**analyzed (1)**
101:10
**analyzing (1)**
101:6
**anatomy (1)**
221:25
**and/or (1)**
161:5
**Andi (4)**
211:22 212:12 214:11
215:6
**Andrea (5)**
209:10,17,18 211:12
215:15
**Andrew (2)**
52:2 55:19
**Andrus (4)**
51:21 52:3,8 55:18
**Angie (2)**
52:9 55:19
**announced (1)**
107:21
**anonymous (3)**
119:20,21 120:14
**answer (34)**
5:25 6:17 27:15,25,25
28:9,10 30:5 36:7

44:9 64:20 69:12
77:17 78:17 109:5
125:15,24 128:22
129:9,13 141:18
156:14 157:8 158:5
159:11 165:6
180:22 181:22
183:20 186:6 216:9
253:4 258:16
264:21
**answered (10)**
26:11,14,15,17 28:6
76:24 95:24 126:22
129:14 252:5
**answering (5)**
27:2 30:9 31:14 39:17
57:21
**answers (1)**
5:22
**anticipated (1)**
166:17
**anybody (5)**
52:11,17 198:8,17
245:6
**anymore (2)**
105:20 124:9
**apologies (1)**
224:24
**appear (1)**
247:16
**appeared (1)**
160:22
**appears (3)**
125:20 169:10 244:21
**applicable (2)**
162:10 163:15
**application (1)**
109:15
**applied (1)**
206:15
**apply (1)**
226:18
**appointments (1)**
205:7
**appreciate (1)**
125:12
**approach (28)**
54:22,23,23 55:3,24
55:24 56:2,10,11,12
57:2,3,25 59:7,9,16
61:11 87:19 92:7,9
92:10 95:10,11,14
96:15 114:19
150:17 178:15
**approached (1)**
139:17

**appropriate (1)**
127:4
**approximately (5)**
4:11 50:15 68:6 99:2
111:13
**April (2)**
108:11 114:3
**area (2)**
93:12,15
**arena (6)**
110:12,16 211:19
213:10 216:18
223:5
**argument (1)**
164:8
**argumentative (1)**
129:10
**arises (1)**
161:2
**arrived (2)**
13:19 14:14
**article (1)**
87:5
**aside (6)**
22:5,13 52:18 83:11
151:10 202:19
**asked (35)**
27:25 36:19 44:11
76:24 95:24 102:5
115:9 118:15
120:20 121:25
126:21 127:8,8
135:15 136:3
141:23 142:14
144:24 157:20
186:6 192:13,15
197:24 198:19,24
200:2 201:23 206:3
206:4 207:24
215:21 216:12
251:25 252:4
258:11
**asking (8)**
41:16 125:12 136:23
163:3 182:2 191:17
214:11 229:4
**asks (1)**
148:24
**assert (3)**
157:24 158:2 160:19
**asserted (3)**
159:8 160:25 166:3
**asserting (8)**
158:9,10,14,16
159:11 160:3,8
227:12

**assigned (1)**
67:13
**assist (1)**
226:4
**assistance (2)**
23:14,15
**associated (4)**
115:12 178:23 231:4
231:14
**Associates (15)**
167:16 168:16 169:3
169:14,17 177:16
184:8,13 230:7,12
233:15,23 237:8
238:22 263:15
**association (1)**
4:16
**Assoiated (1)**
264:11
**assume (3)**
62:17 159:6 213:7
**assuming (4)**
213:16 218:3 228:23
257:8
**assumption (2)**
218:11,12
**assures (1)**
97:24
**attached (7)**
148:14 151:24 169:6
169:16 184:7,17
257:11
**attaches (2)**
156:20 161:17
**attachment (4)**
194:22 256:13 257:23
264:19
**attend (5)**
15:16 33:5 35:3,5
225:2
**attended (5)**
15:17 16:2 19:6 29:6
89:13
**attending (5)**
29:7,16 30:7 31:12
33:16
**attends (1)**
89:11
**attention (10)**
91:6 112:23 152:16
158:23 219:11
244:15 245:19
252:21 259:6 260:8
**attorney (2)**
131:6 181:25
**attorney-client (18)**

133:7 135:23 141:5,8
141:11 154:23
157:10,16 160:4,8
160:16 161:14
162:8 163:12
180:21 181:24
182:5,18
**attorneys (4)**
3:5,14 164:24 166:25
**August (3)**
117:17 209:11 215:14
**auto (5)**
44:19 176:13,21,24
177:2
**automated (12)**
42:9,11,16,23 43:5,18
44:2,17 45:2,9,16
46:24
**automatically (2)**
43:14 44:6
**available (8)**
34:18,19 37:14 76:17
86:10 164:17
182:21 207:5
**Avenue (2)**
3:7 5:15
**average (1)**
253:11
**avoid (1)**
191:9
**avoids (1)**
97:12
**AvroMed (3)**
150:3,8 185:12
**aware (16)**
10:14 41:16 47:15
62:21 110:22
145:23 146:5
158:20 190:21
193:3 195:7 213:24
214:3 221:8,18
258:20

_____
**B**
**B (1)**
263:6
**BA (1)**
1:24
**bachelor's (3)**
15:21,22 16:20
**back (32)**
11:10 43:8 48:6 50:21
51:11 69:11 77:18
96:8,18,22 101:11
102:23 107:3 109:6
127:4 131:2 162:4,5

167:14,19 181:5
193:4,9 208:25
212:4 215:8,10
247:22 249:21
252:14 253:5
258:17
**background (1)**
15:15
**ballpark (2)**
68:13 214:12
**Baltimore (1)**
3:8
**BARLEY (1)**
2:8
**barrier (1)**
122:6
**based (7)**
36:22 62:19 70:3
134:14 144:9
212:11 241:21
**basis (8)**
156:15 160:7 162:20
181:6,23 227:24
228:16 249:10
**Bates (20)**
167:17 186:22 187:3
187:4,6 208:22
231:5,19 237:18
253:25 254:22
255:18 256:14,19
263:16,22 264:5,12
264:16,19
**Bates-numbered (2)**
168:19 209:6
**beach (4)**
251:14,15,17,21
**Beaver (5)**
16:25 17:3,6,13,17
**becoming (1)**
69:22
**began (1)**
24:24
**beginning (4)**
50:9 189:11 212:20
219:12
**begins (2)**
252:23 256:19
**behalf (8)**
4:24 154:9 158:10
167:6 229:18,18,19
230:14
**belabor (1)**
128:11
**believe (43)**
57:6,8,22 88:19 91:12
93:10 99:16 101:22

118:10 121:13,16
121:18 122:7,18
126:13 128:3
135:19 137:18
147:19,21 152:2
154:7,15,17 156:18
157:25 161:11
163:17 168:14
172:19,21 196:15
216:10 220:5 227:5
227:6,8 239:16
240:11 254:15,17
255:10,13
**believing (1)**
249:11
**belt (26)**
88:10,12,12,13,14,17
88:20,23 89:4,5,8,8
89:11,14,15,18,25
92:16,17 93:2,5
94:4 100:4,6,8,12
**beneficiary (2)**
243:15,16
**Bents (1)**
52:9
**best (5)**
36:20 38:22 153:20
225:12 227:14
**Beth (17)**
75:2 135:2,4,5,7,10
135:25 136:4,10,14
136:18 137:6,9,11
137:14 139:14
146:9
**better (4)**
56:18 150:21 212:6
220:22
**bill (5)**
195:13 229:13 242:2
242:8 250:18
**billed (3)**
230:11,14 249:13
**biller (1)**
229:9
**billing (2)**
229:16,17
**bills (1)**
195:20
**bio (1)**
165:11
**biology (2)**
15:20 16:20
**bipolar (2)**
260:13,20
**bit (5)**
15:15 83:18 85:11

152:10 176:18
**blank (2)**
96:24 97:3
**blanks (1)**
212:10
**block (2)**
14:6,12
**blood (1)**
262:18
**blown (1)**
232:14
**board (1)**
226:14
**Bobbie (1)**
75:2
**body (1)**
235:12
**bolded (1)**
259:6
**bonus (3)**
7:14 68:8,9
**Boston (3)**
3:18 146:14 147:9
**bottom (4)**
179:20 191:23 192:17
252:22
**boxes (1)**
197:21
**Boyle (1)**
237:3
**Boylston (1)**
3:17
**brainstorming (1)**
102:8
**brand (3)**
56:18,22,23
**branding (3)**
53:8 55:13,14
**break (20)**
6:10,12,14,18 40:11
47:25 102:10
119:24 124:20
125:13,18,19 126:3
130:19 165:9,12,14
208:8,16 252:8
**breaks (1)**
125:3
**Brian (21)**
73:9,12,13 113:3,24
114:8,23 115:23
117:10 118:14
120:23 121:7
122:11 189:20,24
190:17 192:2,19
256:22 257:14
259:24

**Brian's (1)**
117:15
**brick (4)**
107:23,25 108:3,13
**brief (7)**
102:10 164:9,10,12
164:20 165:9 252:7
**briefing (1)**
255:4
**bring (1)**
96:17
**bringing (1)**
87:7
**brings (1)**
20:13
**Brotzman (5)**
232:3,13,16 233:4,18
**brought (1)**
86:16
**build (1)**
121:25
**built (1)**
118:2
**bulk (2)**
52:10 63:6
**bullet (7)**
175:25 176:12 202:16
202:24 203:3,4
260:9
**bullets (1)**
176:3
**bunch (1)**
184:7
**burden (1)**
172:13
**Burke (182)**
3:6,9 5:2,2 8:17 10:8
10:15 11:18 24:3,7
26:21 27:5,20 28:17
30:14,19,24 31:24
33:23 34:4 36:13
37:10,18 38:3,18
39:5 40:11 41:25
43:2,7,11 44:14
54:10 56:5 57:5,17
60:20 64:17 69:14
76:24 77:10,17 78:3
78:21 79:9,12 80:14
81:7 82:21 84:10
86:11 90:24 93:6
95:24 96:20 98:11
98:14 102:9 106:2
106:20 109:5,21
112:9 113:2 119:23
120:3,10,12 124:18
124:23 125:5,10,14

125:25 126:21
129:2,8,18 130:20
131:6 133:5,17,20
133:23 135:21
137:4 139:2 140:11
141:3,9,14 142:2
144:18,25 146:22
147:24 151:2,5
154:22 155:24
156:13,16,23,24
157:12,14,19
158:16,19 159:17
159:25 160:6,10,18
161:16 162:3,13,18
162:23 163:7,12,21
163:25 165:4 166:2
166:6,18 167:6,13
171:25 180:19
181:9,21,24 182:7
182:10,15 183:22
185:9 188:25 191:5
191:12 193:8 194:3
194:10 202:11
207:14,19 208:8
220:9 221:11 222:6
224:13,16 225:15
225:23 227:3,7
229:11,20 230:22
234:19 240:11,18
241:6 242:14
243:10,17 247:19
249:2,20 250:19
251:25 252:4,7
253:4,24 254:16,20
255:16 258:16
261:4
**Burke's (1)**
133:25
**business (20)**
22:20,23 23:6,10,11
23:12 121:21 122:3
122:5 127:14,24
183:3 190:22 192:8
192:13 194:15
212:7,23 213:21
225:4
**busy (2)**
79:4 115:17

_____
**C**
_____

**C (1)**
3:3
**CA (1)**
262:6
**CA-CSR (1)**
262:24

**calendar (22)**
112:8,17,19,25
113:23 114:7
118:20 119:2,4
120:16 121:9 228:4
232:8 234:14 236:8
237:13 238:2 239:6
239:12,15,23 241:2
**calendaring (16)**
81:10 82:16 112:5
115:8,14 118:2,4
202:25 231:14
232:22 234:8,15,16
237:18 248:20
264:15
**calendars (7)**
112:6 121:17,19
236:18 240:10
241:8,23
**California (5)**
1:4 245:24 246:7,19
249:12
**call (19)**
108:17 110:8,10,14
111:16 118:14
119:10,12,15,20,20
119:21 120:14
170:22 203:19
205:22,25 220:13
260:14
**called (7)**
5:6 19:23 117:4
119:16 174:17
225:24 237:2
**calling (8)**
110:5,24 137:4 142:4
142:15,18 144:25
146:23
**calls (5)**
109:18 111:6 162:7
253:11,13
**canceled (1)**
245:11
**capacity (2)**
92:23 138:15
**capture (2)**
42:19 45:24
**cardiac (23)**
11:3,6 13:20 14:15
25:16 31:10 48:20
49:3,6,15 53:24
54:5 55:7 57:12,13
58:10 67:20 70:25
113:12 168:23
169:10 170:11
179:2

**cardiologist (1)**
228:25
**Cardiology (16)**
167:15 168:15 169:3
169:14,17,22
177:16 184:8,13
230:7,12 233:15,23
237:7 238:22
263:15
**care (4)**
20:17,19 22:8 228:12
**CareLink (3)**
106:7,9 178:11
**CAROLINA (1)**
1:10
**carry (1)**
81:23
**carrying (5)**
81:17,18,19 82:6
85:15
**case (66)**
4:8 15:6,7,11,12
44:24 63:18 64:14
121:15 124:12
126:5 128:18
130:10 131:15
132:11,15 134:24
135:8,11,14,20
136:6,15,18 137:7
138:21 139:8,16
140:6,17 141:22
142:7,16,20 143:10
144:17,23 145:9
146:11,23 147:23
149:8,11 151:13
152:14 153:10,19
155:7 156:7 164:3
164:13 165:25
166:24 168:3
178:13 225:21
227:12 234:13
239:9,11 247:3
253:18 256:2
258:13,22 265:2
**cases (3)**
33:21 108:16 115:17
**categories (1)**
62:4
**category (1)**
180:22
**Cath (6)**
257:14 259:10,11,14
259:15,24
**catheters (2)**
113:19 214:21
**Cathleen (270)**

1:13,19 2:7 4:1,4,5
5:1,5,13 6:1 7:1 8:1
9:1 10:1 11:1 12:1
13:1 14:1 15:1 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1,18 191:1

192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
209:10 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1
221:1 222:1 223:1
224:1 225:1 226:1
227:1 228:1 229:1
230:1 231:1 232:1
233:1 234:1 235:1
236:1 237:1 238:1
239:1 240:1 241:1
242:1 243:1 244:1
245:1 246:1 247:1
248:1 249:1 250:1
251:1 252:1 253:1
254:1 255:1 256:1
257:1 258:1 259:1
260:1 261:1,12
262:11 263:4
**Cathy (1)**
235:9
**causing (1)**
121:22
**caution (4)**
135:22 141:4 154:22
180:20
**CAWR (5)**
170:17,20,22 172:15
173:19
**center (11)**
16:24 17:3,6,12,16
28:7 35:7 174:24
187:19 254:9,11
**centers (4)**
26:8,16 27:17 185:16
**central (10)**
25:12 26:2 32:20,25
33:14 108:25
109:11 123:21,23
124:2
**certain (2)**
45:12,13
**certainly (2)**
115:16 186:2
**certificate (5)**
19:18,19,21 22:14
262:2
**certification (1)**
80:7
**certified (7)**

2:11,12 60:2,14
210:16 262:5,6
**certify (2)**
262:10,16
**Chang (2)**
258:3,5
**change (17)**
60:23 61:2 68:16 69:3
73:10 94:13 101:7
102:10,17 104:10
104:10 105:3
220:17 222:21
233:7 234:12
260:22
**changed (4)**
48:10 71:12 72:24
128:9
**changing (1)**
127:24
**characterization (1)**
242:15
**chart (13)**
227:17,19 228:11
233:13 234:5,7
239:24 240:23
241:17,19,20 243:7
244:5
**check (35)**
110:19 111:9 126:6
126:14,20 141:14
164:21,25 171:9
176:8,19,21,24
177:2,3,5 196:8,9
197:21 204:12,16
204:18,20 205:7,22
206:6 207:25 228:2
230:9 233:5,16,23
238:21 239:18
260:12
**checklist (1)**
171:14
**checkmark (1)**
196:12
**checkmarks (1)**
197:22
**checks (31)**
79:4,15,17,19,24
80:13 97:20 101:2
124:14,15 173:3,3
175:7 177:4,8,9,10
178:11 193:25
194:8 203:11 204:6
207:5,8 222:23
224:2 241:25 242:7
245:2,11 247:2
**child (2)**

16:15 17:4
**chose (1)**
122:2
**chosen (1)**
208:5
**Chris (7)**
139:22,24,25 141:7
142:20 143:8
146:10
**Chuck (15)**
200:16,24 201:9,10
232:17,19,19,21,24
233:2,5,19 257:14
258:2 259:10
**chunk (1)**
179:20
**circumstances (4)**
8:16 194:2,9 208:5
**Civil (3)**
1:14 151:16 263:13
**CL (1)**
174:3
**claim (1)**
242:24
**claiming (4)**
157:9,15,19 181:7
**claims (5)**
241:19 242:12 243:7
250:11,17
**clarify (2)**
13:8 223:16
**clarifying (1)**
189:20
**class (9)**
61:22 62:18,21 63:2
63:12 66:12,15,19
66:24
**cleanup (2)**
101:9 102:7
**clear (4)**
48:23 107:15,19
121:22
**client (15)**
141:9,12,16 157:7,12
157:17 158:4,11
166:8,10,15,19
167:7,9 181:15
**client's (1)**
167:10
**clients (1)**
98:17
**clinic (104)**
31:2,19 35:3,5,6,7,10
36:7 39:16,18 45:14
76:22 77:22 90:5,9
90:10,20,22,23 91:2

91:7,8,15,18,21,24
92:3 93:2,3,10,14
93:21 94:4,8,15,17
94:23 95:12,14
96:14,16,17,18,19
97:11 100:21,24
101:2,4,6,9 102:7
104:9,20,24 105:9
105:11,14,23
110:12 111:2
168:10 170:2 172:9
172:20 173:6,19,24
174:6,13,16,17,21
179:3 185:14 186:3
190:5 195:21 196:6
196:23 197:24
198:16,19,24
199:11 200:2,19,20
201:23,24 207:24
222:16 223:8 224:3
224:8 226:6 228:25
229:2,24 242:21
244:24 245:4,7
254:9
**clinic's (1)**
90:19
**clinical (60)**
7:8 8:11 9:19 12:9
18:8 20:5,17,19
21:10 22:3,6,7
33:10,17 54:15 71:5
71:8,10,16,21,21
72:10,14,18 73:14
73:18 74:6,7,12
75:24 76:19 79:3,8
79:20 80:7 87:4
96:3 110:11 112:20
115:9 121:23
122:22 135:5 138:3
138:6,11,12 144:14
150:18 180:14
183:4,9 186:7
193:12,18 195:12
195:14 225:6
253:12 260:22
**clinically (2)**
19:8 20:2
**clinicians (1)**
225:2
**clinics (46)**
33:25 34:25 35:2 76:6
76:15 77:8 79:7
80:11,12 84:12,18
87:14 88:24 89:3,10
95:4 97:17 98:4,8
99:17 100:2 106:16

145:11 173:2,13,15
174:24 175:3
192:10 193:14
194:14 195:11
196:25 197:10,12
199:6,9 200:17,18
201:9 207:20,22
208:4 223:3,11
224:5
**clinics' (1)**
36:2
**close (4)**
40:14 88:8 166:8
167:8
**closed (1)**
108:4
**closely (1)**
147:7
**closing (1)**
107:22
**CLR (2)**
1:24 262:23
**coach (3)**
29:24 66:22,25
**coached (4)**
29:21,22 30:2 199:4
**coaching (9)**
65:13,18 66:12,15,19
66:21,23 67:7,11
**code (1)**
196:13
**cold (1)**
103:20
**collaborate (3)**
58:21 90:11,15
**collaborated (6)**
51:3 58:18,24 66:8,9
66:14
**collaborating (1)**
62:19
**collaboration (3)**
52:20 53:25 54:9
**collaborative (2)**
91:20 96:15
**collaborators (1)**
51:17
**collected (2)**
101:10 240:10
**collection (1)**
102:6
**college (10)**
5:15 15:16,17 16:3,6
16:8,10,23 17:14
211:7
**colon (1)**
245:25

**COLORADO (1)**
1:5
**COLUMBIA (1)**
1:6
**combined (2)**
115:15 216:20
**come (22)**
52:5 75:4 84:24 85:23
86:7 91:5,6 95:18
96:22 101:14 109:3
112:23 128:14
164:14 178:23
187:23 190:9
192:21 200:5
203:22 221:13
234:8
**comes (1)**
213:5
**comfort (1)**
225:7
**coming (6)**
42:20 86:24 105:15
216:18,25 218:15
**commercially (2)**
34:18,19
**commission (2)**
7:14 265:25
**common (12)**
58:3,8 61:18 62:7,12
116:17 162:9 163:5
163:13,19 165:2
171:18
**commonness (1)**
58:5
**Commonwealth (1)**
2:14
**communicate (5)**
21:3 46:13 111:20
260:18,20
**communicated (3)**
15:6,10 110:23
**communicates (1)**
29:14
**communication (17)**
110:18 119:4 141:11
157:11,17 160:5,11
160:12 181:25
182:5,18 189:5
208:22 256:13
263:24 264:4,18
**communications (20)**
53:15 55:15 115:18
133:23 135:23
141:5 148:25
154:24 161:25
162:8,11,17 163:20

