UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF PENNSYLVANIA

                                      .
UNITED STATES OF AMERICA,      .
CALIFORNIA, COLORADO,          .    Case No. 5:15-CV-06264-EGS
CONNECTICUT, DELAWARE,         .
DISTRICT OF COLUMBIA,          .    601 Market Street,
FLORIDA, GEORGIA, HAWAII,      .    Philadelphia, PA 19106
ILLINOIS, INDIANA, IOWA,       .    Wednesday, December 20, 2017
LOUISIANA, MARYLAND,           .
MASSACHUSETTS, MICHIGAN,       .
MINNESOTA, MONTANA, NEVADA, .
NEW JERSEY, NEW MEXICO,        .
NEW YORK, NORTH CAROLINA,      .
OKLAHOMA, RHODE ISLAND,        .
TENNESSEE, TEXAS, VIRGINIA, .
And WISCONSIN, *ex rel.*       .
CATHLEEN FORNEY,               .
                               .
         Plaintiffs/Relator, .
                               .
              vs.              .
                               .
MEDTRONIC, INC.,               .
                               .
         Defendant.            .
 . . . . . . . . . . . . .
            TRANSCRIPT OF MOTION FOR SUMMARY JUDGMENT
          BEFORE THE HONORABLE EDWARD G. SMITH, U.S.D.J.
                 UNITED STATES DISTRICT JUDGE
APPEARANCES:

For the Plaintiffs:        Susan Laura Burke, Esq.
                           LAW OFFICES OF SUSAN L. BURKE
                           1611 Park Avenue
                           Baltimore, Maryland 21217


(Appearances Continued)

Audio Operator:            Electronically Recorded
                           by Jaime Kulick, ESR

Transcription Company:     JDR Acquisitions, LLC/
                           Advanced Transcription
                           1880 John F. Kennedy Boulevard
                           6th Floor
                           Philadelphia, Pennsylvania 19103
                           (855)204-8184


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For the Defendant:        Kirsten V. Mayer, Esq.
                          Mitchell Dylan Stromberg, Esq.
                          ROPES & GRAY, LLP
                          Prudential Tower
                          800 Boylston Street
                          Boston, Massachusetts 02199

INDEX

                                                              <u>Page</u>

<u>ARGUMENT BY MS. MAYER</u>                                      4

<u>ARGUMENT BY MS. BURKE</u>                                      71

<u>FURTHER ARGUMENT</u>                                          94

<u>COURT DECISION</u>                                  (Reserved)

1         (Proceedings commence at 9:59 a.m.)

2         (Call to order of the Court)

3              THE COURT:  Good morning, Counsel.

4              COUNSEL:  Good morning.  Good morning, Your Honor.

5              THE COURT:  Please be seated.  Thank you.

6         The Court is called to order in the matter of the

7    United States of America, and in particular Cathleen Forney

8    v. Medtronic, Inc.  This is Civil Action Number 15-6264.

9         The Court convenes today to hear argument with

10   respect to the defendant's motion for summary judgment, based

11   on the public disclosure bar.  The defendant claims that the

12   public disclosure bar does apply in this case.  Obviously,

13   the plaintiff -- the defendant claims that; the plaintiff,

14   obviously, disagrees.

15        Counselor, are you ready to argue on why I should

16   throw this case out, based on the public disclosure bar?

17             MS. MAYER:  Thank you, Your Honor.

18             THE COURT:  Certainly.  And you may argue wherever

19   you're most comfortable.

20             MS. MAYER:  Thank you.

21        I'd like to start just by talking very briefly, by

22   way of introduction, about the prior-filed *qui tam*

23   complaints, and then I'll jump right into the initial set of

24   arguments, which is the discussion of why these prior-filed

25   *qui tam* complaints constitute public disclosures under the

1   False Claims Act's public disclosure bar.

2          Over the course of about three years, four years, a

3   series of False Claims Act complaints came out from under

4   seal.  And in each of those complaints, the Relator in the

5   case, which was a former Medtronic employee, made

6   allegations.  Some of those allegations are entirely focused

7   on the same theories that Ms. Forney is alleging in her

8   complaint.  Some of them are focused on other theories, but

9   include theories that Ms. Forney has alleged in her

10  complaint.

11         And one of them in particular, the Stokes case,

12  which we'll talk a little more about later, has a different

13  legal theory and a lot of facts in support of that theory

14  that is not in Ms. Forney's case, but, along the way and

15  necessary to that theory, alleges facts that are very

16  pertinent to, and disclose pertinent facts relating to the

17  allegations in Ms. Forney's complaint.  And I'll tie that

18  together in a minute.

19         What I wanted to say, by way of introduction, is

20  introduce you a little bit to the Relators in these cases

21  because Ms. Forney's brief emphasizes that Ms. Forney is a

22  long-time employee of Medtronic before she left her

23  employment; that, as a result, she is not the kind of relator

24  that the statute intends to bar, and that that's a fact

25  that's germane to the analysis that the Court is going to go

1      through today.

2            I wanted to talk just briefly about the relators in

3      these other complaints, both to balance the record on this,

4      and to point out that, in fact, whether the relator was a

5      long-time employee or not is not relevant.  There is one

6      relevant question that Ms. Forney's experience can speak to,

7      which is:  Does she have independent information that she

8      disclosed to the Government in advance of filing her action

9      that materially adds to the action?  On that point, she's

10     entitled to, and she has, through declarations, stated that

11     the information she supplied was not based on the prior-filed

12     *qui tam* complaints, and that she had not seen them.

13           Other than that statement, all of the color about

14     her tenure at Medtronic, the different positions she held,

15     and the extent of the information she gathered from the

16     company during that time is literally irrelevant and actually

17     cannot be considered for purposes of evaluating the public

18     disclosure bar.

19           But for starters, I also wanted to point out that

20     Ms. Forney is not unusual in being a former employee,

21     bringing a case, and having personal and important

22     information to share with the Government, from her

23     perspective.

24           In the <u>Burns</u> case, the relator was a ten-year

25     employee of Medtronic when the amended complaint was filed.

He had been a sales representative in the Cardiac Rhythm

Business Unit, which is the business unit where the device

checks are at issue in this case.  And he makes allegations

about free device checks used as a kickback in Florida and

North Carolina, with a great deal of specificity, including

providing examples of superbills and physician practices that

he alleges were the recipients of these kickbacks, and

participated in the scheme.

          The Onwezen and Brill -- it's the Onwezen, et al

complaint, which we refer to as the "Onwezen Complaint" in

our papers, had three relators.  It sued multiple defendants,

including Medtronic, in the industry.  And two of the

relators were Medtronic employees.  Onwezen herself was a

clinical specialist, so, again, the exact type of person that

allegedly, at Medtronic, their job is to provide free device

checks and interrogations, day in and day out, to everybody

who needs one for a Medtronic device.  And she was employed

in that role for three years, and said that's what she did.

          Brill was employed for ten years as a field

engineer, which is another type of field support role in

Medtronic, in its business unit, and then was promoted to

principal field engineer.  And between Onwezen and Brill,

they cover Missouri and Massachusetts.  Those are where they

worked, but their allegations go broader than that.

          In the Stokes complaint, the relator was a senior

1    manager of healthcare economics.  He did -- personally

2    developed economic tools and resources for Medtronic to use

3    in this Cardiac Rhythm Unit.  He visited and worked with over

4    300 hospitals across 40 states, teaching them about

5    documentation practices, coding, and billing for devices.

6         And he alleges in his complaint -- this is the one

7    where his legal theory is very different from Ms. Forney's.

8    But he alleges in his complaint that Medtronic reps were

9    trained to and providing -- Medtronic field personnel -- and

10   providing device checks, programming devices and

11   interrogations nationwide, and that -- and then he goes on.

12        He actually had gotten MedPAR data and analyzes

13   clusters of what he alleges are statistically significant

14   outliers in 18 different regions of the country, identifying

15   multiple hospitals in those regions, where he says there was

16   an overuse of the theory in the case, which was that the reps

17   were programming these devices during their checks and during

18   their -- what was service they were providing in doctors'

19   offices, that they were programming the devices to expire

20   quickly, so that there would be a need to ex-clamp them and

21   put a new one in quickly.  So, again, the legal theory is

22   different, but the necessary allegation of the theory is that

23   Medtronic employees were controlling these checks and

24   programming events, and were doing them all the time.  And

25   there's a lot of specificity about where that was happening.

And then, in the <u>Schumacher</u> complaint (phonetic),

he was a short-term employee, only for one year, at

Medtronic.  But he was a business development manager, so,

yet again, another type of position within the organization,

adding color to the allegations.  He certainly alleged

theories of off-label promotion and kickbacks in the form of

cash payments, relating to clinical trials and research.  But

he also, very specifically, alleges that the kind of

reimbursement and other business consulting that is very much

a part of Ms. Forney's theory was being used as a kickback,

as well, during that time frame, and he has some specific

examples related to that in his complaint.

So, collectively, these four complaints -- and I'm

focusing on the Medtronic ones for now, at this introductory

stage -- you know, cover almost 25 years or more of

employment at Medtronic, across a range of positions, a range

of geographies; Florida, you know, District of Columbia,

California, Missouri, Massachusetts.  They have varying

degrees of specific examples of the kind of misconduct that's

at issue in Ms. Forney's case.  And they all allege

substantially the same theories that Ms. Forney is now

pursuing.

So I'm going to turn then to the question of

whether these *qui tam* complaints are the kinds of documents

that qualify as a public disclosure under the False Claims

1   Act because we didn't focus on that in our opening brief

2   because it's really not something that's contested in the

3   case law ever.  And we believe that, under the plain language

4   of the statute and Supreme Court precedent that goes back

5   almost two decades, it's really not something that's in

6   dispute.  So let -- we can talk about that.

7           Before we do, I did want to just, again, mention

8   that, for purposes of argument and the briefing, as we noted

9   in the reply, that Ms. Forney has narrowed her case a little

10  bit to focus on only conduct that resulted -- that occurred

11  on or after March 23rd, 2010, so that the current --

12          THE COURT:  Put it in the --

13          MS. MAYER:  -- version --

14          THE COURT:  -- post-amendment --

15          MS. MAYER:  -- of the post-amendment --

16          THE COURT:  So there's no --

17          MS. MAYER:  -- version of the --

18          THE COURT:  -- pre-amendment --

19          MS. MAYER:  -- bar applies.

20          THE COURT:  No pre-amendment allegations in this

21  case.  Okay.

22          MS. MAYER:  And then, second, that Ms. Forney is

23  not pursuing any claims based on the theory that kickbacks

24  associated with implant procedures remain a part of the case.

25  That was something that was part of her allegations in the

1    complaint, and we addressed it in our opening brief.  But Ms.

2    Burke has confirmed that she is limiting the theories that

3    she is proceeding on and defending here to the device checks

4    and the kickback and the practice management, consulting

5    services aspects.

6              THE COURT:  All right.  Now I want to get this

7    quick.  So it would be no conduct prior to March 10 of 2010?

8              MS. MAYER:  March 23rd of 2010.

9              THE COURT:  March 23rd of 2010.  So we no longer

10   have to dual distinction between pre and post.

11             MS. MAYER:  Right.

12             THE COURT:  And the theory now is limited to the

13   device checks, where somebody goes back, and Medtronic does a

14   device check, as opposed to the implants.  How do we describe

15   that?

16             MS. BURKE:  Yes, Your Honor.  It's limited to the

17   device checks.  But then, in addition, the practice

18   management consulting, which subsumes the -- what the

19   defendant has labeled "administrative work" and

20   "reimbursement."  Those are all a part of what we label the

21   "practice management consulting."

22             THE COURT:  Okay.  But not the implant -- is it the

23   implant -- you check on the implant, that part?

24             MS. BURKE:  Your Honor, the Medtronic clinical

25   specialists and sales reps attend the surgical implants and

1    are there to assist in interrogating the device at the actual

2    implant surgery.  For purposes of limiting the trial and

3    avoiding jury confusion, we've decided to go with what we

4    call the "device checks," which are well after surgery, and

5    are clinics run, in which the patients come back and simply

6    get the device checked.

7           THE COURT:  Okay.  So all implant assistance, at

8    the time the implant is being inserted, those are being

9    withdrawn.

10          MS. BURKE:  That's right.  We are not pursuing that

11   theory of liability at trial.

12          THE COURT:  It's after they are out of the

13   operating room, now they're -- it's post-operative, and they

14   go back for a check, those are what the claim is, that that's

15   the kickback.

16          MS. BURKE:  Yes, Your Honor.

17          THE COURT:  Okay.  Thank you.

18          Counselor, excuse my interruption.

19          MS. MAYER:  So I think where we start, with the

20   question of whether the complaint qualifies as a public

21   disclosure is with the statute.  And the statute -- and I

22   don't think there's any dispute about what the post-PPACA

23   public disclosure bar says about what types of documents

24   qualify as a public disclosure.  But for our relevant

25   purposes, the provision is 3730(e)(4)(A)(i), which is that

1    it's disclosed in a federal criminal, civil, or

2    administrative hearing, in which the Government or its agent

3    is a party.   So the question is:  Are these complaints

4    disclosures in a federal civil hearing, in which the

5    Government or its agent is a party?

6           And Ms. Burke has challenged a couple of different

7    pieces of that.  First, she argues in her brief that, in

8    fact, what Moore, a Third Circuit case from, I think, 2016 --

9    it's either 2016 or early this year, but it's recent --

10   interpreting the public disclosure bar, she argues that Moore

11   holds that what that statute means is not Government or its

12   agent, but just Government.  Okay?  And then she takes that

13   to be a holding in the case, and argues from there.

14          We addressed this in our reply brief, but I think

15   it's critical, when looking just at the language of the

16   statute and at Moore, to recognize that, in Moore -- again,

17   our view is the Court, when you read the decision properly,

18   is not holding, and cannot be viewed as holding that this

19   statutory provision does not mean what it says when it says

20   "or its agent;" that Moore was just sort of referring to that

21   language in shorthand because Provision (i) here was not even

22   a little bit at issue in the appeal, and so there was no need

23   for the Court to be fulsome with its quote from the statute,

24   when it was referring to it.

25          The only public disclosures at issue in Moore were

1   a FOIA report, which is -- the Court discussed whether it

2   qualifies as a public disclosure under (ii), and news media,

3   which qualifies as a public disclosure under (iii).  So, for

4   starters, the Court wasn't actually -- didn't have before it

5   any question about whether anything constituted a public

6   disclosure under (i), let alone whether a particular document

7   should be viewed as qualifying, when the Government was not a

8   party.

9           In the District Court -- and this is where I think

10  some confusion comes into, in some of these cases.  In

11  addition to the tendency to speak in shorthand, in the

12  District Court, because claims bridged the PPACA amendment.

13  There was a claim, which didn't end up getting appealed, that

14  the defendant made, that the information that the relator

15  brought to the case was discovery that the relator had

16  secured by litigating a wrongful death action, a couple of

17  wrongful death actions, in Federal Court; and that,

18  therefore, the discovery, which qualifies as documents as --

19  that were disclosed in a federal civil hearing under the old

20  statute, qualified as a public disclosure, and served as a

21  bar under the old PPACA.

22          And so those were private party litigation, as

23  opposed to litigation where the Government is a party,

24  meaning that it's the widow, who is the plaintiff, suing, you

25  know, the company defendant, and trying to get redress for a

1    wrongful death.  It's a tort claim.  It's not a case where

2    the plaintiff is a relator, who's a statutorily designated

3    agent of a government.

4            And so the District Court referred to the

5    requirements under the new statute as a requirement that the

6    Government be a party to the litigation, as a shorthand way

7    of distinguishing cases where, you know, you've got a tort

8    claim between a private citizen and another private citizen,

9    and nobody is an agent of the Government.  So there is no

10   analysis of the District Court in the briefs or in the Third

11   Circuit about whether an agent of the Government is somehow

12   excluded from the plain language of this amended statute.  So

13   --

14           THE COURT:  It almost seems like they use -- the

15   public disclosure has been interpreted as public disclosure,

16   such that the Government is aware of this conduct, as much as

17   that the public is aware of this conduct.

18           MS. MAYER:  I think it is -- it's not a -- there

19   isn't an obligation, when you're evaluating whether something

20   qualifies as a public disclosure, to determine that the

21   Government was aware of it --

22           THE COURT:  But they were --

23           MS. MAYER:  -- in addition --

24           THE COURT:  -- a party to --

25           MS. MAYER:  -- to evaluating.

1    THE COURT:  -- the suit.

2    MS. MAYER:  And the reason why I just mention that,

3    for clarity's sake and to be candid with the Court, is the

4    news media, you know, bucket, there are documents that

5    qualify as news media that no one would suggest that DOJ

6    lawyer would notice in passing.

7    And the Moore case is a great example because one

8    of the news media reports was from the Vashon Beachcomber,

9    and just because I'm a nerd on this stuff, I had to look up

10   what that was.  And it's a local newspaper for an island in

11   Puget Sound.  It's -- you know, it would be like the

12   functional equivalent of some sort of local hometown weekly

13   from, you know, a small town around Easton.

14   THE COURT:  Right.

15   MS. MAYER:  We have something equivalent in the

16   town I live in, in Massachusetts, where the feature articles

17   are -- sometimes have a lacrosse team bid, and you know, the

18   pictures of the six-year-olds, you know, donating to the --

19   THE COURT:  Right.

20   MS. MAYER:  -- local animal shelter.  This is not a

21   big circulation paper, but it's news media, even though the

22   Government doesn't know about.

23   Here, I think, in particular, there's no need to

24   take an unduly limiting -- well, aside from the fact that

25   Third Circuit, under Moore, simply didn't hold that agent is

1    excluded from the statute here, and nor could they because

2    it's the plain language of the statute.  It would make no

3    sense because -- especially for purposes of False Claims Act

4    complaints.  Although the Government may eventually decline

5    to intervene, when the relator brings the action, in the

6    first instance, they all start the same way, which is by

7    filing -- which is by providing the Government all your

8    information that you want to rely on in the case, and then

9    filing the complaint under seal, and serving it on the

10   Government.

11           So, literally, by statutory definition, every

12   single False Claims Act complaint is not just something the

13   Government might happen on, if they're paying attention to

14   the news in Puget Sound.  But it is a piece of litigation

15   that is served on the Government, and that then triggers, on

16   the part of the Government, some obligations to review the

17   information, to investigate it, to advise the Court within 60

18   days whether it was going to intervene, or seek an extension

19   of that time.

20           And so, for purposes -- to the extent that, I

21   think, Congress -- again, and I don't want to overemphasize

22   the importance of legislative history here, especially where

23   there really isn't any of these particular changes to the

24   False Claims Act.  But as a general directional matter, the

25   balance that we try to strike, and that Congress has tried to

1    strike over the years with the public disclosure bar, again,

2    just directionally, is to allow suits to proceed, where the

3    relator is bringing new information that could really be

4    materially helpful to the Government in rooting out fraud.

5    Those should be allowed to proceed, even if the Government

6    doesn't intervene and take over the case, but that there's

7    got to be some recognition that you can't just keep, you

8    know, pinging the Government *ad infinitum* on the same theory,

9    over and over again.

10              At some point, if you're not bringing anything new

11   to the table, whether you're parasitic or not, even if it's

12   all your own information, if you're really not bringing

13   anything new to the table, and they've already looked at it

14   before, and they've been to this dance --

15              THE COURT:  But I thought --

16              MS. MAYER:  -- if they don't intervene, it can have

17   --

18              THE COURT:  I thought the theories in this case

19   were somewhat novel.

20              MS. MAYER:  So --

21              THE COURT:  And that kind of goes against this

22   whole idea that there might be a public disclosure bar.

23              MS. MAYER:  They're novel in the case law, they're

24   novel -- it's not -- and I -- I mean, I'm happy to represent

25   to the Court I was not aware of the prior-filed *qui tams* when

1          we were litigating the motion to dismiss.  It doesn't change

2          the fact that, under the case law, you do not see cases

3          litigating these issues.

4                    And I think, critically, what you also don't see

5          is, after five complaints, the Department of Justice stepping

6          in and asserting that it believes that this conduct violates

7          the law.  Now you can't -- I mean, they can decline to

8          intervene for any reason at all, and so I don't want to

9          suggest that that's a reason to infer that, under the law,

10         that there's any legal consequence to that.  But what it goes

11         to is that, as a practical matter, these issues have never

12         been teed up to a court to resolve, as to whether this is an

13         anti-kickback statute, and for what --

14                    THE COURT:  Could that be for the very reasons set

15         forth in your motion to dismiss, originally?

16                    MS. MAYER:  That these are not remuneration under

17         the anti-kickback statute?  Yes, absolutely.  I -- you know,

18         again, I don't -- at this stage, on this record, I can't make

19         representations about what was or wasn't in the mind of the

20         lawyers at the Department of Justice, when they investigated

21         claims coming out of this prior-filed complaints, and

22         ultimately chose to pursue some claims in a couple of the

23         complaints, but none of the claims that overlap with Ms.

24         Forney's allegations.  And I don't think the Court can base a

25         decision, based on the Department of Justice's decision not

1    to act.  But yeah, I think, you know, certainly, should the

2    case proceed, that's all relevant information to any

3    potential sort of merits resolution of the issues.

4         Here, what's critical under the False Claims Act,

5    for purposes of evaluating whether these prior-filed civil

6    *qui tam* complaints can qualify as public disclosures is that,

7    in the first instance, <u>Moore</u>, because it is the Third

8    Circuit, certainly has not held that, for purposes of

9    (b)(4)(A)(i) that disclosures are limited to disclosures in a

10   hearing in which the Government, to the exclusion of its

11   agent, is a party.  So agent is in the mix.

12        The next question is:  Well, is the relator an

13   agent of the Government, for purposes of the False Claims

14   Act?  And the answer there is in the <u>Vermont Agency of</u>

15   <u>Natural Resources v. Stevens</u> case that we cited.  It's the

16   Supreme Court.

17        In that case, which was addressing the article --

18   the question of whether relators have Article III standing,

19   and it resolved it.  So you don't actually see this case

20   cited a whole lot.  There was a little flurry afterwards, but

21   then it kind of died out because, at some levels, some issues

22   get decided, and then you go forward.

23        In this case, the -- there are two main legal

24   issues, and it's the first one addressing standing that I

25   want to point the Court to, and we have the cites in our

1    brief.  But here -- this is at -- and I'm trying to get that

2    other case out here.