163:24 165:24
166:4,11,13 167:10
180:21
**companies (2)**
8:3 188:20
**company (8)**
18:21 19:3 20:13
56:16,17 126:25
127:15 248:14
**Compass (3)**
168:23 169:10 170:11
**compel (1)**
164:11
**compensation (4)**
68:3,9,12,16
**competent (1)**
128:18
**competitive (2)**
177:19 205:3
**competitor (1)**
221:25
**competitors (1)**
205:4
**complaint (42)**
130:8,9,9 151:16,25
152:13 153:11,23
154:9 216:4 218:21
218:23 219:7
227:19 233:22
235:23 237:10
238:9 239:9,11,18
239:19 241:17
244:9 245:21
246:14 250:6 251:2
251:5,8,24 252:18
252:20 255:22,24
255:25 256:2,6,7,8
263:13 264:7
**complete (15)**
24:17 36:2 60:2,13
88:5 95:21 186:13
195:16 196:2
197:24 198:19,20
198:24 201:22,23
**completed (9)**
30:15 84:11 89:17
95:8,17 197:15,17
197:23 242:20
**completing (4)**
31:16 39:16 84:16
199:10
**complex (2)**
87:20 92:8
**complexity (1)**
161:2
**compliance (15)**

116:13,20,22 117:2,2
118:8,8,13 119:10
127:12 132:8
149:23 150:6
185:11 190:25
**component (8)**
53:7 82:2,8 113:17
127:17 175:18
230:16,18
**components (4)**
19:14 66:11,21 102:4
**computer (1)**
29:13
**concern (6)**
115:4 119:13,15,16
120:15 213:25
**concerned (1)**
115:3
**concerns (7)**
20:24 21:2,3 115:20
115:24 116:10,12
**conduct (25)**
9:22 38:9 42:17 43:13
60:2,5,6,14 88:24
89:3,14,25 90:3
100:18 105:16,17
121:21 127:14
128:10 130:7,11
193:13 197:14
199:8 221:24
**conducted (18)**
10:6 20:16 26:2 44:6
57:15 63:2 84:12
87:13 89:22 90:8
92:25 97:22 101:24
104:3 127:18 214:2
214:5 229:15
**conducting (8)**
10:18 20:9 44:21
84:17 87:16 89:9,20
194:14
**conducts (3)**
10:13 44:20 89:12
**conduit (2)**
20:23,25
**confident (1)**
253:24
**confirm (2)**
116:10 236:19
**confirmed (1)**
237:12
**confirming (1)**
117:8
**Conklin (1)**
74:25
**connected (1)**

107:17
**CONNECTICUT (1)**
1:5
**connecting (1)**
64:21
**connection (8)**
21:23 44:11 93:4
149:3,7,11 151:13
183:9
**connectology (2)**
63:17 64:13
**connects (1)**
44:9
**consequence (2)**
96:18 97:2
**consider (7)**
135:18 136:12,23
138:25 139:3
140:11 142:15
**considerations (2)**
175:18,25
**considering (1)**
144:25
**consist (1)**
41:8
**consistent (14)**
65:7,24 94:21,22,24
94:25 95:7,10,11,13
178:5,14 199:7
200:22
**consolidated (1)**
124:6
**consolidation (2)**
123:10,13
**constitute (1)**
190:6
**consultant (1)**
55:8
**consulting (2)**
219:22 226:23
**contact (7)**
28:12 53:3,9,17
115:11 118:11
120:20
**contacting (1)**
28:15
**contain (1)**
248:5
**contained (1)**
195:14
**contains (1)**
195:21
**content (16)**
61:6,10,16 63:14,21
63:25 64:9,15,25
65:6,8,23,25 66:19

182:4,13
**context (2)**
29:23 67:11
**continents (1)**
217:15
**continue (10)**
24:10 166:5 176:23
190:22 192:8,12
193:13,25 194:8,13
**continued (1)**
71:13
**continues (2)**
214:10 219:14
**continuing (3)**
114:13 199:8 246:11
**continuum (18)**
48:13,19 50:23,25
51:8,14 52:14 54:2
59:10 60:16 66:4
67:16 68:15,20 69:4
69:8,17,22
**contract (2)**
115:6 220:17
**contributed (8)**
56:13,19 57:8 58:2,12
59:14 61:5 62:25
**contributor (2)**
61:9 63:4
**conversation (35)**
114:10 116:9 117:8
117:14,20 118:7
121:7 136:14,17,21
137:6 138:24 139:6
140:9,11,15,23
141:2,6,21,24
142:10,20,21 143:4
146:21 183:11
194:18 198:11
199:13,14 201:2
211:15 226:7 229:5
**conversations (30)**
99:7 116:12 117:11
117:15 136:4 174:8
175:20 198:14,25
199:17,20 200:5,10
200:12 213:17,20
213:25 214:4,6
215:12 216:15,21
216:24 217:3,21,23
218:4,5,14 257:22
**converse (1)**
41:24
**converses (1)**
212:22
**conversing (3)**
41:13,14 143:5

**convey (3)**
28:18 117:23 129:12
**coordinate (3)**
8:15,21 51:12
**coordinated (1)**
21:19
**coordinating (3)**
13:22 14:21 183:10
**coordinator (11)**
18:4,7,11 21:25 27:4
27:11 28:7 31:7,20
49:12 50:18
**coordinators (4)**
26:7,15 27:17 28:2
**copied (2)**
238:13 239:7
**copies (1)**
210:6
**copy (8)**
179:24 183:21 185:24
194:23 240:12
248:24 249:6
253:17
**copying (2)**
256:23 258:3
**copyright (2)**
179:13,21
**corporate (53)**
51:4,13 52:12,17
53:13,18 54:3 68:7
69:18 76:7,10,12
80:25 83:2,6,7,11
83:16,20 84:2,3,7
84:13,18,23 85:3,7
85:13,23,25 86:3,7
86:15,20,24 87:7,14
87:15 106:5 107:4,9
107:10 116:12
118:11 119:10
143:18 144:5,7
198:12,18,21
217:11,17
**corporate's (1)**
107:13
**correct (103)**
16:5 27:14 28:23
31:21 32:7,8 34:22
36:25 39:9 41:5,6
43:21 48:11 50:20
59:12,19 60:10
69:19 74:14 79:11
80:4 85:12,18,21
91:25 103:10,15,19
103:21,22 104:4,5
105:21 106:25
107:2 124:4,16,17

126:8,9 129:7,24,25
130:5,6,13,15,17
152:14 162:12,13
174:6 175:13,16
177:6 184:8,9,10,15
189:25 190:2,15,16
191:18 194:2,9
198:6,10,20 203:7
204:3 205:7,8,25
206:19,20,24
207:12 208:2,6,7
210:23 212:19
213:22 214:14
217:7 218:19 219:9
222:25 227:6 237:4
241:4,12 244:7
245:5,13,15,17,18
246:12 251:6 252:6
260:3
**correctly (1)**
220:3
**cost (8)**
23:18 204:12 211:17
212:6,23 213:6,21
215:23
**cost-effective (1)**
167:3
**costs (1)**
215:3
**counsel (17)**
3:24 4:18 102:9 126:2
134:17 155:23
157:22,22 165:20
181:19,20 182:10
182:11 222:6
223:20 253:18
255:12
**country (1)**
207:3
**County (5)**
16:25 17:3,6,13,17
**couple (3)**
100:10 125:2 134:22
**course (5)**
19:22 60:17,23 61:3,4
61:4,14,16,16,21
62:4,10,15,23 63:10
63:15,22 64:2,9,16
65:2,13,18 150:16
150:17
**courses (11)**
61:7,10 65:7,8,25
66:7,8,13,14 224:25
225:6
**court (4)**
1:1 4:6,15 5:23

**cover (6)**
23:24 64:7 108:18
111:16,17 159:12
**covered (18)**
61:15,21 62:6,14,15
62:22 63:10,14 66:3
82:9 106:12 192:9
223:18 225:22
227:2,9,11 243:4
**covering (1)**
178:12
**covers (1)**
64:24
**coworkers (3)**
217:5,9,17
**Coyle (15)**
75:2 135:2,4,5,7,11
136:10,14,18 137:6
137:9,11,14 139:14
146:9
**CRDM (9)**
53:24 55:15,20 56:21
190:25 194:24
202:9,17 255:4
**create (6)**
56:17 95:7 115:10
168:13 175:21
188:6
**created (12)**
51:3 56:13,24 62:24
95:9 98:23 168:13
168:14 169:21
174:22 177:24
232:24
**creates (1)**
160:15
**creating (11)**
56:20 58:2,12,18,24
94:21,21,24 99:13
106:17 223:13
**creation (2)**
56:14 61:6
**Crestview (1)**
254:11
**criminal (1)**
124:16
**CRM (5)**
51:5 52:20 54:18
113:17 118:13
**CRR (2)**
1:24 262:23
**CRT (3)**
14:11 241:25 242:7
**CS (6)**
110:15 111:7,15
190:19 193:24

194:7
**CSR-CA (1)**
1:24
**CSs (3)**
110:18,24 113:22
**culture (1)**
199:5
**current (4)**
139:19 183:3,8
209:23
**currently (2)**
6:20,21
**customer (20)**
33:24 34:25 35:2 86:5
86:17,25 87:9 93:3
99:8 101:11 110:6
111:6 198:3 203:12
221:5,9,19 222:4
224:12,21
**customers (16)**
32:18 33:13 84:25
86:8 96:4 98:7
99:13 109:19
110:23 115:10
127:10 185:13
188:18 206:11
221:14 232:23
**customers' (3)**
150:20,21 220:23
**customize (1)**
99:2
**customized (10)**
83:16,22 85:10 98:7
98:16,21,23 99:13
100:2 223:10
**cut (3)**
187:4,7 248:2
**CV (1)**
131:21
**cycle (1)**
214:24

---
**D**

**D (1)**
263:2
**D-O-N (1)**
53:20
**Dan (14)**
144:10,14 145:7
146:9 257:2,16,20
258:2,10,20 259:9
259:13 260:11,25
**Dan's (3)**
257:13 259:24 260:3
**data (36)**
35:20 36:11 39:14,23

39:24 40:2,4 41:4,7
41:15,20 64:4,4,5
95:19 96:11,12,16
96:19 97:3,4,6,12
102:6 105:13
109:19 111:11
172:8,21 173:2,4,6
173:16 178:10
203:5 219:25
**database (2)**
96:23 172:25
**date (8)**
81:25 82:5 167:4
183:17 219:13
235:18 245:9 265:3
**dated (1)**
258:6
**dates (4)**
131:21 166:23 217:20
244:21
**Dave (3)**
127:20 132:7 235:13
**day (25)**
6:11 47:15 50:6 96:17
96:19 105:14
108:21 110:13,16
111:12,20 115:17
119:2 121:14 155:9
155:17,20 175:21
199:15 200:25
245:11 248:3
261:16 262:21
265:23
**day-to-day (1)**
127:5
**days (1)**
142:25
**dealing (1)**
46:25
**deals (1)**
113:18
**DeBlass (7)**
144:11 145:7 146:10
257:3 258:2,10,20
**December (4)**
166:21,22 187:11
230:10
**decide (1)**
111:19
**decided (3)**
101:8 169:24 235:14
**decrease (1)**
211:18
**Decreased (1)**
97:15
**defendant (4)**

1:17 148:11 166:14
263:10
**Defendants (1)**
3:14
**defibrillators (1)**
57:12
**define (2)**
90:22,23
**defined (2)**
86:17 91:2
**degree (6)**
15:19,20 16:16 19:17
22:13,25
**DELAWARE (1)**
1:5
**deliberative (3)**
156:19 158:11 159:23
**deliver (1)**
192:13
**delivery (1)**
38:11
**Delores (1)**
233:6
**demonstrate (1)**
188:19
**department (11)**
17:4 51:5,15,18 52:7
52:13,18 55:17,18
55:20 141:23
**departments (4)**
52:23,24 53:6,13
**depend (1)**
205:10
**dependent (1)**
127:7
**depending (2)**
8:16 46:24
**Deponent (2)**
265:4,21
**depose (1)**
166:15
**deposed (3)**
5:17,18 166:10
**deposition (31)**
1:19 2:7 4:4,9 5:19,20
131:7,18,25 132:3,5
134:18 148:17
151:20 156:17
157:3 158:22,22
164:16 166:5,7,15
166:19 167:8,12,23
209:5 223:21
262:12,13 265:3
**depositions (2)**
166:23 189:3
**Depp (1)**

52:10
**derived (2)**
196:18 204:24
**describe (2)**
90:7 92:8
**described (6)**
15:11 55:23 128:6
129:5 151:11 178:8
**describes (1)**
196:7
**design (5)**
62:3,9,15,23 97:11
**designed (1)**
224:20
**desire (1)**
192:11
**detail (1)**
42:7
**detailed (1)**
257:12
**details (9)**
140:24 141:19 142:11
238:16,19 239:4,6
241:14 259:2
**determine (1)**
42:18
**determined (1)**
203:16
**develop (1)**
121:25
**developed (3)**
19:5 59:13 170:5
**developing (1)**
65:5
**development (5)**
16:15 55:5,6 59:14
62:20
**deviation (1)**
27:9
**device (176)**
8:3 11:12,15 12:13
20:21 21:5,7,9,12
21:17 22:5 26:12
27:22 30:10,15,25
31:14,16,19 35:3,12
35:15,16,18 36:10
36:11,16,20 37:3,9
37:14 38:2,9,10,14
38:16,20,23 39:2,2
39:3,12,14,20,24,25
40:3,5,10,18,19,23
40:24 41:2,9,17,22
42:8,11,16,23,25
43:5,12,17,20 44:2
44:5,17,19 45:12,14
45:17 46:14,17,18

46:20,23,25 61:3,14
61:15,17,17,21 62:3
62:10 63:17 64:3,5
64:13,22,22 79:4,15
79:17,19,24 80:12
95:12 97:20 101:2
104:20 105:18,20
110:19 111:8
124:14,15 126:6,14
126:20 170:21
171:9,17 172:20
173:3,3,19 174:13
174:13 175:7 176:7
176:18 177:2,5,8,8
177:10 178:11
193:25 194:8 196:8
196:9,10 203:11,18
203:25 204:9,9
205:7,10,12,16,16
205:19,21,24 206:9
206:12,13,17 207:4
207:12,13,17,18
208:2 212:23
219:18 222:23
223:4,7 224:2,7
229:24 235:15,25
239:18 244:24
245:2,11 247:2
252:23 253:13
254:9
**device-specific (1)**
226:15
**device/patient (2)**
38:5,8
**devices (50)**
11:3,6 12:7,16 13:20
14:15 19:9,14 20:2
21:16,16,18,23
29:14 35:9,13 37:5
43:14 44:6,22,23,25
45:6,8,9 46:6,12
54:21 55:22 56:9,25
57:13 58:9,10,16
59:6,11 62:5,5
105:12 106:4
172:10 176:13,20
186:5 204:6 211:18
213:6 225:8 243:20
**devise (1)**
91:15
**devises (2)**
91:17,18
**Devising (1)**
90:17
**diagnostics (5)**
11:15 223:4,7 224:6,8

**Diane (4)**
51:21 52:2,8 55:19
**Diane's (1)**
52:9
**diastolic (3)**
12:6,12 13:2
**Dick (1)**
74:25
**dictates (1)**
27:6
**dictation (2)**
30:21 31:18
**difference (4)**
34:17,20 68:11 71:7
**differences (1)**
217:15
**different (41)**
8:15 20:10 21:16,18
32:24 34:13 37:5,6
38:25 42:21 46:12
46:16,19,24 57:7
59:24 70:21 75:13
83:18 85:8 93:18
98:22 113:13,17
121:2 133:13
138:14,15,18 148:5
169:5,16 172:10
177:17,18 178:17
185:16 207:9
214:19 223:11
233:25
**differently (4)**
104:11,18,20,24
**difficult (1)**
33:21
**diminished (2)**
260:12,14
**dinners (1)**
225:3
**Diplomate (2)**
2:11 262:5
**direct (3)**
244:14 252:20 259:6
**directed (3)**
198:5 232:17,23
**directing (1)**
198:9
**direction (2)**
193:17,19
**director (10)**
7:3,6,18,24 10:5,20
13:24 14:21 143:19
144:5
**discharged (1)**
205:5
**disclosure (1)**

162:18
**disclosures (1)**
165:3
**discuss (6)**
167:9 191:24 257:16
257:20 259:16,19
**discussed (20)**
42:6 64:11 85:9 130:3
153:5,12 155:6
156:4,11 165:22
176:4 178:13
190:20 203:2,4
206:14 221:6
225:19 240:25
244:14
**discussing (1)**
143:7
**discussion (7)**
114:23 165:19 186:21
187:10 192:2,6,7
**discussions (1)**
199:24
**disease (1)**
113:12
**disheveled (1)**
105:3
**dissatisfaction (1)**
129:12
**district (134)**
1:1,2,5 4:6,7 25:12
26:3 32:21,25 33:15
47:7,9 49:2,6,14
54:11 59:8 65:13
66:7 67:20,22 69:4
70:8,9,18,24 71:2,4
71:5,16 72:16,24
73:3,6,7,10,11,22
73:24 74:4,8,13,13
74:19 75:10,14,23
76:3,4,20 77:23,25
78:14 80:18,20 81:3
81:12 82:12,15,16
82:19,24 83:3,5,9
83:13,17,22 84:3,4
84:8,24 85:8,11,20
85:24 87:8 107:8,15
107:17,17,19 108:4
111:25 112:11,16
112:18 113:23
114:6,13 115:12
116:6 117:21
118:10 121:20,23
122:21 123:18,20
124:3 136:3 138:17
138:18 146:3 186:9
187:18 188:2

189:21 192:9
193:20 194:12,19
197:11,13,19 199:5
199:5,17 200:6,13
201:7 211:25 212:2
212:6 213:18,18,23
214:7 215:22
250:10 253:11,14
253:15 258:7
**districts (11)**
112:24 113:6,8
123:10,11,12,24
124:6 127:13
221:14 248:19
**Disuession (1)**
263:21
**divide (3)**
111:19,19 121:22
**division (3)**
25:13 48:21 255:5
**divisions (2)**
112:12 188:19
**DN (5)**
233:15,22 235:24
238:21 239:3
**doc (1)**
190:24
**doctor (9)**
199:25 203:16 229:14
229:18 230:12,15
230:17 249:7
250:25
**doctors (3)**
222:14 251:4,8
**doctrine (1)**
163:15
**document (58)**
35:24 148:18,21
150:2,7,14 151:21
151:24 152:3,11
167:24 168:2,12,19
168:19 169:2,5,16
169:25 170:23
171:13 172:15
174:10,11 178:22
179:17,25 182:24
183:14 184:5,12,17
185:2,17 187:3,14
187:24 188:6,12,13
189:10 191:7,16
197:23 201:7
212:18 219:4,8
235:4 248:15 253:9
253:14,22 255:8,11
256:18 259:3,23
**documentation (6)**

63:17 64:13 149:22
149:24,25 257:12
**documented (3)**
88:4 97:23 260:25
**documenting (2)**
39:15 259:24
**documents (56)**
131:24 132:9,13
149:2,7,10,12,14,16
149:17,20 150:3,9
150:12,24 151:11
153:4,12,18,23
154:3,13 155:6
156:3 162:14,25
164:23 167:17
180:5,17,25 181:3
181:10,12,14,17
182:9,12,13,20
183:5 184:20,24
185:3,7,11,12,12
236:18 254:13
255:21,23 256:4,5
257:12 263:16
**doing (20)**
34:21 54:2 79:20
80:11 97:14 100:10
105:6 106:24,25
115:17 147:12
173:17 177:5 183:4
193:14 198:16
212:7,23 213:21
222:24
**domain (1)**
182:21
**Don (3)**
53:19,21 55:12
**double-check (1)**
240:13
**double-sourced (1)**
236:14
**Doug (4)**
137:24 138:2 139:14
146:9
**dozen (2)**
151:7,10
**Dr (5)**
227:25 228:21 229:5
258:12,22
**draft (3)**
95:3 169:20 171:22
**drafted (2)**
95:6 98:4
**drafting (2)**
98:2 239:10
**draw (1)**
260:8

**drop (1)**
116:7
**DSM (33)**
66:13,14 69:4 72:6
73:8,15,23 74:4
75:7,19 80:18,22
81:3,13 82:20 83:14
84:19 85:4 86:7,21
87:2 88:9 92:19
99:14 122:24 123:4
123:18,19,21,22
124:2 138:9 186:2
**DSMs (3)**
65:18 66:25,25
**due (2)**
163:25 243:21
**duly (2)**
5:6 262:13
**duties (1)**
18:6
**Dye (13)**
73:9,12,13 113:3,24
114:23 117:10
121:7 122:12
189:24 190:17
256:22 259:24