3              But here, Justice Scalia, writing for the majority,

4    you know, starts talking about what might provide a basis for

5    Article 3 standing here.  And he recognizes that Stevens, the

6    relator here, contends he's suing to remedy an injury, in

7    fact, suffered by the United States.  So the first step is

8    the injury, in fact, at issue in these cases is an injury

9    suffered by the United States.  And so Scalia says:

10              "It would perhaps suffice to say that the relator

11              here is simply the statutorily designated agent of

12              the United States, in whose name, as the statute

13              provides, the suit is brought, and that the

14              relator's bounty is simply the fee he receives out

15              of the United States' recovery for filing and/or

16              prosecuting a successful action on behalf of the

17              Government."

18              So the first step is to say, you know, well, under

19    the statute, he's a statutorily designated agent, and so many

20    that's enough here.  The Court then, of course, famously

21    says:

22              "But that doesn't fully explain the personal

23              interest that the relator has in the bounty."

24              And so that what we have here -- and I'll go

25    through the different pieces because this is a nuance in the

1    case that sometimes gets lost when it's summarized in the

2    lower courts later on, and they focus on the rationale for

3    standing over the bounty, is that, for the piece where the

4    Government retains an interest, Scalia has said -- and this

5    never changes through the opinion -- this is representational

6    standing, and the Government remains the real party-in-

7    interest to the case.  This is a concept that's familiar in

8    the law, and not unique to the False Claims Act.  The

9    Government can statutorily designate a relator their agent

10   for purposes of pursuing their own interest in a case.

11       The Court then explains why that's not enough by

12   pointing to the fact that the statute provides that a person

13   may bring a civil action, both for the person and for the

14   United States Government.  So there's a sense in which the

15   individual is being given some sort of interest in the case;

16   and then goes on to talk about why -- what aspects of the

17   statute support that, and then says:

18           "For the portion of the recovery retained by the

19           relator, therefore, some explanation of standing

20           other than agency for the Government must be

21           identified."

22       So then this sets up the analysis that ultimately

23   results in the Court concluding that, for the portion of the

24   recovery that is the relator's bounty, the right way to think

25   about standing is that it is a partial assignment of the

1    Government's right to recovery.  And so that gives the

2    relator an interest, even though the injury, in fact, is

3    still with the Government, over the bounty.  But it doesn't

4    change the fact that the Court has carved out, at the outset,

5    for the rest of it, the basis for standing as agency.  So the

6    relator is the agent of the Government.

7           And then the Court goes through its analysis,

8    including, because it's Justice Scalia, not just that

9    analytic analysis under the law, but also a detailed

10   historical analysis of the history of *qui tam* suits, and

11   ultimately concludes that, when combined with the theoretical

12   justification that we just discussed, that -- finds that the

13   standing is based on agency and this partial assignment of

14   right, with the historical discussion that leaves no doubt

15   that a relator, under the SAC, has Article 3 standing.

16          And so this case -- again, and I think it's just

17   the Court confirming what's in the plain language of the

18   statute, so I don't think this is anything that's overly

19   dramatic.  Whether the relator is an agent hasn't been

20   something that's really been, you know, super important since

21   then; it's just there.  There's been more focus on the

22   partial assignment of right part, which covers the bounty,

23   but there it is.

24          So, again, we believe that, when you've got a

25   Supreme Court, in the context of making a decision about the

1    standing of the relator to bring the cases, you know, it has

2    a thoughtful analysis; points out that, under the statute,

3    this is a statutory grant of agency, which covers some, but

4    not the entirety of the relator's -- of the case; and then

5    goes through an analysis for the portion of the case that's

6    covered by the relator's bounty, and finds the partial

7    assignment of right rationale, that it is beyond clear that,

8    for purposes of the public disclosure bar, in a non-

9    intervened case, where we're relying on the relator as a

10   party -- and I'll get to that in a moment -- or really, in

11   any case, the relator is -- qualifies, and these complaints

12   qualify as being disclosures in federal or civil hearings, to

13   which the Government or its agent is a party.

14          The next work that I wanted to talk about, or the

15   next piece to this that I want to talk about is:  Is the

16   Government a party to the two complaints to which it

17   intervened?  There, the relator argued that, because the

18   Government characterized in its -- so those are two cases

19   where the Government, it's undisputed, did intervene to

20   settle the case, and so they joined the case.  The

21   Government, in joining the case, styled its intervention in

22   its own filing.  And this is, you know, not something that

23   the Court -- that was litigated, the propriety of which, but

24   they styled -- chose to style their filing as an

25   intervention, in part, and a declination, in part, signaling

1    that they -- because what the Government is doing here is

2    settling and releasing, with prejudice, certain claims.

3             But the Government takes the position that, if it

4    is not, itself, settling other claims that have been brought

5    in the complaint, the dismissal of that case should be with

6    prejudice as to the relator, but without prejudice as to

7    somebody else, in the future, potentially bringing those

8    claims on the part of the Government.

9             It is not an issue at stake in this case, but

10   occasionally, there are disputes about whether the Government

11   can do that, and if so -- you know, to the extent it would

12   violate normal *res judicata* principles and all that.  None of

13   that matters here.

14            What matters here is, when the Government does

15   that, Ms. Forney is arguing that the Government becomes a

16   party only to certain claims in the case, but not to the

17   others; and that, since the Government, undisputedly, did not

18   settle allegations in the Schroeder and Onwezen complaints,

19   that overlap with Ms. Forney's allegations, the Government

20   did ever become a party in the sense relevant for application

21   of the public disclosure bar to the Onwezen and Schroeder

22   cases.

23            That interpretation of what is going on, I think,

24   is foreclosed by the statute.  And we have pointed the Court

25   to a recent District of Massachusetts case that just kind of

26

1    collects the analysis.

2              I also think it's worth pointing out that Ms.

3    Forney has not pointed to any case law supporting her

4    interpretation of the statute to allow the Government to

5    intervene in a claim only, and not be a party to the whole

6    action.  And so let me explain why I think this argument that

7    has been made doesn't -- her argument doesn't work.

8              First of all, if you start with the language of the

9    statute, in 3730(b)(2), it says that:

10             "The Government may elect to intervene and proceed

11             with the action within 60 days after it receives

12             both the complaint and the material evidence and

13             information."

14             So, when it talks in the statute about the

15   Government intervening, it doesn't say, when the Government

16   may elect to intervene and proceed with claims; is says the

17   action.  And it repeats this formulation in 3730(b)(4), where

18   it says:

19             "Before the expiration of the sixty-day period, the

20             Government shall proceed with the action, in which

21             case the action shall be conducted by the

22             Government."

23             So the statute contemplates intervention as an act

24   that brings the Government into the case.  I think it's a

25   separate question whether you intervene in the case, can you

27

1    settle some claims, what's the effect of that.  I think the

2    point here is the Government can't, just by titling and

3    styling what it's doing, in a way that's not contemplated by

4    the statute, you know, avoid the statute.  And again, the

5    Government -- I have no issue with whether the Government

6    intervened in part or didn't intervene in part in those

7    particular cases, other than to say that, under the statute,

8    they became a party to the action when they did that for

9    purposes, certainly, of the public disclosure bar.

10            The other sort of piece of this that I want to

11   mention is to sort of just take a step back.  This is also

12   not something that's unusual or unique to the False Claims

13   Act.  If you think about a piece of civil litigation,

14   sometimes a plaintiff sues six defendants and has five

15   claims, and three of the claims are against two defendants,

16   and three of the claims are against all of the defendants.

17   Okay?  So the defendants aren't necessarily in all of the

18   claims, but Rule 4 still applies.  Then every defendant,

19   whether they're in some or all of the claims, gets served

20   with the complaint, asked to respond.  They are a full party

21   to the action, even if they are only a party to certain

22   individual claims.  So these are not mutually exclusive

23   concepts, for purposes of how the civil rules characterize

24   the parties.

25            To the extent there's a conflict between the civil

1    rules and the False Claims Act, of course, the statute that

2    provides for specific procedures would control, but there is

3    no conflict here.  So the Government, when it intervened,

4    notwithstanding the way it styled its intervention, became a

5    party to those actions.  And therefore, those are also both

6    actions where, not only is the relator an agent of the

7    Government, but the Government is a party to the action.  And

8    as we've discussed, <u>Moore</u> didn't change anything there.

9         So, then the last question that I think was raised

10   about whether these complaints meet the statutory definition

11   for potentially being a public disclosure is whether a

12   complaint that's not intervened and that comes out from under

13   seal, and is subsequently dismissed, is properly considered a

14   complaint in a civil hearing.  And so, on this argument --

15   and I don't think, you know, even Ms. Burke pushes it

16   particularly hard in her brief, and appropriately so.  You

17   know, she acknowledges the Third Circuit precedent,

18   addressing the scope of what constitutes a hearing.  It's a

19   very deliberately broad definition, and has been held to

20   include anything on a public litigation docket, without

21   reservation.

22        It is certainly true that the specific context of

23   whether an unsealed, non-intervened *qui tam* complaint that is

24   dismissed, that specific factual context is not encompassed

25   by these cases.  But I think the mere fact that we're looking

29

1    at three cases from the 1990s shows you how subtle the law is

2    on this.   It's just never something that's had to be

3    litigated.

4            And in fact, these cases are holding things like

5    discovery in a civil hearing, in a civil litigation that's

6    not subject to a protective order, so this isn't even

7    something on a public docket, is still a public disclosure

8    because it's something that's not barred from discovery from

9    the Court, and so it's something that's potentially

10   accessible.   So the concept of what constitutes a disclosure

11   within a hearing is very broad.

12           The view is very much -- and this is the rationale,

13   one of the analogies, either in Stinson or in one of the

14   other two cases that the Court points to, in saying, look,

15   you know, even though arguments were made that this should be

16   more limited to a full evidentiary hearing or something more

17   cramped than just being on a -- being open and public on a

18   public docket, the Court says, you know, it just doesn't make

19   any sense to limit it that way, there's nothing in the

20   legislative history or concept of the statute to support that

21   after all.   If you can go to a public library and pull up

22   some random news article, and that can count as a public

23   disclosure, but we're now going to hold that you can't go to

24   a court and pull up a complaint on a public docket, and say

25   that, somehow, that is barred from serving as a public

1    disclosure, it doesn't make any sense, and the statute

2    doesn't require it.

3              And so the rationale behind, I think, these

4    decisions of open and broad interpretation of what a

5    "hearing" means here, and what the statute is trying to

6    achieve, is they support, you know, declining to go down the

7    road that Ms. Burke would like you to go down.

8              I'd also like to point out that she doesn't --

9              THE COURT:  I'm -- let me interrupt just for a

10   moment there.  So you are suggesting that, if a complaint was

11   filed and a motion to dismiss is filed, and a motion to

12   dismiss is granted, that that still would qualify as a

13   hearing for purposes of public disclosure?

14             MS. MAYER:  Oh, yeah, absolutely.  It's just -- if

15   a complaint comes out a public docket, just the law is, in

16   the Third Circuit, if a complaint is on a public docket, it's

17   a disclosure.  And if it's in a litigation, it's a hearing.

18   And the reason why is, under the public disclosure bar,

19   there's -- we're -- this isn't a *res judicata* argument or

20   analogy.  What it's saying is that, if there's information

21   out in certain enumerated places in the public, then, if the

22   Government declines to intervene in the case, the relator can

23   only proceed with her action if the relator, in advance of

24   filing her action, disclosed information to the Government

25   that materially adds to those public disclosures, that she's

1    an independent -- that she acquired independent of the public

2    disclosures.

3              And so it's not trying to say -- so it doesn't

4    matter if those cases are ever served or dismissed or

5    litigated beyond litigation that happens while it's under

6    seal, of course.  They're public filings on a public docket,

7    and that constitutes a hearing.  And that's where the Third

8    Circuit drew the bar on what's a hearing.

9              THE COURT:  Okay.

10             MS. MAYER:  Okay.  And I don't want to

11   overemphasize this.  But to the extent there's some sense

12   that -- you know, and I felt Ms. Burke was sort of pushing in

13   this direction, that -- in her brief, that, because these

14   cases come out from under seal, and sometimes they are

15   dismissed within a short period of time afterwards, that

16   that's such a short period of time while they're live, and

17   they may not be served, that that should somehow disqualify

18   them.

19             I do want to point out that, under the False Claims

20   Act, every single one of those complaints was filed quite a

21   long time beforehand.  It could be six months, it could be a

22   year, it could be a couple of years beforehand.  Those

23   original complaints were served -- by statute, required to be

24   served on the United States.

25             During the seal period, the United States is not

1    inactive.  It's not as though Docket Entry Number 1 is the

2    complaint, and Docket Entry Number 2 is an order unsealing

3    it.  Typically, in these cases -- and again, the docket is

4    still sealed in your cases, sometimes they're out from under

5    seal, and I can see it -- the Government seeks extensions,

6    from time to time, of the seal.  They will file a motion,

7    they will file a memorandum in support of the motion, and the

8    Court will consider this and rule.  Occasionally, there are

9    other sort of court business that takes place during this

10   period.  This is litigation, albeit *ex parte*, and of a very

11   special kind.

12           But again, nothing momentous comes from that, other

13   than just to say that, you know, the case coming out from

14   under seal is a midstream event.  And if it's dismissed

15   shortly thereafter, that's fine.  But it's not as though this

16   was -- and it shouldn't matter anyway that this was a two-day

17   case.  This was a case that's been in the court process as a

18   litigation matter for, sometimes, a very significant period

19   of time.  And it hasn't been completely ignored during that

20   time by the United States, by the relevant government

21   parties.

22           So, again -- and critically, this definition of a

23   "hearing" that recognizes that, as long it's a complaint on a

24   public docket, it qualifies as a hearing -- as a disclosure

25   and a hearing, as long as it's federal government or agent,

1    this has been settled law in the Third Circuit since the --

2    you know, for decades.  The amendment to the public

3    disclosure bar didn't alter the language of hearing, which

4    indicates, as a matter of statutory interpretation, that the

5    Court -- that Congress was not interested in changing the

6    settled meaning of that term.

7            And so, again, just sort of taking all of this

8    together, there's just no reason to think that -- to

9    interpret "hearing" in some new and novel way, and I think

10   the Third Circuit precedent would preclude it.  And

11   furthermore, Ms. Burke hasn't provided in her brief any

12   principled basis, other than the argument that these appear

13   to be unimportant pieces of litigation, or litigation pieces

14   that didn't go very far.  She's really not pointing to

15   anything that would support that being relevant or

16   appropriate to point to, to, you know, run against otherwise

17   controlling Third Circuit precedent.

18           THE COURT:  So then there would still be the

19   question of whether these were overlapping cases, correct?

20           MS. MAYER:  Yes.  And that's the --

21           THE COURT:  And then --

22           MS. MAYER:  -- next piece.

23           THE COURT:  -- also, the question of whether the

24   plaintiff has provided new and original information beyond

25   what was --

34

```
 1              MS. MAYER:  Correct.

 2              THE COURT:  -- in those cases.

 3              MS. MAYER:  Exactly right.  So what we've just

 4     done, maybe in more detail than Your Honor hoped to do this

 5     morning --

 6              THE COURT:  No, no.

 7              MS. MAYER:  -- but I think --

 8              THE COURT:  Because I --

 9              MS. MAYER:  -- it's important --

10              THE COURT:  I believe jurisdictional rules should

11     be bright-line rules; and yet, they oftentimes seem to get

12     very not-so-bright-line, and this seems to be a perfect

13     example.

14              MS. MAYER:  I think so.  And do want to, for a

15     point of clarification, clear up one thing.  It is -- the

16     pre-PPACA bar was clearly jurisdictional; the language was in

17     the statute.  There is debate among the Circuit Courts right

18     now about whether the post-PPACA bar is still jurisdictional

19     There are some circuits that have sort of weighed in and

20     found that it is not, and the Third is one of those in Moore.

21              So, for the post-PPACA piece that is left, it is

22     not a -- it has been held not to be a jurisdictional bar.  It

23     is a basis for dismissal of the case.  It is still a

24     statutory prerequisite to suit that --

25              THE COURT:  Right.
```

1      MS. MAYER:  -- that you -- if there is public

2  disclosure, that you are barred, unless you can show you're

3  an original source.  But I don't want the Court to, you know,

4  miss -- to --

5      THE COURT:  Now how does Article III standing fit

6  in with that?

7      MS. MAYER:  I think they are separate questions.  I

8  think the Article III standard issue has been resolved by

9  <u>Stevens</u>, to say that relators, as a general class, can pursue

10  these claims under Article III.  I thin the operation of the

11  public disclosure bar, from a jurisdictional perspective, the

12  old on, was that the statute said a Court shall not have

13  jurisdiction.  So it's a statutory denial of jurisdiction, so

14  it's based on a statute.

15      And likewise, it's now a statutory, not

16  jurisdictional, but still a bar to suit if there is a

17  qualifying public disclosure that raises substantially the

18  same allegations.  If you're not an original source, which is

19  the exception that's been recognized, that's at issue here

20  today, the case is barred, you cannot proceed, it must be

21  dismissed.

22      THE COURT:  Okay.

23      MS. MAYER:  Okay.  So -- but I -- but -- so it's --

24  so -- there we go on that.  So, in terms of turning to the

25  question of whether a relator's allegations are substantially

1    the same, unless Your Honor has any additional questions

2    about that first piece, about the statutory category.

3              THE COURT:  No.

4              MS. MAYER:  Okay.

5              THE COURT:  Thanks.

6              MS. MAYER:  In terms of whether a relator's

7    allegations are substantially the same as the prior public

8    disclosures, we're going to address it under two theories,

9    and we'll talk about the law.

10             The first thing that I do want to say here is we

11   came forward with really specific evidence in our brief.  So,

12   first of all, the relevant comparison is you look at the

13   public disclosures as a whole, all of them.  It doesn't go

14   with sort of a -- they don't each have to quality -- each of

15   them doesn't have to raise substantially the same

16   allegations, just in total, they turn into a bucket of facts

17   and theories and fraud allegations.

18             So, looking at that whole bucket collectively, you

19   then compare it against the theories that are alleged in her

20   complaint.  So, at this level, this piece of the analysis,

21   you're comparing public disclosure to the complaint, so not

22   depositions, not documents provided to the Government or

23   anything like that, you're just looking at the complaint.

24             We, in our opening brief, went through, in some

25   detail, where we see the -- I'm going to start with the

1    device check theory, the device check theory completely

2    alleged, collectively, through these complaints that we

3    pointed to.  And so, from a factual summary judgment matter,

4    we have kind of made our factual -- assuming, for the moment,

5    for argument, and I hope conclusively, that the Court agrees

6    that these complaints qualify as public disclosures under the

7    statute, the type of document that can be a public

8    disclosure.

9        And you turn to the substantial similarity

10   analysis.  We laid out, in detail, how the complaints allege

11   the device check theory.  And the key there is it doesn't

12   have to match every single detail that's alleged.  For

13   example, you know, in her complaint, Ms. Forney alleged

14   certain patients in the eastern -- in Eastern Pennsylvania

15   received free device checks from Medtronic representatives as

16   a kickback to their doctor, and that their doctor submitted

17   Medicare claims as a result.

18       Those specific patients, and Pennsylvania

19   generally, in terms of specific examples, is not in the

20   public disclosures.  It doesn't matter.  What matters is the

21   theory has been completely alleged, so that the Government is

22   on notice that there are whistle-blowers out there in this

23   case.  There's publicly disclosed information that has all of

24   the relevant -- sort of substantially the same relevant

25   allegations of fraud.

1          Medtronic, as a business matter, is providing free

2     device checks, routinely, across the country, to its

3     customers.  It's doing this, in order to induce them to

4     purchase Medtronic devices.  This violates the anti-kickback

5     statute; the actual fraud is alleged.  You know, here are

6     examples of where that is happening.  Under the law, under

7     Moore and Winkelman, we've cited cases for Your Honor to look

8     at.  If you look at what -- the analysis of what constitutes

9     "substantial similarity," that's enough.

10          In the opposition brief, this was where relator, if

11    she thought there was particular allegations in her complaint

12    that were -- that characterized her theory, and that weren't

13    previewed by -- and weren't substantially the same as what

14    had been publicly disclosed, this was sort of her chance to

15    point us to those things.  And she says, in sort of passing,

16    she believes that there are meaningful differences, but she

17    doesn't point to anything.  And so we take -- you know, given

18    that it was -- you know, having made our showing, and we

19    believe it was her burden now to specific -- point to

20    specific evidence that would dispute it, we don't believe she

21    did that, and so we believe that is largely conceded.  She

22    may disagree.

23          But I do want to emphasize for the Court that her

24    opposition brief was where, if this issue needed to be

25    joined, and if she believed that there were specific elements

1    of her device check theory that were materially different

2    from the public disclosures that we have asserted, she needed

3    to put that in her opposition brief, and she didn't do it.

4         What she did do is that she argued that, in

5    particular, the Stokes complaint -- which we've pointed to,

6    and I've talked a little bit about -- should not be

7    considered as a public disclosure relating to the device

8    check theory because the legal theory in Stokes was different

9    than the legal theory she's pursuing in her complaint.  And

10   my response to that is really that I think it's just getting

11   the law wrong.

12        And again, we go back to the law and the statute

13   and as it's articulated in Moore.  The public disclosure bar

14   doesn't require that the public disclosure allege the same

15   legal theory, in order for the disclosure -- to bar it.  If

16   that were the case, then things like reports and news media

17   would never qualify as a public disclosure, frankly, because

18   they often don't assert a legal theory.  What they do is they

19   allege facts.

20        So, for example, you can have a bunch of facts

21   showing that -- Moore is a great example of this -- showing

22   that fishing vessels are not owned by Americans.  And then

23   you can have a different set of facts, and a different public

24   disclosure, or even in the same public disclosure, that says,

25   fishing vessels -- those same fishing vessels certify that

1    they were owned by Americans in a different place.

2          If you put the two together, those two public

3    disclosures together, what Moore says, what the statute says,

4    what everything says, is that those two transactions, X plus

5    Y, if they show a true state of affairs and a false state of

6    affairs, you can put them together and infer fraud from them,

7    and that that's sufficient, right?  So you don't need to

8    actually -- for something to qualify as a public disclosure,

9    it doesn't have to, itself, articulate a legal theory that is

10   the same legal theory that's articulated in the relator's

11   complaint because, otherwise, again, there would be no public

12   disclosures, based on a lot of news media sources and things

13   like that.