**E**

**E (4)**
3:3,3 263:2,6
**earlier (14)**
32:4 42:24 50:13,14
60:4 88:9 103:3
106:17 117:19
170:4 171:2 178:13
186:7 203:14
**early (3)**
114:13 259:17,19
**easier (3)**
115:16,19 186:4
**East (2)**
2:9 4:10
**Eastern (8)**
1:2 4:7 70:11 201:8
201:10 222:17
231:15 250:10
**easy (1)**
5:22
**economics (1)**
255:5
**educate (1)**
84:24
**educated (2)**
55:25 56:11
**educating (7)**
32:18,20,24 33:13,14

55:2 86:25
**education (37)**
19:10 22:16,19 32:21
51:4,5,13,15,17
52:7,13,18,20 54:18
55:3,8,17,18,20,25
56:12 58:17 59:4,19
59:21,25 60:12
71:14,19 143:19
144:5 147:7 223:2
224:5 225:5,12
226:17
**educational (1)**
226:20
**educator (5)**
71:13 72:5 75:7,11,18
**educators (4)**
71:18,23 72:20 73:22
**effect (1)**
202:22
**efficiency (3)**
97:11,13 176:2
**efficient (5)**
93:11,14,22 94:5
185:14
**efficiently (4)**
94:15,17 95:15
223:21
**EH (3)**
229:9 235:24 237:6
**either (10)**
45:22 113:16 166:20
195:13 210:23
240:24 254:19
255:15,24 256:6
**electric (1)**
19:14
**electronic (6)**
111:4 239:10,12,23
240:12,15
**electrophysiologist ...**
246:24
**electrophysiology (9)**
18:21 19:3,4 210:4,11
210:14,16 214:18
214:25
**elements (4)**
58:3,9 95:9,17
**elevate (1)**
259:15
**Eleven (1)**
25:4
**elicit (1)**
157:20
**eliminate (2)**
176:12 177:2

**Ellen (1)**
87:3
**Elsie (1)**
235:14
**email (44)**
111:2,4 115:14 189:4
189:22,23 192:3,16
194:23 208:21
209:6,9,14 210:6
211:12 212:21
215:6,9,15 231:25
233:19 234:9,14
235:3,9,9,13,18
236:4,6 237:12
240:24 256:12,22
257:6,13 258:25
259:9,13,23 260:9
263:24 264:4,18
**emails (3)**
111:7 215:13 244:12
**embarrassingly (1)**
127:2
**employed (3)**
92:22 143:8 145:10
**employee (19)**
59:25 60:13 65:15
70:19,22,22 77:8,12
136:3 146:14
197:19 199:8
210:20,22,24
222:10,11,22 224:2
**employees (6)**
51:15 65:20 70:23
77:2 80:3 178:3
**employer (2)**
183:8 209:23
**employment (2)**
49:21,22
**encourage (2)**
66:22 186:5
**encouraged (6)**
119:9 173:11 220:11
223:6,20 224:7
**encouraging (2)**
76:7 121:23
**ended (3)**
49:16 69:9 239:16
**engaged (1)**
127:10
**Engaging (1)**
67:12
**Engel (2)**
247:7,11
**engineer (29)**
9:19 24:25 25:8,18,24
28:3,22 29:20 31:5

31:9 32:5 33:20
34:9,24 42:5,5 47:4
47:21 68:15,20 71:6
71:9,11 72:5,8 75:6
75:11,18 138:5
**engineers (5)**
54:4 71:18,22 72:20
73:22
**ensure (4)**
38:19 39:2,3 185:14
**ensuring (1)**
38:16
**entail (1)**
226:12
**entailed (1)**
54:25
**enter (5)**
109:19 111:11 173:2
173:4,6
**entered (2)**
197:11 199:4
**enters (1)**
200:12
**entire (6)**
7:18 67:8 76:20 125:6
152:7 248:17
**entirety (1)**
76:2
**entity (1)**
211:7
**entry (2)**
219:25 258:9
**environment (1)**
47:11
**EP (9)**
18:22 211:2,5,10,19
213:11 214:9,16
215:3
**episode (4)**
41:11,17,23,24
**Erickson (1)**
131:24
**ERRATA (1)**
265:1
**Esbenshade-Smith ...**
210:7,10
**ESQ (3)**
3:9,19,20
**essentially (2)**
34:15,21
**estimate (3)**
10:23 37:22 214:12
**estimated (3)**
125:8 184:19,25
**ethics (1)**
191:2

**Europe (3)**
216:16,24 217:12
**European (1)**
218:15
**evaluated (1)**
105:14
**event (17)**
35:11 93:15,20
100:18,19,21 101:5
101:12,24,25 102:3
103:23 104:2,4,13
238:15,18
**events (9)**
84:6,16 93:12 100:15
100:16 223:13
228:6 238:8 239:19
**everybody (2)**
52:6 205:2
**evidence (2)**
120:21 121:2
**Ewing (1)**
75:2
**Ex (1)**
1:13
**exact (1)**
19:20
**exactly (6)**
45:13 113:25 133:5
142:14 218:18
236:12
**EXAMINATION (2)**
5:9 263:3
**examined (1)**
5:7
**examining (1)**
12:11
**example (20)**
26:18,24 27:2,21 30:4
42:12,14 43:12 44:5
45:25 47:12 58:13
62:10 84:13 87:10
150:15 170:11,24
177:12 244:15
**examples (7)**
46:4 58:8 86:24 87:6
87:11 177:18
250:10
**excluding (1)**
180:22
**excuse (1)**
221:6
**execute (4)**
20:14 83:3 84:3
193:13
**executed (2)**
20:11 56:14

**executing (1)**
8:12
**execution (1)**
7:7
**exhausting (1)**
127:6
**exhibit (74)**
148:10,17 151:15,16
151:20 153:11
154:10 162:4,6
167:15,23 186:18
186:19 187:2 189:4
189:10 208:21
209:5 218:22 219:2
219:2 227:16
230:23,25 231:2,9
233:14,20,22
234:21,24,25
235:22 236:21
237:6,15,15,16,22
238:9,24 239:25
240:3,6,24,25 241:3
241:22,23 243:7
244:9,13,16,22,23
245:21 246:2,12
250:5 252:18
256:11,12,18 259:5
263:8,12,14,18,23
264:3,6,8,13,17
**existed (1)**
199:13
**expectation (9)**
195:15,18,23 196:2,4
196:17 199:7
204:22,24
**expectations (2)**
186:2 198:15
**expected (2)**
196:16 198:3
**expensive (1)**
213:7
**experience (5)**
62:2 136:2 214:9,16
221:23
**experienced (2)**
127:11 128:20
**experiences (2)**
65:16,17
**expert (2)**
36:19 39:9
**expertise (2)**
128:10,19
**experts (1)**
220:11
**expiration (4)**
80:24 81:6 82:5 85:16

**expire (1)**
81:25
**EXPIRES (1)**
265:25
**explain (8)**
40:7 42:14 44:12,13
54:20 57:3 67:10
116:2
**explained (1)**
116:4
**explaining (1)**
44:12
**explicit (4)**
150:19,20 220:23
221:3
**exploration (1)**
116:17
**explore (3)**
92:12 96:9 215:22
**explored (1)**
96:13
**exploring (4)**
99:9 211:14 213:7
220:22
**extensive (1)**
220:21
**extent (1)**
166:12
**extra (2)**
78:14 128:14
**extremely (1)**
128:8

**F**
**face (1)**
212:17
**face-to-face (2)**
257:15,19
**facilitate (1)**
122:3
**facilitating (1)**
226:7
**fact (1)**
167:8
**failure (15)**
11:11,16 12:7,12 13:2
13:6 106:6 147:11
223:3,4,7,9 224:5,6
224:8
**fair (7)**
28:5 38:12 46:5 67:2
115:21 184:3,11
**fairly (2)**
191:11 253:24
**fall (2)**
117:16 146:19

**familiar (5)**
134:25 176:10,11
195:3,4
**family (2)**
17:25 251:19
**fan (1)**
112:4
**far (3)**
134:11 178:22 247:23
**faster (1)**
97:21
**FDA (1)**
128:15
**feature (1)**
44:20
**features (2)**
45:13,16
**February (5)**
6:24 49:13 50:19
239:16,20
**federal (1)**
126:8
**fees (1)**
23:23
**feet (1)**
127:6
**fellow (1)**
214:20
**felony (3)**
124:15 126:7 128:5
**field (117)**
8:19 9:8,19,21 24:25
25:8,18,24 28:3,22
29:19 31:5,9 32:5
33:20 34:9,24 39:9
42:5,5 47:4,21 51:5
52:20 53:14,15 54:4
54:4,18,21 55:2,13
55:14,22,25 56:9,12
56:25 58:15,19,20
58:22 59:6,11,16,25
60:3,6,13,15 61:12
63:4 65:16 67:9
68:9,14,20 70:19,22
70:23 71:6,9,11,13
71:18,22 72:4,7,19
73:21 75:6,11,18
77:2,12 80:3 84:25
86:4,4,8,16,25 87:3
87:8 95:18 105:16
105:19 106:25
109:15,23,25 110:9
111:3,23 115:16,19
118:12 122:19
138:4 143:6 150:19
187:18 190:24

194:24 195:10,19
198:14,18,23 202:9
202:17 204:21
217:12 220:11
224:2 248:17
259:25
**fields (1)**
147:8
**fifth (1)**
12:22
**figure (1)**
214:12
**figuring (1)**
38:22
**file (1)**
257:3
**filed (2)**
153:23 154:10
**filing (4)**
152:21 153:3,10,15
**fill (8)**
78:19,24 79:20
195:20 197:20
198:23 199:25
200:2
**filled (11)**
76:6,15,16,21 77:22
78:13,24 79:7 80:10
197:20 260:23
**filling (5)**
76:23 77:7,9 79:8
212:10
**finalize (1)**
92:13
**Finally (1)**
167:5
**find (8)**
104:22 111:16 226:3
238:7,12,20 253:21
255:15
**finding (1)**
80:18
**findings (4)**
35:24 36:8 39:15,18
**finish (5)**
5:24 120:7 124:21
125:3,5
**finished (1)**
15:23
**first (40)**
6:17 7:21 11:9 50:14
58:4,11 74:23 75:19
77:25 88:14 94:8
110:3 113:22,24
114:2 126:12,17
130:8 135:10 136:9

138:20 140:5
141:15 144:16
148:12,24 166:9
168:6 176:12 182:2
184:4 189:22
202:24 203:4
245:24 255:24
256:7 257:5,6
263:10
**Firstly (1)**
94:19
**five (22)**
10:10,10,23 13:13
14:2 19:7,25 20:6
21:13 37:8,21,25
38:13,25 46:8 99:23
99:24,25 100:2
106:15 184:23
214:18
**flip (1)**
168:18
**Florida (5)**
1:6 17:10,21 18:3
254:11
**focused (2)**
67:4 85:15
**folks (2)**
55:13 199:23
**follow (11)**
35:8 98:22 117:10
195:5,6,9 202:10,10
202:20,23 241:6
**follow-up (39)**
26:12,23 35:4,12,16
35:17 36:10,17
39:13,20 42:7 46:18
60:6,15 61:4 63:21
63:25 64:9 72:2,13
94:22,25 95:12,20
100:21,23 101:4
162:19 171:17
172:11 178:11
185:25 192:22
196:23 198:15
204:6,9 205:6 206:5
**follow-ups (9)**
60:3 115:17 122:5
172:12 200:18
205:9,10,13 242:20
**followed (4)**
35:14 118:6 200:21
203:5
**following (1)**
211:14
**follows (2)**
5:8 211:16

**footer (1)**
179:13
**footprint (1)**
169:22
**force (4)**
50:2 69:6 122:15,16
**foregoing (1)**
262:9
**forget (2)**
132:7 150:16
**forgot (1)**
103:2
**form (69)**
8:17 11:18 26:21 27:5
27:20 28:17 30:14
30:19,24 31:24
33:23 34:4 36:13
37:10 38:18 39:5
41:25 43:7,11 54:10
56:5 57:5 60:20
64:17 76:25 79:12
80:14 81:7 82:21
84:10 86:11 93:6
98:11,14,20,23 99:2
106:2,20 109:21
112:9 113:2 144:4
147:24 151:2,5
169:20 183:22
185:9 194:3,10
202:11 207:14,19
219:14 220:9
221:11 224:16
225:15,23 227:7
229:11,20 243:10
243:17 247:19
249:2,20 250:19
**format (1)**
240:20
**former (1)**
139:25
**forms (1)**
110:17
**Forney (315)**
1:13,19 2:8 4:1,4,5
5:1,5,11,13 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
15:16 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1,9

49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1,2 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1,5,17
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1,10
149:1 150:1 151:1
151:16,22 152:1,6
152:19 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1,8 166:1
167:1,15,22 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1,23
183:1 184:1 185:1
186:1,19 187:1,2
188:1 189:1,4,9
190:1,18 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1,21
209:1,4,10 210:1
211:1 212:1 213:1
214:1 215:1 216:1

217:1 218:1,22
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1,2,9 232:1
233:1 234:1 235:1
236:1 237:1,16
238:1 239:1 240:1
240:10,22 241:1
242:1,18 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1,11
252:1,17 253:1
254:1 255:1 256:1
256:12,17 257:1,14
258:1 259:1,24
260:1 261:1,12
262:11 263:4,7,8,12
263:14,18,23 264:2
264:3,8,13,17
**Forney's (1)**
165:23
**forth (1)**
262:12
**forward (5)**
44:25 104:22 136:23
143:11 190:20
**foundation (9)**
10:8 24:3,7 37:18
38:3 90:25 96:20
144:18 202:12
**four (2)**
24:18 150:5
**fourth (3)**
12:15,18 252:21
**frame (4)**
37:15 118:19 143:7,9
**framework (1)**
178:19
**Frank (1)**
74:25
**free (4)**
108:18 219:15 247:2
247:10
**freedom (2)**
121:21 127:13
**frequency (3)**
204:8 205:10,19
**frequent (2)**
190:6 206:10
**front (3)**
151:23,25
**fulfilled (1)**
195:22

**fulfilling (1)**
89:20
**full (1)**
5:12
**full-time (4)**
23:3 24:13,15 254:8
**function (14)**
38:20 39:3 41:9,22
61:3,14,15,17,21
62:4,5,10,15,23
**functioning (1)**
214:20
**functions (1)**
67:6
**further (2)**
261:3 262:16
**FY (2)**
252:24 253:10

_____
**G**

**G (1)**
239:2
**Gail (5)**
1:23 2:10 4:15 262:4
262:23
**game (1)**
107:13
**gap (4)**
222:10,15 244:12,21
**gaps (2)**
97:6,12
**Geisinger (3)**
186:20 187:21 263:19
**Geisinger/Medtron...**
187:9
**gen (1)**
234:12
**general (33)**
6:22 7:9,19 10:7,13
10:19 12:4,17 13:17
14:22 18:5,6 23:12
49:12 63:13,20,24
64:8 65:24 105:3
186:8 209:22
210:23,25 211:2,10
216:15,24 217:3
218:13 226:13
233:7 242:5
**generalities (1)**
63:11
**generally (9)**
64:15,25 66:18 67:10
86:9 106:15 140:25
141:20 142:12
**Geneva (7)**
15:17,23 16:3,7,9

17:11 22:14
**geography (5)**
25:9,10,11 70:10
207:6
**GEORGIA (1)**
1:6
**getting (7)**
93:4 100:11 120:3
122:4,4 125:17
207:8
**Ghassan (3)**
249:11,16,25
**give (7)**
5:21 26:18 54:7
131:13 152:8 188:8
193:22
**given (14)**
44:4 121:20 122:13
125:16,23 127:13
157:5,6 214:8,9,23
215:19 250:10
262:14
**giving (2)**
42:14 259:14
**Gmail (5)**
115:12 231:4,14
235:4 264:10
**go (17)**
18:13 107:3 111:24
118:25 122:19,21
125:8,9 127:3
167:13 179:6,8,18
204:13 213:13
251:13,15
**goal (1)**
198:2
**goes (3)**
187:5,6 260:5
**going (34)**
5:19,20,21,24 48:2
83:19 102:19
103:24 107:16,19
108:12 109:10
118:5 119:7 120:4,9
124:18,24 125:7,9
125:20,24 130:21
141:3,22 148:9
165:15 166:2,20
208:11,12,17
252:10 261:5
**good (8)**
5:11 40:12 66:22
147:4 170:3 208:8
215:2 233:5
**good-bye (2)**
36:6 39:17

**Google (38)**
112:6,8,17,18,25
113:23 114:7 115:7
115:8,13 117:25
118:3,20 119:4
120:16 121:9,17,19
202:25 228:3 231:5
231:14 232:8,21,22
234:8 236:24
237:17,25 239:12
239:15,23 240:9
241:2,7,23 264:11
264:15
**gotten (1)**
258:21
**government (30)**
148:25 149:3,7,11,13
149:18,21 150:10
150:24 151:13
153:15 154:9,14
155:8 156:6,10,12
161:25 162:12,15
162:17 165:24
166:12,14 167:11
184:21 185:4 238:4
255:22 256:5
**government's (1)**
162:21
**grab (1)**
216:3
**graduate (2)**
15:19 16:6
**graduated (1)**
17:11
**graduating (1)**
16:22
**grants (2)**
226:17,20
**GRAY (1)**
3:15
**great (3)**
104:22 254:3 255:20
**green (16)**
3:25 4:13 88:12,13,21
89:4,5,8,8,11,13,15
89:18,25 92:17 93:2
**Greet (1)**
36:4
**Gregorio (3)**
116:13 117:3 118:9
**Gregory (2)**
247:7,11
**group (3)**
31:10 53:17 185:23
**groups (1)**
225:25

**growing (1)**
179:2
**growl (1)**
120:6
**growth (3)**
18:18 68:22,23
**guess (8)**
10:9 83:15 118:14
155:20 161:10
168:8 212:5,9
**guessing (1)**
104:16
**guidance (4)**
170:22 190:20,24
259:14
**guide (1)**
65:15
**guided (2)**
194:13 201:3
**guideline (1)**
168:11
**guidelines (8)**
168:9 169:4,15,18
174:13 184:6
190:12 205:15
**Gulotta (3)**
227:25 228:21 229:5

_____
**H**

**H (1)**
263:6
**habit (4)**
176:22 196:19 202:3
202:6
**Hahnemann (1)**
137:23
**half (5)**
24:2 50:14 120:10
125:8 155:20
**hand (1)**
262:21
**handed (1)**
89:22
**handful (2)**
46:8 185:20
**hands-on (1)**
62:2
**handwriting (1)**
171:11
**happen (6)**
28:14 77:24 123:14
166:20 199:18
245:7
**happened (4)**
101:9 104:13 108:10
112:3

**happening (1)**
199:2
**happens (1)**
159:4
**happy (3)**
152:8 164:10 198:3
**hard (3)**
235:19 239:4 240:12
**HAWAII (1)**
1:6
**head (3)**
53:19,21 209:16
**health (5)**
186:9 209:20 211:7
228:12 243:16
**healthcare (7)**
186:20 187:9 219:24
241:24 242:6 255:5
263:20
**hear (2)**
113:22,24
**heard (6)**
113:5,9 114:2,5
216:18,23
**hearing (2)**
215:10 218:5
**heart (20)**
11:11,16 12:6,12 13:2
13:6 14:11 19:14
106:6 147:11 223:3
223:4,7,9 224:5,6,8
237:2 254:9,10
**Heilman (2)**
221:12 223:23
**held (9)**
2:8 4:9 7:17 17:19
26:8,16 27:17 144:2
165:19
**hello (1)**
39:16
**help (14)**
44:11 90:13 91:5
93:21 94:9 95:6,14
106:18 121:25
173:14,14 177:24
225:3 233:8
**helped (5)**
94:4 95:3 99:20,22
127:23
**helpful (1)**
114:20
**helping (5)**
93:10,14 102:6
128:11 139:15
**hereinbefore (1)**
262:12

**hereunto (1)**
262:20
**Heywood (3)**
245:25 246:8,19
**HF (2)**
14:6 15:4
**high (10)**
127:10 173:12 186:3
188:17 199:2,12
218:3 220:12
243:20,20
**high-level (1)**
185:13
**higher (1)**
238:17
**highlighting (1)**
260:2
**highly (1)**
198:13
**Hilbert (1)**
235:14
**HIPAA (7)**
114:25 115:5,20
116:2 149:25 150:7
185:18
**hire (2)**
67:8,12
**hired (1)**
222:11
**hiring (1)**
76:6
**historically (2)**
57:9,14
**hold (5)**
25:2 48:14 49:18
143:21 234:12
**holding (1)**
111:22
**home (2)**
70:6 204:13
**Honesdale (1)**
99:16
**hope (1)**
190:19
**hopefully (1)**
6:5
**hospital (40)**
6:22 7:9,19 13:17
17:10,20 18:3,9,11
19:8 20:3 21:24
22:7 47:11 49:13
94:10,11 99:12
105:23 137:23
177:14 178:10,11
203:19 204:14
205:6,21 209:22

212:3,7,21 213:3,15
213:21 215:21
216:20 221:22
229:19,24 258:11
**hospitals (2)**
178:6 250:7
**hot (1)**
119:10
**hotline (2)**
119:13 120:15
**hour (8)**
99:5,10 120:10 125:9
130:20 155:19
208:13,13
**hours (2)**
134:21 155:18
**HR (4)**
66:11,20 215:7 257:8
**HRS (1)**
185:12
**human (1)**
44:21
**hungry (1)**
125:17
**hybrid (2)**
70:4,5
**hypothetically (2)**
245:10,15