14         So, what Stokes does is, as I started to preview,

15   Stokes is a complaint where the relator's theory of liability

16   was that Medtronic was using its field sales representatives,

17   who were programming devices and doing checks, to program

18   these devices to expire early, so that the device -- the

19   patient would have to come back in sooner than they otherwise

20   would, in order to get a surgery, so they'd need more devices

21   and generate more revenue, which is horrible.

22         The -- but the key is, essential to this theory --

23   which is not a legal theory Ms. Forney is pursuing.  What is

24   essential to this theory is that the Medtronic field people

25   were out there, interacting with the patients, doing the

1    checks, doing the programming because, if the doctors were

2    doing it, there would be no theory, right?  It's only if

3    Medtronic is doing the device checks and doing the

4    programming after implantation and the followup that you even

5    have the ability to implement this theory.

6         THE COURT:  Well, wouldn't there be a theory

7    against the doctors?  If the doctors were doing the exact

8    same thing that Medtronic was alleged to have been doing,

9    wouldn't that have been generating false claims against the

10   United States?  Like I don't -- but trying to --

11        MS. MAYER:  It might have.

12        THE COURT:  Trying to tie <u>Stokes</u> with the facts of

13   this case --

14        MS. MAYER:  Uh-huh.

15        THE COURT:  -- is a little harder, when you try to

16   distinguish it between facts and legal theory.  Obviously,

17   the legal theory here is not at all the same.

18        MS. MAYER:  Correct.

19        THE COURT:  And -- but it happens to have, as facts

20   in it, the only way they're able to do this is because

21   they're giving these post-implant services.

22        MS. MAYER:  Well, I think -- so, as a hypothetical,

23   you can certainly have a case where you plead -- your

24   defendants are doctors, and you plead that you work for a

25   manufacturer, and you have seen the doctors reprogramming

1    these devices to cause earlier explants because, somehow

2    that, you know, enriches them and causes false claims.

3    That's not the case that Stokes pled, though.

4         Here, what Stokes pled -- and I mean, I'll point

5    you to a few specific paragraphs, so we can go over them --

6    pled that it was Medtronic and other device manufacturers,

7    who manufactured these types of devices, who were using their

8    people to do this and to effectuate the scheme, and that it

9    was done to enrich the manufacturers, who would directly

10   benefit by having these explants happen sooner because it --

11        THE COURT:  And it would provide these services for

12   free, arguably for the doctors.

13        MS. MAYER:  Yes.  And so, for example, we have --

14   sorry, I've just got to find the Stokes complaint.

15        THE COURT:  Because I'm a little curious.  What if

16   you took Stokes out of your bucket, and you just had Burns

17   and Onwezen and Schroeder, et cetera?  If you didn't have

18   Stokes in your bucket, do you still have a public disclosure?

19        MS. MAYER:  Yeah, we do.  I mean, it adds to it.  I

20   think it adds relevant detail because Stokes has all those

21   wonderful allegations, based on the MedPAR data, about the

22   different regions, where hospitals were performing a really

23   high level of explants.  And what that gives you a further

24   example of is regions and hospitals where you've got reps

25   operating to do all these free device checks and

1    reprogrammings, to effectuate that scheme.  I mean, so it

2    just adds more color and detail to what's going on, and puts

3    the Government on notice of it.  But no, we don't think that

4    we need it.  We don't think that, without it, we lack fully

5    qualifying public disclosure that alleges substantially the

6    same allegations, and that material information that she, you

7    know, theoretically or potentially, might add would qualify

8    her as an original source.

9        But I think it's important that these allegations

10   in Stokes, even if they're not the focus of the case, they

11   are facts that do corroborate, and that do provide additional

12   detail.  I think, in and of themselves, they're not as

13   clearly identical to or substantially the same as her theory

14   as the stuff in Onwezen and Burns, in particular, for

15   example; or, on the consulting theory, Schroeder.

16       THE COURT:  Well, this -- the Stokes theory is -- I

17   would think even the plaintiff would concede, is a much more

18   powerful theory of Government fraud, the idea that you would

19   deliberately try to make a device not last as long as it

20   should last, just so you have to create more devices and

21   generate more money for the manufacturer, paid for by the

22   Government.  That's a powerful argument, certainly more so

23   than the argument that you are providing these free services,

24   and that's a kickback, and therefore, it's a violation of the

25   anti-kickback statute; and, thus, the -- what's being

1    submitted to the Government, where you certify you're not

2    violating the anti-kickback statute, is not accurate.

3            MS. MAYER:  And just for the record, the case was

4    not intervened, and it was dismissed.  It didn't -- there was

5    no settlement where Medtronic admitted any -- I mean, it was

6    not substantiated.  This is a complaint, of course --

7            THE COURT:  Right.

8            MS. MAYER:  -- disclosing allegations, and not a

9    finding, so -- but the allegations of the fraud.  We believe

10   the facts in here line up with and do -- and can be added to

11   the bucket of the collective disclosure, for purposes of

12   evaluating what the public disclosure was in this case, and

13   whether it's substantially the same.

14           The other complaint that -- and again, just to sort

15   of focus the Court for a second on what I mean by -- well, I

16   think we've covered Stokes.  So, when it comes to -- the

17   second complaint that the relator takes issue with is the

18   Schroeder complaint.  And -- and again, so just to wrap up

19   the device check theory.

20           So we really have -- I mean, you know, Burns'

21   entire complaint is that free device checks were performed in

22   order to enrich doctors; that reps, you know, got doctors --

23   the doctors were billing for services Medtronic performed,

24   that this is a kickback, here's a list of doctors who did it,

25   here's claim -- here's superbills and claim forms for it.

1    Like it -- this is the case -- this is the device check

2    theory in another case that was completely publicly

3    disclosed.

4            THE COURT:  Is the theory that the doctors -- I

5    understood the theory originally to be that the doctors were

6    getting kickbacks --

7            MS. MAYER:  Uh-huh.

8            THE COURT:  -- that, instead of using their own

9    people, Medtronic provided free people --

10           MS. MAYER:  Yep.

11           THE COURT:  -- for these device checks.  But I

12   didn't believe the theory was that the doctors then submitted

13   a bill for that to the Government.

14           MS. MAYER:  That's correct.  The submission of the

15   bill to the Government piece of it --

16           THE COURT:  Had the --

17           MS. MAYER:  -- was not --

18           THE COURT:  -- anti-kickback --

19           MS. MAYER:  -- is not in --

20           THE COURT:  -- provision --

21           MS. MAYER:  -- Forney's complaint, yeah.

22           THE COURT:  Right.  So I was never under the

23   impression that this complaint had anything to do with

24   doctors then -- okay.  Suppose a device check is -- costs

25   $100, Medtronic does it for free.  The doctor puts it into

1    his bill and sends it up to Medicare.

2              MS. MAYER:  Right.  Yeah.

3              THE COURT:  I don't think that's this theory,

4    right?  The theory is just that, in submitting the bill, you

5    have to certify you're not violating the anti-kickback

6    provision or statute.  You -- this is a kickback -- which,

7    obviously, you disagree with -- and therefore, you are --

8    that certification is untrue, so it's a false claim to the

9    United States.

10             MS. MAYER:  I a hundred percent agree that the

11   theory pled in Ms. Forney's complaint and the theory -- her

12   theory had nothing to do with doctors billing for services

13   Medtronic provided.  That was not alleged.  Her theory was --

14   the first peak switches [sic] -- that, simply by providing

15   the service, you're replacing someone at the medical

16   practice, and therefore, saving the doctor that money, and

17   that's a kickback.  And then, if claims result from that,

18   those claims are false under the 2010 amended version of the

19   anti-kickback statute --

20             THE COURT:  Right.

21             MS. MAYER:  -- which (indiscernible) in that way in

22   the False Claims Act.

23             THE COURT:  And so, if they're not a kickback, as a

24   matter of law, or factually, if they're not a kickback, the

25   whole case goes away.

1    MS. MAYER:  Yes.  Yeah.  The -- yes.

2    THE COURT:  As we went over with the motion to

3 dismiss.

4    MS. MAYER:  As we went over with the motion to

5 dismiss.

6    In terms of, you know, the device check theory --

7 and then you've got Onwezen, the Onwezen complaint, which

8 alleges that, you know, device checks were done day in and

9 day out, at high volume; that they were done for free; that

10 they were done to induce people to use Medtronic devices.

11 The entire theory, we've gone through it, and I can go

12 through it more detail, if it would be helpful for the Court.

13 But we lay out the relevant paragraphs in our statement of

14 facts and our brief in some detail here.

15    And again, Ms. Burke hasn't challenged that she has

16 anything in her complaint that is not substantially similar

17 on the device check point to have identified any of these

18 public disclosures, other than taking issue with the Stokes

19 complaint for the device check theory that we discussed.

20    THE COURT:  What the plaintiff does do is focuses

21 on this idea that her client did not know any of this, and

22 she's an original source of, arguably, new information.

23    MS. MAYER:  Right.  So the original source is the

24 next piece, but first, we need to get through the

25 substantially similar.  So all I want to say is, for --

1    there's sort of a -- in order to say that the public

2    disclosure bar apples to your case, you have to have a type

3    of disclosure that fits within the definition of the statute,

4    and what is disclosed needs to be substantially similar to

5    what has been alleged in the complaint, and that's an

6    assessment that has to happen under the statute.  And if it

7    does, the public disclosure bar bars the suit, full stop.

8    The next step is, if the relator believes she's an original

9    source, that's an exception that's recognized under the

10   statute, and she can come forward and argue she's an original

11   source, which, of course, she's doing that.  And we

12   absolutely need to address it.

13          And there is a piece -- so the original source --

14   there's a couple of prongs to the original source exception,

15   one of which, you know, the relator is not asserting applies

16   here, and we agree.  The one she's going under, if -- and it

17   does sound similar to the substantial similarity analysis,

18   but it's not the same.  But it also a comparison -- a

19   comparative analysis, and that is one which we're going to

20   get to.  But that's the issue of whether she is an

21   independent source of information that materially adds to the

22   public disclosure, that collective disclosure, that she

23   provided to the Government, in advance of filing the action.

24   So it's information provided to the Government, in advance of

25   filing the action, that materially adds to the public

1    disclosure, and she's an independent source of it.

2           And on the independent point, Ms. Forney, as I -- I

3    mean, so, actually, I don't want to confuse things right now.

4    We'll get -- I want to -- and I think we're almost done with

5    the substantial similarity.

6           THE COURT:  Sure.

7           MS. MAYER:  But I want to just sort of close out

8    that piece of it because that's really the piece where, you

9    know, we need to come forward with the public disclosures

10   and, you know, show that they are substantially similar to

11   those allegations in her complaint.  And then, once we finish

12   that, again, from our perspective, we can stop.  We, of

13   course, expect, and we know she has argued that, A, that

14   doesn't work, but to the extent it works, she wants to put

15   herself forward as an original source.  And so we're going to

16   talk through our views of why she doesn't qualify as an

17   original source, should -- as well.

18          So, in terms of the substantial similarity, we've

19   covered the device checks.  And again, I don't think it's

20   really contested that the public disclosure, other than, you

21   know, what we've discussed about Stokes, where I really do

22   think there is nothing in the law that says that the facts in

23   Stokes that do overlap with her case can get thrown in the

24   pot for public disclosure.  Although, obviously, there are

25   facts in Stokes and legal theory that do not overlap, and

1    then those don't come in.  And so, again, I think it would

2    improper to exclude the parts of <u>Stokes</u> that do overlap, but

3    --

4              THE COURT:  But you're satisfied --

5              MS. MAYER:  And we talk --

6              THE COURT:  -- in this collective bucket --

7              MS. MAYER:  Uh-huh.

8              THE COURT:  -- there is the Government being put on

9    notice that Medtronic is providing free services, with

10   respect to these implants, that, if they weren't providing,

11   the doctors would have to provide on their own, and thus,

12   they are providing a financial benefit to the doctors?  That

13   would qualify as a kickback?

14             MS. MAYER:  What -- but what I -- what we're

15   talking about is not what -- whether the theory -- and it

16   doesn't matter, actually, whether the theory is a legally

17   viable theory for this inquiry.  You know, in <u>Moore</u>, for

18   example, the Third Circuit goes to great pains to say, we're

19   not ruling on the 12(b)(6) issue because the defendant had

20   got the case dismissed on public disclosure bar grounds.  In

21   that case, it was litigated at the motion to dismiss stage

22   and had a separate 12(b)(6) argument that the relator's

23   theory didn't pass muster as a legal matter.

24             The analysis of whether the public disclosure

25   applies doesn't evaluate the validity of a legal theory.  It

1    just says, was it disclosed --

2              THE COURT:  But --

3              MS. MAYER:  -- and is that disclosure --

4              THE COURT:  But was --

5              MS. MAYER:  -- substantially similar.

6              THE COURT:  Was the legal theory disclosed to the

7    Government, or just the facts disclosed to the Government?

8              MS. MAYER:  Inn <u>Stokes</u>, it was facts.  In the rest

9    of the complaints, it was the theory --

10             THE COURT:  The legal theory.

11             MS. MAYER:  -- and the facts.

12             THE COURT:  So you --

13             MS. MAYER:  It was the whole --

14             THE COURT:  -- believe that --

15             MS. MAYER:  -- kit and caboodle.

16             THE COURT:  -- legal theory; that is, the same

17   legal theory being brought by the plaintiff here, was in

18   those -- in that bucket?

19             MS. MAYER:  Yeah.

20             THE COURT:  Okay.

21             MS. MAYER:  Absolutely.  The ...

22         (Pause in proceedings)

23             MS. MAYER:  You know, for example, we've got -- I

24   mean, we've got -- I would point the Court to Pages 7 through

25   the top of 9 of our opening brief for arguments that the

1  device check theory allegations are substantially the same as

2  the prior public disclosures.

3        (Court and court personnel confer)

4            THE COURT:  Counsel, do you mind if they bring new

5  chairs in while we're doing this argument?  If they make too

6  much noise, we'll take a short recess.  But apparently, if we

7  don't let them bring them in, we're going to lose them.

8            MS. MAYER:  It's fine with me.  It's up to Susan.

9            MS. BURKE:  It's fine with me, Your Honor.

10            THE COURT:  And you'll get to see the new chairs,

11  which should match the newly upholstered jury chairs, which

12  we used --

13            MS. MAYER:  Right.

14            THE COURT:  -- for the first time over the past

15  week.

16            MS. MAYER:  Right.

17            THE COURT:  Excuse that interruption, Counselor.

18            MS. MAYER:  Sure.

19            THE COURT:  You may proceed.

20            MS. MAYER:  So I'll point you to those parts of the

21  opening brief, and then we address it again in our statement

22  of facts and our reply, I think we go through it in detail.

23            I think the key is that the -- these folks, they

24  alleged devices are provided for free.  That is remuneration

25  under the anti-kickback statute, full stop.  That's the key

53

1    theory here, and that's been previewed in the complaints.

2          THE COURT:  Well, the one thing I -- all right.  I

3    look in the newspaper, and I see that Medtronic is doing

4    something they shouldn't be doing.  So I go out and I file a

5    False Claims Act claim against them because I want to make

6    money off of what I just discovered in the newspaper.  That

7    would barred by the public disclosure bar, correct?

8          MS. MAYER:  So the Government could take that

9    information and proceed on its own.  But if you -- if your

10   only source of that information was the public disclosure,

11   yes, you would be barred.

12         THE COURT:  Because, otherwise, anybody reading the

13   newspaper who learns about this can file suit.

14         MS. MAYER:  Yes.

15         THE COURT:  And you're really not providing the

16   Government with anything that's not available publicly

17   because it was in the newspaper.

18         MS. MAYER:  Yes.

19         THE COURT:  Now, with complaints, we have it a

20   little different.  If you're talking about someone who's

21   filed a complaint in Federal Court that alleges something,

22   that is public, in theory, and once it's unsealed, it's

23   public.  The information has been provided to the Government.

24   So, once one person has filed on a particular legal theory

25   and a particular set of facts, nobody else -- the public

1    disclosure bar would bar anybody else from filing, unless

2    they were an original source, adding additional facts or

3    additional information to the Government?

4              MS. MAYER:  Yeah, because the Government -- I mean,

5    the purpose of the False Claims Act is to get -- is to

6    motivate people to get information about fraud to the

7    Government promptly.

8              THE COURT:  Right.

9              MS. MAYER:  And so that person, the person who's

10   first in the door with the theory and the complaint, gets to

11   the Government.  The Government has --

12             THE COURT:  Right.

13             MS. MAYER:  -- that sort of first crack at it.

14             THE COURT:  So, if ten people file, on ten separate

15   days, it's the first in the door.

16             MS. MAYER:  Well, and there's a separate

17   jurisdictional bar called the "first-to-file rule," as well,

18   which can come into play.  But what I want to emphasize,

19   though, is, if ten people file the same theory on ten

20   successive days --

21             THE COURT:  Right.

22             MS. MAYER:  -- the second through tenth will not

23   have a -- they may have a -- they'll have a first-to-file

24   issue, maybe, but they won't have a public disclosure bar

25   issue if the statute operates the way it normally does --

1          THE COURT:  Because it --

2          MS. MAYER:  -- because that --

3          THE COURT:  -- would have --

4          MS. MAYER:  -- first complaint --

5          THE COURT:  -- been unsealed.

6          MS. MAYER:  -- is still under seal --

7          THE COURT:  Right.

8          MS. MAYER:  -- when the second and the third and

9     the fourth and the fifth are filed.  The public disclosure

10    bar comes into play when that first complaint comes out from

11    under seal and is now a public disclosure, right?  And the

12    relator -- if the relator then -- even if the relator didn't

13    see that complaint, but if another person wants to come

14    forward with the same theory and present it to the

15    Government, what the statute says -- and this is the balance

16    Congress has chosen to strike -- is to say, if your

17    information is independent of that disclosure, so you didn't

18    just read that complaint and then rush to the courthouse, you

19    can proceed, but only if you're bringing something more to

20    the Government that is independent of and materially adds to

21    the public disclosure.  Okay?

22          So the idea is they want to create some ability for

23    the Government not to have to look at the same theory over

24    and over and over and over again, and for defendants to have

25    to just defend the same conduct over and over and over again,

1    and to put a limit on how many times you can kind of bring a

2    second and successive theory.

3              THE COURT:  And so, if the Government decides not

4    to intervene in the subsequent case --

5              MS. MAYER:  Uh-huh.

6              THE COURT:  -- in our case, and your argument is

7    that the other case is the bucket, et cetera, the Government

8    decides not to intervene, Medtronic claims public disclosure

9    bar, who is to decide whether the relator has brought new and

10   additional information to the Government, if the Government

11   is not taking a position on that?

12             MS. MAYER:  Well, you will.

13             THE COURT:  I know.

14             MS. MAYER:  So the law --

15             THE COURT:  It was a --

16             MS. MAYER:  There is --

17             THE COURT:  -- rhetorical question.  But how do I

18   now that the Government hasn't gotten additional information

19   from this relator?

20             MS. MAYER:  So the key is, the question is, and the

21   statute is set up to allow -- the enable the Court to do it.

22   I think -- well, so the way the provision -- the original

23   source provision works is it's the relevant comparison, under

24   the post-PPACA bar, is that you compare the information that

25   the relator brought to the Government in advance of filing

 1    suit, and you compare it to the body of public disclosures.

 2    And so you're not comparing it to what the Government has in

 3    its head; you're comparing it to the body of public

 4    disclosures.   Does that make sense?

 5              THE COURT:  Yes.

 6              MS. MAYER:  Okay.

 7              THE COURT:  It does.

 8              MS. MAYER:  So it's something that's actually

 9    achievable, as opposed to requiring psychic powers --

10              THE COURT:  Right.

11              MS. MAYER:  -- that none of us have.

12              I think -- but -- and there, it's -- and there is

13    some guidance.  But I think it is important to note that,

14    when you are making that evaluation -- well, okay.  So let's

15    just wrap up substantially the same because this is a little

16    bit of a technical doctrine, and I want to make sure we keep

17    the buckets in the right place.

18              We've talked about device checks.  With respect to

19    the consulting theory, we pointed to allegations in the

20    various public disclosures, in detail, in our case, including

21    in the Schroeder case, that disclose substantially the same

22    theory that relator is pressing here.  And relator is --

23    again, doesn't really dispute that, except to argue that the

24    Schroeder case is only litigating two theories, not, again,

25    the theory of liability that she's asserting under these

1    consulting agreements.  So, again, she's making that same

2    argument that the legal theory has to match, and it doesn't.

3    There is no legal support for the proposition that the legal

4    theory has to match.

5         In Schroeder, Schroeder actually alleges a category

6    of kickback which is providing practice management and

7    consulting reimbursement advice as a category of kickback,

8    and has allegations about it in the complaint; and then, in

9    the counts of the complaint, alleges that, and incorporating

10   by reference all the prior pleadings, there are violations of

11   the Anti-Kickback Act.  So we actually think Schroeder does

12   plead the theory, too, and that we think that the relator

13   simply misstates -- misstated the complaint in her opposition

14   brief, when she characterized it as only asserting an off-

15   label promotion theory and a theory of kickbacks related to

16   cash for clinical trials and other things.

17        THE COURT:  So, if there are issues of material

18   fact as to what she provided to the Government that would

19   preclude summary judgment, does that mean this is a defense

20   that you raise with the jury?

21        MS. MAYER:  So I don't think there -- well, I think

22   -- so, in this case, there are no disputes of material fact

23   about what she provided to -- or let me take a step back.

24        I think there is a record here where this issue is

25   fully resolvable by the Court, without it going to a jury, in

1    this case.

2              THE COURT:  So you don't believe there are any

3    contested facts.  It's just whether the facts fall within the

4    public disclosure bar.

5              MS. MAYER:  The -- so, turning to that because

6    you're asking a specific question, I do think turning to the

7    question of an original source, I think the first thing you

8    have to look at is -- so assume we've gotten through

9    substantial similarity, and so we've shown qualifying public

10   disclosures, raising substantially similar -- and they really

11   -- they don 't have to be the same, they just have to be

12   substantially similar, under the law -- the theories, as to

13   what she's pursuing here, collectively taken as a bucket.

14             Then you move to the relator is arguing she is an

15   original source.  And she's going to qualify it by saying

16   she's -- her information, that she provided to the Government

17   in advance of filing of the case, is something that she was

18   an independent source of, it didn't come from her looking at

19   those complaints.  She has a statement in her declaration

20   that she never saw the complaints before she saw our summary

21   judgment.  We're not contesting that.  So she's independent,

22   whatever the information she provided to the Government is

23   independent.  I want to be clear on that.