———————————
**I**

**ICD (13)**
29:3 32:13 33:12 34:8
34:14 58:9 171:7,13
225:25 228:2
238:25 241:25
242:7
**ICDs (1)**
172:16
**idea (3)**
112:7 183:13,21
**identification (10)**
148:13 151:17 167:18
186:23 189:7
208:24 218:23
231:6 237:19
256:15
**identified (7)**
95:25 134:24 147:20
150:5,6 223:22
224:12
**identify (5)**
92:12 95:22,23
119:19 224:20
**identifying (3)**
90:14 251:4,7
**Idle (2)**

52:4,8
**illegal (5)**
128:5 129:7 130:5,10
130:11
**ILLINOIS (1)**
1:7
**immediately (1)**
17:14
**immunity (1)**
163:15
**Impact (1)**
68:25
**implant (43)**
14:11 29:6,7,10,12,16
29:18,25 30:3,7,9
30:11,12,21 31:6,12
31:13,15,18,20 33:5
60:5 61:3 63:10,14
64:16 65:2 110:12
110:16,20 111:9
127:22 128:7,20,20
178:10 185:14
213:10 216:16,17
216:24 218:15
221:22
**implantable (7)**
11:11 29:14 35:9 40:3
40:5 57:12 223:4
**implantation (5)**
203:20,23 204:3,5
252:24
**implanted (14)**
31:15 38:9 45:15
63:16 64:12 203:17
204:2 206:9,17,22
207:4,12,17 243:22
**implanting (1)**
35:7
**implants (34)**
26:12 28:23 29:2,4,19
31:4,11 32:2,13
33:12,17 34:8,12,12
34:14 60:3,14 71:23
72:12,13 108:16
122:6 128:4,16
129:7 145:11 173:3
204:23 206:22,24
213:11 221:24,24
223:25
**implement (1)**
92:13
**implemented (1)**
85:19
**implementing (1)**
90:17
**implements (1)**

91:24
**implicit (1)**
226:24
**Importance (1)**
26:22
**important (7)**
5:24 37:24 38:13,15
38:24 127:21
260:19
**improve (5)**
51:5 52:20 54:18
97:10 175:20
**improves (1)**
97:13
**in-house (4)**
3:24 51:4,13 198:12
**in-office (3)**
176:2,9,16
**inadvertently (1)**
253:23
**inappropriate (3)**
117:9 127:18 189:2
**incentive (1)**
7:15
**incidence (1)**
199:3
**include (7)**
21:20 29:8 41:10 65:9
65:12 81:22 105:6
**included (5)**
63:4 65:9 80:18 101:6
240:6
**includes (1)**
124:12
**including (2)**
148:25 250:8
**increase (13)**
23:7,9 68:3,4 76:8,9
83:6,8,12 106:19
176:5 225:4,7
**increased (2)**
106:3 172:12
**increases (2)**
68:10 205:18
**increasing (2)**
105:8,24
**independent (4)**
16:13 161:12 163:23
185:24
**independently (1)**
160:24
**INDIANA (1)**
1:7
**individual (8)**
84:23 85:23,25 86:24
87:7 194:13 234:11

244:25
**individuals (7)**
74:17 86:7 116:24
134:23 215:20
217:17 218:2
**industry (2)**
135:25 214:22
**inefficient (1)**
104:9
**inference (1)**
229:4
**influence (1)**
127:19
**informal (2)**
53:12 100:21
**informally (4)**
52:22 53:5 72:21,22
**information (46)**
28:18 38:15 39:8
41:11,23 115:8,11
135:19 136:5 145:9
152:20,25 153:8,21
154:4,8 155:7 156:6
157:21 173:9,19,21
195:15,22 230:3
231:3 233:13 234:5
236:5 237:17 239:8
240:23 241:9,12,22
241:22 242:10
243:5 244:10,19
245:14 246:16
250:16,22 264:9,14
**informs (1)**
173:23
**Inghram (4)**
1:23 2:10 262:4,23
**initial (1)**
117:7
**initially (4)**
60:17 107:14 112:20
205:3
**initiated (1)**
234:13
**initiative (21)**
82:11,17,24 83:2,8,12
84:2,13 85:9,10
86:20 87:15 106:5
107:5,8,9,10,11
173:23 178:19
202:4
**initiatives (23)**
76:4,8,11,12 80:18,21
81:3,13 82:15,19
83:5,6,13,16,20
84:4,7,18 85:3,7,14
107:4,4

**inquire (1)**
216:22
**inquired (1)**
114:8
**inserting (1)**
214:20
**inside (9)**
8:25 9:2,3,5 28:12,16
135:25 138:13
143:18
**instance (1)**
193:7
**instruct (3)**
156:13 157:7 181:21
**INSTRUCTED (1)**
264:21
**instructing (2)**
158:4 159:10
**instruction (1)**
62:9
**insurance (3)**
243:16 244:2 245:15
**insurer (1)**
243:2
**integrated (2)**
57:25 59:16
**integration (2)**
223:6 224:7
**integrative (7)**
54:22 55:23 56:10
57:2 59:6,9 61:11
**intent (2)**
195:6 239:5
**interact (4)**
8:2,21 9:6 52:11
**interaction (3)**
38:5,8 64:6
**interactions (2)**
8:8 9:18
**interchangeable (1)**
178:14
**interest (8)**
19:16 156:25 157:6
162:10 163:5,14,19
165:2
**interested (5)**
120:25 139:15 147:22
223:17 262:19
**interface (4)**
52:22 53:3,5,12
**internal (1)**
95:17
**interoffice (1)**
258:2
**interpretation (1)**
64:4

**interpreted (2)**
117:24 121:3
**interpreting (3)**
38:10 223:3 224:6
**interrogate (4)**
40:19 42:25 46:11,13
**interrogated (4)**
40:18 105:12,18
235:15
**interrogates (1)**
40:9
**interrogating (7)**
39:13 40:22,24,25
46:16,19 105:20
**interrogation (10)**
35:18 36:10 64:3
105:16,17 171:7,14
219:19 229:25
235:25
**interrogations (1)**
106:23
**interrupting (1)**
222:7
**intervention (2)**
12:14 13:5
**interview (9)**
137:12 155:10,16,21
156:2,10 160:9,17
161:15
**interviewed (1)**
155:9
**interviews (1)**
156:21
**introduce (1)**
4:18
**investigative (2)**
156:19 159:25
**investigators (1)**
226:18
**invite (1)**
86:3
**invocation (4)**
159:16,18,21 161:19
**invoke (2)**
161:20,21
**invoked (1)**
163:2
**invoking (1)**
164:25
**involve (4)**
11:5 12:25 69:23
105:24
**involved (14)**
11:3 14:21 15:7 18:23
65:5 66:6 82:3
142:15 147:16

174:19 175:19
228:2,5,24
**involving (6)**
12:16 13:5,20 14:9,14
199:20
**IOWA (1)**
1:7
**IPG (1)**
260:12
**ISLAND (1)**
1:11
**issue (7)**
87:9 116:2,4,7,15
143:9 164:2
**issues (6)**
15:7,12 145:24 146:4
146:6 164:20
**item (3)**
64:19 151:8 204:11
**items (10)**
65:10,11 132:19
149:24 150:7
187:25 220:20
223:12,23 233:25

---
**J**

**James (3)**
245:25 246:7,19
**January (21)**
25:6,15 32:6 47:5,22
48:9 49:23,25 50:4
50:22 66:4 67:16
68:16 189:24
190:17 192:16
259:7,17,20,22
260:9
**jeopardize (1)**
139:19
**JERSEY (1)**
1:9
**Jim (1)**
118:11
**Jo (1)**
235:9
**Joann (6)**
8:18,22 9:5,17 15:6
25:20
**job (12)**
1:24 17:19 56:2
128:12 137:11
143:18,21,23 144:7
175:8 177:22 186:4
**jobs (2)**
143:6 144:3
**Joe's (12)**
17:9,20 18:2,10,16

20:3,6 21:13,20,24
22:6,10
**joint (12)**
159:8,21 160:10,14
161:12,13 162:9,22
163:4,13,18 165:2
**Jolla (1)**
246:19
**Jones (1)**
123:3
**jotted (1)**
132:19
**journal (1)**
87:5
**July (3)**
251:16,18,21
**June (13)**
48:18,25 50:22 66:5
67:17,19 69:5 84:19
138:10 154:15,18
155:2,2
**Justice (1)**
141:23

---
**K**

**Karen (3)**
55:9 146:17 147:3
**Kathryn (2)**
3:24 4:24
**Kay (5)**
232:3,13,16 233:4,18
**keep (1)**
107:16
**Kelly (5)**
51:22 52:2,4,8 55:19
**kept (1)**
108:15
**kickback (7)**
124:16 126:7 128:5
225:21 226:21,22
227:6
**kickbacks (5)**
125:6 219:14 249:12
250:8,13
**kind (8)**
21:11 45:19 65:11
70:21 97:20 170:12
170:24 199:17
**King (2)**
2:9 4:10
**Kirsten (6)**
3:19 4:20 40:12
124:18 129:2,8
**knew (2)**
28:9 147:15
**know (106)**

6:13 10:21 19:20
28:10 37:16 48:17
54:6,17 67:25 78:9
91:13,14 99:8 104:6
104:12 108:9 111:8
112:7 113:14,15
116:14,23,25
117:17,17 120:19
121:6 133:3,4,5,6
135:4 137:19,21,24
139:13,21 140:3
142:14 143:11,22
144:2,6,10 145:14
145:17,20,25,25
146:3 147:13
152:10 154:12
155:10 157:4
158:19 161:5
169:23 170:2
172:17 173:9,12,17
174:10 177:21
178:24 179:4,10
183:12,24 184:16
184:23 185:22
188:11,15 193:5
197:9,16 209:20
218:9 219:4 220:20
228:10,21 229:4,22
230:2,10,17 232:10
235:13 236:15
240:7,8 243:14
246:18,20,21,25
247:7,9 249:16,19
249:25 253:23
257:9
**knowledge (21)**
36:22 37:25 38:13
104:7 153:21 154:6
180:16 197:8
217:12 218:7,7
225:9 227:14 247:4
247:6,12,13,17
250:3,23 256:9
**known (1)**
221:4
**Krista (1)**
55:5

**L**

**L (2)**
1:23 3:6
**La (1)**
246:19
**lab (7)**
209:19 210:2,4
211:19 213:8,11

215:3
**labeled (1)**
4:3
**lack (5)**
56:18 90:24 112:21
114:24 161:3
**laid (3)**
108:7,8 121:13
**Lancaster (30)**
1:20 2:9 4:10 5:16
6:21,22 7:9,19 10:7
10:13,19 12:4,17
13:17 14:22 25:21
49:12 183:10 186:8
209:19,22 210:12
210:14,17,23,24
211:2,10 214:17
215:19
**large (3)**
127:17 212:22 213:4
**launched (1)**
57:10
**launches (2)**
32:16 33:13
**law (6)**
3:6 126:8,15,19 164:3
164:13
**lawyer (1)**
118:13
**laying (2)**
180:8 182:25
**lead (6)**
42:12,19 45:21,24
58:14 260:22
**lead-handling (1)**
30:5
**leader (1)**
225:12
**leading (2)**
63:2 80:20
**leads (4)**
63:16,17 64:12,13
**Lean (34)**
84:6,11,16,17 87:10
87:19,23 88:5,16,23
89:2 92:7,10,16,17
92:18,21 93:11,15
93:20 100:14,15,17
100:18,20 101:5,16
101:20,23 103:23
104:12,21 130:5
223:13
**learn (3)**
86:5 112:17 118:23
**learned (1)**
113:25

**learner (1)**
67:13
**learners (1)**
66:21
**learning (11)**
19:13 32:23 33:4,16
63:5 66:22 67:8,13
68:25 76:7 220:14
**learning-support (1)**
61:13
**leave (3)**
18:16 137:16 139:12
**leaving (2)**
88:11 191:6
**left (28)**
123:16 126:23 128:2
128:25 129:25
130:12,16 132:21
132:23,24 137:18
137:20 143:12,13
143:17,23 146:2
179:19 180:5,18
181:4 197:12 248:3
248:14,20,25 249:8
253:23
**legal (5)**
3:25 4:14 164:9,10,12
**Lehigh (10)**
177:15 230:6,11
231:3 233:15,22
236:25 237:7
238:21 264:10
**Leiby (1)**
235:10
**lenient (1)**
191:11
**let's (6)**
50:21 94:7 165:8,9
172:14 191:23
**Letia (1)**
211:13
**Letitia (4)**
210:6,10,17,19
**level (11)**
83:17,22 127:11
173:12 186:3
188:18 207:21
214:19 225:6,7
238:17
**levels (2)**
214:19 220:12
**Levin (3)**
260:10,14,21
**LG (1)**
209:20
**LGH (4)**

50:19 211:9 214:9,15
**life (1)**
17:4
**lifetime (4)**
206:8,13 207:13,17
**light (1)**
190:12
**Lily (2)**
258:3,5
**limited (2)**
149:2 166:19
**limits (1)**
203:9
**line (9)**
141:10 235:23,24
237:5 252:21,23
263:7 264:2,22
**lines (2)**
61:19 62:8
**lingering (1)**
216:5
**list (10)**
54:7 119:4 131:22
135:16 148:2,4,6,7
186:14 239:18
**listed (8)**
99:23 220:20 228:6
238:8 241:18,19
243:8 244:5
**listening (1)**
218:6
**listing (2)**
245:23 249:7
**lists (2)**
176:7 246:11
**litigation (1)**
149:4
**little (8)**
15:15 83:18 85:10
152:10 176:18
179:20 208:13
235:19
**live (3)**
5:14,15 215:19
**lived (1)**
69:24
**Liz (3)**
53:4,9 55:12
**LLC (1)**
2:9
**local (3)**
110:10 190:25 225:6
**location (3)**
70:13,15 175:5
**locations (3)**
174:25 175:3,6

**long (13)**
6:11,23 17:5 18:10
25:2 48:14 49:5
134:20 155:16
176:23 201:5 202:7
208:10
**long-term (1)**
11:25
**longer (8)**
101:13 119:23 120:4
145:12,14 176:20
211:5 232:5
**look (12)**
118:25 127:6 169:15
171:4 179:4,8,12
213:8 235:22
236:17 238:6 257:5
**looked (3)**
41:21,22 96:11
**looking (13)**
11:14,23 12:6 13:4
14:9 41:9,11 172:5
175:23 183:16
232:12 238:23
239:2
**looks (9)**
168:4 169:19 187:5
214:11 231:24
232:17 234:15
235:19 260:3
**loss (2)**
42:18 45:23
**lost (2)**
222:9,22
**lot (4)**
121:20 164:3 223:2
224:4
**lots (3)**
46:4,7 255:20
**LOUISIANA (1)**
1:7
**lower (2)**
45:22 68:24
**Luke's (24)**
91:10,12 99:19
100:18 101:17,21
101:24 103:24
104:18 105:23
106:13 168:23
169:11,21 170:10
170:15 174:12
177:15 222:19
224:3 229:8,23
235:16,25
**lunch (11)**
119:24 120:5 124:20

125:6,9,9,18,19
126:3 130:18 131:6
**Luncheon (1)**
130:23
**LVH (1)**
260:10
**Lynn (3)**
117:4,5 201:12
**Lyons (1)**
75:4

**M**

**main (2)**
175:9 227:9
**maintain (1)**
225:21
**major (4)**
16:13,14 57:10,11
**majority (2)**
79:4 243:18
**making (11)**
10:9 36:11,12,17
39:14 81:23 82:5
101:6 164:17
218:11,12
**male (2)**
53:20,21
**manage (6)**
7:7 53:15 67:2 72:19
73:15 115:18
**managed (1)**
72:18
**management (25)**
11:16 25:16 31:10
48:21 49:3,7,16
53:25 54:6 67:21
81:14,16,22 82:4,11
82:15 84:21 85:7,8
85:14 113:12
190:25 200:4
219:25 223:9
**manager (64)**
48:13,20 49:2,6,15
50:23 51:2,8,14
52:14 54:2 59:10
60:16 66:4,7 67:16
67:20,23 68:15,20
69:4,5,8,18,23 70:9
70:10,18,25 71:4,5
71:16 72:17,25 73:3
73:6,7,10,12 74:8
74:14,20 75:10,15
75:23 76:3 77:24,25
84:5,8 187:18 188:2
189:21 193:20
194:12,19 209:18

210:3,17 213:19,24
214:7 215:22
253:15
**managers (3)**
54:12 65:14 121:20
**manages (1)**
123:10
**managing (3)**
55:14 75:24 225:7
**manual (8)**
45:2,10 46:15,22
176:19,22 177:3,4
**manually (8)**
42:8,11,16 43:6,20
44:3 45:18 46:2
**manufacturer (3)**
29:15 173:7 211:18
**manufacturers (3)**
20:8 95:19 212:24
**mark (6)**
151:15 186:17 218:20
230:24 237:14
256:10
**marked (20)**
148:13,16 151:17,20
167:18,23 186:23
186:25 189:6,10
208:23 209:5
218:23 219:2 231:6
231:8 237:19,21
256:14,18
**market (1)**
176:21
**marketing (10)**
52:25 53:3,6,7 55:12
55:14 147:6,16
151:7 185:21
**Marla (1)**
75:3
**marriage (1)**
262:18
**martyr (2)**
116:5 117:20
**Mary (3)**
51:21 52:8 55:18
**Mary's (2)**
51:23 131:23
**Maryland (2)**
1:8 3:8
**Massachusetts (2)**
1:8 3:18
**master's (4)**
15:21 22:20,22 23:5
**material (2)**
162:18 163:11
**materials (30)**

58:18,21,23,25 59:2,3
59:4,13,15 61:12,13
61:13 62:20,22,24
63:4,5,6,7 65:4,6,12
65:20,23 66:23
151:12 183:6 184:7
185:20,21
**matter (5)**
4:5 18:5 165:23 201:6
262:19
**mature (1)**
128:8
**Mayer (208)**
3:19 4:20,20 5:10
8:20 10:11,17 11:20
24:5,9 26:25 27:10
27:23 28:20 30:17
30:22 31:3 32:3
34:2,6 36:14 37:12
37:20 38:6,21 39:7
40:13,16 42:3 43:3
43:16 44:15 47:24
48:8 54:13 56:8
57:19 60:1 64:23
69:11,16 77:4,6,13
77:21 78:7,16,18,23
79:10,14 80:16
81:11 82:23 84:14
86:14 91:4 93:8
96:6,25 98:12,16,19
102:13,17,25 106:8
106:22 109:9,24
112:14 113:7
119:25 120:7,11,13
124:21 125:2,7,11
125:23 126:4
127:25 128:21,23
129:3,16,20,21
130:18 131:4 133:4
133:14 134:6,8
135:24 141:6,12,17
144:21 148:3,9,15
151:3,9,15,18
154:25 156:15,22
157:9,13,15 158:6
158:18 159:14,19
160:3,7,13 161:10
161:23 162:5,16,20
163:3,10,17,22
164:21 165:4,13,22
167:21 172:4
180:24 181:6,11,23
182:2,8,11,22
183:23 186:15,17
186:24 188:22
189:8 191:9,15

193:16 194:6,16
202:13,15 207:15
207:23 208:10,15
209:3 216:3,7
218:20,24 220:24
221:16 222:12
224:14,18 225:17
226:10 227:4,10
229:12,21 230:24
231:7 234:22
237:14,20 240:8,15
240:21 242:16
243:12,23 247:24
249:4,24 250:21
252:2,9,16 253:8,20
254:3,4,18,23,24
255:14,19 256:10
256:16 258:19
261:3 263:5
**MB (1)**
237:7
**MBA (7)**
23:13,19,24 24:11,14
24:17,20
**McSteen (3)**
118:12 120:19 122:8
**MDTEDPA-47212 ...**
189:6 263:25
**MDTEDPA000047...**
189:11
**MDTEDPA000922...**
209:6
**MDTEDPA000927...**
256:19
**MDTEDPA000927...**
259:5
**MDTEDPA000927...**
257:24
**MDTEPA-92253 (2)**
208:23 264:5
**MDTEPA-92769 (2)**
256:14 264:19
**mean (62)**
9:20 18:19 20:12,25
21:5 26:5,10,14
28:25 29:5,22 30:2
33:3,6 34:25 35:6
35:16 36:9,12,17
38:7 39:23 40:7,22
41:14 42:10,15,22
43:18,25 44:18
45:19 46:2 47:8,13
54:19 57:4 58:25
59:2,22 60:9 66:9
67:11 68:5 72:22
76:18 81:15,18