24             What we're talking about now is what -- the first

25   question is:  What information did she provide to the

1    Government in advance of filing -- in advance of filing the

2    action and commencing the action?  That's what the statute

3    says we need to look at.  And so the first step here is:

4    Well, what is that?

5           And I think it's a good place to start, and it's an

6    important place to start because there is only one category

7    of information that is -- has even been proffered by relator

8    that meets that definition, and that is the stack of

9    documents that she gave to the Court and identified for us,

10   for the first time, in her opposition brief ten days ago.  So

11   that is the information that she contends she provided to the

12   Government in advance of the disclosure.

13          And I say "contends," and I mean -- I don't want to

14   pick an unnecessary fight.  But I think it is important that

15   we start with also noting that her evidence that this set of

16   documents was provided to the Government in advance of filing

17   suit is based entirely on declaration by Ms. Forney that her

18   lawyer told her that this is the set of documents, and the

19   lawyer told her that these documents were provided to the

20   Government in June of 2015, which would be in advance of

21   filing the action; and that, under the rules of evidence,

22   which do apply in this proceeding here, that is hearsay and

23   inadmissible.

24          There is no exception that my lawyer --

25   communication from a lawyer as a hearsay exception.  There is

1    a catchall hearsay permission that a Court can invoke, if

2    they believe the information is reliable enough to do it.

3    But that's something that should be rarely invoked, and it's

4    certainly not something that should be routinely invoked for

5    statements from counsel to client.

6            I also want to -- and so I believe, as a first

7    step, that the Court -- that there is no admissible evidence

8    of a disclosure of information to the Government, in advance

9    of filing suit, because the only evidence that such a

10   disclosure was made is based on hearsay declaration by --

11   hearsay statements in the declaration by the relator.

12           We, obviously, tried to deal a little bit with the

13   merits of the documents in our brief, and we're, obviously,

14   prepared to address it.  But I would be remiss if I didn't

15   point to it.  We did object to those statements in her

16   declaration in our responsive statement of facts, preserving

17   this evidentiary issue.

18           The second thing I wanted to point to is that, when

19   we're talking about the documents and what they are whether

20   they're here, I think -- and as we proceed into this part of

21   the hearing because -- you know, I'm open to what's going to

22   be most useful to the Court, in terms of how to proceed.

23   There are a couple of very unusual things about the way this

24   is being teed up for the Court in this case, that I think all

25   can be dealt with.

1          First, the relator herself does not emphasize or

2    really take any time arguing that these documents support her

3    case for being an original source.  They are mentioned only

4    on the last page of her brief, in a single sentence, where

5    she says, in conclusory fashion, that these documents contain

6    information that materially add to the public disclosures.

7          She points to the statement of facts in support of

8    that, but the statement of fact provisions that she points to

9    aren't statements of fact that identify anything in those

10   documents that she believes materially adds to the public

11   disclosures.  They're pointing to the pieces of her statement

12   of facts that go through the history of Medtronic's repeated

13   efforts to get her to disclose her communication to the

14   Government, and what documents she provided and her -- you

15   know, just sort of the history of how the record on that

16   evolved, which we can talk about in just a moment.

17         The second thing that I want to point to, so, in

18   her opposition brief, where she had every opportunity to -- I

19   mean, even put aside the hearsay issue with this evidence.

20   She had every opportunity -- these are her documents -- to go

21   through and point the Court to where in these documents there

22   are new, material details, that she believes materially add

23   to the public disclosures.  And we believe it was her

24   obligation to do that, under the Court's standing order,

25   under the local -- under civil rules.  This is what you do.

1    You don't just sort of give 900 pages to the Court and to the

2    defendant and say, as a general matter, I think there is

3    information in here that materially adds to your public

4    disclosures, you should have put me on notice of your

5    arguments in advance, which is what she says in her brief.

6    So I don't, essentially, have to do anything in response.

7         I think that, you know, independently, just in

8    terms of just failing to highlight for us, it -- you know,

9    it's going to be challenging, although we're -- we'll do it,

10   if it will be helpful to the Court, to go through these

11   documents and respond on the fly, in a meaningful and

12   effective way, to why we believe whatever she might point to

13   -- and I don't know what that is -- is something that's

14   materially new and different.

15        There are a couple of other issues here, and I just

16   -- I don't want to belabor it, but I do want to mention

17   because it's in our statement of facts, the history  here.

18   We did ask, in our request for production of documents, for

19   communications with the Government, that the relator had with

20   the Government.  We were told no.  Ms. Burke has said -- and

21   I believe her -- that she produced to us, in her productions

22   to us, the actual documents that were produced to the

23   Government.  And we certainly have had the documents and

24   others that have the Bates numbers in the set that was

25   provided to the Court.

1    What was never provided to us was the non-

2  privileged portion of any communication to the Government.

3  And by "non-privileged portion," what I mean is, if I ask, in

4  a request for production of documents, for your

5  communications with the Government, and you believe, for

6  example, that you transmitted documents with a cover letter,

7  and that the content of the cover letter is privileged, what

8  I believe the appropriate thing to do is -- because they're

9  not contending the documents are privileged -- is to produce

10  that communication, minus -- as a set, these are the

11  documents -- with an indication that a privileged letter was

12  withheld, based on privileged, and then, you know, a

13  privilege log that says, here's the date of that

14  communication; or you redact the letter, if only portions of

15  it are privileged, and you produce it.  The key is I was

16  entitled to get that, what was communicated to the

17  Government, that set of documents, as a set of documents,

18  identified as communications with the Government, because I

19  asked for it.  I was told, no, we're not going to do it, you

20  know, it's, again, privileged.

21    So then I asked an interrogatory, to identify

22  communications to -- with the Government, who had them, when

23  they occurred, and what the substance of the communications

24  were.  Again, a great opportunity to say a chunk of this is -

25  - communications with third parties, which includes the

1    Government.  I was looking for other third parties, as well.

2    Lots of objections, including privilege, including there's

3    easier ways to get the information.

4         For purposes of this disclosure of documents, it

5    would have been very easy to stand on all privileges, but

6    also say, documents with the following Bates numbers were

7    produced to the Government, you know, on September or June or

8    July or August X, whatever.  We didn't get that information.

9         We deposed Ms. Forney, and her deposition is

10   attached here, and the relator's counsel cites the relevant

11   portions of the depositions.  And I asked her, you know, when

12   were disclosures made to the Government.  And she initially

13   said a date in 2016, and then corrected herself and said, you

14   know, I believe it was June of 2015.  Why do you believe it

15   was June of 2015; I recall my counsel telling me, at that

16   time, that she was disclosing documents to the Government."

17   So that's the date.  And that statement, in sum, is what Ms.

18   Forney is relying on now, to establish the date that the

19   disclosure was made, my counsel told me, I recall, in June,

20   that it happened.

21        In terms of what was disclosed, I asked Ms. Forney

22   what documents were disclosed to the Government.  I showed

23   her a couple individual documents.  I mean, the -- Your Honor

24   can see, I mean, you have a stack of 875 pages.  By my count,

25   it's about 50 discrete documents, and it's not the complete

set of what was produced to us by Ms. Forney.  There are
others.

You know, I asked her about a couple of discrete
documents, and she was able to say, yes, I believe this was
produced to the Government.  But there was another document I
showed her, and she said, I don't recall, I don't know.  I
asked her, well, were the documents that you disclosed in the
complaint what you produced to the Government; yes, there are
10 or 12 documents, that sounds right.  Later, she said, you
know, I've given it some thought, and I don't want to commit
to 10 or 12.  I'm paraphrasing her, but her quotes are in the
testimony, it could have been 1, it could have been 5, I'm
not familiar with how the production was formatted, I don't
know whether it went as 1 document or 5 documents or 10
documents or 12 documents.

What kind of documents, you know what documents did
you produce?  And she gave me a list of, well, there were
some HR documents and some training documents and some HIPAA
violation documents, some promotional material, reimbursement
consulting.  And the list is -- again, it's in the relator's
statement of facts, but it's a generalized description of
documents.

And so we left the deposition with a witness who
could not tell me the set of what was produced to the
Government.  To the extent she could tell me, she had

1    endorsed the view that it was 10 or 12 or maybe 1 or maybe 5

2    documents, but I don't really know what the document

3    boundaries are, that sounds -- that all was her best effort

4    to tell me.  And she gave me a general description of kinds

5    of documents that was very consistent with it being a set of

6    somewhere in the range of 10 or 12 or 15 or 20 or whatever.

7    She wasn't saying it could be 50.  And so she clearly didn't

8    have personal knowledge of the contents of the set of

9    documents, sitting there that day, at the front of her mind

10   and memory.

11         So I think what I -- as we turn to this analysis of

12   whether relator has provided admissible evidence of a

13   disclosure to the Government in advance of litigation that we

14   should analyze, to evaluate whether it materially adds to the

15   public disclosures, you know, I think it's important just to

16   have this context in front of the Court, where we worked very

17   hard during discovery to find out what this disclosure was,

18   so that we could, ourselves, assess it, so we would have had

19   the opportunity to ask her at deposition about particular

20   documents, and if we had questions about it.

21         And critically, you know, put that aside, I think,

22   for purposes of evaluating the public disclosure bar, to just

23   know what was disclosed in advance of the litigation, and we

24   didn't get that information until the Court got it.  It was

25   contemporaneous.  We got Exhibit 17, which identified, for

1    the first time for us, in a declaration, these Bates numbers.

2    It corrects her deposition testimony, to some extent.  And to

3    the extent it contradicts it, I think it would be improper.

4    I think there's an open question whether it supplements it,

5    versus contradicts it.  And I -- you know, I don't want to

6    get bogged down in evidence issues.

7         But then Ms. Burke had an opportunity in her

8    opposition brief, given this history, to sort of move this

9    ball forward in a meaningful way, and tell the Court and tell

10   us, in her brief, what it is that she believes, in those

11   documents, materially -- if anything, materially adds to the

12   public disclosure because the complaint is irrelevant at this

13   point.  It was not part of that set of documents, and so it's

14   not something that was provided to the Government in advance

15   of commencing the action.

16        Testimony, declaration statements about what a

17   wonderful employee Ms. Forney was, about -- the rest of her

18   deposition, irrelevant.  We are looking only at the

19   information that they contend they disclosed to the

20   Government in advance of the litigation.  And it's, at best,

21   that set of documents that was produced to the Court, and

22   that's captured by the Bates ranges at Exhibit 17.

23        And so, when we're figuring out, you know, what to

24   do with this, Ms. Burke had an opportunity to specify for the

25   Court and for us, and I think the rules require her to

1   specify for us what that is, and she didn't do it.  I'm sure

2   she's fully prepared today to do it.  But the problem is it's

3   not just an abstract problem.  We are going to have to try to

4   go -- this is a very fact-handy, a very fact-intensive

5   analysis, if the Court rules that this information is

6   admissible, and it can be considered at this stage of the

7   case, and for purposes of the summary judgment hearing.

8           Again, you know, I think there -- you know, some of

9   it is easy to dispose it.  You know, there are -- as we've

10  described in our reply brief, there's a company of the

11  AdvaMed Code.  The AdvaMed Code is cited in the -- you know,

12  is attached, actually, to the <u>Burns</u>.

13          There are, you know, statements of Medtronic

14  corporate compliance policies that are, again, largely

15  irrelevant, and they don't advance the ball on any fraud

16  allegations in this case.  They just show that Medtronic had

17  a compliance program.  It doesn't -- you know, to the extent

18  that that's not previewed in the prior public disclosures,

19  that certainly doesn't add anything that's, you know,

20  significant and essential to the fraud in this case.

21          There are examples of promotional materials for

22  consulting services that, on their face, don't say anything

23  about providing for free.  And there's no context around

24  these documents.  There are some consulting materials that do

25  say they're provided for a fee.  There are long -- there's a

1   number of composite documents that are printouts of what Ms.

2   Forney has said at deposition were printouts of a Google

3   calendar, these are the HIPAA violations she averted to; and

4   that one of which was, ultimately, the source for the

5   allegations about particular patient device checks in the

6   complaint.  And we've addressed that, and we can talk more

7   about that as we need to do so.

8           But I think the key is, you know, we looked through

9   these documents, and we don't see anything in them ourselves

10  that even arguably supports the fraud, let alone materially

11  adds to it, under the demanding, high-bar materiality

12  standard that the Supreme Court has said applies in the False

13  Claims Act context, and that is harmonized with the approach

14  the Moore case took, the Third Circuit took in Moore

15          But I'm -- I really -- before we try to do whatever

16  we're going to do in this regard, I really think it's

17  critical to just set the context here, and say that, you

18  know, we're going to be kind of, you know, doing this on the

19  fly because we've been put on absolute -- despite trying, you

20  know, our best efforts, we've been put on absolutely no

21  notice of what Ms. Burke may or may not contend is material

22  here.  And I think that, in and of itself, along with the,

23  you know, admissibility issues and all that, raise sufficient

24  questions that the Court could certainly, in its discretion

25  choose to disregard that stack of documents.

1          THE COURT:  And do you think it would be

2     appropriate to shift the argument over to --

3          MS. MAYER:  I think so.

4          THE COURT:  -- Attorney Burke?  Why don't we take a

5     ten-minute recess because I do want to check on these chairs,

6     and you have been arguing for an hour and a half?  So why

7     don't we take a ten-minute recess, then we'll start up with

8     Attorney Burke.  You will explain why you believe these

9     documents provide additional information to the Government,

10    and that they were provided to the Government.

11         THE COURT OFFICER:  All rise.

12         (Recess taken at 11:24 a.m.)

13         (Proceedings resume at 11:41 a.m.)

14         (Call to order of the Court)

15         THE COURT:  This is still the old chairs, I think.

16         UNIDENTIFIED:  Yes.

17         THE COURT:  You can be seated, thank you.

18         MS. BURKE:  Your Honor, they appear to be in the

19    hallway outside.

20         THE COURT:  Okay.  Well, they might make some

21    disruption, but hopefully, not too much.

22         The Court is called to order.  All parties

23    previously present are once again present.  Attorney Burke?

24         MS. BURKE:  Thank you, Your Honor.

25         Let me begin by explaining that I'm going to cover

1    this in two parts.  The first, and most important, is whether

2    or not the Government or its agent is a party in the lawsuits

3    that Medtronic has proffered as the public disclosures.  It's

4    the relator's position that, neither the Government, nor its

5    agent is a party in any of those lawsuits, and we'll walk

6    through -- we'll walk Your Honor through that.

7            We will then turn to the analysis that is called

8    for by Moore for the original source, and walk Your Honor

9    through the fact that Your Honor's prior ruling, under Rule

10   9(b), actually has law of the case impact, and is the same

11   analysis that you need to conduct here, in order to find that

12   relator is, in fact, an original source.  The level of

13   specificity and the level of detail that were provided in the

14   second amended complaint that survived the motion to dismiss

15   is the same detail, the same information, and the same

16   specificity that, under Moore, is required to clear the

17   original source bar.

18           But turning first to this critical issue of first

19   impression.  Medtronic argues that we said that Moore somehow

20   rewrote the statute to exclude the word "agent."  Not at all.

21   In their brief, they had claimed that the Government was a

22   party.  We filed a brief, pointing out that that can't

23   possibly be true because the Supreme Court has held that the

24   Government is not a party in declined actions.

25           For the first time then, in their reply brief, they

1    come forward with a new argument, in which they don't contest

2    our dispositive case law, which proves that the Government is

3    not a party, and instead, they make, for the first time in

4    the reply brief, an argument that, well, the Government

5    should be considered a party because the relator is its

6    agent, and for that, they rely on a Supreme Court case that

7    was issued in 2000.

8              The problem is that they are not actually relying

9    on the holding of that case, and they are failing to disclose

10   critical language.  In that case, the question was:  How does

11   the relator have standing?  One of the arguments proffered

12   was that, well, the relator has standing as the statutorily

13   designated agent, and the Court noted that argument.  It then

14   -- and I'll read -- and that's the portion that the -- that

15   Medtronic read to you.  The Supreme Court, however, held that

16   that wasn't right.  It states, and I quote:

17             "This analysis is precluded, however, by the fact

18             that the statute gives the relator himself an

19             interest in the lawsuit, and not merely the right

20             to retain a fee out of the recovery.  Thus, it

21             provides that a person may bring a civil action for

22             a violation of Section 3729 for the person and for

23             the United States Government."

24             Citing 3730(b).

25             "It gives the relator the right to continue as a

1          party to the action, even when the Government

2          itself has assumed primary responsibility for

3          prosecuting it, entitles the relator to a hearing

4          before the Government's voluntary dismissal of the

5          suit, and prohibits the Government from settling

6          the suit over the relator's objection, without a

7          judicial determination of fairness, adequacy, and

8          reasonableness."

9      And I omitted all the statutory cites that they

10  included in there.

11          And then it concludes, the Supreme Court concludes:

12          "For the portion of the recovery retained by the

13          relator, therefore, some explanation of standing,

14          other than agency for the Government, must be

15          identified."

16      The relator cannot be the Government's agent.  It

17  doesn't advance the Government's interest; it advances its

18  own interest.  The Government is not bound by what we, as the

19  relator, do.  We can't dismiss the lawsuit.  We cannot even

20  decide on the terms of settlement.  We are not the United

21  States's agent.  And there is an entire body of case law

22  after this Supreme Court decision, including the Supreme

23  Court decision that we cited to, a 2009 decision, that very

24  clearly holds that the Government is not a party in the

25  lawsuits when they have declined.  To accept this novel

1    interpretation that Medtronic is putting forward, that

2    somehow the relator is acting as a Government agent, would

3    turn the entire statutory scheme on its head.

4          It's also nonsensical to think that Congress, which

5    is well aware of the case law finding that the relator is not

6    an agent, but instead, is a -- and the phrase is made very

7    clear by the Supreme Court, as they talked back to the

8    dissent.  In Footnote 4, they made it very precise:

9          "More precisely, we are asserting that a *qui tam*

10         relator is, in effect, suing as a partial assignee

11         of the United States."

12         That is the phrase that captures the relationship

13   between the relator and the United States.  If Congress, in

14   dramatically, radically lowering the public disclosure bar,

15   wanted to subsume, within its new shrunken public disclosure

16   bar, all declined *qui tams*, it easily could have referenced

17   the relator.  After all, the term "relator" is used in the

18   statute to refer to the relator.  By contrast, the term

19   "agent" is used in the statute to refer to CMS and the other

20   departments, the parts of the United States that do, in fact,

21   as an agent; so, therefore, like a false claim made to the

22   United States or its agent, meaning it's paying agent.

23         And of course, as Your Honor is aware, the

24   definition of "agent" is a legal definition; it means one who

25   is entitled to act for.  The relator cannot and does not meet

1   that level.

2          And so what we're dealing with here is a situation

3   in which this bucket of public disclosure that Medtronic has

4   gathered up from reviewing Pacer files, and finding declined

5   *qui tams*, none of which were actually litigated in any way,

6   this bucket is a bucket that doesn't rise to the level of an

7   eligible bucket under the statute.  The -- prior to the

8   amendment, any lawsuit counted.  So, prior to the 2010

9   amendment, those would have been public disclosures.

10         But Congress decided, wait, we think too many *qui*

11  *tams* are being dismissed, we think the balance that we're

12  trying to strike of incenting people who know information to

13  come forward has tipped too far towards the defendants.

14  Fraud remains a tremendously, huge financial burden on the

15  Federal Government.  We're going to right that balance by

16  enormously and "radically," as the Third Circuit has called

17  it, by shrinking the types of things that qualify for public

18  disclosures.  And one of the main ways they shrunk it was to

19  say only a fraction of litigation actually counts as a

20  disclosure.  And that fraction is the fraction where the

21  United States is a party, or its agent is a party.  And so we

22  don't have that here.

23         And so, Your Honor, at the outset, it's important

24  to understand this isn't a jurisdiction inquiry.  And in

25  order to make the decision as to whether we even have to get

1    to the original source analysis, Your Honor first has to

2    decide that there's been eligible public disclosures.  We

3    don't think there are any.

4            And the -- I want to turn next to -- the argument

5    is clear as to the ones where the United States declined in

6    full.  Those are simply crystal-clear.  That then leaves two

7    in which the United States declined, in part, and intervened,

8    in part.  And then they immediately settled it, with

9    Medtronic paying 23.5 million in settlement for the

10   allegations that they had paid kickbacks.  So turning to that

11   -- just that issue, which we think is the only kind of

12   wrinkle in what is, otherwise, clear-cut, non-eligible

13   disclosures.

14           Let's look at what it means when the United States

15   intervenes, in part, and declines, in part.  When we look at

16   that, Your Honor, we say, all right, the United States is

17   deciding that it is going to become a party to an action, as

18   to a certain degree.  Had Medtronic not settled the lawsuit,

19   and had the United States intervened, it would have filed a

20   new complaint as to just the conduct that it's going after.

21   That's the way the United States handles the False Claims Act

22   cases.  They want to make sure that they control what they're

23   intervening on, and they want to make sure they're not forced

24   to intervene on other matters.

25           And so, in this instance, the United States very

1    clearly said, we want to be a party to this case, as respect

2    to this covered conduct.  We've investigated that, we think

3    Medtronic is at fault, and we want to pursue Medtronic for

4    this conduct.  The other conduct, it said it was declining to

5    intervene.

6            Now we -- there is no case right on point as to the

7    meaning of that.  But the case that's proffered by Medtronic

8    to suggest that, somehow, because they intervene in part,

9    they have to be held to intervene in full, is completely

10   inapposite.  It's a District Court decision out of Rhode

11   Island.  And there, they were talking about two different

12   lawsuits:  A Wisconsin lawsuit and a Rhode Island lawsuit.

13           The Rhode Island relator -- the Government had

14   intervened, in full, in the Wisconsin lawsuit, was clearly a

15   party and intervened in full.  The Rhode Island relator was

16   trying to say, well, you know, yes, they intervened, but they

17   really were only interested in this subset.  No, they had

18   intervened in full.  So that case doesn't give you any

19   guidance, it doesn't shed any light on the problem.

20           What I can tell you is that, at least since the

21   late '90s, when I was at DOJ in the Civil Frauds Section, the

22   United States has always successfully managed to pull its --

23   define for itself when it is going to be a party.  And the

24   practice of intervening, in part, and declining, in part, has

25   not been barred by the Courts.  The Courts have permitted it,

1    they have gone along with it, just as it did in the <u>Onwezen</u>

2    and the <u>Schroeder</u> matter.  The Court signed off on that

3    approach, and the Court signed off on that settlement.