94:18 95:2 96:21
100:15,24,25 101:3
104:19 107:18
109:25 183:2
210:13 213:3
240:16
**meaning (1)**
87:24
**means (5)**
46:11,13 96:22
172:17 175:7
**meant (4)**
39:12 40:18 60:5,6
**measure (1)**
92:14
**measures (1)**
92:3
**measuring (1)**
90:18
**mechanism (1)**
108:22
**mechanisms (2)**
242:2,8
**Medicaid (1)**
244:3
**medical (9)**
8:2 16:24 17:2,6,12
17:16 19:8,13
243:19
**Medicare (16)**
205:14 228:13,18,22
228:23 229:2,6
241:20 242:13
243:8,14,21 244:3
249:13 250:12,18
**medication (1)**
103:11
**medications (5)**
103:3,7,18,20,21
**Medtronic (257)**
1:16 3:24 4:5,21,23
4:25 7:22 8:5,9,10
8:14,19,22 9:3,5,6
9:10,13,15,22,24,25
10:2,6,13,18 11:15
12:3,7,13,16 13:3
13:16,19,23 14:14
14:20 15:10,15
18:15,17 21:20,23
23:17,18,22 24:11
24:13,22,23 25:3,14
25:21,25 26:5 28:13
28:16 29:9,11,17
30:8,12 31:9,11,13
31:16 32:20,25 33:7
33:9,12,14 36:24

37:5,14 38:23 48:10
48:15,24 49:15,19
49:22,24 50:7 51:4
51:13 52:12,18
53:13,17 55:10
56:21 57:10 67:6
69:2 76:22 77:9
89:19 90:11,12
91:21 92:22 93:4
100:17 101:20
103:23 105:16,19
106:25 107:21
109:3,18 110:7
111:3 112:12,24
113:13,18 115:6
118:18 124:14
126:6,14,19,23
127:12 128:3,25
130:2,12,14,16
131:20 132:10,14
132:18,20 133:2
137:14,17,20
138:13 139:10,18
139:20 143:9,12,17
143:19,24 144:3
145:10,13,15,18,21
145:24 146:2 147:6
147:14 149:14,17
149:20 150:9
151:10 167:16
172:25 173:5 178:3
178:4,18 179:2,14
179:21,25 180:4,5
180:17,18 181:2,4
181:14,18 182:20
183:8 185:11
186:12,20 187:8
189:19 194:24
195:12 196:5 197:3
197:6,16 198:5,9
199:8 201:6 202:6
202:21 203:17,19
203:22,25 204:2,6
204:16,19,21
205:22,24,25 206:5
206:6,11,17 207:4,4
207:12,17,24,25
208:2 210:19 213:6
217:11 219:13
220:10 221:9,19
222:4 223:5 224:2
224:11,22,25
226:11,12 228:9
232:5 244:25
246:25 247:10,17
248:3,21,25 249:8

249:13,15 250:8,13
255:4 263:16,19
**Medtronic's (8)**
11:25 29:3 32:15
34:14 119:10
148:12 149:23
263:10
**Medtronic-related (...**
150:4
**meet (3)**
134:17 150:21 188:20
**meeting (7)**
157:21,25 158:3
159:13 171:22
217:25 259:18
**meetings (3)**
218:10 257:15,20
**member (2)**
28:12,15
**members (2)**
8:25 9:4
**memo (2)**
258:2,10
**memory (1)**
103:14
**mentally (1)**
131:22
**mentioned (10)**
44:23 60:18 66:16
81:4 83:25 106:16
107:5 159:23
175:24 182:23
**mentor (1)**
67:5
**Mertz (6)**
200:16,24 232:19
233:19 257:14
258:3
**met (1)**
259:16
**metrics (3)**
101:7,9,10
**MEXICO (1)**
1:10
**Meyer (4)**
256:23 257:7,9 258:3
**Michael (1)**
237:3
**MICHIGAN (1)**
1:8
**mid-November (1)**
50:17
**middle (1)**
255:2
**Mike (1)**
123:3

**milliseconds (2)**
42:18 45:23
**mind (4)**
106:5 129:6 130:12
252:19
**minimal (2)**
117:16 214:21
**Minneapolis (3)**
70:7 144:8,9
**MINNESOTA (1)**
1:9
**minutes (3)**
102:16 125:8 208:14
**mischaracterizes (1)**
81:8
**misrepresent (1)**
242:17
**missed (1)**
97:25
**missing (4)**
96:13,16,19 191:13
**Mitchell (2)**
3:20 4:22
**model (6)**
216:16,18,25,25
218:15 226:4
**Mohsen (3)**
249:11,17 250:2
**moment (5)**
14:17 87:12 225:16
247:15 248:9
**monitor (1)**
9:14
**monitoring (10)**
105:7,8,10,25 106:4
106:10,19 168:10
174:14 184:6
**Monitors (1)**
9:14
**MONTANA (1)**
1:9
**month (3)**
50:9,10,14
**months (7)**
104:14 135:12,14
136:9 138:22 140:7
141:13
**morning (6)**
5:11 47:6,20 158:20
176:18 233:5
**mortar (4)**
107:23,25 108:3,13
**motion (4)**
77:4 128:21 129:11
188:22
**motions (1)**

129:18
**move (10)**
25:9 48:25 49:9 78:16
124:19 129:8
164:11 189:2
190:20 258:8
**moved (3)**
49:11 68:14 207:2
**moving (1)**
136:22
**multiple (5)**
20:7 174:25 175:3,6
188:19
**mutually (1)**
127:7

_____
**N**
_____

**N (2)**
3:3 263:2
**name (24)**
4:13 5:12 12:9 51:23
52:4,9 53:4,14
56:18,20 75:3,4
100:22 101:18
118:3,18 131:24
132:7 135:15
150:16 197:18
232:18 249:14
265:2
**named (4)**
134:25 139:21 144:10
250:9
**names (16)**
45:12 51:25 74:23
155:22 217:16
245:23 246:11,13
247:15,22 248:5,10
248:13 249:7
250:25 251:24
**nature (2)**
8:7 158:8
**navigating (1)**
226:3
**near (2)**
258:12,21
**need (15)**
6:10,13,16 45:3 89:2
89:24 109:3 110:6
111:8 152:4,9,9
214:21 226:24
240:18
**needed (28)**
43:6 45:18 46:23 76:6
76:16 77:8 78:13
80:11 81:17,20,24
82:6 85:15 86:10,13

86:16 89:5 102:5
110:19,25 128:19
192:13 193:25
194:8 197:4,7
199:24 205:21
**needs (15)**
47:7,9 115:13 150:20
150:22 188:20
215:7 220:23 221:3
221:5,10,20 222:5
224:12,21
**needs-based (1)**
150:17
**Neifert (1)**
233:6
**NEVADA (1)**
1:9
**new (49)**
1:9,10,10 27:22 29:3
32:15,18,21 33:13
33:14,15 34:14
48:12 55:2,25 56:12
56:17 61:6,7 65:15
65:19 66:21,23 67:8
67:12 71:14,19
81:10 82:16,22,25
83:7,25 84:15 94:14
94:16 124:19
125:20 128:13
166:20 176:20
190:12,23 199:16
207:5 215:3 222:11
223:5 253:10
**newer (1)**
43:19
**night (2)**
108:21 111:18
**ninth-hour (2)**
47:10,13
**nonresearch (5)**
32:2,13 33:12 34:7,12
**nonresponsive (4)**
77:5 78:17 128:22
188:24
**Norm (2)**
75:8,19
**normal (4)**
38:19 39:3 41:9,22
**Normally (1)**
159:4
**North (2)**
1:10 254:10
**Notary (4)**
2:13 5:7 262:7 265:25
**noted (1)**
261:7

**notes (13)**
131:19 132:17,25
133:7,13,13,15,16
133:18,22 134:10
134:15 238:25
**notice (3)**
157:3 158:22 161:3
**noticed (4)**
156:17 158:21 159:5
160:21
**notified (1)**
190:19
**notwithstanding (1)**
167:7
**November (25)**
1:21 2:1 4:11 44:25
45:11 49:8,10,16,25
50:4,7 84:20 114:12
138:10 143:10
166:21 227:25
229:9 233:6,16,24
236:2 238:22 255:4
262:21
**number (22)**
105:11 119:11 124:13
150:25 172:19
177:7 184:20,24
186:7 187:6 203:10
205:9,13 220:6
223:23 226:4
231:19 253:11
254:2,22 255:18
256:19
**numbers (8)**
82:7 85:17 127:22
172:16 175:14
186:22 187:4
263:22
**numerous (3)**
98:4 190:4 225:9

O

**o'clock (1)**
126:3
**O'Hearn (3)**
53:19,21 55:12
**object (77)**
8:17 10:15 11:18 24:3
24:7 26:21 27:5,20
28:17 30:14,19,24
31:24 33:23 34:4
36:13 37:10,18 38:3
38:18 39:5 43:2,7
43:11 54:10 56:5
57:5 60:20 76:25
77:10 79:12 81:7

82:21 84:10 86:11
93:6 96:20 98:11,14
106:2,20 109:21
112:9 113:2 125:25
129:10 147:24
151:2,5 156:13
162:7 181:21
183:22 185:9
191:12 194:3,10
202:11 207:14,19
220:9 221:11
224:13,16 225:15
225:23 227:3,7
229:11,20 242:14
243:10,17 247:19
249:2,20 250:19
**objecting (1)**
125:12
**objection (14)**
10:8 41:25 64:17
78:16,21 79:9 80:14
90:24 126:21
144:18 188:25
191:5 251:25 252:4
**objections (4)**
129:17 148:11 191:10
263:9
**objective (1)**
104:21
**obscured (2)**
186:22 263:22
**observe (1)**
97:6
**obvious (1)**
212:15
**obviously (1)**
247:9
**occasion (1)**
7:25
**occasional (3)**
9:8,11 54:15
**occasionally (3)**
6:4,5 128:13
**occasions (1)**
190:5
**occur (1)**
213:11
**occurred (4)**
155:11 217:24 229:25
230:2
**occurring (1)**
214:4
**occurs (1)**
260:25
**October (2)**
190:13 194:25

**offer (3)**
205:4 206:11 222:2
**offered (3)**
204:12,25 223:25
**office (8)**
105:15 107:17 108:3
175:10 221:22
229:15 230:8 233:6
**officer (2)**
191:2 262:8
**offices (9)**
2:8 3:6 107:15,19,24
107:25 108:14
109:2 175:9
**offline (1)**
134:7
**oh (5)**
57:24 232:16 234:11
235:7 246:5
**Okaloosa (1)**
254:10
**okay (80)**
6:19 12:20,24 13:15
43:11 45:5 50:6
56:16,24 57:23 59:5
59:13,18 67:24
70:22 74:2,22 75:22
76:15 82:3,14 83:11
83:19,24 84:15 85:6
85:13,22 89:6,24
92:6 94:7,24 111:6
113:21 119:22
120:12 136:13
142:6 146:8 153:14
154:2,21 155:5
168:6,12 175:17,23
176:11 177:11
178:4,7 179:4,10
201:20 202:13
212:20 223:19
230:6,20 231:24
232:20 233:4 234:2
234:10,23 235:7
236:13,13,15,20
237:14 239:17
240:3,22 241:16
244:8 246:25 254:3
254:23
**OKLAHOMA (1)**
1:11
**old (1)**
244:2
**older (11)**
43:14 44:6,19,23 45:6
45:9 46:5,11,25
176:18 205:19

**omitted (1)**
64:19
**onboard (2)**
116:6 117:21
**onboarded (1)**
114:14
**onboarding (3)**
199:16,21,24
**once (6)**
89:13 101:15 174:12
204:25 221:3
249:25
**one-day (1)**
101:12
**one-page (1)**
178:21
**ones (4)**
15:3 72:15 227:9,11
**ongoing (6)**
13:18 14:14,25 121:5
143:11 186:11
**open (14)**
137:3 138:25 139:5
140:10,14 141:24
142:4,18 144:24
145:4 146:22
238:15,18 239:5
**opened (1)**
238:23
**operations (5)**
7:4,6,18,25 186:10
**opportunity (6)**
7:15 18:18,20 19:2
68:22,23
**ops (4)**
10:5,21 13:24 14:22
**optimization (1)**
179:18
**options (1)**
21:7
**OptiVol (3)**
168:23 169:9 170:10
**oral (3)**
164:7 165:24 166:11
**order (3)**
60:14 150:20,21
239:23
**organization (4)**
111:23 113:20 187:18
200:6
**organizational (2)**
55:5,6
**original (3)**
239:11 255:24 256:6
**outcome (1)**
262:19

**outside (11)**
55:10 100:11 139:18
148:2 165:21
211:25 218:8 247:4
247:5,11,13
**overall (1)**
150:23
**overheard (1)**
260:10
**overnight (1)**
105:13
**owns (1)**
173:2

P

**P (2)**
3:3,3
**p.m (11)**
102:21,22 130:24,24
165:17,18 208:19
208:20 252:12,13
261:7
**PA (4)**
32:20,25 123:21,23
**Paceart (11)**
96:11 172:9,22,24,25
173:5,7,24 178:10
178:12 226:3
**pacemakers (5)**
13:3,6 57:11 58:9
243:19
**pacer (12)**
19:6,11,17 22:14
230:9 233:5,15,23
234:7 238:21
241:25 242:7
**Pacers (1)**
172:16
**pacing (1)**
45:21
**packet (1)**
171:19
**page (54)**
98:10 148:19 151:23
151:25 152:2,17
168:18 169:13
170:14 171:6,22
173:18 174:15,17
174:24 179:19
183:21,24 189:12
189:14 219:12
227:15,19 231:22
233:14,20,21
234:21,23 235:6,7
236:20 237:6 238:8
239:24 240:24

241:17 243:7 244:5
244:10,15,22
245:20,20,22 246:2
246:3,5,6,11 263:3
263:7 264:2,22
**pages (14)**
98:9,13 171:15,20
172:6,7 174:2,3,5
175:11 177:21
178:23 179:5
231:21
**paid (3)**
23:18 228:19 250:7
**Paine (2)**
113:5,24
**painful (1)**
220:16
**Palmerton (3)**
244:11,20,24
**paper (4)**
88:3 231:20 240:16
259:5
**papers (1)**
185:25
**paperwork (9)**
30:16 31:7,17,20
195:14,21 198:24
199:25 201:22
**paragraph (25)**
152:17,18 211:16
212:21 214:9
215:23 219:12,13
227:18 244:8
245:20,22 246:2,6
246:10 247:16
250:5,17 252:19,20
254:5,8,25 255:2
257:5
**Park (1)**
3:7
**part (33)**
14:2 23:21 25:13
41:15 46:18 65:20
76:10 79:23 82:10
87:14 93:2 99:9
101:23 102:7,7
113:11,13 114:11
117:25 134:14
155:17 169:13
170:15 173:10,22
174:23 178:16
180:9 196:23 200:9
227:12,18 230:13
**Part-time (1)**
24:13
**Partial (1)**

23:20
**partially (1)**
248:18
**participant (1)**
218:6
**participate (4)**
121:24 136:11 199:19
229:2
**participates (4)**
228:12,17,22,23
**participating (4)**
140:6 144:17 146:10
147:22
**participation (2)**
137:7 229:6
**particular (14)**
9:23,25 23:8,11 70:10
86:8,17,23 87:2,9
87:22 104:7 242:25
255:3
**parties (2)**
166:25 262:17
**partner (7)**
18:21 19:3 104:21
173:10,11 186:2
220:18
**partnered (1)**
225:3
**partnering (4)**
168:15 185:13 188:18
220:12
**Partnership (3)**
186:21 187:10 263:21
**parts (1)**
191:14
**party (2)**
156:24 157:6
**passing (1)**
52:16
**passive (1)**
218:5
**patient (59)**
21:3,10 36:4,6,21
38:2,10,17,20,23
39:4,17 41:13,15,24
47:11 64:5 96:22
105:15 115:7,11
168:9,11 169:14,18
170:22 179:18
184:5 203:5,17
204:13 205:5,14,21
206:9,12,18 207:2
228:2 229:9 230:9
231:3 233:13,14,22
235:24,24 237:2,6,7
237:17 238:21

239:3,18 242:25
243:14 244:2 264:9
264:14
**patient's (1)**
40:10
**patients (29)**
11:16 12:7,12 13:2,3
13:6 14:11 35:8,13
35:13 45:14 94:20
96:17 105:9,11
111:13 172:15,20
174:2 223:9 225:8
226:4 241:19
242:12 243:8,19
244:5,19 245:16
**Patients' (1)**
105:12
**Patricia (4)**
256:23 257:7,9 258:3
**Paul (1)**
74:25
**pay (1)**
23:13
**paycheck (1)**
68:24
**pdf (1)**
240:16
**pending (5)**
6:12,16 57:18 125:13
125:15
**Penn (3)**
22:24 24:17,20
**Pennsylvania (28)**
1:2,20 2:10,14 4:7,10
5:16 6:22 25:12
26:2 33:15 69:22,24
70:2,11,14,16 99:16
106:14 123:20
124:2 201:9,11
211:7 222:18
231:15 250:11
262:8
**people (13)**
8:16 51:16 54:3 66:25
74:16 101:19 108:6
122:18 131:22
139:17 147:21
181:3 247:18
**people's (2)**
197:14 199:20
**perform (14)**
35:3,16,18 42:8,10,15
43:6 44:2 45:18
67:5 101:2 124:15
126:14 127:8
**performance (11)**

145:24 146:4,5
257:13,16,21
259:15,17,19,25
260:3
**performance-based...**
65:14,19
**performances (1)**
213:9
**performed (18)**
35:15 36:16 45:3
46:23 127:16
145:11 186:8
195:16 196:3
197:10,12 199:6
213:9 230:15,18
242:3,9,19
**performing (8)**
36:9 39:12,20 46:2
124:14 126:13
136:2 196:6
**performs (3)**
126:6 241:25 242:7
**period (7)**
25:14 44:24 73:19
101:13 143:14,21
247:3
**permitting (1)**
126:2
**person (20)**
8:14 53:22 55:4 78:14
106:24 108:25
110:9,25 132:8
147:5 180:18
192:14,18,21,24
193:6 194:19
198:12 204:21
222:24
**personal (7)**
127:11 133:18 247:4
247:5,12,13,16
**personally (6)**
119:18 136:7 174:7
200:7 228:7 230:19
**personnel (6)**
9:8 15:11 110:2
190:24 195:11,19
**persons (1)**
181:2
**perspective (3)**
61:18 62:6,11
**Pg (1)**
265:5
**Philadelphia (1)**
166:22
**phone (1)**
118:14

**phones (1)**
109:16
**physical (3)**
107:23 258:12,21
**physically (1)**
81:19
**physician (22)**
21:4 31:14 94:13
109:2 128:16
183:12 190:4
192:12 193:15
194:14 204:15,19
205:20 206:4,16,21
207:9 221:21 226:5
226:8 248:10,13
**physician's (1)**
31:18
**physician/practice (...**
97:7
**physicians (21)**
29:21,23 94:14,16
96:14 104:10,17
108:25 168:15
171:23 173:12,23
174:8 186:3 192:10
204:12 225:2 226:2
250:7,9,17
**physicians' (2)**
30:9,21
**pick (1)**
200:14
**picked (2)**
180:9 182:25
**picture (2)**
56:22 238:18
**pictures (10)**
120:21 121:4 231:2
231:13 236:18
237:16,25 240:2
264:9,14
**piece (1)**
259:4
**pieces (2)**
202:8 231:20
**pilot (5)**
11:12,13,21 13:9
114:12
**Pittsburgh (6)**
15:18,24 16:4,8,12,17
**place (9)**
35:11,12,13 101:13
115:10 137:21
138:14 242:2,8
**places (2)**
177:18 236:8
**Plaintiff (5)**

152:21 153:2,9,22
154:5
**Plaintiffs (2)**
1:14 3:5
**plan (7)**
107:13 109:12 190:20
190:23 192:20
193:6,12
**play (1)**
20:10
**plays (1)**
25:21
**pleading (1)**
241:21
**please (32)**
4:18 5:4,12 6:13
15:25 40:8 42:15
43:9,22 54:20 56:7
57:4 74:10,24 77:18
84:9 93:24 109:6
132:12 134:12
152:10 153:7 169:8
175:14 191:10
193:9 194:4 233:8
253:5 254:6 255:2
258:17
**point (24)**
50:7 53:2,9,16 60:22
62:16 116:8 118:21
120:18 121:12
124:5 136:13
140:17 158:17
159:10 160:18
161:7 165:12
171:20 182:14
202:17,24 203:3
208:9
**pointing (1)**
191:17
**policy (17)**
149:23 150:6 189:19
194:24 195:3,4,5,6
195:9,19 202:9,10
202:18,20,21 203:6
203:10
**poor (4)**
257:16,20 259:16,19
**populate (1)**
238:16
**populated (1)**
119:2
**population (1)**
243:22
**portal (1)**
232:22
**portals (1)**