4            And so we think, Your Honor, for that reason, given

5    that there has been no opposition and no case law in which

6    the United States is prohibited from intervening, in part,

7    and declining, in part.  And the case -- the very case at

8    issue here, the Court did not prohibit it.  So, therefore, we

9    can assume the Court allowed -- that particular Court allowed

10   the United States to become a party, to part, and not a

11   party, to part.  And there's no reason why Your Honor should

12   look behind that court order or that ruling or that

13   settlement.

14           So we think, therefore, the only relevant part of

15   the case, the only statutorily eligible public disclosure is

16   the case that is described by the covered conduct.  And we

17   laid that out for Your Honor, it's laid out in detail in the

18   settlement agreement, and it has no overlap, it has no

19   similarity with the facts and the allegations alleged in

20   Relator Forney's complaint.  So, for that reason, we really

21   think that Medtronic has come up empty in its effort to scour

22   pacer and try to find something that would suffice as a

23   public disclosure.  We do not think any of those complaints

24   survive analysis under the amended version.

25           For that reason, Your Honor, and because, as Your

1    Honor -- as we had stated before, we believe the Rule 9(b)

2    analysis controls, we -- when we talked about the rest of it,

3    we simply pointed out what we thought were fairly

4    straightforward and self-evident points for Your Honor.

5           Number one, the Stokes case has absolutely no

6    overlap.  It had -- it involves a different scheme.  It has

7    simply -- it does have one allegation, in which it states

8    that this conduct is happening, that device interrogations

9    are performed by the device representative themselves.  But

10   it does not give any names of physicians, names of clinical

11   specialists, or hospitals, dates, times, places, no detail

12   whatsoever that overlaps in any way with the free device

13   checks that we have alleged in our complaint.  There's just

14   no overlap at all.

15          Similarly, there is no overlap with our practice

16   management consulting.  Our practice management consulting

17   has been pled with care in the complaint.  It is -- it comes

18   from this terminology of lean sigma, it's a particular type

19   of practice management consulting that was started recently;

20   in fact, after the folks who are relators in these other

21   matters were even with the company.  So Stokes is the most

22   clear-cut.  It just -- there is no overlap; it doesn't relate

23   in any way.

24          The Onwezen and the Schroeder are similarly

25   deficient, in terms of the overlap.  They go into that case.

81

1    Those are the two that were settled, right?  So, even if we

2    assume that the entirety of the complaints, you know, even if

3    Your Honor is not persuaded, as we are, that these aren't

4    public disclosures, and even if you were to look at the

5    entirety of the complaint, you're still not dealing with

6    overlap.  There's no details, Rule 9(b) details, about the

7    free device checks, no names of doctors, no locations of

8    practices, no dates of the device checks given for free, no

9    names of the staff providing the checks.  And again, there's

10   no allegations that relate to the lean sigma consulting

11   whatsoever.  So there's just not an overlap with the Onwezen

12   case.

13            Schroeder is the same.  He worked in business

14   development, and he really -- he really had a lot of detailed

15   information about the payment of kickbacks, including

16   different kinds of free services, but not the ones that are

17   at issue in our case.  He -- first, on devices, he doesn't

18   even allege that, so there's no physicians or dates or device

19   checks dates at all.

20            But then, on the -- even on the practice management

21   consulting, his main focus is on the off-label promotion,

22   which doesn't overlap.  And the payments of kickbacks that he

23   was referring to had to do all with cash and dinner and trips

24   and studies and the like, which, of course, the United States

25   intervened and settled some of those because they agreed that

1    some of these studies and the kind of management consulting

2    that was being given was actionable, and the 23.5 million

3    settled all of that.  But that's all conduct that's separate

4    from our lean sigma consulting.

5         Relator Forney has laid out the kind of

6    reimbursement and administrative help and practice

7    management, and it was done through this -- you know, the

8    terminology was "lean sigma," and that's they went into the

9    practices and said, you know, okay, we've got this, you know,

10   key staff, who have been trained in this lean sigma approach,

11   and we're going to come out and give you this free advice.

12   None of that is mentioned in the Schroeder case.  So Onwezen

13   and Schroeder, again, you have no substantial overlap.

14        That leaves the other two cases, the Burns case and

15   the Doe case.  And there, you do have -- you do have a

16   similar -- you do have a similar theory of liability, and you

17   have details.  So you have Rule 9(b) specificity that's

18   required.  And so what we need to do, what we need to look

19   at, both for the overlap issue, as well as for the original

20   source analysis, is we read more, we read the Third Circuit's

21   teachings.

22        And we say, okay, as I sit here today, how am I

23   supposed to figure out, I've got two complaints that, were

24   the United States had been a party, which it wasn't, would be

25   public disclosures.  But say Your Honor thinks that they are

83

1   public disclosures, okay, let me look at <u>Burns</u> and let me

2   look at <u>Doe</u>.   In both of those cases, they did have specific

3   details that they pled, and that they pled in relation to the

4   device check theory.

5           In <u>Burns</u>, he pled that -- in Paragraph 29, he pled

6   that free device checks were done by Burns, by himself, for

7   Bradenton Heart Center, Lakewood Ranch Cardiovascular,

8   Pinnacle Cardiovascular, Advanced Cardiology, Aldrich

9   Cardiovascular, Heart and Vascular Center.   That's in

10  Paragraph 29.

11          In Paragraph 30, he alleges, not that he performed

12  the device checks, but that he observed the same conduct, so,

13  presumably, observed other Medtronic employees doing so in

14  Naples, Florida in 2001 to 2002, and in North Carolina in

15  2001 -- 2000 and 2001.

16          And then, in Paragraph 30, he identifies Dr. Joseph

17  Pace as someone who billed for device checks that were done

18  by Burns.

19          And in Paragraph 43, he identifies healthcare

20  providers that didn't supervise his work as Bradenton Heart

21  Center, Lakewood Ranch Cardiovascular Center, Healthcare

22  America.   All of those are located in Bradenton, Florida.

23  So, when you measure what -- so that's -- those are Rule 9(b)

24  specific details that are of the similar ilk as Relator

25  Forney's.

1          To the same effect, in the _Doe_ case, there is one

2    allegations that is similar, and that is -- first off, just

3    as background, the _Doe_ Relators are not Medtronic employees.

4    They're board-certified cardiologists.  And they are making

5    the same allegation that Relator Forney is, is that these are

6    kickbacks, and that they were being induced to use Medtronic

7    and the other devices by all this free service.

8          And in particular, Relator 2 -- they're anonymous,

9    so we don't know who that is.  But Relator 2 made rule --

10   allegations that read the Rule 9(b) specificity level in

11   Paragraphs 110 to 115.  And he alleges that, on September

12   24th, 2014, a Medtronic Senior Clinical Specialist performed

13   a free interrogation of a pacemaker without any physician

14   being present.  At the conclusion of the device check, the

15   Medtronic Clinical Specialist completed a billing sheet,

16   marking the CPT Code 93280, for a global billing, rather than

17   using the required 26 modifier.  So, between that -- _Doe_,

18   that paragraph, and the other paragraphs in _Burns_, that's --

19   those are the specific details that Your Honor has before it,

20   that you need to then compare with the specific details that

21   Relator Forney was able to bring forward.

22         And what are the details that Relator Forney is

23   able to bring forward?  What you need to do is -- first, what

24   you need to do is tackle this notion that Medtronic is

25   claiming now that, somehow, Relator Forney didn't bring any

1     information, didn't bring any evidence forward.

2            And I would point out that it was completely

3     Medtronic's option as to when they filed this motion for

4     summary judgment.  It was a surprise to us.  We were not

5     aware -- prior to the deposition of Relator Forney, we did

6     not even know public disclosure was a factor.  We only

7     learned of it during that deposition.  Relator Forney did the

8     best job that she could and provided answers, in which she

9     did testify what was given to the Government.  She testified

10    that everything in the second amended complaint, all of those

11    documents, had, in fact, been given to the Government.

12           She testified to the best of her recall about the

13    specific documents shown to her.  And during the colloquy

14    with counsel, I also represented to Medtronic that the --

15    that we had produced all of the documents.  Medtronic was not

16    forced to file the motion without doing further discovery.

17    If they wanted to know in advance, before this particular

18    argument session, they had the right to hold off on filing.

19           In fact, as Your Honor knows, we think this is all

20    premature because it's not a jurisdictional motion.  It's

21    just another discretionary argument that they were free to

22    make on summary judgment at the end.  So, in terms of their -

23    - you know, their argument that they've suddenly been

24    blindsided, quite the opposite.  They, alone, controlled when

25    this was filed, and they, alone, controlled how much

1   discovery they did.  They could have served discovery on the

2   Government, if they wanted to hear from the Government what

3   documents we had given them.  They didn't do that.  They

4   could have served discovery on us, saying, identify the Bates

5   numbers of the documents that you gave to the Government.

6   They didn't do that.  So, you know, from our perspective, the

7   notion that, somehow, we were remiss is contradicted by the

8   record.

9        What we put in the record, and what Relator Forney

10   testified to is that everything that's talked about in the

11   SAC, all of those documents were given to the Government.

12   Your Honor has already had to review the SAC to decide -- the

13   second amended complaint -- to decide whether or not it had

14   enough detail to survive their challenge.  As you will

15   recall, they challenged it as lacking specificity.  They

16   challenged it as not having enough national information to

17   survive, and that the case should be confined.  They also had

18   not only you rule on that, but they also had the Magistrate

19   rule on that, so that's been ruled on twice already.

20        And I would just refresh Your Honor's recollection

21   of the paragraphs in the second amended complaint that

22   provide this kind of detail that is far and above and

23   different from the detail that Burns provided and that that

24   cardiologist provided.

25        First, Paragraphs 4, 5, and 12 give Relator

1    Forney's background.  They explain how she was with the

2    company for a long time, and how -- where she gets her

3    insights from.

4            Paragraphs 18, 20, 21, 22, 23, 24, and 25 all give

5    specific Rule 9(b) details that go to the how and the when.

6    They talk about the payment of commissions; the fact that all

7    of the clinical specialists and others were incented,

8    financially incented.

9            And Your Honor, just to refresh your recall, the

10   Moore Third Circuit teaching says, okay, when I'm sitting

11   here as a District Judge, and I'm trying to figure out

12   whether the body of information is enough to serve as an

13   original source, I look to see, did it give the Government

14   new details, new specifics about the how, the what, the when,

15   and the where.  On the financial incentives, that's all brand

16   new.  It's all brand-new details of the implementation.

17           Relator Forney brings forward Paragraphs 26 to 28,

18   details about the training; again, brand-new details about

19   the implementation, none of which is in any of the other

20   documents.

21           Paragraphs 29 to 32, that goes to the specific

22   dates, the patients, the types of services, the precise

23   details and what was done; all brand new.  None of that, none

24   of that overlaps.  None of that was known by Burns, none of

25   that was known by that cardiologist in New Jersey.

1          Paragraph 49, again, additional details on the

2     what?  Examples of dates, doctors, patient names.  Number --

3     Paragraph Number 50, Paragraph 52 and 53, again, all brand-

4     new, specific details.

5          This information, Your Honor has already ruled,

6     sufficed to satisfy the challenge under 9(b).  That very same

7     information suffices to satisfy the challenge under the

8     public disclosure bar.  It is the same analysis.  The Third

9     Circuit said courts should look to Rule 9(b) as a guideline,

10    as a guideline to how to think about what kind of information

11    they're looking for.

12         And Your Honor, the second amended complaint itself

13    refers to the documents and quotes a lot of the documents.

14    We have provided Your Honor the universe of documents that

15    was provided to the Government.  Those documents provide a

16    substantial amount of specific, individual detail well and

17    above what we put in the very detailed second amended

18    complaint.

19         For example, in addition to all of the examples of

20    the free device checks that are crafted in the second amended

21    complaint, the underlying Google calendars that Medtronic has

22    had since the very beginning of discovery, and has been on

23    notice of, even with the filing of the complaint.  We've

24    always made crystal-clear that the calendars are at the hub

25    of this case because the calendars provide the detail of when

1    a device check was given, who it was -- who it was given to,

2    who it was given by, and the date that it was done.

3           So the documents Bates-numbered 01249 to 1772, and

4    02252 to 2274, voluminous amounts of additional calendar,

5    more detail.  All of that detail is completely new to the

6    Government.  It was not in any of the public disclosures, it

7    was not known to those relators.

8           So Relator Forney is exactly the type of relator

9    that is bringing forward a huge quantity of specific,

10   detailed information about the who, the what, the when, and

11   the where, the implementation of this fraudulent scheme.  The

12   question to ask is:  Does her information make the quality of

13   the case against Medtronic better?  That's the test that

14   <u>Moore</u> laid out.  And clearly, it does.

15          It's illuminating, in fact, that the other

16   relators, who had a fairly limited window, they weren't --

17   they were -- one was a -- one was a clinical specialist and a

18   sales rep himself, so he knew of his own conduct.  One was a

19   cardiologist, who had Medtronic come into his office, so he

20   knew of that conduct.  But those are very narrow windows,

21   compared to Relator Forney's window.  She supervised a team,

22   so she had access to the entire team.  Plus, because she was

23   management, she had access to corporate-wide information.  So

24   she's clearly the type of original source that is bringing

25   forward a substantial quantum of additional information.

1          I would also point out, Your Honor, that, within

2     the documents that we gave Your Honor is substantial

3     additional detail on the value selling, the practice

4     management, more names of the -- more names of the clinical

5     specialists who were involved in this fraud.  You can look at

6     those at 02275 to 276, a whole list of names involved.

7          You can read the value selling pamphlets, the

8     training, where it teaches the Medtronic clinical specialists

9     how to go out there and offer these as a form of kickbacks.

10    That's at 1915 to 2146.

11         There's strategic planning documents, there's more

12    on the financial incentives that all of these salespeople are

13    given.  There is educational packets on exactly how these

14    folks are taught to go in and curry favor with the

15    physicians, and to get the physicians to commit to brand

16    loyalty.  So the information that has been provided to the

17    Government and has been provided to Your Honor is a

18    substantial body of information that improves the quality of

19    this fraud case against Medtronic.

20         It's not coincidental, Your Honor, that all of

21    these other cases that were brought were never litigated.

22    They were dismissed immediately.  The Burns case was

23    dismissed six days after it was unsealed.  Stokes was

24    dismissed while it was still under seal.  Doe was dismissed

25    one day after it was unsealed.  And the Onwezen and

1    Schroeder, Onwezen was dismissed the same day.  And Schroeder

2    had no activity, and they appear to just have neglected to

3    close the case, and a clerk just, later, closed it,

4    absolutely  no activity.

5           It is an open question in the law as to whether

6    that type of activity actually suffices to qualify under the

7    civil hearing prong.  And Your Honor, this, again, is a new

8    legal issue for you.  I don't think you have to reach it

9    because I think the better decision is that these are not

10   public disclosures that qualify because the United States is

11   not -- neither the United States, nor its agent.

12          But I would just note this, in -- as a last point

13   for Your Honor, that, were you to consider the United States

14   or its agent as a party, I would encourage Your Honor then to

15   go the next step and say, okay, in these particular

16   circumstances, does that body of case law that sits out

17   there, that says that civil litigation counts as a hearing,

18   does it -- can it apply in these kind of unique

19   circumstances.  We don't think so.

20          We don't think you need to get there because we

21   think, first, you should rule that there is no statutorily

22   eligible public disclosure.  And that's why I left that to

23   the end because it is a novel point, and there's not a lot of

24   law to give Your Honor guidance.  But I just raise that as

25   yet an additional reason why we don't think that there's any

1      way that Medtronic is entitled to summary judgment here.

2            So, just to recap briefly, Your Honor, we first

3      believe that you should deny the motion for summary judgment

4      on the very simple and straightforward grounds that neither

5      the United States, nor its agent is a party to any of these

6      lawsuits.  We think that that applies very directly and

7      clearly, without even any discussion, to four of the cases --

8      excuse me -- to three of the cases.  And we think it also

9      applies just as clearly, but perhaps worthy of some

10     discussion, to the Onwezen and Schroeder because there is the

11     additional point that they did intervene, in part.

12            So we think that -- we think that, when you do the

13     analysis, and you look at the conduct that's inter -- been

14     intervened on in the Onwezen and Schroeder case, and you look

15     at the fact that there was no intervention on Burns, Stokes,

16     and Doe, Your Honor should reach the clear, legal conclusion

17     that Medtronic has failed to put forward a statutorily

18     eligible public disclosure.

19            We, second, think that, were you not to hold that

20     way, you, nonetheless, should hold that these -- given the

21     particular circumstances of all five of these civil

22     complaints, none can be found to have been done in the

23     context of a civil hearing, that -- you know, that, although

24     as a general matter, litigation and documents filed in

25     litigation are presumed to be leading to a hearing or part of

1    a hearing, in these cases, we know, conclusively, there was

2    no hearing.  They were all dismissed with no hearing.  So,

3    therefore, that general body of law does not apply here.

4    Your Honor knows, from the actual facts of these cases, that

5    there was no hearing.  And so, therefore, it, again, puts

6    these outside the statute.

7         The second reason that Your Honor should deny the

8    motion for summary judgment is that Relator Forney easily,

9    easily clears the bar of being an original source.  She

10   brought forward substantial information, which is

11   memorialized in the second amended complaint, and is backed

12   up by the documentation provided to Your Honor; significant

13   Rule 9(b) details of the how, the what, the when, and the

14   where of this fraudulent scheme.  The quality of the case

15   goes way up with her involvement.

16        That's exactly the reason why Congress re-balanced

17   the public disclosure bar, and lowered it radically.  That's

18   why the Third Circuit, when it reviewed how a District Court

19   Judge should decide these issues, gave Rule 9(b) as the

20   guidepost and the guidelines.  Your Honor has already found,

21   through Rule 9(b), that those allegations suffice.  The same

22   ruling applies here.  And for all those reasons, Your Honor,

23   we believe that you should deny Medtronic's motion.

24        THE COURT:  Very well.

25        MS. BURKE:  Thank you.

94

1           THE COURT:  Thank you, Counselor.

2           Attorney Mayer, did that give you something to

3      respond to?

4           MS. MAYER:  Yes.  I'd like to start kind of in the

5      reverse order of the way I did my original presentation, and

6      respond to the arguments about original source first,

7      although I do want to address some of the points she made

8      about the interpretation of whether these complaints fall

9      within the scope of what the statute allows to serve as a

10     public disclosure, as well, because I think she's missing

11     Stevens.  And I'd like to point out to the Court my views on

12     that, as well as a couple of other things.

13          But let's start with the back end for right now,

14     and let's start with what she's doing with the -- sort of

15     trying to combine this analysis of whether the allegations in

16     the public disclosure are substantially similar to the

17     allegations in her complaint, versus whether she has provided

18     materially new information that add -- that -- whether she

19     has provided information to the Government, in advance of her

20     case, that materially adds to the prior public disclosures

21     because they're two separate inquiries.  She kind of tends to

22     put the two of them together.  And she's leading the Court

23     down a path that's legally incorrect by doing so.

24          First, with respect to the substantial similarity.

25     And bear with me for just a moment.  A question whether two

1    complaints are substantially similar does not involve any

2    assessment of whether either complaint meets 9(b).  The

3    reason why the question of whether a relator's theories are

4    substantially similar to what's been publicly disclosed

5    doesn't involve any 9(b) analysis is because public

6    disclosures are not limited, in any way, shape, or form, to

7    complaints.

8         And so the notion that, somehow, if -- you know,

9    what Ms. Burke did is she sort of very neatly went through

10   and, on the fly, argued that three of the five complaints

11   that we are arguing would serve as a public disclosure don't

12   meet 9(b), so you can sort of put them aside, and the only

13   ones we need to deal with as potential public disclosures,

14   notwithstanding all the statutory arguments, are <u>Burns</u> and

15   <u>Doe</u> because they have some 9(b) details.  So now let's focus

16   on those, and start talking about original source.

17        So what she's trying to do there is argue that,

18   somehow, the False Claims Act imports into the evaluation of

19   whether a public disclosure is substantially similar to a

20   relator's allegations an analysis of whether the public

21   disclosure meets 9(b).  And there is -- that's nowhere

22   present because most public disclosures, if you look at the

23   various categories that are allowed to be a public disclosure

24   in the statute, are not the sort of things that you would

25   ever apply Rule 9(b) to.  And so that project is just, full

1   stop, legally wrong.  It's precluded by -- it would be a

2   gross error.

3       And she, notably, is citing no case, zero, for the

4   proposition that that is the analysis that you should apply

5   here.  She is inventing it out of whole cloth, and it's

6   certainly not in Moore, which I am trying to get my fingers

7   on right now because we will talk about it in a second.

8       But for starters, with respect to whether the two

9   complaints are substantially similar, you do not look at

10  9(b).  The -- sorry.  Why can't I put my hands on Moore?  If

11  you can bear with me for just one moment, Your Honor.

12      THE COURT:  Certainly, Counselor.

13      MS. MAYER:  Oh, it's right in front of me.  That

14  always happens, right?

15      In Moore, the Third Circuit first addressed whether

16  the fraud alleged by the plaintiff was publicly disclosed.

17  Okay?  And they said the first thing we do is consider

18  whether the sources on which defendants rely in arguing that

19  the fraud was publicly disclosed qualify as disclosure

20  sources.  We've talked about that, and we'll come back to

21  that later.  And then we next determine whether substantially

22  the same allegations or transactions were publicly disclosed

23  through these qualifying sources.

24      (Pause in proceedings)

25      MS. MAYER:  And the way the Third Circuit says you

1    go about that analysis is you say -- that you ask whether the

2    allegation of fraud, which would be -- and again, <u>Moore</u> says

3    (z) [sic] -- is factually described sufficiently in the body

4    of the public disclosures, through, for example, saying, if

5    you're relying on various transactions to demonstrate that

6    fraud.  And the fraud alleged here was that, under a treaty

7    that required U.S. ownership of vessels, the defendants had

8    created a situation where they had fraudulently enabled

9    foreign ownership of the vessels, while representing to the

10   Government that -- the U.S. Government, to get these

11   licenses, that they were -- these were U.S.-owned.  So that's

12   the fraud alleged by the relator.