115:10
**portion (2)**
100:5 132:22
**position (36)**
7:17,21,24 18:2 24:23
25:3 48:10,12,15,19
48:20,24 49:9,12
50:18 68:15,19 69:8
69:18,25 72:4 76:22
122:24 123:23
139:19 147:14
157:4 159:15,20
160:13 161:4
163:10 164:9,11,12
193:21
**positions (3)**
49:18 54:5,8
**possess (2)**
181:15,20
**possession (1)**
183:25
**possibly (3)**
96:21 97:19 183:3
**post-approval (1)**
11:25
**post-high (2)**
22:16,18
**post-implant (3)**
71:25 219:18 260:11
**Posted (4)**
231:3 237:17 264:10
264:15
**potential (10)**
158:17 159:2,12,17
159:17,21 161:12
226:8,18 241:12
**potentially (1)**
112:25
**practice (16)**
26:19 66:23 94:20
176:21 196:19
201:5 202:3,5
203:18 205:20
206:4,16,21 207:9
219:25 230:13
**practices (2)**
177:19 222:14
**practicing (1)**
63:19
**practicum (5)**
61:23,25 62:8 63:18
64:14
**precise (1)**
158:8
**predischarge (2)**
204:18,20

**preparation (3)**
132:2 134:18 164:7
**prepare (2)**
131:18 239:17
**prepared (5)**
133:25 164:2,13,14
239:8
**presence (1)**
165:21
**present (14)**
3:23 12:17 155:21
157:18 166:18
167:2 190:5 192:11
193:15 194:17
204:16,20 206:5
207:25
**presentation (4)**
187:17,21 188:9
263:19
**presenting (1)**
174:21
**presently (1)**
156:25
**prestudy (9)**
61:12,12 63:5,7 65:4
65:6,12,20,23
**pretty (1)**
125:19
**previous (1)**
133:16
**previously (4)**
125:21 133:19,21
138:16
**prework (1)**
62:25
**pricing (1)**
217:14
**primarily (1)**
65:5
**primary (4)**
53:16 72:15 122:3
198:2
**principal (2)**
51:17 53:2
**print (1)**
248:4
**printed (6)**
30:20,25 41:21
239:13 241:8,13
**printing (2)**
31:17,18
**printout (2)**
238:7 240:16
**printouts (2)**
240:25 241:2
**prints (1)**

40:10
**prior (11)**
45:15 60:18 64:11
143:14 152:21
153:3,10,13,15
201:4 237:11
**private (2)**
243:16 244:2
**privilege (32)**
156:20 157:10,24
158:2,7,8,12,15
159:9,22,24 160:2,4
160:8,11,16,25
161:13,14,17,17,20
161:21,22 162:22
163:5,14,15,19
165:3,23 181:7
**privileged (4)**
133:7,10 157:16
160:12
**privileges (13)**
158:17 159:3,7,12
160:21,22,23 161:8
161:9 162:10 163:2
163:22 166:3
**PRO (1)**
179:18
**probability (4)**
199:2,13 218:3
243:20
**probably (21)**
7:12 37:19 52:15
63:18 64:5 96:2,12
110:21 116:16
118:13 122:11
141:22 150:2 151:6
153:18 185:11
215:21 217:5,6
232:23,25
**problem (18)**
87:17,19,20,20 88:3
90:10,15,19,22,23
91:3,7 92:7,8,12
95:23,23 104:7
**problems (1)**
260:2
**procedure (2)**
29:25 30:3
**procedures (1)**
128:7
**proceed (2)**
77:11 165:8
**proceedings (1)**
262:9
**process (13)**
67:8 80:7 97:11 98:22

99:9 126:16 128:6
129:5 130:2 156:19
158:12 159:23
196:24
**produce (7)**
40:20 162:11 163:6,9
168:5 238:3 253:25
**produced (12)**
132:10,14,25 133:8
149:2,6 162:14
166:13 168:3 240:9
254:21 255:17
**produces (1)**
41:3
**product (47)**
9:25 18:24 32:15
33:13 34:18,19
54:23 55:24 56:11
57:3,11 59:4,19,21
61:19 62:7,12 80:23
81:5,14,15,17,19,22
81:24,25 82:4,4,6
82:10,14,22 83:7,25
84:15,21 85:6,8,15
85:16 162:9 163:13
181:25 182:6,17
226:11,12
**production (8)**
148:13 161:24 162:24
164:22 181:13,18
253:22 263:11
**products (19)**
9:24 32:18,21 33:14
33:15 57:10 58:5,5
58:13 59:23 60:18
60:24 67:6 71:14,19
82:25 113:18
128:13 173:5
**professional (2)**
230:15,18
**program (12)**
23:3,13 36:20 38:23
56:13,14,17,19,25
58:11 241:20 243:9
**programmed (3)**
21:9 39:3 43:19
**programmer (16)**
29:9,11,13,17 40:6,9
40:19,21,23,25 41:3
41:21 42:25 46:14
82:7 85:17
**programmers (2)**
80:23 81:5
**programming (14)**
20:21 21:6,7,12,15,22
22:5 30:8 31:13

38:2,14 64:5 196:9
196:10
**programs (1)**
58:17
**project (4)**
54:18 69:7 85:14
94:12
**projects (1)**
105:22
**promotes (1)**
97:24
**promotion (2)**
67:24 68:2
**prompted (1)**
216:21
**prosecution (11)**
159:9,22 160:10,14
161:13 162:9,22
163:4,13,18 165:2
**protect (4)**
157:24 158:3 163:23
165:3
**protects (1)**
163:19
**protocol (6)**
20:14 21:8 26:17 27:3
27:6,9
**protocols (2)**
20:11 27:16
**provide (23)**
22:7 31:6 38:16 71:13
126:19 128:11
149:21 151:12
154:3 173:14
203:11 204:2,21
206:6 208:2 217:13
219:14 221:2 225:3
231:16 239:6
253:17 254:16
**provided (47)**
71:10,17,18 72:11,14
133:16,19,21 148:2
148:4,7 149:3,6,10
149:17,22,23,25
150:9,24 153:21
154:8,13 156:3,4
162:15 183:8 188:4
188:13 199:10
217:14 221:9,19
222:4,17 223:2
224:4,11,25 225:5
247:2,10,18 253:15
255:11,22 256:4
**provider (2)**
241:24 242:6
**providers (8)**

20:24 21:2 219:24
228:12,17 241:18
242:11 243:6
**providing (13)**
20:17,20 31:19 72:13
87:15 93:21 106:17
126:7 128:4 130:4
193:25 194:8
198:14
**Prudential (1)**
3:16
**public (5)**
2:13 5:7 182:21 262:7
265:25
**pull (1)**
236:8
**pulled (4)**
172:22 173:8,22
236:10
**pulling (2)**
173:16 174:21
**purporting (1)**
191:7
**pursue (1)**
19:15
**pursuing (3)**
24:11,14,20
**put (10)**
109:13 135:15 169:22
172:8 182:19
193:21 196:11
234:14 236:7
250:25
**puts (2)**
56:17 161:4
**putting (4)**
83:11 171:19 202:19
218:25

_____

Q

**Quakertown (2)**
244:11,20
**quality (1)**
198:15
**quarter (1)**
127:21
**quarter's (1)**
127:20
**question (55)**
5:25,25 6:4,6,11,16
6:17 14:10 27:3
30:5,6 43:8 44:10
44:14,16 45:16
57:17 78:4 114:14
125:13,14 128:24
129:15,23 137:12

141:18 150:17
153:6,18 157:8,20
164:19 169:7 181:8
186:6 189:20 190:3
190:9,11 192:15,25
193:7,9 194:5,20
202:14 206:15
211:17 212:16
213:5 216:8 223:16
226:9,13 249:21
**questions (34)**
5:21,22 26:11,14,15
26:17 27:12,15,24
28:6 29:24 30:3,9
31:14 36:7 39:18
40:14 103:25
116:18,20 121:17
121:19 134:23
150:19 164:18
165:6,8,10 215:9,14
215:18 220:22
261:4 264:21
**qui (1)**
149:4
**quickly (1)**
124:22

_____

R

**R (2)**
3:3 260:12
**R-wave (1)**
260:15
**Rachel (1)**
75:2
**Rafferty (1)**
74:25
**raised (6)**
121:16,19 192:24
193:6 194:19
215:14
**raises (1)**
211:17
**raising (1)**
211:22
**ran (10)**
17:4 18:8,22 29:9,12
40:21 144:19
211:10 247:21
248:10
**ranting (1)**
260:11
**rare (1)**
128:18
**RDR (2)**
1:24 262:23
**reach (12)**

27:12 109:2 116:14
116:18 120:22
135:13 146:8,13,18
147:3,5 164:23
**reached (7)**
118:9,17 136:9
146:14 147:18
165:25 212:15
**reaching (4)**
117:7 211:24 212:12
215:17
**read (26)**
43:8,10 69:11,13
77:17,19 78:3,5
87:5 109:5,7 191:7
191:8,13,21 193:8
193:10 220:3
238:19 239:4
249:21,22 253:4,6
258:16 265:5
**reading (29)**
94:10,11 95:22 98:5
98:15 99:12,19
105:22 106:12
167:16 168:10,16
169:3,14,17,23
170:18 172:9
173:25 174:5,6
175:4 177:16 184:8
184:14 190:18
201:13,21 263:16
**Reads (1)**
265:5
**ready (2)**
164:9,14
**real (2)**
156:24 157:6
**realized (1)**
127:15
**really (4)**
43:24 54:3 117:16
173:17
**Realtime (2)**
2:12 262:5
**reason (6)**
103:4,8 122:13 154:7
163:5 265:5
**reasonable (2)**
37:22 229:3
**reasons (3)**
62:12 163:7,8
**recall (135)**
12:4,16 13:16 14:17
14:20 23:25 24:4,6
31:6 34:5 39:21
41:19 45:12 47:23

51:24,25 53:22
56:22,23 67:18
76:14 81:2 82:13
85:5 86:2,23 87:12
88:7 90:6,21 91:9
91:11 99:4,13,20
100:9,10 101:18
107:13 113:25
116:4,24 117:7
118:18 123:15
137:2 140:24,25
141:19,20 142:11
143:12 147:25
149:19 150:3,8,11
150:23 152:5
154:19 155:12,17
155:22 179:25
180:2,8,10,15 185:6
185:10,18,19,20,22
188:16,23 192:7,23
193:2 196:25 197:5
198:7,8,11,17,22
199:2,14,15 200:7,8
200:9,11,15 209:15
212:11 215:10,17
215:25 216:13,14
216:15,23 217:11
218:4,14 222:16,18
224:15 226:6
236:12,16 240:19
246:15 247:20,22
248:6,7,9,22,23,24
249:3,5,6,9,18,23
250:4,20,24 251:9
257:10,19 259:2
**recalled (1)**
14:3
**recalls (1)**
226:2
**receive (2)**
23:14 109:18
**received (16)**
23:15 180:4,7,17
181:2,3,13,14,19
182:3,9,16 249:12
249:15 250:13
258:24
**receiving (1)**
164:22
**recess (6)**
48:4 102:21 130:23
165:17 208:19
252:12
**recognize (7)**
167:24 187:14 189:13
189:16 209:14

231:10 237:22
**recognized (1)**
197:18
**recollection (3)**
241:13 251:4,7
**recommendation (1)**
176:25
**recommendations (8)**
35:22 36:11,12,16,18
36:21 39:15 101:7
**record (31)**
5:12 43:10 48:3,7
69:13 77:19 78:5
81:8 102:20,24
109:7 130:22 131:3
152:9 165:6,16,20
167:20 171:25
182:19 191:14
193:10 208:18
209:2 234:19
249:22 252:11,15
253:6 261:6 262:14
**recorded (1)**
41:17
**records (3)**
141:15 239:13 244:13
**reduce (5)**
97:16 105:11 176:9
176:15 177:7
**reduction (4)**
50:2 69:6 122:15,16
**refer (3)**
87:21 232:4 255:23
**reference (6)**
106:9 171:17 236:25
238:7 254:7 255:3
**referenced (2)**
255:21 256:6
**referral (2)**
179:18 225:3
**referred (2)**
36:24 211:13
**referring (15)**
33:8 66:15 80:11
133:6,12,15 148:5
162:3,5 172:2,18
220:7 234:21 253:9
255:9
**refers (5)**
172:19 201:8 232:10
232:25 237:6
**reflect (3)**
172:2 234:20 254:14
**reflected (2)**
185:3 192:15
**reflecting (1)**

133:22
**reflective (1)**
188:17
**refrain (1)**
222:7
**refreshed (1)**
134:10
**regarding (4)**
186:7 190:4 211:14
235:13
**regardless (1)**
205:12
**region (1)**
250:11
**regional (2)**
217:25 218:10
**Registered (2)**
2:11 262:4
**registration (2)**
30:16 31:16
**regular (2)**
11:21,22
**regularly (1)**
52:19
**regulation (1)**
163:16
**reimbursement (9)**
195:10,14,19,21
219:23 221:13,15
223:24 250:12
**Rel (1)**
1:13
**REL-00471 (4)**
167:17 184:4 185:3
263:17
**REL-00481 (2)**
168:20 169:9
**REL-00482 (1)**
170:14
**REL-00483 (1)**
170:24
**REL-00484 (2)**
171:4 172:3
**REL-00485 (3)**
172:5,14 174:4
**REL-00486 (1)**
173:18
**REL-00492 (1)**
174:9
**REL-00506 (1)**
177:20
**REL-00510 (1)**
182:24
**REL-01421 (1)**
231:21
**REL-01423 (1)**

236:21
**REL-01667 (1)**
238:24
**REL-0239 (2)**
187:2,5
**REL-0240 (1)**
187:7
**Rel-1418 (2)**
231:5 264:12
**REL-1666 (2)**
237:18 264:16
**related (4)**
131:15 184:7,12
262:17
**relating (1)**
149:4
**relationship (1)**
8:12
**relationships (2)**
127:23 215:20
**relator (3)**
5:2 152:19 156:20
**Relator's (2)**
148:10 263:9
**relevant (6)**
44:24 135:20 136:6
145:8 214:16 247:3
**relied (2)**
239:22 240:2
**relocation (2)**
69:23 70:12
**relying (1)**
242:10
**remember (26)**
11:10 19:22 52:7
53:11 87:6 104:23
105:24 129:22
131:21,23 170:7
171:19,21 200:23
200:25 201:5
211:23 212:12,14
217:16,20 234:18
236:10 251:20,23
259:18
**remembered (1)**
143:6
**remote (14)**
69:25 105:7,8,10,25
106:3,10,19 168:9
174:13 176:5 184:6
192:9 201:24
**remotely (2)**
105:13,19
**rep (27)**
79:5 106:25 110:11
110:15 111:7,7,15

117:4 140:2 143:16
144:4 150:18 173:8
173:20 174:19,20
175:13 193:20
194:12,18 200:3,6
200:17 201:10,12
211:18 214:6
**rep's (1)**
114:20
**repeat (1)**
175:14
**rephrase (1)**
214:22
**replace (3)**
108:13 109:11 122:23
**report (16)**
30:20 31:17 40:10,20
41:4 73:2,5 96:23
247:21 248:4,8,10
248:13,23,24 249:7
**reported (6)**
1:23 30:12 72:24
101:11 108:23
135:6
**reporter (9)**
2:11,12 4:15 5:3,23
262:2,5,6,6
**Reporter-CA (1)**
2:13
**reporting (5)**
4:14,17 31:15 72:23
108:22
**reports (1)**
38:11
**represent (4)**
156:22 253:20 254:21
255:16
**representative (9)**
8:19 77:15,23 78:20
78:25 90:12 91:22
105:17,19
**representatives (6)**
8:2,8 79:24 95:18
111:3 253:12
**represented (1)**
157:2
**reprogramming (1)**
238:25
**reps (25)**
33:10,17 71:4 73:2
74:3 79:15,17,19
96:2 110:18,23
111:18 112:11,16
112:18 113:22
114:6,18 172:8
173:25 187:19

190:19 192:19
193:5 213:18
**request (10)**
47:10,14 134:2
148:18,24 161:24
164:22 203:22
204:15 234:17
**requested (2)**
173:20 204:19
**Requests (2)**
148:12 263:11
**require (2)**
45:22 70:12
**required (6)**
45:10 60:13 127:22
204:6 207:21
211:19
**requirement (1)**
89:21
**requirements (1)**
89:18
**requires (1)**
128:14
**reread (1)**
131:20
**resource (53)**
7:3,6,8,18,25 8:11
9:22 10:3,5,6,12,19
10:20 11:2 13:24
14:8,22 18:4,6,11
18:22 20:7,9,23
21:2,24 22:11 25:19
25:24 26:7,13,15
27:3,7,11,16 28:2,6
31:7,11,20 32:7,10
33:18 34:15,17
49:11 50:18 159:2
186:10 226:8,13,19
**resource (3)**
84:25 86:4,10
**resources (1)**
220:13
**respect (9)**
11:23 58:16 85:14
102:2 115:4 159:15
159:20 162:24
163:25
**respond (8)**
12:21,22,24 13:15
15:4 192:14 224:11
224:20
**responded (3)**
117:18 162:6 192:18
**response (12)**
114:17 115:2 119:17
140:13 142:3,17

181:7 190:14 192:3
194:11 210:5
237:11
**Responses (2)**
148:11 263:9
**responsibilities (15)**
7:5 25:17 32:9,12,14
32:17,19,22 33:19
34:8,24 72:6 75:23
80:17 136:2
**responsibility (5)**
32:6 76:2 110:4
111:14,22
**responsible (2)**
108:17,20
**rest (6)**
48:23 116:6 117:21
150:8 202:20 203:6
**restate (1)**
87:18
**restriction (1)**
163:16
**result (2)**
108:7 259:13
**resynchronization (2)**
57:13 58:10
**retaliated (1)**
122:9
**return (1)**
258:11
**revamp (5)**
12:6,8 15:4 105:4,6
**reveal (7)**
11:12 15:4 135:22
141:4 154:23
180:20 182:9
**revealing (2)**
182:16 250:12
**reveals (4)**
182:4,5,7,17
**review (13)**
35:20 41:7,15 64:3
131:25 132:3,6,9,13
134:10,14 152:4
164:6
**reviewed (6)**
39:22 41:4,20 131:19
131:24 132:17
**reviewing (4)**
36:11 39:14 152:7
200:17
**reviews (1)**
152:3
**RF (1)**
230:10
**RHODE (1)**

1:11
**rhythm (16)**
11:3,6 13:20 14:15
25:16 31:10 48:20
49:3,6,15 53:24
54:6 55:7 67:20
70:25 113:12
**Rich (4)**
51:21 52:2,8 55:19
**Ridgecrest (1)**
249:12
**Riefenstahl (7)**
209:10,17,18 211:13
211:23 215:7,15
**right (53)**
10:21 55:20 60:7 82:9
104:25 105:20
124:10 136:11
148:8 150:25
153:24 157:23,25
176:5,8 179:10,11
197:25 210:20
218:18 219:16,20
223:15 226:11
227:13 228:11
230:4,18 233:10
235:23 239:25
240:17 241:17
243:15,16,24 244:4
244:6 245:3,4,8,10
245:12 247:11
248:8,25 249:8,13
249:17 251:21
258:25 259:11
260:5
**RNs (1)**
260:10
**Robert (1)**
259:10
**Roberts (2)**
127:20 132:7
**role (21)**
9:17 10:5,20 20:10
25:20 28:21 49:14
49:24 61:9 62:19
63:3 71:7 72:5,16
75:14 79:23 102:2
139:19 188:3
209:25 213:23
**rolled (5)**
11:12,13 13:9 248:16
248:18
**room (3)**
36:20 180:11 235:16
**ROPES (1)**
3:15

**rose (1)**
226:25
**roughly (2)**
50:17 104:13
**Rubin (1)**
87:3
**Rui (6)**
116:13 117:3,7 118:9
118:16 119:8
**rule (2)**
163:16 180:6 192:7
**rumors (3)**
216:18,25 218:14
**run (16)**
7:8 8:11 22:6 40:23
43:20 94:14,17
95:14 96:23 104:11
104:18,20,24 105:5
248:12 253:25
**running (7)**
29:17 30:8 31:12
40:25 228:24 248:7
248:23
**runs (5)**
7:10 210:11 211:2,5
228:25
**RVP (1)**
118:17

_____

**S**

**S (2)**
3:3 75:3
**S---------------- (1)**
263:6
**safer (1)**
145:12
**salary (3)**
7:11,12 68:10
**sales (65)**
33:10,17 71:4 73:2
74:3 76:8,9 77:14
77:23 78:19,25 79:5
79:15,17,19,24
82:22,25 83:7,7,8
83:12 84:2,16 96:2
110:10,15,23 111:7
111:7,15,18,23
112:11 113:19
114:18,20 117:4
140:2 143:16 144:4
150:17 172:8 173:8
173:20,25 174:19
174:20 175:13
187:19 188:12
192:19 193:5,20
194:12,18 200:3,6

200:17 201:10,12
213:18 214:6
215:21 253:12
**Salesforce (20)**
81:9 82:16 108:12
109:10,19 111:11
111:23 112:4,22
114:11 247:21,25
248:5,11,14,16
249:7,14,17 250:2
**Salesforce.com (4)**
107:6,12 109:14
111:10
**sample (1)**
238:14
**samples (4)**
185:12,18 240:4
241:14
**Sandstrom (1)**
55:5
**sat (1)**
96:13
**satellite (1)**
175:9
**saturation (1)**
176:3
**saw (7)**
41:24 45:23 119:7
197:13,14,14,15
**saying (13)**
28:25 30:2 39:16,17
42:22 43:25 45:5
120:25 195:18
197:25 198:2
206:10 228:16
**says (28)**
111:8 152:19 168:22
172:15 187:9
190:18 191:23
209:9 214:8 215:7
219:13 228:11
230:20 232:3 233:4
233:13,14 235:12
241:18 245:24
250:7 252:24
257:11,14 258:10
259:9,23 260:10
**scanned (2)**
185:23,24
**schedule (8)**
78:13 108:15,21
109:13 111:8
112:22 167:4
203:19
**scheduled (1)**
166:24