13           And so the question is:  Did the prior public -- as

14   the Court is analyzing this -- and this is at -- I'm trying

15   to find the page cite for you -- 303.  So it's 812 F.3d, at

16   303.

17           So the first thing, when you have a situation like

18   this, where -- and again, these -- nobody was alleging that

19   the -- that fraud theory was present in any public

20   disclosure, but just that the facts that reveal the fraud

21   were disclosed in that prior public disclosure.  The Court

22   says, okay, so now we look at the facts in the public

23   disclosures.

24           Well, in the news media, there was information

25   about the vessel captain being American, but not having

1    control of his vessel.  And in the FOIA reports, we had

2    information about representing to the Government, by the

3    owners, that this was a U.S.-controlled vessel.  So we have a

4    disconnect there that gives rise to that inference of fraud

5    that is the theory that is alleged.

6              In this discussion of substantial similarity, which

7    concludes before the Court turns to original source, there is

8    no discussion of whether 9(b) details are alleged or present

9    it the public disclosure.  It's simply not a part of the

10   analysis.  The Court eventually talks about 9(b), and we'll

11   talk about that in a second.  But for purposes of evaluating

12   whether the public disclosures that Medtronic has put forth

13   in the summary judgment argument and in its papers are

14   substantially the same as the allegations in Ms. Forney's

15   complaint, the question is just whether the facts alleged in

16   those complaints reveal the theory of fraud that she is

17   propounding in her case.

18             We believe they actually propound that theory of

19   fraud.  But the whole point is they just have to plead and

20   reveal those facts in this public forum, and they more than

21   do.  And so there's no 9(b) analysis.  The fact that she has

22   pled what she -- in her second amended complaint, which she

23   claims to be more specific details on certain respects, and

24   that the lean sigma brand was revealed, is irrelevant to the

25   substantial similarity analysis, provided her theory that

consulting services, practice management consulting, and

device checks were -- that's her theory, device checks were

provided for free, and that was a kickback to doctors, and

Medtronic did it to sell product.  That's in every -- that's

in Onwezen and Doe and Burns and -- not Schroeder.

But we believe facts supporting that are in Stokes;

not the whole theory, but facts supporting it, that Medtronic

fields sales were, as a routine matter, going out and,

widespread, across the country, going to specific hospitals,

doing device checks and interrogations and reprogramming as a

fact.  That, in and of itself, isn't -- is not enough to

preview Ms. Forney's fraud, but that, when added to the other

disclosures, adds a little bit to it, including specific

examples of hospitals and regions in the country where this

was going on.  So that's the substantially similar test.

So her argument that you should somehow not

consider and reject the notion that anything other than the

Burns and the Doe complaints were substantially similar to

her allegations because, on her view on the fly, they lack

some 9(b) specificity about individualized claims, is

completely incorrect under the law.  And Moore provides her

no support with that, and she has cited no case for that

proposition, and it's not in the statute.

Next, in terms of original source analysis under

Moore.  Her lead argument, in her brief and today, is that

1    the analysis of whether Ms. Forney qualifies as an original

2    source, and whether what she's provided to the Government

3    materially adds to what was publicly disclosed, is that you

4    look at the second amended complaint.  And there are two

5    fundamental errors with that.

6              First, you start, again, with the statute.  The

7    statute does to say, when you evaluate what information a

8    relator provided to the Government in advance of the

9    litigation, you should look, in the first instance, to the

10   complaint, or that you should look at all to the relator's

11   complaint.  In fact, unless the relator provides a copy of

12   the complaint to the Government in advance of commencing the

13   action, the complaint itself is just that.  It's allegations,

14   but it's not a part of what the relator must provide to the

15   Government, in order -- and what can be considered, for

16   purposes of whether they've added material information to the

17   Government to meet the requirements of an original source

18   under the public disclosure bar.

19             Again, this is technical, but this is the way

20   congress has set up the statute.  And this requirement that

21   the relator, to qualify as an original source, provide

22   information to the Government in advance of the action is not

23   a new requirement.  It's phrased a little -- you know, it's

24   part of the revision of the statute here.  But it's not a

25   new, either limit, or expansion, versus the old bar.  A

1    relator has always been obliged to provide the Government

2    with information in advance of commencing the action, in

3    order to qualify as an original source, and then the

4    information is what's critical.

5           Here, relator's second amended complaint wasn't

6    created or filed with the Court until this year, which is

7    fully two years after she commenced this action; and,

8    therefore, her -- so the first reason why her second amended

9    complaint cannot be considered, when you're evaluating what -

10   - whether information she provided to the Government in

11   advance of her commencement of the action satisfies the

12   requirements of being an original source, is that the second

13   amended complaint and whatever it contains -- first of all,

14   it's just allegations, and we're at summary judgment.

15          More to the point, the document itself contains

16   characterizations of documents, allegations that are

17   untethered to documents, and frankly, some really, really

18   troubling exaggerations and misrepresentations of documents,

19   and contains a lot of information that Ms. Forney herself

20   apparently doesn't have, and can't explain where it came

21   from.  That document was filed and created in 2017, and so

22   that document is absolutely, under the plain language of the

23   statute, barred from consideration.

24          Some relators do disclose, in their disclosures to

25   the Government, in advance of filing and action, a copy of

1    the complaint.  You will occasionally, in the case law, see

2    reference to the relator's disclosing complaints as part of

3    that packet.  The documents that were provided to you and

4    were identified for us don't contain a copy of even the

5    original complaint in the case, and so the complaints are

6    out.

7              I will note, just so that the Court understands,

8    when you look at Moore, and when you look at other cases in

9    this area, what you are seeing.  Public disclosure bar is

10   sometimes litigated at the motion to dismiss stage.  When

11   it's litigated at a motion to dismiss, there has been no

12   discovery or effort to take discovery.  It is a motion to

13   dismiss.

14             Under those circumstances, what a defendant will

15   do, if they want to raise the public disclosure bar at that

16   point, is put in the public disclosures.  But with respect to

17   the relator's qualifications as an original source, unless

18   the relator offers a declaration or some sort of voluntary

19   supplemental information about their disclosure to the

20   Government in advance of the litigation, all that we have on

21   the record is what relator alleges in the complaint is their

22   disclosure in advance of the litigation.  And Courts

23   routinely use the complaint and allegations in the complaint

24   as a proxy for that because we're litigating the public

25   disclosure bar in the absence of discovery, at an early

1    stage.

2            In this case, we are litigating this issue now,

3    after discovery.  And so it's no longer either necessary or

4    appropriate to rely on a complaint because we don't have to

5    worry about allegations about what was or wasn't in Ms.

6    Forney's mind.  We actually have, to the extent we have it,

7    information about what she disclosed, and the limits of that,

8    in advance.  And it would be improper to expand the scope of

9    that beyond what the statute limits the relator to, for

10   purposes of what she has to do in advance of the litigation

11   to potentially qualify as an original source.

12           So the second amended complaint is a giant red

13   herring here.  It's a completely irrelevant document, for

14   purposes of evaluating whether Ms. Forney is an original

15   source.  And to be clear, it's relevant for assessing, you

16   know the substantial similarity because it helps define her

17   theories.  But there's no 9(b) analysis.  That's just looking

18   for the facts in the body, collectively, of the public

19   disclosures; facts that disclose the theories of fraud that

20   she's alleging in the complaint.  After that analysis, we go

21   to original source.  She's got to point to the information

22   she gave to the Government in advance of the litigation, and

23   that is not in the second amended complaint, or any of her

24   complaints.

25           By way of explanation, our opening brief, we did

1    not -- even though we had tried, we had -- did not have the

2    discovery that she's now provided to us in court, through

3    this briefing process, about the documents that she says were

4    provided to the Government in advance of filing the case.

5    And so we relied on her testimony to say that the documents

6    at issue are the documents that are identified in the second

7    amended complaint because that was the best -- we thought

8    that was the record for purposes of the issues in this case.

9         We thought it was reasonable to believe we had the

10   information that there was to have on the record, having

11   asked for it in a document request and interrogatory and a

12   deposition.  We thought that we had exhausted the reasonable

13   avenues that we should be required to take during discovery,

14   in order to discover a particular piece of information, of

15   non-privileged information.

16        And I, as an aside, want to point out that I think

17   Ms. Burke's suggestion that she had until the close of

18   discovery to force us to keep coming up with yet more

19   inventive ways to try to ask for the same information

20   iteratively is -- shouldn't even be a speed bump in the

21   Court's consideration of whether we did everything that we

22   were required to do to try to elicit the Bates numbers or the

23   identification of the actual communication that was provided

24   to the Government.

25        The issues in this case were and are and remain

1   ripe for decision.  This is not a premature motion.  At the

2   time we filed it, by the way, there was a jurisdictional

3   issue here.  Absolutely, the pre-PPACA claims are in it.  It

4   was not until our opposition briefing that they were taken

5   out.  And so this was absolutely and remains appropriate to

6   raise to the Court, immediately.

7           Now, so focusing, though, on this.  So we cleared

8   up a couple of things.  Number one, when evaluating whether

9   we've got substantial similarity, we don't apply 9(b) to the

10  publicly disclosed complaints to eliminate a bunch of them.

11  That's error.

12          When you turn to whether she's an original source,

13  all the discussion about, you know, the detail in the second

14  amended complaint is irrelevant because that document is not

15  a document that was disclosed to the Government in advance of

16  Ms. Forney's commencement of the action.  And that is the

17  information that the statute requires materially add to the

18  public disclosures in the case.

19          I next turn to her argument that Moore says that,

20  when evaluating whether information materially adds to the

21  public disclosures, the analysis that you're supposed to do

22  is just ask whether the relator's complaint meets 9(b).  So,

23  in addition to the problem that you don't look at the

24  relator's complaint in a case like this, where we're passed

25  the motion to dismiss stage, and we actually have, you know -

1   - take, you know, something of a record of -- and it's clear

2   that that second amended complaint was not produced to the

3   Government in advance of filing the action, it didn't exist,

4   the argument that, if a Court rules at a motion to dismiss

5   that a particular relator's complaint meets 9(b), or simply

6   decides not to dismiss the case, and allow it to proceed into

7   discovery, as Your Honor did here, the notion that, somehow,

8   that establishes that, to the extent there's some later

9   public disclosure bar analysis, she automatically qualifies

10  as an original source because her complaint survived 9(b), is

11  both a complete misreading of <u>Moore</u> and an -- well, it is.

12  It's a complete misreading of <u>Moore</u>, and it doesn't make any

13  sense under the statute, either, for two reasons:

14          First, it's simply not what <u>Moore</u> said.  <u>Moore</u> was

15  crystal-clear -- and now I'm going to lose <u>Moore</u> again --

16  when it says that the analysis that you need to do to

17  evaluate whether knowledge is -- materially adds to a public

18  disclosure, is that you have to do a comparative analysis.

19  You have to compare the information that was provided to the

20  Government in advance of the disclosure to the public

21  disclosure.

22          Rule 9(b) -- when Your Honor evaluated whether Ms.

23  Burke's second amended complaint and first amended complaint

24  satisfied Rule 9(b), you looked only at each of those

25  complaints.  There's no comparison to anything, let alone to

1    public disclosure of information that was neither before the

2    Court, nor on the horizon, at that point, for any of the

3    parties.

4              So the notion that -- you know, first off, that,

5    somehow, <u>Moore</u> created a shortcut or a cheat to the analysis

6    that needs to be done under the statute, comparing the

7    information, to see if it materially adds to the public

8    disclosure, is just sort of mystifying, where that came from.

9    So, first of all, the fact that her second amended complaint

10   went through 9(b) is both irrelevant because the second

11   amended complaint is irrelevant.  But it's also irrelevant

12   because the Court doesn't hold that, if a complaint survives

13   9(b), the relator qualifies as an original source, without

14   doing any kind of a comparison -- comparative analysis.

15             So let's turn to -- and those are -- they're so

16   critical to clear this stuff up because it is technical.  And

17   if you move quickly through, sometimes you can miss stuff.

18   So let's see what <u>Moore</u> says about materially adds and about

19   9(b), so we can understand it and put it in context.

20             When <u>Moore</u> is addressing materially adds -- which,

21   by the way, was in 2016, and it was before the U.S. Supreme

22   Court ruled in <u>Escobar</u>, which -- issued a decision in

23   <u>Escobar</u>.  And in <u>Escobar</u>, it was addressing the concept of

24   materiality under the False Claims Act, and there, in the

25   context of liability provisions of the False Claims Act, but

1    in that decision issued some important statements about what

2    "materiality" means.  I don't believe that what <u>Moore</u> says

3    and what the Supreme Court said are in conflict.  I believe

4    the two can be harmonized.

5            And I mention the Supreme Court case because -- and

6    we mentioned it in the briefs because I think it informs how

7    to read <u>Moore</u>, and how to sort of build on <u>Moore</u>, as you

8    conceive of the analysis that needs to be done here.  But it

9    is certainly relevant, and it would certainly be

10   inappropriate to, you know, read <u>Moore</u> in a way that was

11   inconsistent with <u>Escobar</u>.

12           So <u>Moore</u> looks, because it didn't have the benefit

13   of the Supreme Court decision, first to a dictionary, and

14   they choose the <u>New Oxford</u>, to look at "add" and the word

15   "material."

16           In the <u>Winkelman</u> case, which we've also cited in

17   our brief, which was a First Circuit decision, looking at how

18   <u>Escobar</u> -- what <u>Escobar</u> had to say about materiality impacts

19   the public disclosure bar, the Court cited <u>Moore</u> -- again, I

20   think these decisions are all in harmony with each other --

21   and looked to <u>Black's Law Dictionary</u> for "materiality,"

22   instead of the <u>Oxford New English</u>, but it's the same concept,

23   is you look at what these words mean.

24           And so they say it's -- you know, it's significant,

25   it's influential, it's "essential," is another word that

comes into play in these decision.  The Third Circuit says that:

> "To materially add to the publicly disclosed allegation or transaction of fraud, a relator must contribute significant additional information to that which has been publicly disclosed" --

And then it says:

> "-- so as to improve its quality."

And that gets to their definition of what "add" means, is to put something in or something else, so as to improve or alter quality.  So that's the -- that's this gloss on it.

What the Supreme Court adds is a couple of things. First of all, it emphasizes that materiality, in any context in the common law and otherwise, is both a very demanding standard, this is not a low bar; and number two, when you ask whether something is material, it's about is it material to -- is it important or does it add essential facts to the recipient of the information.

So, again, I don't think this is some magic silver bullet.  I'm just saying these -- this is what the discussion around materiality is.  So the question is not does it, in the abstract, add to the quality of the case, which is Ms. Burke's construal of what the Court in the Third Circuit here is trying to do.  I think the right way to look at this is

1    you have to ask whether the information that the relator

2    disclosed to the Government, in advance of filing the action,

3    significantly adds, you know, new, essential facts to the

4    fraud that was publicly disclosed, in a way that's meaningful

5    to the recipient of the information, which is the Government.

6    So it's got to be significant and essential, from the

7    perspective of the Government.   Okay?   Because they are the

8    recipient of the public disclosure, of that information.   So

9    it's just a whose perspective is it in.   It's not the world,

10   in the abstract, but the Government.

11            It's also clear that it's a comparative analysis

12   here.   Again, what -- as the Court goes on, it talks about

13   whether -- you know, it talks a little bit about the

14   relationship between the substantial similarity standard and

15   the materially adds standard.   And it recognizes that, just

16   because they found that some -- that to -- that the public

17   disclosure is substantially similar to the relator's

18   theories, that doesn't answer, it's not coextensive with has

19   the relator's information that they provided to the

20   Government, in advance of the action, materially added,

21   right?   That they're different because there has to be able

22   to be a gap between the two, or the materially added

23   information -- in theory, otherwise the materially added

24   requirement wouldn't be meaningful.   And so it said, just

25   because we found there was substantial similarity in Moore

1    doesn't mean that the relator's information materially added.

2           So then it says, well, how do we figure out what

3    "materially added" means in this context.  And we already

4    know that they're substantially same.  And the -- that's

5    where they use 9(b).  And they don't use 9(b) to say evaluate

6    the relator's complaint.  What they do is they say -- and

7    it's said in the context of a case where the fraud that was

8    alleged was pretty thin in the public disclosures, and there

9    was a huge gap.

10          There wasn't -- these weren't -- this wasn't a

11   public disclosure from a corporate insider.  This was a

12   public disclosure from a couple of news media sources and

13   some FOIA information that literally disclosed American --

14   like a couple of salient facts, contradictory facts.  And

15   then the whole body of the public disclosure required an

16   inference of fraud to be knit together between the two.

17          The who, what, when, where, and how, the 9(b) is

18   what the Court says, that when we're trying to figure out

19   what are the kinds of facts that, if they're not in a public

20   disclosure, are salient.  It's who, what, when, where, how.

21   You know, is the relator adding information on those points

22   that's missing, and that is really essential to and

23   significant?  A demanding, high bar.  Okay?

24          And so, in Moore, the issue there was that the

25   relators had been able to go through civil discovery in a

1    wrongful death case that did not, itself, qualify as a public

2    disclosure under the new bar, and had depositions of the

3    principals.  They had taken document discovery.  And so they

4    were able to flesh out the context, the color, the -- all the

5    why behind what was going on.  Like it wasn't just, oh, I see

6    an American ship captain who doesn't have control, and a

7    representation that there is control.  It literally got at,

8    through the depositions and all that evidence, disclosure of,

9    you know, here's how the sham transactions work, here are the

10   filial and financial relationships among the different people

11   that affected the transaction, and also, a lot of important

12   facts about how the companies worked, what the different

13   corporate relationships worked, how the money interacted in

14   between and among them.

15        So it was -- and those are facts that are not just

16   general here's how we do business facts.  These were facts

17   that were directly pertinent to the -- proving that there was

18   actual fraud going on, as opposed to, well, we're going to

19   infer fraud from these disparate facts, but you know, is it

20   really fraud.  So, there, that was the way that analysis

21   went.

22        You had a low degree, very little, by way --

23   roughly, pretty little, by way of the public disclosure.  And

24   so the bar for what's going to materially add is going to be

25   a lower bar.  And in this particular case, the relator,

1    because they had litigated this case all the way through had

2    had access to all that discovery, was able to put in quite a

3    bit more.

4         Winkelman is a great example of another case

5    that's, again, applying that same concept of materiality

6    here.  But there, what had been publicly disclosed was

7    higher.  The theory of fraud itself had been publicly

8    disclosed in news media.  And what Winkelman says -- and it

9    applies very much here, too -- is that, when there's more

10   that's been disclosed, the bar for what you need to add, to

11   add something that's significant and essential for the

12   recipient of the information, to qualify as an original

13   source, is going to be much higher, right?

14        So that's why Ms. Burke is trying very hard, of

15   course, to exclude chunks of our public disclosure because,

16   if the only things that count as public disclosure is, you

17   know, three paragraphs from the Burns complaint, she's got a

18   much lower bar to meet, to try to argue that her clients --

19   the information her client provided to the Government in

20   advance of filing the case, you know, might qualify as a

21   public disclosure.

22        But when you look at the -- all the public

23   disclosures as a whole, you see, you know, an extensive --

24   you see, on the device check theory -- you know, start there

25   -- allegations that Medtronic's business was to have field

1    employees doing device checks, on demand.

2         Onwezen alleges that the business model was that,

3    if you implant our device, we will do everything, from then

4    on, for you, it's ours, we got it covered.  That's the device

5    checks, the interrogatories, it's billing information, it's

6    everything.  Talk about practice management consulting?

7         It's -- there are allegations in the prior-filed

8    complaints that we had a promotional product that was a heart

9    failure clinic in a box, where we'll give you the forms,

10   we'll show you how to do it better, we'll do all of this.

11   This is in the prior-filed stuff.  Branded lean sigma, no,

12   but it's the same exact kind of things that she describes.

13        And so, when you have this, and you're trying to

14   figure out whether what she's disclosed to the Government

15   materially adds, you have to ask, in light of the body of all

16   of this, are the additional facts that are contained in those

17   disclosures essential.

18        So let's turn of some of what she highlights here.

19   Again, I maintain, and I've made -- and I don't think I need

20   to reargue, you know, the issues about lack of admissibility

21   around the evidence of the date and content of the

22   information provided to the Government in advance of the

23   disclosures, but we've already covered that.

24        In terms of what she's saying, aside from the

25   complaint -- which, again, is not -- doesn't qualify as

1    information provided to the Government in advance -- she

2    pointed to -- she listed that, in the information, in the

3    documents that they gave the Government, she said there was

4    substantial additional detail on value sales, practice

5    management, the names of CSs involved in the fraud.   There

6    were value selling pamphlets, strategic planning documents,

7    and a bunch of other things.

8         She only actually provided Bates ranges for a

9    couple of these.   So, again, I mean, this is -- we're even at

10   oral argument, and we're getting descriptions, and we're not

11   actually even getting what's specifically in here that's --

12   that matters or that's difference.   But let's take on some of

13   these things that she's identified, just to give you a sense

14   of what needs to be done.

15        With respect to the value selling instruction

16   pamphlets, which are 1915 to 2146, these are value-based

17   selling roleplay workbook and pre-service reading.   So these

18   are the documents that they gave the Government.   Again, if

19   you look at the documents, what -- they don't add -- first,

20   they don't add anything material to the fraud allegations.

21   What they're doing is they're saying they're training people

22   how to sell products by finding out what the recipient of

23   your sales pitch cares about.   It's like Selling 101.

24        This isn't a book that is teaching people how to

25   provide free services.   This is a book about teaching sales

1   reps how to listen to their audience and understand what

2   matters to them, engage a doctor in a conversation, find out

3   that, oh, gosh, it's really hard for us to, you know, get

4   patients on snowy days; well, you know, we have a remote

5   monitoring option that allows you to have your patients

6   checked remotely, so that they don't have to come into the

7   office; wow, that's really great, that might be a reason why

8   I might choose a Medtronic product.  Okay?  That's value

9   selling, that's what these are teaching people how to do.

10  So, first of all, they don't add to the fraud.

11           Second of all -- and I think this is important, as

12  well -- if you look at the dates on these documents -- now

13  keep in mind, we're talking here about conduct March 23, 2010

14  forward.  So Relator Forney provided to the Government -- and

15  it's just the documents -- these value-based selling

16  workbooks and things are dated 2006 and 2008.  Full stop.  So

17  it's two years -- the latest one of these is two years prior

18  to the time period where the conduct is at issue.  Now, if

19  Ms. Forney had given a statement to the Government

20  contemporaneous with this, saying, hey, these workbooks were

21  used in 2010 and 2012 and 2016, that would be one thing.  But

22  we don't have that, she didn't do that.