**scheduler (1)**
109:11
**schedules (1)**
114:21
**school (16)**
19:6,11,21 22:15,16
22:18 210:12,14,15
210:18 211:3,5,10
214:10,16 215:2
**schooling (1)**
16:11
**Sciences (1)**
211:8
**Scientific (2)**
146:15 147:10
**scientist (1)**
12:10 87:3 226:7
**scientists (1)**
9:11
**scope (1)**
100:11
**Scott (5)**
51:21 52:2,3,8 55:18
**Scratch (1)**
227:22
**screen (1)**
232:15
**screenshot (2)**
235:8,9
**screenshotted (1)**
233:19
**seal (2)**
152:22 153:3
**seamless (3)**
178:6 199:7 220:15
**second (28)**
88:10 130:9 152:18
202:16 203:3
212:20 216:3
218:20,22 219:6
227:18 233:21
235:23 238:8
241:16 244:9
245:21 250:6,6
251:2,5,8 252:18
255:21,25 256:7
253:22 264:7
**Section (1)**
195:19
**secure (1)**
127:19
**security (1)**
114:25
**see (68)**
40:13 44:10 47:11
83:17 112:21

114:21 118:4
120:21 127:7
148:18 152:23
162:23 168:22
169:21 170:20
171:11 174:23
179:13,15,20,22
183:17,18 187:12
190:7 191:3,18,18
209:7,12 210:8
211:20 212:11,25
214:13 219:2
227:17,20 228:14
231:21 233:10
235:10,19 236:21
237:5 238:17,24
239:19,24 240:23
241:7 244:11,13
245:3,23,25 246:7
250:14 252:25
254:7 255:6 256:20
256:23 257:17,25
258:8,14 259:7
**seek (1)**
190:24
**seeks (1)**
157:20
**seen (11)**
27:8,8 67:25 148:21
151:21,23,24 152:5
152:11 219:8
241:15
**sees (1)**
172:20
**Seighman (2)**
232:17,19
**select (1)**
94:11
**self-pay (1)**
245:16
**sending (1)**
108:20
**sense (6)**
6:6 18:6 96:12 99:21
120:4 215:2
**sensing (1)**
42:19
**sent (9)**
100:17 101:20 105:13
157:3 181:10
185:23 209:15
259:9,13
**sentence (4)**
152:19 214:10,22
250:6
**sentences (2)**

191:6,21
**separate (9)**
13:13 76:9 93:13
113:20 167:4
170:16,19 177:19
179:7
**separated (1)**
211:6
**separately (2)**
57:16 241:6
**September (1)**
162:2
**serial (2)**
82:7 85:17
**series (1)**
171:14
**serve (3)**
127:9 212:2,2
**served (4)**
91:8 96:3 158:24
161:23
**service (45)**
49:2,6,14 54:11 65:14
66:7 67:20,23 69:4
70:9,9,18,24 71:5
71:10,16,17 72:11
72:17 73:11 74:8,14
74:20 75:10,15,23
76:3 77:24,25 84:5
84:8 127:23 172:13
172:13 186:9
204:11,24 206:23
207:21 213:24
222:17 225:12
226:23,24 253:15
**services (9)**
72:14 206:19 219:22
219:23,24 224:10
247:10,17 249:15
**serving (1)**
178:6
**set (10)**
23:8 95:19 148:12
175:19,22 205:14
232:21 262:12,21
263:10
**sets (4)**
23:7 77:3 80:4 128:15
**setting (2)**
115:7 223:10
**settings (2)**
31:2,19
**seven (11)**
10:10,23 13:13 14:3
73:16,17,18 74:5,6
74:12,16

**share (4)**
115:24 152:25 153:8
153:13
**shared (13)**
117:3 118:16 141:22
152:19 153:14
154:2 155:6 156:5
157:21 180:12
187:25 201:4 236:7
**she'd (1)**
135:18
**sheet (3)**
99:8,10 265:1
**sheets (1)**
178:8
**shifted (2)**
109:22 112:5
**short (2)**
208:15 251:12
**short-staffed (1)**
224:4
**shortening (1)**
176:7
**Shorthand (3)**
2:12 262:2,6
**show (4)**
151:19 159:6 242:24
244:25
**showing (8)**
148:16 167:22 186:25
189:9 209:4 231:8
237:21 256:17
**shown (1)**
169:23
**shows (1)**
253:10
**side (2)**
179:3,19
**Sigma (33)**
84:6,11,16,17 87:10
87:23 88:5,17,23
89:2 92:7,10,16,17
92:18,21 93:12,15
93:20 100:15,15,17
100:18,20 101:5,16
101:20,23 103:23
104:12,21 130:5
223:13
**sign (1)**
197:21
**Signature (1)**
265:21
**signed (2)**
128:17 197:18
**significance (1)**
226:6

**significant (3)**
81:2,12 82:18
**signifies (1)**
209:21
**siloed (5)**
54:22,23 55:24 56:11
57:2
**silos (2)**
57:15 58:4
**similar (2)**
83:17 170:3
**similarity (1)**
58:5
**similarly (1)**
105:4
**simply (3)**
135:21 180:19 182:19
**single (2)**
75:6 228:2
**sit (1)**
240:19
**site (2)**
20:14 28:19
**sites (1)**
9:21
**Sitting (1)**
246:18
**situation (1)**
190:22
**situations (1)**
191:2
**six (9)**
14:19 73:16,17,18
74:6,12,16 245:2,11
**size (1)**
88:2
**skill (5)**
23:7,8 77:3 80:4
128:15
**skills (5)**
18:20 19:2,4 64:6
225:9
**slide (3)**
175:19,22,24
**SlideDeck (1)**
187:8
**slight (2)**
68:4,5
**slightly (2)**
57:6 187:7
**small (2)**
99:15 106:13
**smoothly (1)**
111:24
**snapshot (1)**
231:24

**snapshotted (1)**
244:12
**SNYDER (1)**
2:8
**solution (9)**
90:17,18,18 91:16,19
91:25 92:4,13
221:18
**solutions (14)**
92:13 96:9 113:4,11
113:15,16 173:14
173:14 174:23
221:3,8 222:3
224:10,19
**solve (2)**
87:20 90:13
**solving (3)**
87:17 92:7 104:8
**somebody (9)**
108:18 123:22 139:21
154:8 199:16 200:7
200:12 211:25
229:13
**sorry (24)**
16:2 45:6 51:10 57:23
58:6,7 79:16,18
93:19 110:9 126:10
180:25 181:4,16
187:3 193:3 206:15
213:13 226:20
227:22 228:10
232:18 246:4,17
**sort (3)**
131:21 179:19 185:16
**sounds (1)**
66:24
**source (12)**
39:25 196:15 233:12
233:20 234:3 236:4
236:6,9 237:9 241:9
241:12 244:10
**speak (5)**
63:11 135:10 139:7
140:16 142:6
**speaking (3)**
66:18 129:16 191:10
**speaks (3)**
64:18 164:3 191:16
**specialist (18)**
4:15 54:16 71:5,8,10
72:11 76:19 79:21
115:9 122:22 135:5
138:3,7,11,12
144:14 195:12
221:13
**specialists (25)**

33:10,18 71:17,22
72:14,18 73:14,18
74:7,7,12 75:24
79:3,8 80:8 87:5
96:3 110:11 112:20
121:24 150:18
193:12,18 237:2
253:12
**specific (16)**
53:22 98:8,17 117:5
180:3 199:3,15,16
218:7,17 221:9,15
221:19 222:4,14
250:9
**specifically (12)**
91:11 104:23 178:9
184:23 200:23
212:14 213:16
215:25 216:13
224:11,20 243:25
**speculating (1)**
201:16
**spend (1)**
98:2
**spending (1)**
70:6
**spent (4)**
97:17 177:8,10
251:19
**spoke (9)**
42:24 60:4 116:19
138:20 140:5,20
142:8 217:18
235:13
**spoken (3)**
15:5,9 135:7
**sponsor (2)**
20:13 36:19
**spots (2)**
96:24 97:3
**Spotts (1)**
75:8
**spouses' (1)**
114:21
**spread (1)**
175:7
**spring (1)**
155:13
**St (36)**
17:9,20 18:2,10,16
20:3,6 21:13,20,24
22:6,10 91:10,12
99:19 100:18
101:17,21,24
103:24 104:18
105:23 106:13

168:23 169:11,21
170:10,15 174:12
177:15 222:19
224:3 229:8,23
235:16,25
**stack (1)**
152:7
**staff (36)**
7:9 32:21,25 33:7,9
33:15 36:7 39:18
76:20 86:5,8,17,25
87:8 94:14 95:18
96:14 104:10 105:3
105:15 106:24
109:15 115:16
150:19 177:24
178:4 186:4 213:8
214:18,24 220:15
221:22,22,23
222:21,24
**staffing (5)**
225:18,20 226:21,21
227:2
**staffs (1)**
225:6
**stand (4)**
166:2 222:10,14,23
**standalone (1)**
178:21
**standard (2)**
92:10 125:19
**start (7)**
4:2 11:9 16:8 94:2,7
156:10 172:14
**started (8)**
13:9 15:23 24:22
50:18 75:3,14,19
184:4
**starters (1)**
71:8
**starting (3)**
120:5 174:15 187:6
**starts (4)**
174:17 245:20,22
246:7
**state (9)**
21:8 22:24 24:17,20
43:22 56:6 194:4
200:16 262:7
**stated (5)**
12:19 120:22,22
122:11 198:21
**statement (2)**
44:18 45:20
**states (40)**
1:1,4 4:6 108:2

128:15 152:20,21
153:2,2,9,9,22,22
154:4,5 156:16,18
156:23 157:18,22
157:23 158:10,21
158:24 159:5
160:15,20 161:3,5
164:24,25 168:9
188:14,14 212:21
215:24 216:19
217:2 231:17,17
**States' (4)**
159:16,21 161:18,19
**stating (1)**
175:25
**statute (1)**
163:16
**stay (1)**
70:13
**stayed (3)**
70:15 119:8 124:2
**Steinhilber (1)**
55:9
**step (7)**
51:11 79:5,5 96:8
111:9 127:4 193:4
**stepped (1)**
79:6
**stipend (2)**
23:22,24
**stock (1)**
180:12
**stomach (1)**
120:5
**stop (4)**
44:22 118:21 120:16
121:10
**stopped (2)**
118:15,24
**strategic (4)**
178:19 186:21 187:10
263:20
**strategies (2)**
221:15 223:24
**strategy (1)**
107:14
**Street (3)**
2:9 3:17 4:10
**strike (27)**
45:7 51:11 58:6,7
77:4 78:17 79:16,18
91:17 93:19,25
126:11 128:21
129:9,11,19 181:5
181:16 188:22
189:2 195:7 202:13

206:15 221:6
228:10 242:23
246:17
**Stroke (1)**
186:12
**Stromberg (3)**
3:20 4:22,22
**structure (2)**
72:23 217:15
**structures (2)**
68:8,10
**students (1)**
214:25
**studies (26)**
10:3,6,12 13:13,18,23
14:3,18,20,24 18:22
18:23,24 20:7 21:19
21:20 22:11 25:25
26:5,8,16 27:17
31:12 34:15 180:10
186:11
**study (25)**
8:25 9:4,11 10:19
11:13,13,14,17,21
11:22 12:2,3,10,11
12:15 13:10,16 14:8
14:13 28:8,12,15
32:2 180:14 183:6
**study-specified (1)**
26:23
**studying (1)**
11:8
**subject (5)**
21:2 27:7 117:14
256:25 257:2
**subjects (1)**
26:13
**subjects' (1)**
20:23
**submission (1)**
162:19
**submit (1)**
185:2
**submitted (11)**
154:15,18 184:20,22
184:23 241:19
242:12,21,25 243:7
250:11
**submitting (6)**
154:20 185:6,10,18
185:19,20
**Subscribed (2)**
261:15 265:22
**subsequent (4)**
136:14 137:5 142:19
167:12

**substance (14)**
114:16 131:10 136:20
138:23 140:8,22
141:2,21 142:9,12
143:3 146:20 156:9
192:5
**successful (2)**
127:15 128:20
**Sue (2)**
221:12 223:23
**suggest (1)**
164:18
**suggestions (2)**
171:24 175:20
**suit (5)**
152:21 153:3,10,15
200:21
**summer (8)**
104:14,15 136:19
137:10 142:8,13
144:20 251:10
**Sunday (2)**
142:21,23
**super (2)**
195:13,20
**supplement (1)**
63:5
**supplemental (1)**
216:9
**supplied (1)**
226:24
**supply (1)**
246:13
**support (48)**
9:9 25:19,23 29:8,18
30:11 31:4 32:7,23
33:3,24 34:25 35:2
47:7,8 71:14,19,23
71:25 76:4 84:4,8
87:15 102:4 128:4
128:19 156:3 178:9
179:2 189:19
194:24 202:9,18,20
203:6,10 206:12
211:19 214:21
216:17 217:13
219:15 220:13
225:18,20,25
242:10 243:5
**supported (38)**
25:25 26:4,6,7,9,10
26:11,12 28:23 29:2
29:3,5 31:11,25
34:7,11,14 80:21
81:13 82:11,19 83:5
83:6,9,14,15 84:6

**T**

**T (4)**
245:25 246:8,19
263:6
**take (28)**
6:10,13,18 13:22
18:20 19:2 24:16
40:11 47:24 51:10
68:19 96:7 98:25
101:13 102:9 116:8
120:24 130:18
157:5 165:9,13
171:4 181:5 208:15
247:15 249:5
251:10 252:7
**taken (9)**
48:4 102:21 111:15
130:23 165:17
208:19 232:6
252:12 262:9
**takes (2)**
99:10 176:19
**talk (15)**
83:20 86:7,16 87:8
116:22 131:5,9,12
134:6 144:16,22
145:12 213:15
215:7 221:14
**talked (24)**
39:13 47:5,20 67:17
83:12,23 92:15
114:24 116:3,25
137:9,11 146:24
170:4 175:11
176:17 202:16
219:15,19 220:6,8
223:12 229:6 245:6
**talking (13)**
13:9 39:11 43:4 46:10
46:16 118:7 139:2
146:23 169:4
170:25 174:3 184:4
223:24
**talks (1)**
172:11
**tam (1)**
149:4
**Tampa (3)**
17:10,20 18:11
**tape (4)**
4:3 102:10,11,18
**taught (10)**
54:21 55:22 56:9,25
58:11 59:6,9 66:11
66:13,19
**Taylor (7)**

139:22,24,25 141:7
142:10 143:8
146:10
**teach (9)**
58:19,20,22 59:11
61:22 62:17 63:12
66:25 67:4
**teaching (8)**
58:4,15 59:15 66:6,8
66:10,14 150:18
**team (20)**
28:12,15 51:19,20
52:7,12,19 84:25
100:17,20 101:14
101:16,20,24 104:3
104:8 111:20 118:3
190:21 215:22
**teams (2)**
8:25 9:4
**tech (11)**
31:5,9 32:5 34:9,14
34:24 42:5 47:4,21
68:14 215:3
**technical (35)**
24:25 25:8,18,24 28:3
28:22 29:19 33:19
39:9 54:4 67:5 71:6
71:9,11,12,18,22
72:4,7,19 73:21
75:6,11,18 116:20
128:9,19 138:4
189:19 194:24
202:9,18,20 203:6
203:10
**technically (1)**
128:18
**technicians (1)**
254:9
**technology (7)**
18:22,23,24 19:7,11
22:15 29:4
**techs (1)**
210:16
**Tejada (2)**
258:12,22
**tell (17)**
5:12 6:8 84:9 110:11
110:15,18,24 113:8
145:5 175:2 178:22
197:3,6 199:23
201:15,22 238:11
**telling (9)**
116:5 136:22 154:20
198:12,18,23 200:7
200:24 201:20
**tells (1)**

172:9
**template (1)**
98:6
**ten (6)**
37:17,21,25 38:14,25
45:15
**tend (1)**
170:18
**TENNESSEE (1)**
1:11
**tenure (2)**
73:11 74:8
**term (4)**
87:23,25 88:2 129:11
**terminate (1)**
49:22
**terminated (11)**
7:22 89:19 121:16,18
122:14,14 123:20
123:23,25 145:17
145:21
**terms (6)**
9:17 72:10 85:2,6
110:2 201:20
**territories (1)**
123:7
**territory (2)**
123:4 200:4
**test (4)**
42:12,17 44:20 45:21
**testified (1)**
5:7
**testify (2)**
103:5,9
**testifying (1)**
102:11
**testimony (9)**
57:6 64:18 131:10,12
134:9,13 242:15,17
262:14
**testing (19)**
42:8,10,15 43:6 44:3
45:3,10,18,19 46:2
46:10,12,15,22
63:16 64:12,22
176:12,22
**Texas (2)**
1:11 254:10
**text (1)**
179:20
**TFE (5)**
59:8 139:25 140:4
143:17 144:4
**Thacher (2)**
113:4,24
**Thank (3)**

69:14 103:17 186:16
**Thanksgiving (1)**
50:12
**theme (1)**
171:18
**theory (1)**
159:16
**therapeutic (1)**
13:5
**therapy (7)**
12:13 21:8 38:10,11
38:16 57:13 58:10
**they'd (2)**
110:14,15
**thing (5)**
60:9 93:16 97:14
133:8 170:16
**things (11)**
56:15 65:22 93:13
128:9 166:9 191:18
196:6 201:14,18,21
220:6
**think (68)**
13:8 14:19 32:4 34:23
39:11 42:24 44:4,8
45:5 50:22 52:3
59:5,19 60:4 61:24
64:18 68:17 69:17
71:11 72:23 74:11
75:16 80:2 83:25
87:13 92:6,15 94:3
99:6,22 100:14
105:2,4 106:12
107:5 115:23
116:16 120:9
122:11 125:18
139:5,14 143:5
144:19 145:7 146:2
146:19 147:4
153:18 155:12
170:18 175:6 182:2
182:4,7,8 184:3
186:13 191:10,16
198:13 203:14
211:6 212:3 214:15
214:18 223:22
233:2
**thinking (6)**
13:12 45:8 50:11
61:23 142:13
143:15
**third (4)**
12:3 105:23 214:8
260:9
**thorough (1)**
95:20

Remaining left-column entries:

84:19,23 85:3,22
86:21 99:19 100:14
101:25 104:2
174:12 195:12
**supporting (19)**
32:10,13,15 33:11,12
33:16,18 72:12 76:7
76:10 80:18 84:16
93:11,15,23 129:6
193:21 225:25
226:2
**supports (2)**
8:10 9:21
**sure (26)**
40:13 53:14 57:23
71:3 74:11 81:23
82:5 93:25 116:17
133:11,11 153:8
160:19,24 169:9
175:15 203:15
208:16 217:6
218:18 233:8,18
236:15 238:10
251:3 252:9
**surgical (1)**
219:15
**Susan (26)**
3:6,9 5:2 125:3,23
129:20 133:4 137:3
139:2,5 140:11
142:2,4,15,18
144:25 146:22
149:12 154:19
158:13 162:17
164:23 191:9 240:8
253:20 255:15
**sustain (1)**
127:24
**swear (1)**
5:4
**Swim (1)**
251:18
**switched (2)**
260:13,20
**sworn (4)**
5:6 261:15 262:13
265:22
**system (15)**
81:10 82:16 112:5
115:8,15 118:2,4
127:12 231:15
232:22 234:9,15,16
238:2 248:20
**Systems (3)**
186:20 187:10 263:20

**thoroughness (1)**
97:24
**thought (3)**
169:25 186:10 216:6
**thousand (2)**
206:22,24
**three (23)**
57:15 58:4 60:18,24
61:19 62:4,7,12
65:7,25 78:12,20
99:23,24,25 100:2
106:15 134:21
150:12 177:21
185:15 231:21
257:11
**threshold (5)**
42:12,17 45:21
176:12,22
**thumb (2)**
180:6 192:8
**Thursday (2)**
189:23 192:16
**thyroid (1)**
103:11
**tied (2)**
76:20 108:19
**time (99)**
6:11 7:18 18:14 25:7
28:2 29:2 31:5
37:15 38:24 40:12
44:24 45:15 48:24
51:14 54:25 56:20
60:15 70:7,17,24
71:15 73:15,17,20
73:23,24 74:4,12,19
75:9,12 80:22 81:3
86:6 87:2 88:9,11
89:9 97:16 98:2,25
99:14 101:13
102:13 110:3
111:12 118:17,19
122:17 123:9
126:12,17,24
132:20 134:7
138:20 139:4 140:5
140:19 143:7,9,14
143:20 144:22
152:4,8,10 158:25
159:2,10 161:7
164:19 172:12
176:2,9,16,20,23
177:8,10 199:16
200:25 201:8 202:7
202:21 205:17
207:3 211:4,9,23
212:13 215:18