23           So the question you're asking is:  Is this value-

24  based selling stuff, on its face, information that materially

25  adds to the allegations of fraud that we already see in the

1    publicly disclosed information?  And the answer is no.

2         It's also worth noting that these -- you know, this

3    value-based selling have some examples in roleplay where

4    you're going to be talking about, you know, device checks and

5    all of that, but again, fully publicly disclosed in the prior

6    disclosures that there were people, clinical specialists,

7    whose job at Medtronic was to go do device checks, post-

8    implantation.  That's what _Onwezen_ alleged, my job, up to 40

9    a day -- or 40 a week, I mean, a high volume, that's what I

10   did, day in and day out, right?  That's all fully disclosed.

11        So, you know, seeing a document that says, you

12   know, you're trained to ask good questions of your customers,

13   to understand where they have problems that you can solve, is

14   just basic selling stuff.  It doesn't support fraud at all,

15   let alone add to her theories.  And it goes on from there.

16        In terms of the name -- in terms of the other

17   document that she pointed out to, which are the Google

18   calendars that she called out, this relates to the device

19   check theory, at Bates Numbers 01249 to 1772, and 02252 to

20   2274.  These are documents that she provided to the

21   Government and relied on in drafting her original -- her

22   first amended complaint, and then in her second amended

23   complaint.

24        These documents certainly do provide information,

25   details about efforts to schedule device checks.  And then

1      they also provide information about -- they're sort of

2      slightly illegible -- and that's generous -- printouts of

3      calendar entries, with a lot of fairly indecipherable

4      information on it.  And again, what was provided to the

5      Government was just the documents, not context.

6            They span a date range of, roughly, September 2011

7      to January 2012, so it's a short time frame.  And they show

8      that lots of -- if you take them at their face -- and again,

9      I don't think this is necessarily evident, just on the face

10     of the documents.  But even being most generous to Ms. Burke,

11     they show lots and lots and lots of device checks were

12     scheduled to occur, lots and lots and lots of device checks

13     were scheduled to occur.

14           The <u>Onwezen</u> complaint, on its own, the allegation

15     that, hi, as a clinical specialist, our jobs are to go out

16     and do device checks, all day, every day, these calendars

17     don't add anything material from the perspective of the

18     Government to that allegation.  Okay?  Because all these do

19     is they show, at best, at best -- and again, on their face, I

20     don't even think it's clear what they show.  And keep in the

21     mind, the document, and not testimony explaining the

22     document, was provided to the Government.  They show, on

23     their face, very little.

24           I -- also, to the extent that Ms. Burke has

25     emphasized that these documents meet 9(b), help meet 9(b),

 1   are pertinent to the Medicare claims at issue in this case,

 2   which she's been pursuing, I also want to point out that --

 3   and we mentioned it in passing in our brief -- her

 4   allegations in her second amended complaint, in Paragraph 49

 5   in the first amended complaint that the Court insufficient to

 6   pass 9(b) because they didn't identify patients as actual

 7   Medicare patients, for whom Medicare claims were submitted.

 8   And that was essential for -- you know, to pass 9(b).  And

 9   then, in her second amended complaint, she amended that

10   paragraph, and said, oh, these are Medicare patients, and

11   they did have claims submitted for them.  All the information

12   she is relying on to make those allegations are in here.

13        And we deposed Ms. Forney on it.  And if you look

14   at the documents, it is crystal-clear there is not one piece

15   of payer information in here, and there is not one piece of

16   claim information in here.  So these documents do not show

17   Medicare beneficiaries, Medicare payer, Medicare claims, or

18   Medicare payment.

19        That -- when we say these show less to the

20   Government than what the Burns complaint did, one of the

21   things I mean is the Burns complaint attached many fewer

22   examples of superbills.  But number one, they were bills.

23   And number two, at least for some of them, they actually

24   indicated that Medicare was a payer on it.  That's not -- she

25   has nothing, not one thing in this huge stack of documents

1    that identifies a person for whom Medicare was a payer, and

2    not this detail on these checks.

3           These documents show the Government what they

4    already knew from the prior public disclosures.  All those

5    complaints on device checks, the device checks are being

6    scheduled, the Medtronic people are doing them all the time,

7    and that they're going forward.  These documents, even though

8    they are a high volume of checks, it's for a short period of

9    time.  And they don't add anything to what Onwezen alleged,

10   what Burns alleged, and all of that because, again, they're

11   showing that Ms. Forney is seeing the same thing, and is

12   alleging the same thing that others have alleged, just based

13   on her experience in Pennsylvania.

14          In terms of some of the other documents that you

15   see in this giant stack, she cited to, I think Bates names

16   [sic] 275 to 276 as documents that provide names of CSs

17   involved in the fraud.  I would draw the Court's attention to

18   the documents Bates-numbered REL-00275 and 00276.  My

19   document, with those Bates numbers, are blank health

20   insurance claim forms that contain no information whatsoever,

21   and certainly no information about CS names.

22          And for what it's worth, this is raising, in my

23   mind, once again, questions about the integrity of the

24   production, about -- I mean, maybe Ms. Burke just miscited a

25   document in oral argument, which is fine.  But we've only

1   gotten pointed now, on the fly, to maybe four different jump

2   cites within her documents, and one of them doesn't line up

3   with her description.  So, either your documents match mine,

4   or mine match hers, or I'm not even sure who has what at this

5   point, which, again, is -- I realize we moved for summary

6   judgment on this jurisdictional and other issue before

7   summary judgment ended.  But we had asked 16 times until

8   Tuesday for exactly her communications with the Government.

9   And now I'm wondering whether we even still have them.

10           Other documents in here -- and this is what I mean

11   by they don't materially add to the broad public disclosure

12   that's already there.  There are no emails in this stack of

13   documents, just by way of example.  When you think about the

14   kind of documents that a corporate insider could potentially

15   pull and provide to the Government to really provide

16   meaningful, essential, new evidence of fraud, that maybe the

17   Government had only seen disclosed before in prior public

18   disclosures at a higher level:  Emails; internal corporate

19   planning documents that talk about, we got to provide these

20   free services, here's the ROI for the free services that

21   we're going to be providing, right?  Those kind of documents

22   that sometimes appear in cases.  None of that is in here.

23           What you have are, you know -- just looking at the

24   first document, we have a PowerPoint presentation about 2009

25   CPT codes for device monitoring.  It opens with a disclaimer

1    that the sources for this are AMA-published and Federal-

2    Register-published information, and you shouldn't rely on our

3    coding advice, you should really, you know, rely on your own

4    coders, but this is sort of for your information because we

5    want you to have this coding information about our products.

6    This program has the prior approval of the American Academy

7    of Professional Coders and AHIMA.  And then it goes through

8    codes, and it's coding information.

9         In the prior public disclosures are disclosures

10   about providing coding and billing information and education

11   to doctors.  Stokes alleges it in the case.  It's a fact, not

12   a fraud theory.  But it's a publicly disclosed fact that he

13   is a health economics guy and was going around teaching

14   hospitals about coding and billing and how to do all this

15   stuff.

16        Then there's a whole chunk of this material are

17   just documents that are hospital outpatient services lab

18   sheets, reimbursement and billing advice, again, coding

19   information.  We've got a copy of the AdvaMed Code, we've got

20   a copy of the CMS Avoiding Medicare Fraud and Abuse Roadmap

21   for Physicians.  Providing this information to the Government

22   doesn't materially add essential, significant information

23   about the fraud that she is pursuing in her case, relative to

24   these five complaints, public disclosures articulating what's

25   going on.  Most of it isn't even relevant.

1          She's got completely inexplicable composite

2     documents in here, again, showing process flow at a couple

3     examples of practices in the East Reading area.  And I'm

4     looking at REL-00471, for example.  There's nothing in here

5     that talks about Medtronic providing services for free, and

6     there's nothing in here that talks about Medtronic providing

7     device checks for free.  It's just not -- there's nothing on

8     the face of the document that is germane to the theories in

9     her case.

10          Could Ms. Forney provide testimony about this that

11     would potentially explain that this is a document that

12     somehow does provide evidence that supports her theories?

13     Maybe.  But she didn't provide it to the Government in

14     advance of filing her case, and we have no evidence that she

15     provided it to the Government at all.

16          We do know she was interviewed by the Government,

17     but both the Government and Ms. Burke are retaining privilege

18     over that.  And so you can't assume that Ms. Forney explained

19     these documents and why they support evidence of fraud, when

20     they don't, on their face, even relate to her theories

21     because, to the extent any such disclosure even was made,

22     it's either privileged or not in advance of the case being

23     filed, as it needs to be, in order to qualify her as a

24     relator.

25          There are -- there is a PowerPoint in here -- I

1    mean, just by way of example, you know, part of what matters,

2    too, is there is stuff in here that just seems wholly

3    irrelevant.  There's a document here, REL-00522, called

4    "Quality at the Roots, Ensuring Quality from Idea to

5    Explant."  It's a PowerPoint that is talking about

6    reliability data relating to recalls.  There is no theory in

7    this case that relates to recalls and reliability of product,

8    right?  But this was part of the disclosures to the

9    Government.

10           There is a document deciphering the code, which is

11   an instruction manual on the AdvaMed Code, which she mentions

12   in her complaint.  But it is something that the Government

13   may not have had already, except for the fact that it's

14   already been disclosed because it was talked about in the

15   Burns complaint.  Burns alleged -- Burns describes

16   deciphering the code in his complaint.  So the fact that they

17   are providing a copy of it doesn't add anything to what's

18   already been prior publicly disclosed.  And all it is, is an

19   industry guidance on AdvaMed.

20           Again, this doesn't add anything.  This isn't a

21   significant, essential, new piece of information that adds

22   materially to this body of public disclosure about the fraud

23   alleged, which is you are providing device checks for free,

24   in order to get remuneration.

25           You certainly see, you know, an agenda about a

1    clinical specialist annual meeting that says, hey, we want

2    you guys to contribute to profitability.  Okay.  But that's

3    it, right?  No explanation.  This is not a document that adds

4    to the <u>Onwezen</u> and other allegations, that say, my job was to

5    go do device checks for free, to make sure the doctors knew

6    that, once they implanted our product, we would take care of

7    everything for them, from that point forward, right?

8            There are, you know, some compliance policy pieces

9    of information here that say Medtronic has a compliance

10   policy.  It doesn't add anything that's essential, that's

11   demanding, that's significantly new to all of the prior

12   disclosure.  Again, it doesn't even talk about the fraud, and

13   there's no context and no connection drawn.

14           The last type of document that I'll sort of talk

15   about here -- but it's really -- these are just -- they don't

16   do what she says they do.  You know, they certainly have some

17   documents that talk about, here's what we expect from a

18   clinical specialist, here's what we expect from a manager of

19   clinical specialists.  Those documents in order to be

20   compensated, in order to be promoted say, you are expected to

21   do device checks, to proactively reach out to customers, and

22   make sure they're being taken care of, to add value.  Okay?

23           That doesn't add anything materially new to the

24   already existing body of allegations about Medtronic reps

25   going out and doing free device checks, in order to sell

1    product.  This just says, in fact, your job is defined, in

2    part, as going out and doing device checks, and we want you

3    to add value; i.e., we want you to sell the product.  It's

4    just giving the Government the same information that it

5    already has because those definitions of the position are not

6    connected to -- it's not a performance review of an

7    individual who's being disciplined for, you know, you are

8    doing -- are refusing to do free device checks, you know, I'm

9    going to discipline you and demote you or something like

10   that.  And I'm just making stuff up because there's nothing

11   like that.

12        That's the kind of new information; the who, what,

13   where, how information that Moore was talking about, and that

14   was available in Moore because of the discovery that had been

15   taking place, the depositions, the document discovery of the

16   defendant.  There is nothing here that does that.

17        She mentioned, you know, strategic planning

18   documents.  Yeah, there's a document about how to do a

19   strategic plan.  There's, you know, documents about how to

20   handle recalls.  There's a HIPAA privacy fundamental, and

21   there's no HIPAA claim in this case.  Again, there's sort of

22   healthcare economics information that just -- none of this is

23   about -- is pertinent to or adds materially to what the fraud

24   is.  None of it contains individual employee information or

25   connections between employees and managers, instructing them

1    to perform fraud, instructing them to do the kind of stuff

2    that's at issue here.

3         So, even if the Court considers this sort of giant

4    set of documents that the relator has produced, kind of at

5    the eleventh hour, there is nothing in there that materially

6    adds to the public disclosures, and to the extent that this

7    is what was provided to the Government in advance of filing

8    the action.

9         I wanted to just wrap up because I know I've been

10   going for a long time.  If I might just address a couple of

11   Ms. Burke's points about the first part of this, which is

12   qualifying for the statute.  First, she pulled <u>Stevens</u> out

13   and read from it, and argued that the holding in <u>Stevens</u> is a

14   rejection of the notion that the relator serves as an agent

15   of the Government.  And I think I read, actually, the same

16   parts of the decision, too.

17        The issue is not whether the Court held that, for

18   purposes of the bounty piece, the relator is a partial

19   assignee of the Government's right to recovery.  I think I

20   acknowledged that, I said it's part of the holding.  The

21   question is:  What about the rest?

22        And the way the Court tees it up is that the Court

23   says -- I'm on it -- where the Court says:

24             "It would perhaps suffice it to say that the

25             relator is simply the statutorily designated agent

1           in whose name, as the statute provides, the suit is

2           brought, and that the bounty is simply the fee,

3           that would take care of things, but that analysis

4           is precluded by the fact that the relator himself

5           has an interest."

6       I want to point the Court to the modifier on the

7   "simply."  The Court is saying maybe it would be -- it would

8   perhaps, in theory, suffice it to say that there's a simple

9   answer here, across the board, the relator is an agent

10  because the statute designates him an agent.  But what the

11  Court is saying is it's not that simple, it's a little bit

12  more complicated, and we have to deal with the bounty

13  portion.  And that's why, at the end of that paragraph, after

14  the Court explains why that simple answer, to cover the

15  entirety of standing, doesn't work.  The Court says:

16          "For the portion of the recovery retained by the

17          relator, therefore, some explanation of standing

18          other than agency must be identified."

19      And then goes on to say, again:

20          "There can be no doubt, of course, that, as to this

21          portion of the recovery, the bounty he will

22          receive, he has a concrete private interest."

23      And then the Court goes on to talk about:

24          "However, we believe that an adequate basis for the

25          relator's suit for his bounty is to be found in the

1            doctrine of an assignee of a claim and the partial

2            assignment of right, and therefore, that the U.S.

3            injury, in fact, suffices to confer standing on

4            Relator Stevens."

5        So what the Court is quite explicitly doing is

6    saying, yeah, the statute designates you the agent, but our

7    inquiry doesn't stop there.  That's what's being rejected

8    here.  You've got this bounty that you have an independent

9    right to sue for.  And for that, and that portion, we need

10   another answer, and we like the answer which is that you're a

11   partial assignee of rights, which is entirely consistent with

12   Footnote 4 and everything else she said.  And so the Court is

13   saying this is a little bit more complicated.

14        And we cited a Fifth Circuit case, which is after

15   Stevens, which recognizes this is not a big deal because this

16   issue that we're really -- you know, just sort of cut away

17   because the Supreme Court had resolved the issue.  But

18   there's a Fifth Circuit decision which sort of acknowledges,

19   again, this sort of split issue that the relator is an agent,

20   and the relator is an assignee for purposes of the bounty in

21   a footnote in that decision, and it's cited in our brief.

22        So, again, I just -- this case, I think just the

23   plain language and the logic of what the Supreme Court said

24   in Vermont Agency supports the fact that the relator -- I

25   mean, they're statutorily -- they're a statutorily designated

1    agent.  This is all consistent with the structure of the

2    state.  The U.S. remains a real party-in-interest.

3            Of course, if the relator litigates the case, it

4    ends up binding the United States across the board because,

5    if Ms. Burke, you know, goes to trial and loses, the United

6    States can't come in and say, oh, and now we want to

7    relitigate our 70 percent sure.  So of course the United

8    States is bound the same way a principal is bound by the

9    agent, by the relator's actions.

10           And in fact, the fact that the United States

11   retains a lot of rights, even when they don't intervene,

12   including the right to ask for copies of all the pleadings,

13   to supervise, to participate, if it elects, and not to, if it

14   doesn't, to monitors, required to be informed of the

15   proceedings, and can intervene for good cause shown at any

16   time is also indicative of the fact that they're a principal

17   who retains some degree of control over their agent.  The

18   agent certainly has the right to litigate the action, when

19   the Government doesn't intervene, and with respect to the

20   relator's bounty, has some special rights with respect to

21   Government objection to settlements and things like that,

22   which are -- the Supreme Court recognized.  But none of that

23   changes the fact that there's an agency relationship that

24   covers the rest of the case, and so -- that's designated by

25   statute.

1    With respect to the argument that the <u>Gadbois</u> case

2    somehow is inapposite and doesn't hold on the point that,

3    when the Government intervenes in an action, they become a

4    party to the action, <u>Gadbois</u> is an example.  It cites

5    <u>Eisenstein</u> for the proposition, when the Government -- which

6    is a Supreme Court case from the 2009 -- when the Government

7    intervenes in an action, it intervenes in an action; when it

8    doesn't, it's not a party.

9    You know, look, the plain language of the statute

10   says "intervene in the action."  It doesn't say you intervene

11   in the claim.  Her argument that the DOJ has somehow modified

12   through some sort of -- by its practice, whether longstanding

13   or not, of filing papers when it's choosing to settle a case

14   by saying that it's intervening in some, and not in others,

15   and that Courts acquiesce to that, doesn't change the

16   language of the statute or the status of DOJ.

17   I think any litigant would be free to argue that,

18   even when DOJ files that, the DOJ becomes a party to the

19   action.  There's -- no court has ever disagreed with the

20   proposition that I'm advancing to you, and <u>Gadbois</u> agrees.

21   It says you become a party to the action when you intervene.

22   There's just -- you can't -- DOJ can't, by fiat, with

23   filings, just invent some new limitation that doesn't apply.

24   Plus, this is the normal way things work, which is

25   -- in civil litigation, which is, if a party is only in a few

1     claims in a case, and not all of them, they're still a party

2     to the case, right?  That doesn't mean that somebody can sue

3     them on claims that haven't been asserted against them.

4     Fine, it doesn't mean anything.  It just means -- but it

5     still means that they're a party to the case.

6                 If you've got three plaintiffs, right?  And two of

7     the plaintiffs are pursuing two of the claims, and one of the

8     plaintiffs is pursuing, you know, a different two claims,

9     they're all still parties to the case.  So it's -- I think

10    it's really important here to recognize that, first of all

11    and foremost -- and it really ends the question -- the False

12    Claims Act itself says that, when the Government intervenes,

13    they intervene in the action.  Full stop.  That ends the

14    inquiry.  There is no case that says otherwise, and there is

15    no reason that's been given to suggest otherwise, other than

16    DOJ's practice in filing documents, which has never been

17    critically reviewed by a court, except to the extent you're

18    starting to see it be critically reviewed by Courts like

19    Gadbois, and the Courts are rejecting it.  And Ms. Burke

20    hasn't pointed to any court that's accepted it at face value,

21    where it's been contested.

22                And then second, again, in normal civil litigation,

23    when you're either a party or not a party, whether you're in

24    all or some of the claims of the case.  And so we believe

25    that that's consistent, as well.  So the Government is a

1    party to two cases.  The relator is an agent of the

2    Government with respect to all three, for purposes of the

3    public disclosure bar.

4         With respect to substantial similarity, it's the

5    last issue.  I think I address the principled concern with

6    Ms. Burke's argument, that, somehow, most of these complaints

7    should be ignored because they weren't pled with 9(b)

8    specificity.

9         I think the only other thing I would say is I do

10   think, if the Court has any questions or hesitation about

11   whether the paragraphs we've presented do show that they're

12   substantially similar, this is not a high-bar test, whether

13   they're substantially similar under the Court's -- you know,

14   the much more fact-intensive test is the one under the

15   original source question, which is:  Given all the public

16   disclosures, does the information that she provided to the

17   Government in advance of the case materially add to the body

18   of what was publicly disclosed.

19        But there is no requirement that the public

20   disclosures themselves have any particular level of detail.

21   They just need to disclose, as a general matter, the fraud

22   that's alleged in the complaint.  And here, we think they

23   more than do.

24        THE COURT:  Very well, Counselor.

25        Any final word, Attorney Burke?  You two, you don't

1    seem to agree on anything.

2         MS. BURKE:  Your Honor, I'll be brief, but I think

3    there are a couple of important points to make; first, about

4    whether or not a relator is an agent.

5         There is a 2009 case that's after the <u>Stevens</u> case.

6    And in that case, it held that, when the United States

7    declines, it's no longer a party.  It's impossible to

8    reconcile that later Supreme Court holding with the manner in

9    which Medtronic reads the <u>Stevens</u> case.  On the other hand,

10   if you read the <u>Stevens</u> case and look at what the Court

11   actually held, what the Court held was that the relator was a

12   partial assignee.  That holding is, in fact, then consistent

13   with the later Supreme Court ruling and --

14        THE COURT:  Yeah, but the problem with that is, if

15   a statute says "the Government or its agent," who could it be

16   talking about?  Who else would be an agent in this type of

17   case, except the relator?

18        MS. BURKE:  Well, Your Honor, the term "the

19   Government or its agent" is used elsewhere in the statute.

20   And what it's talking about is, for example, Centers for

21   Medicare and Medicaid.  They are referred to as an "agent of

22   the Government," so --

23        THE COURT:  Isn't that considered the Government.

24        MS. MAYER:  No, it --

25        MS. BURKE:  No, it's considered an agent because it

1    says, if you file a claim on the Government or its agent.  So

2    they are -- in that context, they're considered an agent.

3         THE COURT:  So you think the "Government" means

4    just you have to file a claim against the United States

5    Government or the United States Government, and any agency of

6    the United States Government would not be the United States

7    Government?

8         MS. BURKE:  So -- well, for example, it says the

9    phrase "in which the Government or its agent is a party."

10   So, for example, if there was a case that wasn't -- it wasn't

11   a *qui tam*, but it was simply a lawsuit, and it was a lawsuit

12   against the Centers for Medicare and Medicaid, and that was

13   the named party.  That would qualify under this as something

14   that constituted a statutorily eligible public disclosure.