216:16 217:18
232:6 247:2 248:21
251:19 261:7
**times (3)**
78:12,20 79:2
**tired (1)**
125:17
**title (2)**
7:2 71:12
**titled (1)**
151:25
**titles (1)**
116:24
**to1458 (1)**
264:12
**today (38)**
5:20 42:6 103:3,5,9
103:13,19 131:7
132:2 134:4,9,13
148:5,22 156:23
163:4 164:13 166:4
166:6,8 167:8 186:7
190:4 191:11
212:10 219:16
220:6,8 221:6,10,20
223:18 225:19,22
227:5 235:15
240:19 246:18
**today's (3)**
131:18 134:18 151:20
**told (15)**
108:23 112:21 113:3
113:5 117:19 122:8
127:3 193:24 194:7
196:17,21 201:13
201:16,18 202:2
**Tom (7)**
117:4,4 118:12
120:19 122:8
201:12 202:2
**tool (3)**
107:16 112:5 123:3
**tools (1)**
12:2
**top (10)**
168:22 169:11 171:8
183:16 190:14
209:9,16 214:19
215:6 235:8
**topic (11)**
86:9,18 87:2,9 120:8
124:19,24 125:4,6
125:20 167:12
**topics (2)**
156:11 166:6
**Total (1)**

172:16
**touch (1)**
119:9
**Tower (1)**
3:16
**track (2)**
254:22 255:17
**tracking (4)**
80:23 81:4 82:7 85:16
**train (1)**
215:3
**trained (5)**
77:3 80:3 127:9 140:4
222:11
**training (24)**
57:14 80:7 84:12,17
88:6,17 89:2,4,5,8
89:12,14 92:16,17
92:18,22 107:3
147:16 149:24
150:6,14 185:19
214:23 220:21
**trains (1)**
214:17
**transcript (1)**
148:14
**transcripts (3)**
132:2,4,5
**transition (1)**
111:21
**transitioned (1)**
67:22
**transitioning (2)**
113:6,9
**trends (1)**
173:19
**trial (5)**
8:13 9:9 11:9 12:9
21:10
**trials (11)**
7:8 8:11 11:2,5,8 18:8
22:3,6 183:4,9
186:8
**tricky (1)**
43:24
**tried (2)**
112:17 202:23
**Troubleshoot (1)**
33:21
**troubleshooting (1)**
64:4
**truck (3)**
147:17 221:21 223:25
**true (3)**
122:7 244:4 262:14
**trust (1)**

176:24
**trusted (2)**
121:4 127:2
**truthfully (3)**
103:5,9,13
**try (6)**
42:20 112:7 131:21
221:2 238:7,20
**trying (10)**
23:9 43:23,24 44:10
117:22 158:6
161:10 167:3 212:3
212:6
**TSG (2)**
4:13,16
**Tuesday (1)**
1:21
**tuition (1)**
23:23
**turn (19)**
15:14 50:21 83:20
152:16 168:6,17
170:14 177:20
179:12 219:11
227:15 231:19
234:23 236:20
245:19 254:5,25
257:23 259:4
**turned (2)**
164:4,5
**turning (8)**
173:18 174:9 177:11
178:16 194:22
244:8 252:17,19
**turnover (1)**
74:9
**turns (2)**
161:16,18
**Tuzi (5)**
8:18,22 9:5 15:6
25:21
**Tuzi's (1)**
9:17
**two (25)**
13:12 14:5 17:7,13
51:16 56:3 65:22
81:4 98:18 99:5,11
101:22 102:15
123:11,11 124:5
142:25 150:12
166:9 178:22
180:10 186:10
231:20 233:25
236:8
**two-year (1)**
73:19

**type (12)**
9:25 23:11 46:12,22
46:25 76:22 77:8
171:8 196:10 204:8
223:13 225:20
**types (6)**
27:24 54:7 57:11
70:23 172:11
200:11
**typically (3)**
37:13 229:15 260:23

_____

**U**

**Uh-huh (20)**
12:23 13:11 69:10
77:16 94:6 109:4
169:12 170:6 176:6
179:23 228:15
235:17 236:3 246:9
253:2 254:12
256:21 258:4,15
259:8
**ultimately (4)**
107:15,18 118:7
127:18
**uncouple (1)**
126:24
**uncoupled (1)**
130:14
**undergo (1)**
205:14
**undergraduate (1)**
22:13
**underneath (2)**
138:19 210:5
**understand (21)**
6:8 38:4,7,24 43:25
44:9 64:15,25 94:18
129:6 130:11
150:20 158:7,9,13
159:14,19 161:11
203:15 212:6
220:22
**understanding (19)**
63:9,13,21,25 64:8
65:8,24 94:19
112:10,15 117:22
124:7,8 126:18
130:4 153:17
193:11 226:5 242:5
**unfold (1)**
200:12
**unfounded (1)**
116:11
**unipolar (2)**
260:13,21

**unique (2)**
36:7 39:18
**unit (1)**
70:25
**United (32)**
1:1,4 4:6 108:2
152:20 153:2,9,22
154:4 156:16,18,23
157:18,22,23
158:10,20,24 159:4
159:15,20 160:15
160:20 161:3,5,18
161:19 164:24
188:14 216:19
217:2 231:17
**University (4)**
15:18 16:3,11,17
**unscheduled (2)**
47:17,18
**unusual (1)**
86:3
**updated (1)**
189:18
**upset (1)**
192:12
**Upstate (2)**
99:16 106:13
**usage (1)**
176:5
**use (15)**
37:14 59:15 60:15
82:15 107:6,11
110:17 117:9
118:20 120:15
121:9 164:19 173:2
174:7 178:2
**usual (3)**
190:23 192:9 194:15
**utilization (1)**
186:5
**utilized (1)**
248:16

_____
**V**

**V (1)**
4:5
**v- (1)**
1:15
**vacation (2)**
251:10,20
**Valley (10)**
177:15 230:6,12
231:4 233:15,23
237:2,7 238:21
264:10
**value (3)**

117:6 219:24 224:10
**variables (1)**
97:15
**varied (1)**
205:17
**variety (3)**
65:16,16 221:24
**various (3)**
178:6 219:23 224:9
**vary (2)**
204:9 205:16
**Vascular (1)**
254:11
**verbal (1)**
148:7
**Verbano (5)**
1:23 2:10 4:16 262:4
262:23
**verbiage (4)**
19:21 56:23 170:21
176:10
**versus (5)**
34:18 54:22 67:13
105:14 185:24
**video (2)**
4:14 165:20
**videographer (19)**
3:25 4:2 5:3,23 48:2,6
102:15,19,23
130:21 131:2
165:15 167:19
208:12,17,25
252:10,14 261:5
**videotaped (3)**
1:19 2:7 4:3
**view (1)**
239:7
**violated (2)**
115:20 202:25
**violates (1)**
126:7
**violation (4)**
124:16 126:15,19
128:5
**violations (3)**
149:25 150:7 185:19
**VIRGINA (1)**
1:12
**virtual (4)**
147:16 221:23,24
223:25
**vis-a-vis (1)**
160:19
**visit (1)**
221:23
**visually (1)**

45:23
**Vogl (1)**
118:11
**Voice (7)**
119:13,15,16 120:15
231:5 236:24
264:12
**voicemail (2)**
236:25 237:9
**voltage (2)**
42:18 45:22

_____
**W**

**wait (3)**
145:19 234:11,25
**waited (1)**
125:15
**waive (2)**
161:8,9
**waived (3)**
159:6 160:20,23
**walked (1)**
94:20
**want (19)**
15:14 43:23 54:6
102:10 107:3
117:15 119:8,25
121:4,22 125:5
127:14 164:11
165:7 169:19
178:25 203:15
251:3 260:8
**wanted (12)**
94:14,17 98:8 99:8
104:11,18,24 105:4
120:20 125:21
134:22 238:20
**wants (1)**
166:14
**wasn't (6)**
46:24 57:23 86:2
115:3 236:4 248:16
**wave (1)**
260:12
**way (17)**
35:10 42:21 75:20
97:15 104:21,22
108:24 112:13
117:25 119:9 122:4
131:20 132:18
171:18 176:9,15
262:18
**ways (3)**
110:22 188:20 220:12
**we'll (5)**
6:16 83:20 167:14

254:20 255:16
**we're (8)**
5:19 120:8 124:18
125:24 164:17
174:3 198:16
206:11
**we've (18)**
14:18 124:24 125:2
143:7 155:6 156:4
165:25 206:14
208:12 209:5
219:15 220:5
223:12 225:19
227:2,8,11 244:13
**web-based (2)**
109:14 114:19
**weeds (1)**
127:5
**week (2)**
142:23,24
**well-known (1)**
246:22
**went (11)**
73:19 80:2,6 101:17
129:4 130:2 131:22
201:5 220:20
225:25 251:14
**weren't (6)**
104:3 124:9 133:8
212:7 213:20 245:4
**West (17)**
167:16 168:16 169:3
169:14,17,22
170:18 173:25
174:5,5 175:4
177:16 184:8,13
201:13,21 263:15
**when's (2)**
138:20 140:5
**WHEREOF (1)**
262:20
**willing (2)**
90:11 136:11
**Willwerth (4)**
137:24 138:2 139:15
146:9
**Wind (2)**
244:12,21
**window (1)**
176:8
**windows (5)**
26:23 27:7,8,13
238:23
**WISCONSIN (1)**
1:12
**withheld (1)**

133:9
**withhold (1)**
162:16
**withholding (1)**
162:21
**Witmer (1)**
239:2
**witness (111)**
5:4,6 8:18 10:9,16
11:19 24:4,8 26:22
27:6,21 28:18 30:15
30:20,25 31:25
33:24 34:5 37:11,19
38:4,19 39:6 42:2
43:12 54:11 56:6
57:9 64:21 69:15
77:2,12,20 78:6,22
79:13 80:15 81:9
82:22 84:11 86:12
91:2 93:7 95:25
96:21 98:18 103:12
106:3,21 109:8,22
112:10 113:3 126:2
126:23 135:16,22
136:24 139:3
140:12 141:4
144:19 145:2,8
147:21,25 151:6
152:3 154:23
156:14 157:7
164:16,17,19 165:5
165:5,11,21 167:14
172:2 180:20,23
185:10 193:11
194:4,11 207:20
216:5 220:10
221:12 222:8,9
224:17 225:16,24
227:8 234:20
240:14 243:11,18
247:20 249:3,23
250:20 252:6 253:7
258:18 262:11,15
262:20 263:3
**witnesses (2)**
134:24 166:23
**wives (1)**
114:20
**woman (1)**
53:20
**word (3)**
26:10 35:11 56:18
**words (1)**
121:4
**work (54)**
6:20,21 9:14 16:23

17:5,8 18:10,13
20:3,5 21:12,23
22:10 24:10 25:8,14
34:21 50:16 54:25
59:23 63:6 68:7,8
78:15 93:2,3,9
100:3 109:20
111:17 127:6,12,16
131:23 138:14,19
139:10 162:8
163:12 173:17
175:5,8,12,13
181:25 182:6,17
184:13 190:23
192:19 228:19
242:2,8 258:12
**worked (31)**
6:23,24 16:24 17:9,12
27:22 52:19 53:24
54:8 55:4 87:4,4
106:19 108:24
127:16 135:25
137:19,22,22 138:4
138:7,16,17,18
144:15 147:6,7,15
193:6 202:6 203:15
**workflow (12)**
51:6 52:21 54:19
94:25 95:7 170:7,25
177:12,23,25 223:8
224:8
**workflows (8)**
94:21,22,25 101:6
105:2 106:18
185:15 223:10
**working (17)**
17:20 19:8 20:2 50:3
50:6 54:3 69:21
70:6 88:10 89:20
91:22 106:16
114:15 126:25
171:21 201:6 223:5
**workload (1)**
111:19
**workplace (1)**
70:2
**works (1)**
147:11
**worksheet (31)**
95:5,6,8,9,16,17
97:23 98:3,9,13,15
98:15,20 99:14
100:3 106:18
168:24 169:10
170:11,12,15,25
171:8 177:13,23,25

196:7 197:17,19
198:20 260:24
**worksheets (15)**
36:2 39:16 95:3 97:18
98:17 170:5 174:22
197:15,21 199:10
220:2 223:14
242:20,23,24
**world (1)**
127:24
**wouldn't (4)**
103:9 146:7 241:11
252:19
**Wozny (3)**
3:24 4:24,24
**wrap (2)**
67:7 224:9
**Wright (2)**
146:17 147:4
**writing (1)**
171:12
**written (4)**
20:15 151:12 166:13
191:22
**wrong (1)**
260:16

_____
**X**
_____
**X (1)**
263:6
**X------------------ (1)**
263:2

_____
**Y**
_____
**yeah (18)**
37:11 46:9 50:13
68:17 102:17
171:12 226:16
231:23 232:21
233:3,11 235:11
239:4 240:14
241:10 246:4,6
260:7
**year (10)**
16:19 23:22 140:20
155:3,14 206:22
251:3,7,11 252:3
**years (25)**
10:10 17:7,13 19:7,25
20:6 21:13 24:16,18
25:4 26:20 28:22
31:8 45:15 56:3
68:21 126:24,25
128:8 196:19 199:3
204:9 205:11 215:5
244:2

**yellow (12)**
88:15,17,20,23
92:16 93:5 94:4
100:4,6,8,11
**Yep (2)**
232:14 236:23
**York (3)**
1:10 166:20 253:10

_____
**Z**
_____
**zero (2)**
179:16,16

_____
**0**
_____
**00004721 (2)**
189:23 192:17
**00004723 (2)**
194:23 202:17
**00004730 (1)**
189:15
**000510 (1)**
179:12
**004730 (1)**
189:12
**00481 (1)**
169:13
**00482 (1)**
170:23
**00494 (3)**
174:15 175:11,15
**00495 (1)**
174:24
**00502 (1)**
175:23
**00503 (3)**
174:16 175:12,15
**00504 (1)**
177:11
**00508 (1)**
177:21
**00509 (3)**
178:16 179:5 184:12
**00510 (3)**
178:17 179:5,17
**00511 (3)**
178:17 179:6 183:16
**00512 (1)**
185:4
**0059 (1)**
178:18
**01421 (1)**
233:20
**01422 (2)**
234:23 235:6
**01428 (1)**
235:5

**01448 (2)**
244:15,22
**02199 (1)**
3:18
**07 (1)**
47:5

_____
**1**
_____
**1 (10)**
4:3 126:3 148:10,17
148:18 162:4,6
187:11 215:14
263:8
**1-13-10 (2)**
189:5 263:24
**1:00 (2)**
124:25 125:19
**1:07 (2)**
130:22,23
**1:30 (1)**
125:10
**10 (15)**
104:16 150:24 153:4
153:11,22 154:3,13
155:5 156:2 185:6
256:11,12,18 263:8
264:17
**10:20 (2)**
48:3,4
**10:34 (2)**
48:5,7
**100 (1)**
78:25
**11 (2)**
28:21 31:8
**11.11.11 (2)**
237:18 264:16
**11/16 (1)**
235:20
**11/30 (1)**
244:25
**115- (1)**
7:13
**11th (1)**
168:18
**12 (16)**
25:4 26:20 28:22 31:8
68:21 141:12
150:24 153:4,11,23
154:3,13 155:5
156:3 264:17,24
**12-1-09 (2)**
186:22 263:21
**12:12 (2)**
102:20,21
**12:23 (2)**

102:22,24
**12:51 (2)**
119:25 120:8
**120,000 (1)**
7:13
**126 (2)**
2:9 4:9
**133496 (1)**
1:24
**13t (1)**
230:10
**13th (1)**
190:17
**14 (2)**
1:21 2:1
**1458 (1)**
231:5
**148 (1)**
263:8
**14th (2)**
4:11 259:7
**15 (2)**
125:8 263:14
**151 (1)**
263:12
**156 (1)**
264:23
**16 (2)**
263:12 264:13
**1611 (1)**
3:7
**167 (1)**
263:14
**16h (1)**
236:2
**16th (2)**
229:9 262:21
**17 (2)**
126:24,25
**1772 (2)**
237:19 264:16
**18 (6)**
135:12,13 136:9
138:22 140:7
219:12
**181 (1)**
264:24
**186 (1)**
263:18
**189 (1)**
263:23
**19 (13)**
227:15,20 233:14,21
234:21 237:6 238:8
239:24 240:24
241:17 243:7 244:5

**1980 (2)**
263:18
16:21 17:12
**1982 (2)**
17:17,23
**1990 (2)**
19:7,11
**1991 (4)**
17:9,24 19:7,12
**1996 (8)**
18:12 19:5 24:23
25:15 32:5 47:4,21
138:6
**1st (2)**
166:21 209:11

_____
**2**
_____
**2 (12)**
151:15,16,20 153:11
154:10 195:10,19
202:17 203:3
208:13 263:12
264:8
**2:21 (2)**
130:24 131:3
**20 (2)**
244:10 261:16
**2001 (1)**
24:19
**2005 (2)**
23:2 24:19
**2007 (14)**
25:5,6,15 32:5,6
47:22 48:9,16 50:22
56:3 66:4 67:16
68:16 138:6
**2008 (5)**
25:5 190:13 194:25
255:4 258:9
**2009 (18)**
44:25 45:11 48:16,17
48:18,25 50:22 56:4
66:5 67:17,19 69:5
84:20 138:10
143:10,15,17
187:11
**2010 (10)**
114:12 189:24 190:17
252:24 253:10
257:2 258:25 259:7
259:22 260:10
**2011 (26)**
49:8,10,16,25 50:4,7
50:17 84:20 104:15
108:10,11 114:3
117:17 123:12

138:10 209:11
211:4,9 215:15
227:25 229:10
230:10 233:16,24
236:2 238:22
**2012 (14)**
6:25 10:25 11:10,10
12:5,16 49:13,23,25
50:4,19 137:18
239:16,20
**2015 (7)**
154:16,18 155:2,4
179:13,21,24
**2016 (2)**
155:3,15
**2017 (5)**
1:21 2:1 4:11 262:21
265:23
**208 (1)**
264:3
**21 (6)**
245:20,22 246:2,3,6
264:3
**21217 (1)**
3:8
**218 (1)**
264:6
**22 (5)**
233:6,16,24 238:22
264:6
**231 (1)**
264:8
**237 (1)**
264:13
**24 (2)**
252:19,20
**24th (1)**
190:13
**256 (1)**
264:17
**26th (2)**
259:22 260:9
**27 (1)**
246:11
**29th (1)**
258:9
**2mV (1)**
260:12

_____
**3**
_____
**3 (6)**
152:17 167:15,23
202:24 203:5
263:14
**3,048 (1)**
253:13

**3:07 (2)**
165:16,17
**30,000 (1)**
127:6
**30th (1)**
166:21
**353 (1)**
5:15
**36 (1)**
254:5
**39 (1)**
254:25

_____
**4**
_____
**4 (4)**
186:18 187:2 263:18
263:23
**4,Presentation (1)**
186:19
**4:01 (1)**
165:18
**4:05 (1)**
167:20
**421 (1)**
231:23
**450 (1)**
235:16
**4730 (2)**
189:6 263:25
**48 (2)**
219:12,13
**486 (1)**
174:4
**487 (1)**
174:4
**488 (1)**
174:4
**49 (1)**
227:18
**491 (2)**
172:5 174:4
**493 (1)**
174:9
**4th (2)**
257:2 258:25

_____
**5**
_____
**5 (5)**
166:22 189:4,10
263:5,23
**5-4-10 (2)**
256:13 264:18
**5:06 (2)**
208:18,19
**5:15-cv-6264-EGS (...**
1:15 4:8

**5:23 (2)**
208:20 209:2
**50 (4)**
122:18 128:8 244:2,8
**505 (1)**
177:11
**512 (3)**
167:17 184:12 263:17
**52 (8)**
245:20,22 246:2,5,6
246:11 247:16
250:18
**53 (1)**
250:5

_____
**6**
_____
**6 (4)**
152:17 208:21 209:5
264:3
**6:29 (2)**
252:11,12
**6:38 (2)**
252:13,15
**6:49 (2)**
261:6,7

_____
**7**
_____
**7 (22)**
192:16 218:22 219:2
219:2 227:16
230:23 233:14,22
234:21 235:22
237:6 238:9 239:25
240:24 243:7 244:9
245:21 246:2,12
250:5 252:18 264:6
**778 (2)**
256:14 264:20
**7th (2)**
189:24 194:25

_____
**8**
_____
**8 (13)**
230:25 231:2,9
234:24,25 236:21
240:25 241:22
244:13,16,22,23
264:8
**8-1-11 (2)**
208:22 264:4
**800 (1)**
3:17
**8635 (3)**
1:24 2:13 262:24
**88 (1)**
233:20

_____
**9**
_____
**9 (11)**
185:6 237:15,16,22
238:24 240:3,6
241:3,23 264:13,23
**9/11/2014 (1)**
183:17
**9:00 (1)**
124:24
**9:08 (2)**
2:2 4:12
**92774 (1)**
260:5
**92775 (2)**
260:4,6
**9th (1)**
227:25