15        THE COURT:  The Center --

16        MS. BURKE:  So it's --

17        THE COURT:  -- for Disease Control is an agent of

18   the United States Government?

19        MS. BURKE:  Yeah, the -- it -- yes, the -- it's an

20   agent, it's an agency of the Government.  So you're thinking

21   of it as this is talking only about *qui tam* litigation.  It's

22   not.  It's talking about all civil litigation.

23        So it used to be the case that a defendant, such as

24   Medtronic, would scour all lawsuits, among -- even amongst

25   private parties.  So Congress, when it amended it, says,

1    okay, wait a minute, this has gotten -- this has tipped the

2    balance too far, we didn't want it to be so easy for

3    defendants to get away from these *qui tam* lawsuits, so we're

4    going to -- we're going to reign back in and shrink that pool

5    of statutory-eligible lawsuits, and we're going to shrink it

6    down to lawsuits that involve a -- they can involve a private

7    party, but the Government or its agent has to be one of the

8    parties.

9            So, for example, if, you know, the Town of Easton

10   sued the Federal Government and, through that lawsuit, all

11   sorts of facts came out that were pertinent, that would be an

12   eligible public disclosure because the Government or its

13   agent was a party.  So you can't think of this just as

14   talking only about *qui tam* lawsuits; it's not.  It's all

15   civil lawsuits.

16           And I would suggest the fact that -- I mean, I view

17   the -- and I apologize.  I do not know the Latin phrase that

18   captures this, but of statutory interpretation.  But

19   "relator" is a term of art used in the statute.  If Congress

20   wanted to subsume declined *qui tams* into this category, and

21   Congress, obviously, is put on notice that the relator has

22   been held not to be an agent, but is held to be a partial

23   assignee, and the -- Congress is, obviously, put on notice

24   with the 2009 case of the Supreme Court that the United

25   States is not -- even if the relator pursues it, the United

1    States is not considered a party.  Now, if the relator was an

2    agent, then the U.S., by definition, would be a party.

3         So, given that -- given the Supreme Court holdings,

4    if Congress wanted to make sure it subsumed declined *qui tams*

5    into this -- you know, into this statutorily eligible bucket,

6    it would have used the term "relator."  So I think that

7    there's no way you can read the two Supreme Court decisions

8    that preceded the congressional change the way that Medtronic

9    is urging.  I think it's counter to the -- it's counter to

10   that 2009, the <u>Einstein</u> [sic] decision, 556 U.S. 928.  It

11   basically makes that -- it basically ignores the impact of

12   that because that could -- you could not reach a decision

13   that the United States is not a party if you deemed relators

14   to be their agents.

15        So I think -- I just think we're right on the law

16   on that one, Your Honor.  And for that reason, I think that

17   these need to be dismissed as having not identified

18   sufficient public disclosures.

19        I'll speak briefly to the <u>Gadbois</u> case, simply just

20   to point out what I said about it.  That case doesn't have a

21   partial intervention, partial declination.  It's got two

22   different lawsuits.  One intervened; one declined.  So,

23   therefore, it doesn't shed any light on what's before Your

24   Honor, which is one of these partial interventions, partial -

25   - and as a practical matter, there hasn't been litigation

1    about this.  The Courts have gone along with it.

2         And in the particular case that we're dealing with,

3    the Onwezen and Schroeder case, the Court entered that order.

4    It could have rejected that and said, you're either in or

5    you're out.  It didn't do that.  It went along with that

6    approach.  And so I would suggest there's no reason for Your

7    Honor not to go along with that approach, as well.

8         Importantly, I want to turn to the way in which

9    Medtronic tries to get Your Honor to ignore the second

10   amended complaint, and also suggest that, somehow, we haven't

11   introduced admissible evidence because -- through -- that,

12   instead, it was just hearsay.  That's simply wrong.  The --

13   we put in an affidavit, we put in a declaration from Forney

14   as Exhibit 16, in which she says, at Paragraph 5:

15        "Through my counsel, I am providing the Court with

16        a Bates-stamped copy of the documents that my

17        counsel provided to the Government in June 2015.

18        The documents provided to the Government were not

19        Bates-stamped, but otherwise, the documents are the

20        same.  My counsel has marked this copy as marked

21        Relator's Exhibit 18."

22        That's direct knowledge.  She knows that.  That's

23   what was done.  These documents that we gave you and had

24   given to Medtronic were given to the Government.

25        The other thing I would point out, and the reason

1    that I just suggest you look to the second amended complaint,

2    the second amended complaint, she testified in her deposition

3    that everything in the second amended complaint was given to

4    the Government.  So it's simply a way for Your Honor to look

5    at the documents, to look -- and they're quoted at length in

6    the second amended complaint.  And the testimony there is at

7    Forney 255 to 56.

8              So the suggestion that, somehow, at this -- that,

9    halfway through discovery, you're supposed to simply accept

10   all of Medtronic's allegations that these documents are

11   meaningless to prove the fraud, and ignore our claims, that,

12   in fact, we are relying on these documents, and they will

13   prove the fraud.  It -- you're -- it's not at a point where

14   you're permitted to do that.  I mean, under <u>Celotex</u> and the

15   others, discovery hasn't closed.  We still get the benefit --

16   we get the benefit of the assumption that that is fraud.

17             All of Medtronic's arguments, basically, are the

18   same arguments they use to argue there's no fraud.  They

19   characterize all -- they characterize everything we've put

20   forward as novel, immaterial, not proving any kind of fraud.

21   They simply dispute the entirety of the case.

22             Well, when you look at it from our point of view,

23   we believe it's a strong fraud case.  We believe that sending

24   people out, incenting clinical specialists and sales reps to

25   get out there and give free services; services that are then

1    billed to the Government, services that are not paid for,

2    services that are not paid for by the physicians, that is a

3    kickback.

4         And so, when you look at it from our perspective,

5    all of the documents that we gave you, and all the documents

6    we gave the Government are material.  And they will be used

7    to show the jury all of these people were financially

8    incented to believe in this -- to behave this way.  And it

9    worked.

10        I mean, it worked even on Relator Forney.  I mean,

11   you know, she did it.  And she supervised other people,

12   instructed other people to do it.  The documents go to how

13   they were trained to do it, it goes to the implementation.

14   It goes to all of the specific details.

15        And on that, I would suggest, Your Honor, that you

16   just look at the language of the Moore case.  Medtronic tries

17   to claim, okay, well, you know, that somehow I'm ignoring the

18   remainder of the public disclosures, except for the 9(b)

19   elements.  Not at all.  Those complaints, you can trudge

20   through them, as I did, you can read them in their entirety.

21   What I gave you were the high points.  I gave you their most

22   specific, their most detailed allegations because those are

23   the most powerful, right?

24        The most powerful information is found in the Burns

25   complaint and in the Doe complaint.  And they've got actual

1    transactions, actual fraudulent transactions that they

2    identify.  And those have power, and those have merit, and

3    they are very similar to what we have.  But we have more, and

4    we have different, and we have -- and we also have a

5    completely different kickback scheme with the lead sigma.

6            So, when you look at <u>Moore</u>, which is really the

7    case that's going to guide your analysis, it doesn't say, try

8    to put yourself in the shoes of the Government and make a

9    very stringent determination on materiality, not at all.

10   What it says is look at what is out there in the public, look

11   at it -- look at it in the public, and then look at Rule 9(b)

12   to see whether anything new has been added.  And so it reads,

13   you know:

14           "Rule 9(b)'s pleading requirement is of some

15           assistance."

16           And it talks about 9(b).  And then it says:

17           "In our view, this standard also serves as a

18           helpful benchmark for measuring 'materially adds.'

19           Specifically, a relator materially adds to the

20           publicly disclosed allegation or transaction of

21           fraud when it contributes information -- distinct

22           from what was publicly exposed -- that adds in a

23           significant way to the essential factual

24           background; the who, what, when, where, and how of

25           the events at issue."

1      Measured by that standard, it is impossible to rule

2   for Medtronic.  We have definitely added substantially to the

3   factual background.  They've got some good facts that they've

4   alleged; we have way more.  And we have a voluminous amount

5   in the calendars that we have given to Your Honor.  So we

6   have that -- we pass that bar.  And that is what the Third

7   Circuit says is the bar of "materially adds."

8      And we think the reason then Medtronic is fighting

9   so hard to claim you shouldn't look at the second amended

10  complaint, and you shouldn't actually look at the documents,

11  and kind of mocking the import of the documents, is because

12  it's pretty clear we pass that Third Circuit test.  I mean,

13  we have provided to the Government a substantial amount of

14  additional factual information.  We've given them names,

15  we've given them dates, we've given them details on how it is

16  done.

17     And so, Your Honor, we think that this motion for

18  summary judgment should be denied, and that the case should

19  resume discovery.  Thank you, Your Honor.

20          THE COURT:  Thank you very much, Counselor.

21          MS. MAYER:  Your Honor, may I just address --

22          THE COURT:  Sure.

23          MS. MAYER:  -- two --

24          THE COURT:  A final word?

25          MS. MAYER:  -- two small points, Your Honor?

1                    THE COURT:  Sure.

2                    MS. MAYER:  First, with respect to the agency

3        issue, Ms. Burke is arguing that -- is conflating two terms,

4        which mean very different things.  An "agency" is not an

5        "agent," they're different.  CMS is an agency, DEA is an

6        agency.  There are places in the False Claims Act that talk

7        about aspects of the act that apply to officers or agencies

8        of the United States.  That's distinct from whether the

9        Government or an agent is acting.

10                   Second, is that provision meaningless?  Because --

11       I'm going to take her at her word.  Because I've almost, but

12       not quite, memorized the False Claims Act.  That -- there's

13       provisions that say, if you make payment to the Government or

14       an "agent," as opposed to "agency."  I'm assuming it says

15       "agent" for purposes of this discussion.

16                   The Government sometimes contract out, they use

17       physical intermediaries to collect money.  Like there could

18       be a private entity that the Government has contracted with

19       to collect funds, a granting institutions that's doing grants

20       with federal funds.  And if you make a false claim to an

21       agent -- to someone who is either an agent or a contracted

22       delegatee [sic] of authority from the Government, there is a

23       way for this to make perfect sense without it being

24       coextensive with federal agencies, which is how Ms. Burke

25       would have you read the term "agent."

1          Finally, _Eisenstein_ doesn't support Ms. Burke's

2     position that an agent -- that, when it -- when the statute

3     says "the Government or its agent," it means the Government,

4     and nothing else.  In particular, she said _Eisenstein_ makes

5     no sense because it holds that, in an non-intervened case,

6     the Government is not a party, and it couldn't be the case

7     that, if its agent satisfied this requirement, that would

8     make the Government a party.  And that's not the case.

9          _Eisenstein_ doesn't talk about agents in that term,

10    but _Eisenstein_ talks about what it means to be a real party-

11    in-interest.  Okay?  And it says:

12              "The phrase 'real party-in-interest' is a term of

13              art used in federal law to refer to an actor with a

14              substantive right, whose interest may be

15              represented in litigation by another."

16          And it refers to Federal Rule 17(a).  And FRCP

17    17(a) lists different types of examples, they're non-

18    exclusive, of where a real party-in-interest may have

19    delegated authority to someone to act in their interest for a

20    certain purpose, and one of those examples is designated by

21    statute.  So that's all that we're talking about here, not

22    for the part of the bounty where the rationale for relator

23    standing, according to _Vermont Natural Resources_, is that

24    they're a partial assignee in the Government's right.

25          And for the rest of it, where the Government

1    remains a real party-in-interest, and is a real party-in-

2    interest, the False Claims Act has delegated to relators the

3    authority to sue on behalf of the United States, as well as

4    the relator suing on their own behalf.  And that's just sort

5    of the run-of-the-mill, same kind of agency that Stevens

6    recognized and that is recognized in Eisenstein in a

7    different context.

8            Finally, with -- I mean, if it matters to the

9    Court, in the Gadbois case, if you read, you know, three

10   sentences down, the Court does talk about, after going

11   through its analysis of the statute and the plain meaning of

12   the statute, it goes down and does some additional analysis

13   about the Court is concluding that the functional result of a

14   Government complaint is to amend the pleading.  And it

15   concludes -- and I'm looking -- by saying:

16           "This means that the Government became a party to

17           Mrs. Denk's whole action, every allegation, every

18           cause of action, even if it elected only to proceed

19           with and ultimately settle the claims related to

20           controlled Schedule II drugs."

21           I understand that Ms. Burke wants to say that,

22   somehow, if, ab initio, you say up front, I'm only going to

23   intervene in part of it, but the whole gist of this argument

24   of what's going on here and of the analysis here is that the

25   statute's plain language is plain, that you intervene in an

1    action, there's no separation.  It's a District of Rhode

2    Island decision.  It is not binding, in any way, on this

3    Court.  It's only useful to the extent it's persuasive, and

4    that's the spirit in which it's offered.

5              Again, you know, she has no authority that she's

6    pointed the Court to that holds otherwise, other than a

7    practice of U.S. Attorney's Offices that does not appear ever

8    to have been challenged meaningfully by the Courts or both

9    other parties, and whose import, especially in the context of

10   whether it renders the United States a party, for purposes of

11   something like the public disclosure bar, hasn't been

12   addressed.

13             And so I, under those circumstances, respectfully

14   suggest you default to the plain language of the statute,

15   unless -- with respect to -- sorry, next to last.  Just

16   because she mentioned in passing, if the Court has questions,

17   I want to address them.

18             She said that, because we filed a motion for

19   summary judgment before discovery concluded, that somehow,

20   under <u>Celotex</u>, she is entitled to the benefit of an

21   assumption that she has shown fraud or is showing fraud, or

22   something along those lines.

23             I wanted to emphasize that you are entitled, under

24   the rules, to ask for summary judgment at any point in time.

25   If the relator believes that there is additional factual

1    material that needs to be developed, in order for this motion

2    to be ripe for consideration, there is a provision in the

3    rules that allows her to assert that.  And if she can make a

4    showing that there is specific additional discovery that's

5    needed, in order to litigate the issues brought forward on

6    summary judgment, then the Court can hold the summary

7    judgment motion and go forward on that.

8         Rule 56 has been amended; I forget if it's (d) or

9    (f) or what now, at this point.  But this is -- there's a

10   procedure, if you think summary judgment is premature, and

11   you need additional discovery, and you're entitled to it, to

12   take it, to do it.  She didn't invoke that provision.  She is

13   not asserting that there's more discovery that she's entitled

14   to or needs, in order to resolve the issues in the motion.  I

15   think it puts to bed whether this is a premature motion.

16        The second issue is with respect to what inferences

17   or whatnot that she might or might not be entitled to.  There

18   is nothing special that she gets, in terms of inferences,

19   just because this is a summary judgment motion that's been

20   filed in the middle of summary judgment, versus otherwise.

21   The standard approach applies.

22        We were the moving party, so it's our burden to

23   assert a record upon which we can say there are uncontested

24   facts that demonstrate that, to the extent we have a burden,

25   we can carry it, and to the extent she has a burden, she

1    can't meet it.  To the extent we do that, the burden then

2    shifts to her to point specifically to facts that either

3    materially place necessary facts in dispute, or that

4    demonstrate -- to introduce new facts that demonstrate she

5    can meet her burden.  There is nothing different or unusual

6    about what's going on here, compared to the normal summary

7    judgment approach.

8            And I think we've done that.  We believe we've more

9    than carried our burden of demonstrating public disclosures

10   that are substantially similar to the allegations of fraud

11   that Ms. Forney alleged in her complaint.  I don't believe

12   there are any contested facts around that, only dispute about

13   legal issues and legal consequences of what's been disclosed.

14   The complaints say what they say.  Her complaint says what it

15   says, and those are the operative facts, for purposes of that

16   inquiry.

17           When we turn to original source, we believe that,

18   since it's something she has a choice to invoke, she needs to

19   invoke it in the first instance; she has.  We believe we did

20   a good job why we don't believe she meets the standard.  I

21   don't believe, with the exception of -- I -- actually, I --

22   there's no facts in dispute around the original source, and I

23   do want to end by pointing this out to the Judge.

24           We disagree about whether the information -- the

25   legal impact, from an admissibility perspective, of what

1    she's offered as of record.  She pointed to Ms. Forney's

2    declaration that says, you know, I'm aware that these

3    documents were provided.  I think her deposition makes clear

4    that she didn't have personal knowledge of those documents,

5    and that her knowledge of the date that anything was

6    submitted to the Government was from her counsel.  Her

7    counsel provided the Bates ranges.

8         Ms. Forney didn't even know if it was 1 document or

9    5 documents or 12 documents.  She certainly didn't have

10   personal knowledge of the Bates ranges.  And that's fine, as

11   far as it goes.  I'm just saying that the way Ms. Burke has

12   chosen to put her evidence in is it's hearsay, and it's

13   inadmissible.  So we disagree about the legal import, but not

14   the actual underlying facts, so it's ripe for a decision on

15   that.

16        In terms -- if the Court chooses to consider the

17   documents that were submitted to the Government in advance of

18   filing the case, and chooses to accept that this is the set

19   of what they were, we don't have any way to dispute that

20   that's what they were, and so that is the set that we're

21   going forward with, as what was provided.  Ms. Burke has,

22   even through this entire argument, not pointed the Court,

23   except in a couple of rare instances, to anything in those

24   documents, specifically, that she believes supports her

25   argument that they materially add to the public disclosures.

1    And that's where I will end because she concluded

2  her argument by saying that she focused on <u>Burns</u> and <u>Doe</u> and

3  the 9(b) specificity there, the individual transactions and

4  claims, because she said that's the really good stuff.  I

5  want to close by pointing to something, if you are going to,

6  unfortunately, spend a piece of the next part of your life

7  going through these documents.

8    She has promised, at oral argument and in her

9  brief, names and dates and all sorts of specificity about the

10  fraudulent scheme and the fraud that happened here, and in

11  particular the money stuff that adds to <u>Burns</u> and <u>Doe</u> and the

12  other complaints, right?  She's setting the bar, and saying

13  it's the specificity about claims submitted to the Government

14  payers.

15    She, on her device check theory in those calendar

16  documents, which we only -- you know, which -- again, if you

17  look at -- the Government had no testimony about them or

18  characterization of them.  What she gave the Government was

19  just the pieces of paper you have here.  Okay?  That -- those

20  don't provide -- they provide no -- very little intelligible

21  information.  To the extent they do provide it, it's about

22  schedules and checks, no payer, no claim information.  So, if

23  claim information is the money here, it's not there in her

24  case.  And I specifically and on the record, you know --

25  well, okay.

1          When, you turn to the consulting theory -- and

2     she's mentioned the words "lean sigma" several times.  First

3     of all, the words "lean sigma," I think, first appeared in

4     the second amended complaint.  In any event, the consulting

5     theory is more thinly pled than the device check theory.  The

6     Court certainly did not dismiss it.

7          But I would like to point out that, when you're

8     looking at these documents and you're looking for money in

9     the documents, there is no document that shows transaction

10    level claim or detail with respect to any consulting theory

11    that might have.  She didn't plead any documents that would

12    show that.  She didn't offer any examples of claims that

13    resulted from some consulting kickback.  It has never been a

14    part of her allegations, which, again, are irrelevant to this

15    inquiry, but she's emphasizing them, and it's certainly not

16    in these documents.  So she, herself, in what she submitted

17    to the Government, on these -- what she claims is the most

18    important type of material additional information, it's just

19    not there.  And with that, I'll conclude.

20              THE COURT:  Counsel?

21              MS. BURKE:  One final, Your Honor?

22              THE COURT:  Sure.

23              MS. BURKE:  Your Honor, I simply want to address

24    this issue of hearsay, to make sure that Your Honor does

25    consider the information that we provided, all of the

1    documents, because, obviously, that's an important

2    evidentiary submission.

3            Prior to the deposition, we had no knowledge that

4    public disclosure was going to even be an issue at all.  And

5    so, therefore, Ms. Forney had not refreshed her memory about

6    what had happened several years ago.  We, subsequently, put

7    in a declaration, firsthand knowledge, that she, herself,

8    knows and is able to testify to exactly what was given the --

9    given to the Government.

10            And in addition, she also testified that she met

11    with the Government for a half a day.  And she testified in

12    the deposition itself, which I encourage you to read in full,

13    she testified to her recollection, prior to being refreshed

14    after the fact with the older -- you know, with the older

15    email transmissions and the like.  So this is firsthand --

16    this declaration is firsthand knowledge.  There's no hearsay

17    here.  She would be able to come and testify to a jury what

18    was given to the Government, what she gave to the Government,

19    and the like.  So I just wanted to make sure that Your Honor

20    is considering the documents as part -- as an admissible

21    submission.

22            Obviously, we just have to agree to disagree with

23    Medtronic on materiality.  You know, we believe there's a

24    significant volume, a huge volume of specifics, of details,

25    of the who, when, what, where, about the implementation of

1   this fraudulent scheme, that aren't found in the other

2   complaints.  And you can peruse the entirety of all of the

3   other complaints, which I've done.  And what we brought

4   forward is nowhere in any of those; the same theories in two

5   of them, yes, different facts.  Thank you, Your Honor.

6            THE COURT:  Very well, Counselor.

7            Counsel, thank you very much for your thoroughness.

8   I appreciate all the time you've given to this.  I know you

9   went over the lunch hour here, so I hope you were able to get

10  some food, and I hope everyone has a very safe trip home.

11           I will consider all your arguments here and take

12  another look at it all and make the appropriate decision.

13           MS. BURKE:  Thank you, Your Honor.

14           THE COURT:  Thank you very much.

15           MS. MAYER:  Thank you, Your Honor.

16           THE COURT:  And have a very happy holiday season.

17           MS. BURKE:  Thank you.  You too, Your Honor.

18           MR. STROMBERG:  You too, Your Honor.

19           MS. MAYER:  Thank you.  You too, Your Honor.

20           THE COURT OFFICER:  All rise.

21       (Proceedings concluded at 1:37 p.m.)

22                          *****

1

2                          <u>CERTIFICATION</u>

3            I certify that the foregoing is a correct

4    transcript from the electronic sound recording of the

5    proceedings in the above-entitled matter to the best of my

6    knowledge and ability.

7

8

9

10

11   _____          January 18, 2018

12   Coleen Rand, AAERT Cert. No. 341

13   Certified Court Transcriptionist

14   For JDR Acquisitions, LLC/

15        Advanced Transcription

16

17

18

19

20

21

22

23

24

25